**Case No. 4:14-cv-1698**

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---

**DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,**
***Plaintiffs,***

***v.***

**BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
***Defendants.***

---

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---


**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General
For Civil Litigation

**KAREN D. MATLOCK**
Chief, Law Enforcement Defense Division

**CYNTHIA L. BURTON***
Assistant Attorney General

**MATTHEW J. GREER**
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin TX 78711
(512) 463-2080/Fax (512) 495-9139
COUNSEL FOR DEFENDANTS

*Attorney in Charge

**I. NATURE AND STAGE OF PROCEEDING** .......... - 1 -

**II. ISSUES TO BE RULED UPON BY THE COURT** .......... - 2 -

**III. STANDARD OF REVIEW** .......... - 2 -

**IV. SUMMARY OF THE ARGUMENT** .......... - 3 -

**V. STATEMENT OF FACTS** .......... - 5 -

**A. Description of the Pack Unit** .......... - 5 -

**B. Pack Unit Staff Fully Implement the TDCJ's Comprehensive Summer Mitigation Strategies.** .......... - 7 -

**1. Ice water is provided.** .......... - 8 -

**2. Fans are provided.** .......... - 9 -

**3. Showers are available.** .......... - 11 -

**4. Ventilation is adequate.** .......... - 12 -

**5. Respite areas are provided and accessible.** .......... - 13 -

**6. Wellness-checks are conducted and effective.** .......... - 15 -

**7. Training and education are provided to both offenders and officers.** .......... - 17 -

**8. Medical Care is accessible.** .......... - 19 -

**9. Work restrictions help protect the offenders.** .......... - 20 -

**10. Light clothing and chill towels are allowed.** .......... - 22 -

**C. The named Plaintiffs and their medical histories.** .......... - 23 -

**VI. ARGUMENT** .......... - 23 -

**I. The Fifth Circuit has repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons.** .......... - 23 -

**II. TDCJ implements a compressive plan to protect offenders from heat, and multiple levels of analysis demonstrate the effectiveness of those measures.** .......... - 30 -

**A. TDCJ and the Pack Unit implement effective mitigation measures that exceed those required by the Fifth Circuit.** .......... - 31 -

**1. Acclimatization** .......... - 31 -

**2. Water** ............................................................................................................- 33 -

**3. Fans** ...............................................................................................................- 34 -

**4. Showers** ..........................................................................................................- 35 -

**5. Ventilation** ......................................................................................................- 35 -

**6. Respite** ............................................................................................................- 36 -

**7. Wellness-checks** ..............................................................................................- 37 -

**8. Training and education** ..................................................................................- 37 -

**9. Medical care & Monitoring** ............................................................................- 38 -

**10. Work restrictions** ...........................................................................................- 39 -

**11. Light clothing and chill towels** ....................................................................- 39 -

**B. The TDCJ's current mitigation measures are proving effective on multiple levels.** . - 39 -

**1. Remedial measures are proving successful throughout TDCJ** .......................- 39 -

**2. Remedial measures are working at the Pack Unit** ..........................................- 40 -

**3. Plaintiffs' experts offer no explanation for the lack of heat-related incidents at the Pack Unit.** ...................................................................................................- 42 -

**4. The named Plaintiffs are not at a substantial risk of harm from heat.** ..........- 46 -

**III. The Court should decline to order any injunctive relief.** ...................................- 50 -

**IV. Evolving standards of decency do not mandate air-conditioned prisons.** .........- 55 -

**A. Air conditioned living quarters is not recognized by the federal or state governments as a necessity or universal right.** ...................................................- 56 -

**B. Air-conditioned prisons are not the societal norm.** .............................................- 59 -

**C. TDCJ's purchase of pig barns has been factually misrepresented by Plaintiffs, and is irrelevant to the issues here.** ............................................................................- 62 -

**D. Pack Unit's Building Structure Comports with *Ruiz* and Contemporary Standards.** ......................................................................................................- 64 -

**V. Plaintiffs' ADA and Rehabilitation Act claims fail as a matter of law.** ............- 65 -

**A. Plaintiffs have not shown that they cannot thermo-regulate.** .............................- 67 -

**B. Plaintiffs have not identified a program or service from which they have been excluded.** ........ - 68 -

**C. Plaintiffs receive reasonable accommodations.** ........ - 72 -

**D. TDCJ is immune from Plaintiffs' ADA claims.** ........ - 73 -

**E. Plaintiffs' RA claims fail because they fail to show that they are excluded *solely* by reason of their disability.** ........ - 73 -

**VII. PRAYER FOR RELIEF** ........ - 75 -

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240 (1999) .......... - 50 -
*Althouse v. Roe*, 542 F. Supp. 2d 543, 573 (E.D. Tex. 2008) .......... - 49 -
*Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) .......... - 25 -
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) .......... - 2 -
*Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2511 .......... - 2 -
*Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir.1995) .......... - 49 -
*Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) .......... - 25 -
*Ball*, 792 F.3d at 590 .......... - 28 -
*Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir.2005) .......... - 66 -, - 73 -
*Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill. 1996) .......... - 47 -
*Blackmon v. Garza*, 484 Fed.Appx. 866, 872, fn. 6 (5th Cir. 2012) .......... - 25 -
*Blackmon*, 484 Fed.Appx. at 872 .......... - 27 -
*Blanks v. Swn. Bell Comm'ns*, 310 F.3d 398, 400 (5th Cir.2002) .......... - 65 -
*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996) .......... - 71 -
Carrion v. Wilkinson, 309 F.Supp.2d 1007, 1016 (N.D.Ohio 2004) .......... - 71 -
*Cheek v. Nueces County Tex.*, 2013 WL 4017132 at *18 (S.D.Tex., 2013) .......... - 70 -
*Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000) .......... - 25 -
*Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 879 (S.D. Ill. 2009) .......... - 47 -
*Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004) .......... - 70 -
*Decker v. Dunbar*, 633 F.Supp.2d 317, 343 (E.D.Tex.2008) .......... - 47 -
*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001) .......... - 24 -
*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (*en banc*) .......... - 67 -
*eBay-Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) .......... - 51 -
*Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974) .......... - 50 -
*Edelman v. Jordan*, 415 U.S. 651, 668-669 (1974) .......... - 51 -
*Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363 (5th Cir.2013) .......... - 68 -
*Estelle v. Gamble*, 429 U.S. 97, 102 (1976) .......... - 55 -
*Ex Parte Young*, 209 U.S. 123, 159-60 (1908) .......... - 50 -
*Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994) .......... - 23 -, - 24 -
*Farmer*, 511 U.S. at 834 .......... - 24 -
*Farmer*, 511 U.S. at 844 .......... - 24 -, - 26 -
Galvin v. Cook, No. CV 00-29-ST, 2000 WL 1520231, at *6 (D.Or. Oct.3, 2000) .......... - 71 -
*Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F.Supp.2d 528, 529 (S.D.Tex. 2011) .......... - 67 -
*Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) .......... - 25 -
*Gates*, 376 F.3d at 339 .......... - 26 -, - 27 -
*Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir.2001) .......... - 24 -
*Gibbs*, at 617–18 .......... - 25 -
*Gladden v. Roach*, 864 F.2d 1196, 1200 (5th Cir.1989) .......... - 49 -
*Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir.2011) .......... - 66 -
*Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011) .......... - 67 -
*Hall*, 190 F.3d at 697 .......... - 24 -
*Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009) .......... - 66 -

*Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012)............................................................... - 70 -
*Hernandez ex rel. Hernandez v. Texas Dep't. Of Protective and Regulatory Services*, 380 F.3d 872, 883 (5th Cir. 2004)............................................................................................... - 25 -
*Hoffman v. Baylor Health Care System*, 2014 WL 772672 (N.D.Tex. 2014)......................... - 67 -
*ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) ......................................... - 51 -
*Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007)............................................ - 66 -
*Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir.1994) ............................................................. - 49 -
*Kentucky v. Graham*, 473 U.S. 159, 165 (1985)...................................................................... - 50 -
*Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir.2002) .................................................. - 24 -
*Lee v. Valdez*, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 at *13 (N.D. Tex. May 20, 2009) ............................................................................................................................. - 71 -
*Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 410 (5th Cir. 2013)......................... - 67 -
*Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir.2009)........................................................... - 47 -
*McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex. 2006) ................. - 72 -
*Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir.2013)........................................ - 66 -
*Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012)......................................... - 69 -
*Oswalt v. Sara Lee Corp.*, 74 F.2d 91, 92 (5th Cir. 1996)...................................................... - 67 -
*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ...................................................................... - 53 -
*PCI Transportation Inc. v. Fort Worth & Western Railroad Co.*, 418 F.3d 535, 545 (5th Cir.2005) ........................................................................................................................ - 51 -
*Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 63 F.3d 690, 693 (5th Cir.1995) ... - 50 -
*Penry v. Lynaugh*, 492 U.S. 302, 331 (1989) ......................................................................... - 56 -
*Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992)............................................. - 25 -
*Ruiz v. Estelle, et al.*, 503 F.Supp. 1265, 1274 (S.D. Tex.1980) ............................................ - 64 -
*Ruiz v. Johnson*, 154 F. Supp. 2d 975, 996 (S.D. Tex. 2001)................................................. - 65 -
*Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 704 (N.D. Tex.2014).................. - 74 -
*Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir.2010) .......................................... - 71 -
*Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)................................ - 66 -, - 73 -
*Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir.1988) ..................................... - 2 -
*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, (1999).......................................................... - 67 -
*Tamayo v. Perry*, 553 F. App'x 395, 400-01 (5th Cir. 2014).................................................. - 56 -
*Trop v. Dulles*, 356 U.S. 86, 100-101 (1958) ......................................................................... - 55 -
*Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) .......................................................... - 70 -
*United States v. Georgia*, 546 U.S. 151 (2006) ...................................................................... - 73 -
*Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir.2008) ....................................................... - 28 -
*Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645-46, 122 S.Ct. 1753, 1760 (2002)................................................................................................................. - 51 -
*Wolff v. McDonnell*, 418 U.S. 539, 566, (1974) ...................................................................... - 53 -
*Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996)................................ - 66 -, - 74 -
*Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995)............................................................. - 23 -
*Woods*, 51 F.3d at 581............................................................................................................. - 25 -

**Statutes**

18 U.S.C. § 3626(a)(1)............................................................................................................. - 52 -

18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2) ................................................................................... - 52 -

18 U.S.C. §3626(a)(1)(A) ........................................ - 52 -

42 U.S.C. § 12102(1) ........................................ - 66 -

Tex. Govt. Code § 501 ........................................ - 61 -

Tex. Govt. Code §§ 2002.051- 2002.056 ........................................ - 61 -

Tex. Util. Code § 39.903 ........................................ - 59 -

**Other Authorities**

*Correctional Institutions Division—Prison*, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/unit_directory/p1.html (last visited Nov. 15, 2015) .................... - 5 -

*Ahead of Second Special Session, Alabama's Prisons in Crisis*, ALABAMA NEWS (Sep. 7, 2015, 5:05 PM), http://www.alabamanews.net/home/top-stories/Ahead-of-the-Second-Special-Session-Alabamas-Prisons-in-Crisis-325492141.html ........................................ - 60 -

John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment As A Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1741 (2008) ........................................ - 55 -

www.sos.state.tx.us/tac/ ........................................ - 61 -

**Rules**

Tex. S.B. 7, 76th Leg., R.S. (1999) ........................................ - 59 -

**Treatises**

1B Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 16.08 (4th ed. 2006)- 49

**Regulations**

Admin. Code §259.160 ........................................ - 61 -

Admin. Code Title 7 ........................................ - 61 -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **No. 4:14-cv-1698** |
| | § | |
| **BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,** | § | |
| **Defendants.** | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**NOW COME** Brad Livingston in his Official Capacity as the Executive Director, Robert Herrera in his Official Capacity as the Warden of Pack Unit, and the Texas Department of Criminal Justice and submit Defendants' Motion for Summary Judgment and attached Appendix.

## I. NATURE AND STAGE OF PROCEEDING

Plaintiffs initially moved for class certification immediately after filing their original complaint. (D.E. 5) Rather than take up the issue prior to discovery, the Court deferred ruling until after discovery and after the motion was re-urged. In the intervening months, the parties have conducted wide-ranging discovery including hundreds of thousands of pages of disclosures and numerous depositions. This Court opted against bifurcated discovery and Plaintiffs were afforded several months to complete any necessary discovery for their motion. After informing the Court that they did not intend to request or obtain any medical records from the putative class members (D.E. 281), Plaintiffs filed their Amended Motion for Class Certification. (D.E. 272) Defendants have offered their response, and resolution of the issues is still pending before the Court. (D.E.

307) After disclosure of Defendants' expert reports, Plaintiffs were afforded the opportunity to submit rebuttal expert reports, but chose not to do so. (D.E. 295) Defendants now move for summary judgment on the claims asserted on behalf of the named Plaintiffs.

## II. ISSUES TO BE RULED UPON BY THE COURT

**I. Whether, in light of TDCJ's comprehensive heat-mitigation strategy and track record of success, Defendants have been deliberately indifferent to a substantial risk of serious harm to the named Plaintiffs due to the indoor temperatures at the Pack Unit.**

**II. Whether injunctive is relief is warranted where no Constitutional violation has been established and where Plaintiffs request for injunctive relief is overbroad.**

**III. Whether contemporary standards of decency require air-conditioned prisons where society has not adopted air-conditioning as a universal right.**

**IV. Whether Plaintiffs ADA and Rehabilitation Act claims can be squared with controlling law.**

## III. STANDARD OF REVIEW

The role of a court or judge in summary judgment proceedings is to make the "threshold inquiry of determining whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If this inquiry reveals that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," judgment should be entered in his favor. FED. R. CIV. P. 56(c). Disagreement among the parties as to the facts will not prevent summary judgment. *Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2511. On the contrary, summary judgment is precluded under Rule 56(c) only when the dispute is genuine and the disputed facts might affect the outcome of the suit. *Anderson*, 477 U.S. at 248; *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir.1988).

When petitioning a court for summary judgment the movant need not disprove the non-moving party's claims. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); accord *Slaughter v Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir.1986). Thus, if the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff] will bear the burden of proof at trial" the defendant is entitled to judgment in his favor. *Celotex*, 477 U.S. at 322.

## IV. SUMMARY OF THE ARGUMENT

In view of the undisputed facts, the named Plaintiffs' Eighth Amendment and disability claims fail as a matter of law. Under the Eighth Amendment, Plaintiffs have failed to show that TDCJ officials have ignored a serious risk of harm posed to their health or safety due to the indoor temperatures at the Pack Unit. TDCJ has designed, implemented, and improved upon a comprehensive heat mitigation strategy that includes protective mitigation measures, thorough training and education, and close monitoring to ensure the well-being of offenders during the summer months. These measures meet and exceed those previously required by the Fifth Circuit to meet the Eighth Amendment, which does not require air conditioned prisons. Undisputed evidence confirms that these measures are robustly implemented at the Pack Unit, and, combined with the physiological health benefits of acclimatization, that they are effective. As shown below, their efficacy is demonstrated on multiple levels, including expert medical testimony describing the appropriateness and utility of TDCJ's measures, system-wide macro-level analysis that shows the remarkable rarity of heat-related illness throughout TDCJ, and on the micro-level by analyzing the health effects (or the lack thereof) of the heat on each of the named Plaintiffs. Taken together,

this evidence shows that the indoor temperatures at the Pack Unit do not pose a substantial risk of serious harm to the named Plaintiffs. Though the temperatures are uncomfortable and at times unpleasant, this does not state an Eighth Amendment claim under binding precedent.

Injunctive relief would be inappropriate here for multiple reasons. First, an injunction could only stand on a finding of a Constitutional violation, which is not present here. Second, an order to air-condition the entire Pack Unit would be overbroad within the meaning of the Prison Litigation Reform Act, as recently interpreted by the Fifth Circuit.

Further, evolving standards of decency do not require air conditioned prisons. At both federal, state, and local levels, our society has not defined air conditioning as a necessity, but instead as a luxury. This is seen through census data, public housing requirements, and Medicare rules. Further, across the southeastern United States, state prison systems operate without air conditioning. In Texas, both the Pack Unit and numerous other facilities were designed and constructed under close federal judicial oversight following *Ruiz*. The stipulations include detailed specifications on heating and ventilation, but do not require air-conditioning, even though the feature was widely used at the time.

Finally, Plaintiffs' ADA and Rehabilitation Act claims also fail as a matter of law. Each of the named Plaintiffs are able to maintain their thermoregulation, which is the operative question under the disability inquiry. Plaintiffs also have been provided a host of reasonable accommodations in the form of mitigation measures, and Plaintiffs have failed to identify a program or service they are unable to access. Finally, Plaintiffs ADA claims fail because TDCJ is immune under the Eleventh Amendment as the alleged conditions do not rise to a Constitutional violation, and Plaintiffs' RA claims fail under the more stringent causation standards applicable to

the RA.

## V. STATEMENT OF FACTS

### A. Description of the Pack Unit

The Wallace Pack Unit is a prison operated by the Texas Department of Criminal Justice. It is one of 109 custodial facilities operated by TDCJ across the state. (Appx. 1091:17-19[1]) Located in Navasota, Texas, it was brought on line in September 1983. The Pack Unit is a type I Geriatric facility, which means it is a single level facility that affords offenders sheltered sleeping areas, shorter distance to the pill window for medication administration, and longer times for meal consumption. (Appx. 222) Seventy (70) wheelchair accommodations compliant with the Americans with Disabilities Act (ADA) are also available at the Pack Unit. (Appx. 222) The Pack Unit is not a "nursing home." Offenders over the age of 65 years are assigned to the Pack Unit if and only if they are independent in activities of daily living, such as bathing, grooming, feeding, toileting, etc. (Appx. 222) Elderly offenders who are not capable of managing their independence in the activities of daily living are assigned to assisted living and/or long term inpatient care. (Appx. 222)

The Pack Unit houses approximately 1450 offenders with approximately 334 employees. Pack (*P1): Correctional Institutions Division—Prison,* TEXAS DEPARTMENT OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/unit_directory/p1.html (last visited Nov. 15, 2015). All services are on a single level, including assisted disability services showers and CPAP accommodating housing. (Appx. 793-98) The Pack Unit and the Luther Unit work in cooperation to operate cow/calf production; edible and field crops, farm shop, security horses; security pack

---

[1] Depositions are referred to by their Appendix page number, followed by the line numbers (Appx. __:__).

canines, swine finishing, and grain storage. There are sixty (60) wheelchair accommodated cells and a 12-bed infirmary. Medical care is available 24 hours a day, seven days a week. Digital Medical Services, electronic specialty clinics and chronic care clinics are available. In addition to the medical services provided, there are several educational programs, a faith-based dormitory, Protective Safekeeping, Adult Education Program, Life Decisions Program, Peer Education, Reentry Planning, Chaplaincy Services, Community Tours and GO KIDS Initiative.

The Pack Unit has three separate housing areas: the main building, expansion dorm, and the trusty camp. In each of these areas, the offenders are not housed in individual cells, but instead, the unit is set in a dormitory style setting. Each offender is assigned their own cubicle in an open room. As has been alleged, the housing areas at the Pack Unit do not contain refrigerated air. Like many TDCJ facilities, the environmental conditions within the Pack Unit were specified in minute detail during the *Ruiz* litigation. (Appx. 630-666)

Though not air conditioned in the housing areas, the Pack Unit has several areas with air conditioning that offenders are able to access: the education department, lower administration, infirmary, laundry captain office, food service captain office, lieutenant's office, regular visitation room, barber shop, trusty camp office for the sergeant and lieutenant, the trusty camp visitation, trusty camp food service office, agriculture office, farm shop office, kennel office, unit maintenance office, warehouse office, and the BOQ dayroom. (Appx. 747; Appx. 1137:22 to 1138:3; Appx. 1125:5-18; Appx. 1145:20 to 1146:3) Many of the named Plaintiffs regularly spend significant amounts of time in these areas. For example, Plaintiffs Cole, King, and Brannum all voluntarily work in the offender craft shop all day Monday-Thursday, which has an area where there is a window A/C unit they are allowed to access. (Appx. 1176:19 to 1178:2; Appx. 1193:4

to 1194:10; Appx. 1216:14 to 1217:8) Plaintiff Yates, regularly attends the law library, which is also air conditioned. (Appx. 1286:13 to 1287:2)

### B. Pack Unit Staff Fully Implement the TDCJ's Comprehensive Summer Mitigation Strategies.

TDCJ recognizes the potential for danger that comes with housing offenders in an un-air-conditioned environment, and has devised, implemented, and continuously reviewed and improved upon a series of measures designed to protect offenders from effects of heat. (Appx. 582-624) Officials from multiple disciplines meet yearly, and TDCJ's mitigation measures, training and education, and formal policies have evolved over the years as TDCJ has built on its successes and improved on its practices. (Appx. 674-76; Appx. 1102:11-25 to 1103:1-3) The TDCJ's practices are reflected in formal policies and procedures and in a yearly directive from the administration to all TDCJ employees to specifically address heat-illness prevention. (Appx. 582-624)

The TDCJ's mitigation strategy includes protective measures made available to offenders, training and education for both offenders and staff, and active monitoring and medical care to ensure the well-being of offenders. These measures meet and exceed those required by binding precedent. The record is undisputed that each measure is in place at the Pack Unit. Even under the extreme conditions of 2011, no heat-related illnesses were reported from the Pack Unit to TDCJ Health Services. (Appx. 811) Following a report of heat-related illnesses at the Pack Unit in late June of 2012, officials from within TDCJ and the Pack Unit administration met to discuss the mitigation measures at the unit and ways to enhance them. (Appx. 777-788, 791-92) Today, the Pack Unit aggressively implements TDCJ's mitigation measures, and the results have led to the near elimination of indoor heat-related illness over the last three summers. (Appx. 948-1038)

**1. Ice water is provided.**

The provision of ice water is an important remedial measure implemented by TDCJ and the Pack Unit. TDCJ Administrative Directive 10.64 establishes that drinking water and cups shall always be available to offenders in conditions of hot weather. (Appx. 587) Furthermore, when the outdoor heat index is over 90 degrees, units will provide additional water and cups in offender dorms and housing areas and during meal times, along with ice, if possible. (Appx. 589)

At the Pack Unit, ice water is available and passed out to the offenders 24 hours a day, seven days a week. (Appx. 1129:19-22; 1134:20-21; Appx. 1106:5-11; Appx. 1150:23-24). Seven offenders are assigned to ice and water distribution at the Pack Unit. (Appx. 626-629). These designated offenders are assigned to a water and ice wagon, which they take on a pushcart to make sure the jugs in the housing dormitories are full of ice and water. (Appx. 1113:1-25; 1114:1-7). These offenders walk up and down the hallway constantly checking and refilling the water jugs. (Appx. 1115:14-17). The expansion dorm also has push button water fountains with cold water. (Appx. 790) Offenders at the Pack Unit are provided access to ice water and regular water constantly throughout the summer months.

From a medical perspective, access to ice water and regular water is the number one remedial measure that can be implemented during times of high temperatures because hydration is the single most important factor in the prevention of heat related injury and effectiveness of thermoregulation. (Appx. 31, 178) Water is four times more efficient at transferring heat than air. (Appx. 12) Dehydration, the loss of water, impairs thermoregulation independent of environmental temperatures. *Id*. Access to ice water and regular water is one of the actions taken by TDCJ and the Pack Unit that has largely mitigated the risk of heat illness at the Pack Unit. (Appx. 214)

Plaintiffs' deposition testimony confirms they all have regular access to ice water and drink quite a bit of water every day. (Appx. 1179:2-17; Appx. 1198:3-19; Appx. 1289:10-16; Appx. 1249:4-10; Appx. 1213:15-24; Appx. 1236:12-17; Appx. 1269:7-17) Several named Plaintiffs testified when the ice jug runs out, it generally doesn't take very long before it is refilled and the officers and offenders tasked with refilling them do a good job. (Appx. 1180:17-19; Appx. 1213:25 to 1214:2; 24 to 1215:24; Appx. 1267:17-22, 1268:15-24; Appx. 1292:3 to 1293:5)[2] In addition, the expansion dorms have push button water fountains and the offenders are served an iced beverage 3 times a day with meals. (Appx. 1212:3-6; Appx. 1198:15-19). Even in the instances where the refill crew has not yet refilled a jug, there is always water available from sinks in the dorm area. (Appx. 1249:8 to 1250:12; Appx. 1196:2-14). The evidence is undisputed that iced water is available nearly all of the time, and there is never a time when the offenders are entirely without water from sinks and fountains.

**2. Fans are provided.**

Every offender at the Pack Unit has access to a personal fan and large fans in their housing areas. TDCJ Administrative Directive 10.64 establishes that in situations where the outdoor heat index is over 90 degrees Fahrenheit, units must ensure maintenance of fans, blowers, and showers in offender housing areas. (Appx. 589) Furthermore, when the outdoor heat index is over 90 degrees, units will allow fans for offenders in all custody levels, to include administrative segregation and disciplinary status. (Appx. 590) Units also should ensure a fan program is in place

---

[2] Curiously, only one of the Plaintiffs testified that he filed a grievance about the water coolers running out of water regularly and not being refilled. (Appx. 1195:7-24). Despite this, his evidence is not corroborated by the other named Plaintiffs' testimony nor by Pack Unit staff. However, Cole did testify that he drinks at least 10, 14 or 16 oz. bottles of water every day, drinks at least half a pitcher of ice water every single meal he goes to, and also has ice water in the craft shop and air conditioning that he utilizes. (Appx. 1194: 8-19; 1206a:5-22; 1198:3-19).

allowing the permanent issue of fans to indigent offenders. *Id*. Also, personal fans shall only be confiscated if altered or stolen. *Id*.

Offenders either purchase their own personal fans or they are given them if they are indigent. The Pack Unit has taken aggressive steps to ensure that each and every offender has a personal fan. (Appx. 1131:13-23;1132:16 to 1133:16; Appx. 1118: 15-19; Appx. 1143:25 to 1144:3). At the Pack Unit, offenders are allowed to have personal fans and these fans are not confiscated unless they have been manipulated or tampered with or are stolen. But as a rule of thumb, the Pack Unit does not confiscate fans. (*Id.*)

In addition to personal fans, there are large fans positioned in the housing areas. There are four big fans in each dorm area, one in the front and one in the back and two mounted fans to blow into the cubes. (Appx. 790-791; 1118:20 to 1119:8; Appx. 1144:5). The Pack Unit also has at least eight backup fans on standby when their fans go out. (Appx. 1120:14-19). The Pack Unit also has four "Big Ass Fans" in the Expansion Dorm. (Appx. 1121:20-24).

From a medical perspective, the use of fans increases air flow across the skin, which increases the evaporation of sweat, and helps cool the skin. (Appx. 032) A new study published in the Journal of the American Medical Association found electric fans can make at least a six degree difference in the ambient temperature our bodies can cope with before we start to overheat. *Id*. The study found that you experience a lower amount of physiological strain at 42 degrees Celsius (107.6 degrees Fahrenheit) with a fan than you do at 36 degrees Celsius (96.8 degrees Fahrenheit) without a fan. (Appx. 032) This remedial measure is effective because it helps increase the evaporation of sweat on the skin. (Appx. 032)

Plaintiffs' deposition testimony reveals that they all have personal fans. (Appx. 1181:15-16; Appx. 1199:1-3; Appx. 1224:4-18; Appx. 1234:4-6; Appx. 1246:17-23; Appx. 1263:16-17; 1291:8-24) Plaintiffs also confirm that there are large fans in each dorm. (Appx. 1182:4-21; Appx. 1205:1-5 & 1197:16-21; Appx. 1246:17 to 1247:1; Appx. 1264:20-24; Appx. 1290:11-25; Appx. 1222:2-13) The fans do help. (Appx. 1223:20-21; Appx. 1181:22-23; Appx. 1263:20 to 1264:6) The implementation of this measure is undisputed.

**3. Showers are available.**

Offenders are afforded access to three showers every day, with afternoon and evening showers utilizing cold water for its cooling effect. (Appx. 790-91) While the provision of showers has always been part of TDCJ mitigation strategy, it is incorporated into the extreme temperature conditions policy during the summer. (*See* Appx. 584-595). If the outdoor heat index is over 90 degrees, TDCJ units offer additional showers to offenders if possible, and drop the water temperature in housing areas where a temperature adjustment is possible. (Appx. 589). Following the issuance of the *Ball* opinion, TDCJ administrators took action to ensure that the temperatures were lowered in showers to ensure their cooling effect. (Appx. 796-98)

At the Pack Unit, offenders are given several opportunities to shower daily. Additional showers have been allowed at the Pack Unit for some time. (Appx. 1116:25 to 1117:8) The water temperature for the extra showers is lowered. (Appx. 1156:14-20) For Offenders housed in the main building, showers are available up to three times per day, with afternoon and evening cool down showers supplementing the always scheduled morning showers. (Appx. 29; Appx. 1201:8 - 19; Appx. 1262:1 to 1263:15). For offenders housed in the expansion dorm and trusty camp, access to showers is even more generous—unlimited shower access is available from 6:00 AM to 11:00

PM. (Appx. 1135:23 to 1136:4; Appx. 1218:25 to 1221:7; Appx. 1232:16-20). Both the expansion dorm and the trusty camp showers allow for cold water shower. (Appx. 790-91) If an offender needs to take a shower to cool down between 11:00 PM and 6:00 AM, the officers of the Pack Unit have been trained to allow them to do so. (Appx. 1135:23 to 1136:4)

Medically, showers are an effective remedial measure to take when combating warm temperatures because water helps transfer heat away from the body. Showers facilitate thermoregulation by artificially facilitating the transfer of heat from the body into the environment, effectively lowering body temperature. (Appx. 209). All of the named Plaintiffs in this lawsuit confirmed in their depositions that they have access to cool down showers. (Appx. 1179:3-15; Appx. 1192:9-12; Appx. 1218:25 to 1221:7; Appx. 1232:12 to 1233:20; Appx. 1245:3- 23; Appx. 1262:1 to 1263:15; Appx. 1245:3-23; Appx. 1282:21 to 1286:12). Most testified that they take advantage of the opportunity to take a cool down shower and find that the showers effectively cool them down for some period of time. (Appx. 1179:3-15; Appx. 1201:8-19; Appx. 1218:25 to 1221:7; Appx. 1232:12 to 1233:20; Appx. 1262:1 to 1263:15; Appx. 1282:21to 1286:12). It is undisputed fact, therefore, that the offenders at Pack Unit are provided the opportunity to shower multiple times per day in cool water.

**4. Ventilation is adequate.**

The TDCJ has long understood and supported the importance of air exchange. Since the early 1990's TDCJ has worked diligently to maintain its facilities, including extensive updates to the ventilation systems present at prison units. (Appx. 645-653) In regards to housing areas, the 2015 yearly heat precaution email stated: "When using fans, air should be drawn through the

structure and exhausted outside. Take full advantage of the fresh air exchange system or prevailing winds to assist in the movement of air as applicable." (Appx. 609-614)

At Pack, adequate ventilation is provided throughout offender housing areas. Certain sections of offender housing at Pack are equipped with operable windows for ventilation. Though the expansion dorms are not equipped with operable windows, air exchange is supported by a robust ventilation system. (Appx. 1126:11- 19). Data from a 2012 TDCJ Filed Report indicates that the ventilation at Pack supports air exchange, as no offender housing area had an average air movement rate of lower than 297.2 cubic feet per minute per occupant, well above the average amount of 15 cubic feet per minute per occupant. (Appx. 671). The unit Risk Manager, Debra Allison, testified that steps are undertaken to ensure that the ventilation system is functioning properly. (Appx. 1141:23 to 1142:5). The deposition testimony of the Plaintiffs supports the TDCJ's position that the ventilation at the Pack Unit is not only constitutionally adequate, but also plays a role in mitigating the chances of heat-related illness. (Appx. 1241:11- 19).

**5. Respite areas are provided and accessible.**

TDCJ and the Pack Unit provide on demand access to air conditioned areas should an offender request to access one. On July 24, 2015, an email sent by Deputy Director Eason memorialized the use of air conditioned respite areas as a remedial measure implemented at Pack Unit. (Appx. 533) Though respite areas were being used throughout the TDCJ system, the directive sought to formalize the practice and ensure offender awareness of how to access a respite area. (Appx. 796-97) This email directed each Unit Warden to designate air-conditioned areas on the facility as respite areas and send a memorandum to all unit staff listing the locations. (Appx. 533) Furthermore, the email also required a notice posted in common areas to notify all offenders

of the locations of respite areas on the unit, as well as instructions for requesting the use of a respite areas. (Appx. 533) In the event that an offender notifies staff of a heat-related illness, staff is required to allow the offender to be evaluated by medical staff, and if appropriate, provided immediate access to a respite area. (Appx. 533)

At the Pack Unit, these respite areas are: the education department, lower administration, officers dining hall, infirmary, laundry captain office, food service captain office, lieutenants office, regular visitation room, barber shop, trusty camp office for the sergeant and lieutenant, the trusty camp visitation, trusty camp food service office, agriculture office, farm shop office, kennel office, unit maintenance office, warehouse office, and the BOQ dayroom. (Appx. 747; Appx. 1137:22 to 1138:3; Appx. 11255-18; Appx. 1145:20 to 1146:3). The notice also says that if an offender is experiencing difficulty due to the heat, please notify a staff member immediately. (Appx. 747). All an offender has to do to get respite in an air conditioned area is to ask for it, and if they ask for a respite area from the heat the medical department is going to be notified. (Appx. 1147:15 to 1149:12; Appx. 1138:4-15). Offenders are evaluated by medical if they request respite from the heat because both officers and the medical staff need to know if there is anything else that needs to be done to protect the offender. (Appx. 537-38) Offenders are not charged any fee for this service. (Appx. 537-38)

From a medical perspective, the use of air conditioned respite areas is important because it is a helpful back-up system to the other measures already in place to help mitigate the heat. (Appx. 29-30). These areas are where an offender can be placed when necessary to aid in cooling and reducing core body temperature. (Appx 29). Respite areas are a preventative measure and can be

used as part of an initial response to an offender who feels symptoms which might be related to heat. *Id*.

Plaintiffs' deposition testimony reveals that they all know of the notice identifying potential air conditioned respite areas. (Appx. 1183:14 to 1184:3; Appx. 1203:25 to 1204:3; Appx. 1225:22 to 1226:25; Appx. 1237:14 to 1238:6; Appx. 1251:6-15; Appx. 1271:11-21; Appx. 1297:8-11) Curiously, only one of the named Plaintiffs, Dean Mojica, has requested to go to one of the respite areas. (Appx. 1184:4-6; Appx. 1203:25 to 1204:3; Appx. 1238:7-25; Appx. 1251:16 to 1253:8[3]; Appx. 1271:22 to 1272:23)

**6. Wellness-checks are conducted and effective.**

TDCJ performs wellness checks on heat-sensitive offenders to ensure their well-being and identify any heat-related issues before they escalate into a more serious condition. (Appx. 583). Upon an offender arriving at a TDCJ facility, medical staff tracks the medical history and medication intake of offenders to determine if they may be susceptible to heat-related illness. (Appx. 587). Subsequently, during times of potential heat extremes, TDCJ performs "Wellness Checks" on these offenders, a process during which correctional officers check on offenders who are potentially predisposed to temperature-related issues because of current medication or medical history. (Appx. 583). This measure was strengthened following the events of the summer of 2011, as TDCJ officials felt that earlier intervention would ensure that heat sensitive offenders were treated before heat stress escalated into more serious symptoms. (Appx. 673-76)

---

[3] Plaintiff Wallace did say that he was refused access to a respite area at one point, when he was waiting in a line and asked to go to the barbershop; however, when he asked to go into the area he did not tell the officer he needed respite from the heat. After 10 to 15 minutes the officer directed all of the waiting offenders into the respite area anyway. (Appx. 1252:1- 25).

At the Pack Unit, a wellness check-list is generated to identify offenders who may be susceptible to heat-related illness. (Appx. 1108:17 to1109:11) The individual offenders identified on the wellness list are then checked on during times of potential heat illness to ensure they are not exhibiting signs of heat related illness, which they are trained to identify. (Appx. 1109:25 to 1110:23) During wellness checks, correctional officers are trained to go through the dorm, observe heat sensitive offenders, and to take immediate action if they see something wrong or the offender voices a complaint. (Appx. 1111:20 to 1112:5) The performance of wellness checks is documented so as to ensure compliance with TDCJ policy. (Appx. 1111:15- 19)

TDCJ "Wellness Check" policies work with Correctional Managed Health Care ("CMHC") polices to mitigate the potential for heat related illness. (Appx. 172-173) Medical providers at the unit are responsible to diagnose offender medical conditions and monitor offender medication. (Appx. 597-607) Medical providers place work restrictions on offenders who are heat sensitive and, therefore, excluded from certain work assignments. (Appx. 172-173) These work restrictions are noted on the Pack Unit well-check list and the heat sensitive offenders are monitored to ensure their safety during warmer weather. (Appx. 172-173) Wellness checks are an important measure TDCJ, in conjunction with its medical providers, takes to monitor, treat, and combat heat related illness.

The monitoring process also takes place system-wide. CMHC policies require that all heat-related illness be reported to TDCJ Health Services. (Appx. 240) Those reports are collected and complied by a registered nurse, Phyllis McWhorter. (Appx. 240-41) When she receives a report, she reviews the offender's current HSM-18 data to ensure that the offender has the proper heat-

related restrictions. (Appx. 241) If he/she does not, she contacts the unit provider to bring this to their attention for review.[4] (Appx. 241)

The named Plaintiffs confirmed in their depositions that Pack Unit staff are being diligent in their performance of wellness checks. (Appx. 1188:22 to 1189:6; Appx. 1206:15- 20; Appx. 1259:9-14; Appx. 78, Ln. 1277:17- 25) Plaintiff Ray Wilson would not confirm an exact time frame for the wellness checks, but Plaintiff Fred Wallace confirmed the checks happen about every 30 minutes. (Appx. 1277:17- 25; Appx. 1259:9-14)

**7. Training and education are provided to both offenders and officers.**

Training and education of offenders and staff is another important component of TDCJs mitigation strategy. TDCJ Administrative Directive 10.64 establishes that each warden shall ensure training for the prevention of injuries due to extreme temperatures is provided by unit medical staff to all supervisors designated by the warden. (Appx. 591). Supervisors shall then be responsible for training employees and work assigned offenders. (*Id.*) Also, non-work assigned offenders shall be notified of heat awareness via the dayroom bulletin boards and other common use areas, or through publications such as *The Echo* or the TDCJ *Offender Orientation Handbook*. (*Id*. at 9) Each summer a heat precaution reminder is sent to every unit. (Appx. 609-624) This heat precaution reminder outlines that training includes ensuring employees and offenders are aware of the signs of and treatment for heat-related illnesses by conducting training. (Appx. 609) The reminder also requires all employees carry an information (pocket) card which lists the signs of heat-related illness. (*Id.*)

---

[4] It should be noted that it's the health care provider, not TDCJ Health Services or correctional staff, who assesses and decides what restrictions based on medical conditions are appropriate for each offender.

At the Pack Unit, the pocket card carried by all officers and staff lists the symptoms of various heat illnesses and treatment for those illnesses. (Appx. 749-750) Posters are put up in offender housing instructing offenders to: drink water often, rest in the shade, report heat symptoms early, and know what to do in an emergency. (Appx. 752) Another poster titled "Refresh. Rehydrate. Replenish" provides offenders with a urine color chart so that they can monitor whether they may be dehydrated or not. (Appx. 753) Officers are provided with training on heat related illnesses and prevention through: a video provided by UTMB; a leaflet provided by UTMB; a training packet consisting of the yearly heat reminder email, medical policy CMHC 27.2; the unit policy, Pack Unit SOP Temperature Extremes Hot and Cold Weather; AD 10.64; and a training circular. (Appx. 757; Appx. 609-624; Appx. 759-763; Appx. 583-595; Appx. 597-607; Appx. 805-808; Appx. 1151:16 to 1152:5, 21 to 1153:5; Appx. 1122:1-11) Officers are also trained on drugs and co-morbidities that may affect heat tolerance; and to provide 24/7 access to water at all times. (Appx. 1159:1 to 1160:25; 1161:19-21; 1162:4-10) Offenders also are trained on the leaflet from UTMB and on the risk management training circular. (Appx. 757; Appx.1154:19 to 1155:5). Offenders also are trained by their work supervisors, if they have a job assignment, or through the newsletter, posters, through the offender orientation handbook. (Appx. 1163:11-20; Appx. 800-803) Offenders also receive counsel from medical staff on heat stress. (*See e.g.*, Appx. 100-01, 121)

From a medical perspective, training and education about heat illness treatment and prevention, including proper hydration is very important because it is up to each individual to drink the available water. (Appx. 031) Offenders are instructed to be aware of the signs and symptoms of heat illness, including urine color which might indicate dehydration, and to report symptoms of

possible heat-related illnesses immediately so proper medical attention can be obtained. (*Id.*) Heat related injury and stroke are preventable given access to water, medical care, resident education and offenders taking personal responsibility for health related behaviors. (Appx. 177)

Plaintiffs' deposition testimony confirms they all have received training about heat-related illness prevention and treatment whether through posters in the housing areas, through work training, or through training in the offender craft shop. (Appx.1185:16 to 1187:6; Appx. 1206:4-14; Appx. 1209:11 to 1211:15; Appx.1239:12 to Pg. 78, Ln. 1240:10; Appx. 1257:15 to 1258:11; Appx. 1278:6 to 1279:21; Appx. 1297:8 to 1298:11). Wilson also had significant training on heat illnesses outside of TDCJ. (Appx. 1273:21 to 1274:11). Not only is this an undisputed fact, it is a remedial measure that is important in reducing the incidents of heat related illnesses at the Pack Unit.

### 8. Medical Care is accessible.

Minor incidents of headaches, dizziness, or shortness of breath are part of the experience of summer for free and imprisoned people alike. These sorts of symptoms do not cause lasting impact, and can be appropriately treated by medical staff. (Appx. 162)

Any offender who reports to a staff member that he is not feeling well due to the heat, or if he requests to access a respite area, staff will either take the offender to the medical department for evaluation or he will be taken directly to a respite area and medical staff are summoned for triage. (Appx. 537-39) Offenders are not charged a co-pay for this service. (Appx. 537-39) This allows potential heat stress to be addressed early, and before it escalates into a heat-related illness.

In addition to care at the unit level, TDCJ also monitors heat-related illness system-wide. Healthcare staff at the unit report all potential heat related illnesses to the TDCJ Health Services.

(Appx. 240-41) This data has been used to identify trends, and facilitate corrective action, including at the Pack Unit. (Appx. 777-788, 791-92)

Medical care is also an important component in the management of conditions that can affect heat tolerance. Many offenders who have risk factors for heat injury are acclimatized to heat and will suffer no heat-related illness or injury. (Appx. 56, 65, 72, 81, 86-87, 95-96, 103 and 115; also Appx. 163, 174, 178-179) The elevated risk posed by conditions such as diabetes, obesity, hypertension, and cardiovascular disease (among others) is reduced by care and management for that condition. (Appx. 22; *also* Appx. 168-170) There is no dispute that each of the named Plaintiffs know how to access medical care, and have done so in the past. (Appx. 41-132)

**9. Work restrictions help protect the offenders.**

TDCJ and the Pack Unit also take steps to reduce offender activity in times of high temperatures to reduce the possibility of heat stress. TDCJ Administrative Directive 10.64 and CMHC 27.2 establish at apparent outdoor temperatures of approximately 90 degrees: staff are to ensure adequacy of water intake; look for signs of heat exhaustion; and provide five minute rest breaks every hour. (Appx. 594; Appx. 599). When the apparent outdoor temperature reaches approximately 105 degrees: staff are to promote high water intake; provide five minute rest breaks every one-half hour, lying down with feet up; and are to reduce work by one-third. *Id*. When the apparent outdoor temperature reaches approximately 130 degrees: staff are to secure outside work or reduce work pace by one-half to two-thirds; provide 10 minute rest breaks every one-half hour, lying down with feet up; and insist on increased water intake. *Id*. The annual heat precaution email reminder reiterates that Wardens and Units are to restrict outside activity in accordance with AD-

10.64. (Appx. 610). Staff are also to ensure that anyone working in areas of extreme heat such as, field, maintenance, and yard squads are provided frequent water breaks. *Id*. Staff are also to provide additional water, including ice if available, to employees and offenders in work areas. *Id*.

The Pack Unit has a unit specific standard operating procedure ("SOP") for extreme temperature conditions. (Appx. 759-763) Not only does the Pack Unit SOP restrict outside activity in accordance with AD-10.64, it also provides other specific work restrictions. (Appx. 760 & 762) For example, all officers assigned to supervise outside work squads must: be fully cognizant of the SOP and AD 10.64; and be trained to recognize signs of heat & cold stress and must know emergency procedures for treating any weather related physical trauma as well as basic first aid. (Appx. 762) There are also certain restrictions placed on certain types of work squads. Maintenance squads may turn out in any weather for emergency repairs or inside work. *Id*. Community Work Squads may turn out in any weather, if working indoors, out of the weather. *Id*. The Line Force will not turn out when the Heat Index is 105 degrees Fahrenheit, without a warden's approval. *Id*. The Outside Yard Squad also will not turn out when the Heat Index is 105 degrees Fahrenheit or above; except, they may be turned out to address safety/security issues outside the Unit or in emergency situations. *Id*. The Trash Crew, Inside/Outside Yard Squad, Farm Shop, Buffalo Ranch, and Livestock Handlers/Kennel Workers may be turned out in any weather based on the senior security supervisor's discretion. *Id*. This is because these jobs are critical to the safe and sanitary operation of the unit and are critical to the operations of each area. *Id*. The Pack Unit also follows AD-10.64 with regard to outdoor work restrictions. (Appx. 1157:12 to 1158:3; Appx. 1107:5-12). The Pack Unit restricts outdoor work based on certain temperature criteria, which is important in preventing heat-related injuries.

**10. Light clothing and chill towels are allowed.**

The ability to wear lighter clothing and the availability of special cool down towels are additional measures implemented by TDCJ and the Pack Unit. TDCJ Administrative Directive 10.64 establishes that offenders shall be provided and required to wear clothing appropriate for the temperatures and hazards imposed by UV radiation. (Appx. 587) Furthermore, when the outdoor heat index is over 90 degrees, offenders are allowed to wear shorts in dayrooms and recreational areas. *Id*. at 7. Each summer a heat precaution reminder is sent to every unit. (Appx. 609-624) This heat precaution reminder lists allowing offenders to wear t-shirts and shorts in dayrooms and recreational areas as a precaution to be taken in housing areas. (Appx. 611) In addition to lighter clothing, offenders frequently will wet a towel or cloth and wrap it around their neck or other areas to keep cool. (Appx.1130:17-21, Appx.1131:1-5)

At the Pack Unit, offenders are allowed to wear shorts and t-shirts in their dorms, dayrooms and recreational areas. (Appx. 1123:1-1124:8; Appx. 1150:19-25; Appx.1156:14-20) From a medical perspective, allowing offenders to wear lighter clothing in their dorm, dayrooms and recreation areas is one of the important prevention measures that is working. (Appx. 173, 177) Plaintiffs' own expert, lists wearing light clothing as a personal adaptation that can help lower the risk of heat-related illness. (D.E. 272-4 at 19)

Offenders also can purchase a "chill towel" from the commissary which can be used in the housing area or brought to their work assignment. (Appx. 1130: 17-21; Appx. 1131: 1-5, Appx. 771, 790-91) When wet, the towel begins to evaporate and cool, providing cool, soft comfort to the user. When it stops cooling, simply re-wet the towel in hot or cold water and wring it out. Within minutes, it's cool again. (Appx. 790-91, see also *Chilly Pad*, FROGG TOGGS,

http://www.froggtoggs.com/cooling/the-chilly-pad/chilly-pad.html (last visited Nov. 15, 2015). The towels are sold to offenders at just over half the cost the manufacture charges the general public. (Appx. 771, 790-91, *Chilly Pad*, FROGG TOGGS, http://www.froggtoggs.com/cooling/the-chilly-pad/chilly-pad.html (last visited Nov. 15, 2015).

Plaintiffs testified that they are allowed to wear lighter clothing, such as shorts and t-shirts, in their dorms and dayrooms, and some of the Plaintiffs testified that this helps them during the summer. (Appx. 1185: 9-18; Appx. 1200:7-18; Appx. 1227:16-18; Appx. 1239: 3-8; Appx. 1248: 8-14; Appx. 1265:15- Appx. 1266: 6; Appx. 1288: 7-11)

### C. The named Plaintiffs and their medical histories. (Please see attachment filed under seal.) [5]

## VI. ARGUMENT[6]

### I. The Fifth Circuit has repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons.

Offenders are protected from cruel and unusual punishment under the Eighth Amendment of the United States Constitution. *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995). The Constitution does not mandate comfortable prisons, but, the Eighth Amendment's prohibition against cruel and unusual punishment does require that offenders be afforded "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994). The resulting

[5] In order to avoid the necessity of filing Defendants' Motion for Summary Judgment under seal, this section of Defendants' statement of facts is provided in a separate document, but should be read and incorporated as Section C of Defendants' Statement of Facts.

[6] In addition to the arguments and authorities cited below, Defendants adopt and incorporate by reference the argument and authorities contained in Defendants' Response to Plaintiffs' Amended Motion for Class Certification as applicable to the issues here. (D.E. 307, 309)

inquiry, deliberate indifference, is an "extremely high" standard. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001).

A two-part test determines whether a prisoner has established a constitutional violation. *Woods*, 51 F.3d at 581. First, he must demonstrate the objective component of conditions "so serious as to deprive prisoners of the minimal measure of life's necessities, as when it denies the prisoner some basic human need." *Id.* (quotation omitted). This requires a showing of an "unnecessary and wanton infliction of pain ...." *Farmer*, 511 U.S. at 834.

The second part of the inquiry focuses on the subjective state of mind of the defendants. "The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the ... officials were actually aware of the risk, yet consciously disregarded it." *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir.2002). "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Hall*, 190 F.3d at 697 (*quoting Farmer*, 511 U.S. at 834). Thus, the "'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838). Further, a prison official cannot be held liable even if he "responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety. *Farmer*, 511 U.S. at 844.

As well established as the legal principles may be, plaintiffs have continuously sought to lower the applicable standard to negligence. It is clear that the deliberate indifference requirement is more than mere negligence. *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir.2001). Deliberate indifference "is a degree of culpability beyond mere negligence or even gross negligence; it must

amount to an intentional choice, not merely an unintentionally negligent oversight." *Gibbs*, at 617–18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992); *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000)). "[A]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez ex rel. Hernandez v. Texas Dep't. Of Protective and Regulatory Services*, 380 F.3d 872, 883 (5th Cir.2004) (quoting *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir.1999)).

In the specific context of risks posed by indoor temperatures, the Fifth Circuit has specifically defined the Constitutional inquiry which should drive the Courts' analysis here. The bright line for when heat amounts to a Constitutional violation is when heat goes from being not just uncomfortable, but, rather to the level of posing "an unreasonable risk of serious damage to a prisoner's health." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015). Stated more succinctly, to be un-Constitutional, the indoor temperatures must pose a "substantial risk of serious harm." *Id*. The Court reaffirmed that "merely uncomfortable" heat in a prisoner's cell does not reflect "a basic human need that the prison has failed to meet" and is not constitutionally suspect." *Id.* (*quoting Woods*, 51 F.3d at 581). The Fifth Circuit has for over a decade, repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons. *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir.2004); *Blackmon v. Garza*, 484 Fed.Appx. 866, 872, fn. 6 (5th Cir.2012); *Ball*, 792 F.3d at 599. Instead, prison officials may discharge their Constitutional obligations by implementing measures designed to mitigate the health risks posed by the heat, but have declined to establish any maximum temperature levels. These measures need not remove any and all risk of a heat-related injury, they only need to lower that risk "to a socially acceptable level. Some risk is

permissible and perhaps unavoidable." *Ball*, 792 F.3d at 599; (*accord*, *Farmer*, 511 U.S. at 844 (holding that a prison official's duty under the Eighth Amendment is to ensure "reasonable safety")).

The Fifth Circuit first defined the Constitutional test regarding heat in prisons in 1995 in *Woods*, 51 F.3d at 581. In *Woods*, the offender Plaintiff in the Louisiana prison system claimed he was being housed in extended lockdown in a cell that was inadequately cooled in the high temperatures. *Id.* While he claimed that this aggravated a sinus condition, there was no medical evidence of any adverse health affect. *Id.* The Court held that an uncomfortable temperature alone does not violate the Eighth Amendment, first establishing the principle that cooling is not a basic human need that prisons must provide. *Id.*

In *Gates*, the Fifth Circuit affirmed a district court's injunction that required the Mississippi Department of Corrections to "provide fans, ice water, and daily showers when the heat index is 90 degrees or above, or alternatively to make such provisions during the months of May through September." *Gates*, 376 F.3d at 339. In the Mississippi Delta, the summer temperatures average in the nineties with high humidity, and the plaintiff's expert testified that that heat index in the housing areas reached as high as 127-140°F. *Id*. at 334. *Gates*, 376 F.3d at 334. (Appx. 812- 815) Death Row primarily was not an air-conditioned facility, but did have industrial sized fans in the hallways to help with circulation. *Id.* Most offenders had smaller fans. *Id.* Although the windows could be opened, holes in the cell window screens allowed mosquitoes into the cells. The court found that "ventilation is inadequate to afford prisoners a minimal level of comfort during the summer months." *Id.* The court further found that "the probability of heat-related illness is extreme on Death Row, and is dramatically more so for mentally ill offenders who often do not take

appropriate behavioral steps to deal with the heat. Also, the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature." *Id.* Importantly, after making these findings, the Fifth Circuit affirmed the *remedial measures* of fans, extra showers, ice water, and ventilation---not cooling of death row. *Gates,* 376 F.3d at 339. This ruling forms the baseline measures that Fifth Circuit prison systems must implement to mitigate the heat.

Subsequently, the Fifth Circuit declined to hold that an offender (Blackmon) who was 63-64 years old, had pre-existing high blood pressure, and was taking medications that could have interfered with his body's ability to dissipate heat, had demonstrated as a matter of law required by the Eighth Amendment that the "remedial measures required by the *Gates* court are insufficient to address the risks of high heat and humidity, particularly with regard to prisoners who are younger and healthier than Blackmon." *Blackmon*, 484 Fed.Appx. at 872. Even though Blackmon's expert testified that there were 51 days where the heat index was 103 degrees or higher, the Fifth Circuit specifically noted that "like the *Gates* court, we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment." *Id*. at 871-72, fn. 6. In reversing and remanding the case for a new trial, the Fifth Circuit held the district court erred by granting judgment as a matter of law in favor of the defendants where the "evidence did not militate so strongly in Defendants' favor that a reasonable jury could not have reached a verdict in Blackmon's favor." *Id*. at 874. The fact questions for the new trial included (1) whether prison officials provided enough cool water; (2) whether the remedial measures at the Garza West Unit were inadequate to satisfy the Eighth Amendment's demands in summer heat where there was an industrial fan as well as an air handler but no air conditioning; offenders were not able to use

personal fans because of a lack of electrical outlets; the windows were sealed; the only water came from dirty sinks; and Blackmon alleged he had to wait an hour to take a shower because two of the four showers were broken; and (3) whether, despite remedial measures implemented by prison officials, Blackmon was exposed to serious health risks while incarcerated at Garza. *Id.* at 871-872. *Blackmon*, therefore, stands for the proposition that to demonstrate deliberate indifference in a summer heat living conditions case, the plaintiff must show either that remedial measures are not being implemented, or if they are being implemented, the measures are inadequate to eliminate the health risks posed by summer heat. *See also, Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir.2008) (holding that high temperatures combined with alleged prohibition on leaving bunk to drink water and only periodic access to showers constituted a cognizable Eighth Amendment claim).[7] But, in either case, cooling by "air conditioning" is not suggested by the Fifth Circuit to meet the requirements of the Eighth Amendment.

The Fifth Circuit's previous precedent recently culminated in *Ball v. LeBlanc*, in which the Court again rejected the notion that the Eighth Amendment requires air-conditioned prisons. *Ball* involved a similar suit filed by three offenders housed in the particular section of the Angola State Prison designed for death row. *Ball*, 792 F.3d at 590. They claimed the lack of air-conditioning in light of their medical conditions placed them at substantial risk of harm in violation of their Eighth Amendment rights. *Id.* The plaintiffs sought an injunction that the prison be air-conditioned to the heat index at or below 88° F, the same relief sought here. *Id.* at 589. The District Court granted their request for injunctive relief by finding a Constitutional violation and ordering the state to lower the temperatures to 88° F, a measure that only could be accomplished through air-

[7] It should be noted that at trial, the offender-plaintiff's claims were proven false, and the jury returned a verdict in favor of the defendants.

conditioning. *Id*. at 598. The Fifth Circuit reversed.

In holding that the District Court did not abuse its discretion in finding a substantial risk of harm, the Fifth Circuit specifically noted that such a finding was predicated on the fact that the district court held that the *Gates* measures had not been fully and adequately implemented. *Id.* at 595-96. The offenders did not possess person fans and the existing fans were positioned in a way that did not provide air flow to each cell, nor [do] the fans provide "a detectable cooling effect." *Id.* at 595. Ice was only available once per day when the offender was permitted to leave his cell. *Id.* at 595-96. The showers temperatures were between 100-120 degrees, which meant they provided little relief from the heat. *Id.* at 596.

Despite finding a plausible Eighth Amendment violation, the Fifth Circuit held that the injunctive relief ordered by the District Court was impermissible under the PLRA for three reasons. First, the goal of the injunction was too broad: "[A]ir conditioning… is unnecessary to correct the Eighth Amendment violation. Under the PLRA, Plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Id.* at 599. Importantly, the Fifth Circuit explained that the Constitution does not require the elimination of all risk of heat illness as the injunction was designed to create. The Fifth Circuit held the Constitution requires only that the risk be lowered "to a socially acceptable level. Some risk is permissible and perhaps unavoidable." *Id.*

Second, the injunction was overbroad in its scope. By ordering the entire facility air conditioned, the District Court provided an overbroad remedy, where a more appropriately tailored remedy would be targeted to the Plaintiffs specifically. Coupled with an order to keep the Plaintiffs in the appropriately accommodated cell, a narrower means was available, and had to be utilized

under the PLRA. *Id.* at 599-600.

Finally, the injunction also was held overbroad because the court failed to consider or order remedial measures of the type ordered in *Gates*, 376 F.3d at 336. Even if those measures needed enhancement or more robust implementation, the PLRA mandates that these types of measures be implemented before air-conditioning could be deemed necessary. Air conditioning, therefore, is not the appropriate remedy until all of these steps have been considered. *Ball*, 792 F.3d at 600 ("…assuming that air conditioning is an acceptable remedy here—and it is not…") *Gates*.

As shown fully below, TDCJ's comprehensive response to the dangers of heat negates both the objective and subjective components of the deliberate indifference inquiry. No one within TDCJ disputes that, absent protective mitigation measures, the heat in the Pack Unit housing area can create a risk of harm to offenders who live there. The TDCJ devised, implemented and continuously reviewed and improved upon summer mitigation measures. (Appx. 674-76; Appx. 1098:1- Appx.1100:1) With the mitigation measures in place at the Pack Unit, the named Plaintiffs are not denied a minimal measure of life's necessities or basic human need under the objective prong of the deliberate indifference inquiry. In addition, under the subjective prong, TDCJ's implementation of a comprehensive strategy that includes mitigation measures, education, and monitoring along with TDCJ's belief in their efficacy, negate any notion that TDCJ's executives or staff are consciously disregarding a substantial risk posed by the heat.

## II. TDCJ implements a compressive plan to protect offenders from heat, and multiple levels of analysis demonstrate the effectiveness of those measures.

In light of the standards set forth in *Ball* and *Gates*, the appropriate inquiry should focus on the measures actually in place at the Pack Unit, and the extent to whether those measures are effective. Plaintiffs failed to dispute that TDCJ implements its mitigation measures. The measures

implemented exceed those required by the Fifth Circuit. That these measures have proven effective can be demonstrated on multiple levels. The medical testimony explains the utility of each measure along with the protective health effects of acclimatization. A macro-level analysis shows the remarkable rarity of heat-related illness at the Pack Unit and throughout TDCJ. A micro-level analysis of the medical history of each named Plaintiff demonstrates that while the conditions at the Pack Unit might be uncomfortable at times, none are at substantial risk of harm from the heat. Together, this evidentiary record shows that the named Plaintiffs cannot meet their burden to show that they are at a socially unacceptable risk of serious harm or that Defendants are deliberately indifferent to such risk.

### A. TDCJ and the Pack Unit implement effective mitigation measures that exceed those required by the Fifth Circuit.

TDCJ has devised, implemented, and continuously reviewed and improved upon a series of measures designed to protect offenders from the effects of heat. These measures were created and are reviewed by prison officials from multiple disciplines within the complex field of prison administration. These officials meet yearly, and TDCJ's mitigation measures, training and education, and formal policies have evolved over the years as TDCJ has built on its successes and made improvements where appropriate. (Appx. 673-76; Appx. 1102:11- Appx. 1103:3) The result is a comprehensive strategy that meets and exceeds the measures established by the Fifth Circuit.

#### 1. Acclimatization

The human body is a compilation of complex, interconnecting biochemical pathways with redundancy, feedback loops and layers of backup systems. If one process fails, then another process is triggered to compensate and accomplish the function. (Appx. 22) Such a process is acclimatization, which is a major factor in protection from heat related illness. Acclimatization

increases the body's capacity to handle high temperatures in a number of ways. (Appx. 10-14) The human body generates "heat shock proteins" which protect vital system functions from damage and protect our body at the cellular level. (Appx. 11, 13-14) Acclimatization takes place over the course of several days after the body is exposed to higher temperatures. (Appx. 13) The body's multiple and redundant cooling systems and their enhancement through acclimatization explain why a person may have an impairment or take a medication that might affect one or more of these systems, but are nonetheless safe and will not suffer a heat-related injury. (Appx. 56, 65, 72, 81, 86-87, 95-96, 103 and 115; *also* Appx. 163, 174, 178-179)

Both TDCJ and Correctional Managed Healthcare Committee policies recognize the importance of acclimatization. It is listed as the best preventative measure for heat stress. (Appendix. 597) Newly received offenders are screened upon arrival for conditions that might affect heat tolerance, and the necessary individuals are added to the well-check procedure. (Appendix 587; See also, section 7, *supra*) Beverages with sodium added can be considered based on the offender's level of acclimation. (*Id.*) When any new offender receives a work assignment, his workload is reduced and separated by mandatory rest periods as he becomes acclimated. (*Id.*)

At the Pack Unit specifically, the vast majority of the offenders are acclimated to the heat as it is a unit of assignment and not an intake or transfer facility, and the offenders have lived in an un-air-conditioned environment for some time. This is true for each of the named Plaintiffs, whose medical records indicate that they are acclimated to the heat, even though they may find the conditions to be uncomfortable. (Appx. 56, 65, 81, 86-87, 95, 103, 115) The health benefits of acclimation combined with aggressively implemented mitigation measures provide an explanation why, despite the fact that the Pack Unit houses many older offenders and offenders with complex

medical conditions and medications, indoor heat-related injuries have been nearly eliminated.

### 2. Water

As outlined above, the record is undisputed that the Pack Unit provides ice water and water from sinks and fountains to the offenders. (See *Statement of Facts,* Section B. 1.) The availability of water is an important remedial measure implemented by TDCJ and recognized in *Gates and Ball* as a method of combating the effects of heat. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. In *Gates* and *Ball*, Plaintiffs' own expert opined that, short of providing air conditioning, the remedial measure of providing an ample supply of drinking water at all times and ice several times a day, among other measures, is adequate for cooling the human body when the temperature or heat index exceeds 88 degrees F. (Appendix 514; Appendix 521).[8] Defense experts concur that this is an appropriate and effective measure. (Appx. 12, 31, 178, 214).

Plaintiffs' concerns that arsenic in the drinking water poses a threat to offenders safely drinking the water during summer months are greatly overstated. First, a new arsenic water treatment system should be initiated and fully operational no later than January 18, 2017. (Appx. 578). This is the culmination of a multi-year process in conjunction with the Texas Commission on Environmental Quality. (Appx. 570-79). Second, Dr. Bojes, a manager and unit director at the Texas Department of State Health Services ("DSHC"), wrote a detailed report. (Appx. 540-48). She noted that even when overestimating water consumption, that "DSHS concludes that drinking elevated levels of arsenic in water at the Pack Unit is not likely to cause non-cancer health effects. Even assuming nine year uninterrupted and high year-round consumption rates, drinking elevated levels of arsenic in water at the Pack Unit would theoretically produce 0.13 additional cases of

[8] Dr. Vassallo's reports in *Gates* and *Ball* are attached for convenience of the Court but not adopted.

cancer than would otherwise occur in a population of 1,478. (Appx. 544-45) For these reasons, the data supports the message that TCEQ has posted for the offenders: "This is not an emergency…You do not need to use an alternate water supply." (Appx. 581) Offenders and staff at the Pack Unit, therefore, can safely drink the water pending the installation of the new water treatment facility.

**3. Fans**

The use and availability of fans is an important remedial measure implemented by TDCJ and recognized in *Gates and Ball* as a method of combating the effects of heat. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. As shown above, the record is undisputed that the Pack Unit diligently implements the use of fans. (See *Statement of Facts,* Section B. 2.)

From a medical perspective, the use of fans increases air flow across the skin, which increases the evaporation of sweat, and helps cool the skin. (Appx. 032) A new study published in the Journal of the American Medical Association found electric fans can make at least a six degree difference in the ambient temperature our bodies can cope with before we start to overheat. (Appx. 032) The study found that you experience a lower amount of physiological strain at 42 degrees Celsius (107.6 degrees Fahrenheit) with a fan than you do at 36 degrees Celsius (96.8 degrees Fahrenheit) without a fan. (Appx. 032)

In *Gates* and *Ball*, Plaintiffs' expert opined that, short of providing air conditioning, the remedial measure of providing an electrical fan to all offenders, among other measures, is an important remedial measure for cooling the human body when the temperature or heat index

exceeds 88 degrees F. (Appx. 511, 514, 522).[9] In both cases, the Fifth Circuit agreed. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. Its use at the Pack Unit is undisputed, effective and appropriate.

**4. Showers**

The Pack Unit exceeds the number of daily showers that were considered a significant remedial measure by the *Gates* and *Ball* Courts. (See *Statement of Facts*, Section B. 3.) *See Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. The *Ball* court specifically pointed out that the showers should have a lowered temperature to facilitate cooling. With three showers per day, including afternoon and evening cold showers in the main building, and unlimited cold showers in the expansion dorm and trusty camp, the Pack Unit is providing frequent access to this cooling measure. (Appx. 790-91)

Both the CDC and Plaintiffs' expert endorse the use of this measure. Dr. Vassallo, has previously stated that "[Offenders] must be allowed access to showers at least once a day; the CDC recommends frequent cool showers, if exposure to heat cannot be avoided." (Appx. 514; Appx. 521. Subsequently, the *Gates* and *Ball* opinions incorporated daily showers into their requirements. *Gates*, 376 F.3d at 339; *Ball* 792 F.3d at 600. There is no dispute regarding the implementation of this measure or its effectiveness.

**5. Ventilation**

Though the *Gates* measures specifically reference adequate screen covering over windows, the intent of the measure was to ensure that each cell had adequate air flow with the outside air. (See *Statement of Facts,* Section B. 4.) Plaintiffs' expert report from the *Gates* case confirms this fact. (Appx. 515-23) Within the main dorm and trusty camp, there are both operable windows and

[9] Dr. Vassallo's reports in *Gates* and *Ball* are attached for convenience of the Court but not adopted.

a ventilation system. While the expansion dorm does not have operable windows, the *Gates'* measure of ventilation is achieved through a robust ventilation system that moves 425 cubic feet of air per minute, satisfying the intent of the *Gates* court through an alternate means. (Appx. 669)

**6. Respite**

Air-conditioned respite areas are an important remedial measure implemented by TDCJ beyond what was required in *Gates*, suggested in *Ball*, and identified by Plaintiffs' experts as the most effective mitigation measure. (See *Statement of Facts*, Section B. 5.) Though the *Ball* court did not require access to air conditioning at the Louisiana facility in question, it suggested that such access is an appropriate mitigation measure the lower court should consider as opposed to facility-wide air conditioning. *Ball*, 792 F.3d at 600. TDCJ took note of the Court's comments and took action to formalize its use of respite areas. (Appx. 533) This action ensured for both staff and offenders that instructions were clear on how to access the respite areas. Further, the Pack Unit provides that medical staff will evaluate the offender to ensure there are no additional health concerns. Offenders are not charged any fee for this service. (Appx. 537-38)

In this measure, Plaintiffs' experts and TDCJ are in agreement. Both Drs. McGeehin and Vassallo point out that spending time in air conditioning is the most important preventative measure. "Increasing access to air conditioning is the central aspect of any heat response plan." (D.E. 272-4 at 19, ¶81) "[The ability to sit in air-conditioning when needed] is by far the most effective measure for preventing heat-related disorders." (D.E. 272-3 at 12, ¶54) TDCJ is implementing this important heat-mitigation measure. Both the named Plaintiffs and the Pack Unit staff agree that each offender has seen or been given notice that these air-conditioned respite areas are available. The testimony and evidence shows this is an undisputed fact.

**7. Wellness-checks**

Though not a measure specifically required by the *Gates* or *Ball* Courts, TDCJ's use of well-checks helps to prevent heat stress from escalating into more serious conditions. As documented above, it is undisputed that the Pack Unit diligently implements this measure by checking on heat-sensitive offenders every half hour. (See *Statement of Facts,* Section B. 6.) Further, the systemic oversight through TDCJ Health Services further helps to ensure that the heat-sensitive offenders are closely monitored. Plaintiffs' expert, Dr. McGheehin (D.E. 272-4 at 19, ¶79) opines that personal contact with high risk individuals is an important part of a heat response plan. Dr. Vassallo points out how heat stress causes "an inflammatory progression." (D.E. 272-3 at 8, ¶31) The well-check process is designed to ensure that heat-sensitive offenders are regularly monitored to allow for early and preventative intervention should symptoms arise. There is no factual dispute regarding this measure's implementation at the Pack Unit, its importance, or its effectiveness.

**8. Training and education**

Training and education of offenders and staff is a component of TDCJ's mitigation strategy beyond measures required in *Gates* or *Ball*, but of no less importance. (See *Statement of Facts*, Section B. 7). In *Gates* and *Ball*, Dr. Vassallo opined that, medical staff and correctional staff should receive training in prevention, symptoms, and emergency treatment of heat-related illness. (Appx 522)[10] Here, Plaintiffs' expert Dr. McGeehin, recognizes that a societal adaptation to reduce heat-related illness and death includes increased awareness of heat-related signs and

[10] Dr. Vassallo's reports in *Gates* and *Ball* are attached for convenience of the Court but not adopted.

symptoms among emergency medical service units and other health care personnel. (D.E. 272-4 at 19, ¶79).

Both the named Plaintiffs and the Pack Unit staff agree that offenders are trained on heat related illness signs, symptoms, treatment and prevention through a number of means. The testimony and evidence shows this is an undisputed fact.

**9. Medical care & Monitoring**

The provision of medical care is an important and appropriate component to TDCJ's mitigation efforts. TDCJ spends $537 million on offender medical care every year. (Appx. 1092: 7-8) For any offender who reports to a staff member that they are not feeling well due to the heat or requests access to a respite area, staff will either take the offender to the medical department for evaluation or he will be taken directly to a respite area and medical staff summoned for triage. (Appx. 537-39) Offenders are not charged a co-pay for this service. (Appx. 537-39) This allows potential heat stress to be addressed early and before it escalates into a heat-related illness.

In addition to care at the unit level, TDCJ also monitors heat-related illness system-wide. Healthcare staff at the unit report all potential heat-related illnesses to the TDCJ Health Services. (Appx. 240-41) This data has been used to identify trends and facilitate corrective action, including at the Pack Unit. (Appx. 777-788, 791-92)

Medical care is also an important component in the management of conditions that can affect heat tolerance. Many offenders who have risk factors for heat injury are acclimatized to heat and will suffer no heat-related illness or injury. (Appx. 56, 65, 72, 81, 86-87, 95-96, 103 and 115; also Appx. 163, 174, 178-179). This is in part because these offenders receive care for the chronic conditions. The elevated risk posed by conditions such as diabetes, obesity, hypertension,

and cardiovascular disease (among others) is reduced by care and management for that condition. (Appx. 22; *also* Appx. 168-170) In addition to system-wide monitoring, the medical care provided at the unit level both as responsive care for heat-illness and preventative care for the management of chronic illness, forms an import part of TDCJ's preventative and remedial efforts.

**10. Work restrictions**

As outlined above, TDCJ and the Pack Unit also take steps to reduce offender activity in times of high temperatures to reduce the possibility of heat stress. (See Statement of Fact, B. 9) Once, again the TDCJ takes the extra steps to protect offenders from heat illnesses.

**11. Light clothing and chill towels**

The ability to wear lighter clothing and the availability of special cool down towels are additional measures implemented by TDCJ and the Pack Unit. (See *Statement of Facts*, B. 10) Plaintiffs' expert lists wearing light clothing as a personal adaptation that can help lower the risk of heat-related illness. (D.E. 272-4 at 19) Further, by providing the Frogg Togg cooling towel for half the cost charged to the general public, the TDCJ is providing yet another means of seasonal comfort.

**B. The TDCJ's current mitigation measures are proving effective on multiple levels.**

**1. Remedial measures are proving successful throughout TDCJ.**

The combined effects of acclimatization along with TDCJ's training, monitoring, and mitigation measures also demonstrate their effectiveness in reducing the risk of heat-related illness to a socially acceptable level. Following the events of 2011 and 2012, the agency's strengthened efforts with regard to training, monitoring, and mitigation measures, the number of heat related illness has steadily declined in each and every summer. (Appx. 239- Appx. 244: Appx. 673- Appx.

676; Appx. 1102:11- Appx. 1103:3) The summer of 2015 set a new low of 54 heat related incidents.[11] (Appx. 240-42) This number is not limited to incidents requiring significant medical intervention. (Appx. 831-1038) It includes incidents of heat exhaustion where nothing more than rest in a respite area and cool water were necessary. (*Id.*) When reduced further to include heat related incidents that occurred indoors as opposed to outdoor incidents that could not be prevented through air conditioning, the TDCJ has only experienced an average of 23 incidents per summer over the last three years. (Appx. 240-42) In a system of nearly 150,000 offenders, 99.98% of those offenders pass through the summer without suffering an indoor heat-related illness. Considering that the summer period of June – September consists of 122 days, each presenting its own unique possibility that the day's temperatures will cause an illness, the odds of an offender having an indoor heat-related illness on a given day is 1 in 795,652.[12]

**2. Remedial measures are working at the Pack Unit.**

The experience at the Pack Unit and the administration's response to heat-related illness demonstrates the responsiveness of the TDCJ administrators and the efficacy of remedial measures. In late June, 2012, the medical staff responded to several offenders reporting symptoms of heat-related illness. (Appx. 777-788, 791-92) UTMB tracked and compiled monthly reports regarding possible heat related illness system-wide. (Appx. 777-788) A preliminary report for the month of June 2012 was distributed on July 6, 2012, a Friday. (Appx. 777-788) That same day, a senior official in the TDCJ health services and a senior official in UTMB correctional managed care reviewed the report and noticed the increase in reports of heat-related illnesses from the Pack

[11] This number alone is testament to the effectiveness of TDCJ's measures given the fact that it maintains an outdoor workforce of tens of thousands of offenders.
[12] 122 days x 150,000 offenders = 18,300,000 chances per year for an offender to have a heat-related illness. 23 incidents / 18,300,000 chances = 1 / 765,652.

Unit. (Appx. 777-788, 791-92) The TDCJ officials forwarded the report to the director of training to make him aware of the situation. (Appx. 777-788, 791-92) A meeting was scheduled for the next business day (Monday, July 9, 2012). (Appx. 777-788, 791-92) The meeting included representatives from the medical staff at the Pack Unit and the unit administration, including Warden Herrera. (Appx. 777-788, 791-92) The group reviewed the current unit practices and made recommendations to enhance the mitigation measures in place. (Appx. 777-788, 791-92) At the time, ice water was distributed to the housing areas twice per day. (Appx. 777-788, 791-92) Ice production was at times falling behind demand on hot days. (Appx. 777-788, 791-92) The medical staff felt offenders were not drinking sufficient amounts of water, and additional advisories were created and posted in the housing areas. (Appx. 777-788, 791-92)

In the time following the July 2012 meeting, the Pack Unit has bolstered its heat mitigation measures. Both ice production and distribution has increased. (Appx. 791-92) The unit received a new ice machine and continued to use its previous ice machine. (*See generally, Statement of Facts*, Section B.) Pack Unit increased its ice water distribution, and specifically assigned offender-workers to the task of ice water distribution. (*Id.*) Twenty-four hours a day and seven days a week, these offender workers are tasked with constantly filling and refilling water coolers in the housing areas. (*Id.*) Additional fans have been purchased and the loaner fan program has ensured that every offender at the facility has a personal fan. (*Id.*) An additional cooldown shower was added so there are now three showers per day available for offenders in the main housing areas.[13] (*Id.*) The water temperatures have been lowered to make the cool showers as beneficial as possible. (*Id.*) Maintenance has been increased on the ventilation system to ensure maximum

[13] Offenders in the trusty camp and expansion dorms have on demand access to the showers throughout the day.

airflow. (*Id.*) Second floor fire escape doors are now opened in the summer time to allow for even more airflow into the dorms. (*Id.*) Respite areas have been identified and notices posted for the offenders on how to access them. (*Id.*) Staff are committed to providing respite when an offender asks for it. (*Id.*) This includes a precautionary evaluation by medical staff, for which they do not pay a co-pay. (Appx. 536-39) Additional offender training has taken place. (*See generally*, *Statement of Facts*, B. 7)

The results at the Pack Unit after the changes made in 2012 demonstrate the efficacy of these measures. There have been eight incidents reported as *potential* heat related illness to TDCJ Health Services in 2013, 2014, and 2015. (Appx. 948-1038) Nearly all were caused by work or activities taking place outdoors, and required nothing more than a few hours of rest and hydration in the medical department. (*Id.*) All of the documented incidents were offenders who were working the fields or outdoors, or participating in recreation. This is so for all offenders at the Pack Unit, including those that are "heat-sensitive" by Plaintiffs' definition. While Plaintiffs' experts have repeatedly opined that without air conditioning, offenders are at extreme risk of harm, they offer no explanation for why this is *not* happening at the Pack Unit. This success demonstrates what Defendants' medical experts advise: the benefits of acclimation plus the aggressive implementation of mitigation measures are sufficient to protect Pack Unit offenders from a *substantial or excessive* risk of harm during the summer heat.

#### 3. Plaintiffs' experts offer no explanation for the lack of heat-related incidents at the Pack Unit.

Plaintiffs' experts offer thinly supported statements for their conclusion that Pack Unit offenders are at substantial risk of harm, but do not seem to have any explanation for why, if the

risk of harm is as dire as they claim, heat-related illness happens so rarely in the Texas prison system or at the Pack Unit.[14]

The basis for Dr. Vassallo's opinion is tenuous at best, and in some instances, factually incorrect. First, Dr. Vasallo cites to (unspecified) studies that "have shown that the incidence of heat-related illnesses and deaths increase starting at heat index numbers in the mid to high 80s." Dr. Vassallo also points toward studies that show an overall increase in mortality rates during high temperatures. Most studies involving heat-related illness have been limited primarily to athletes training or competing outdoors, military personnel outdoors and heat waves in large cities outside of Texas involving populations that are not acclimatized and that are affected by the "urban heat island" effect. (Appx. 20) Likewise, most articles citing mortality from heat-related illness are based on a population that is not acclimatized and, therefore, would not apply to a population that is protected by acclimatization, like TDCJ offenders. (Appx. 21) Defendants' experts' findings regarding mortality and the protective effects of acclimatization manifests itself in the undisputed fact that overall mortality *decreases* in TDCJ during the summer months. (Appx. 27 and 33)

Finally, Dr. Vassallo's report contains false assumptions. She stated "they do not have the ability to sit in air conditioning whenever they need it. This is by far the most effective measure for preventing heat-related disorders." In fact, the offenders do have that ability. (Appx. 533; *also* Appx. 766-775) She opines that offenders are reluctant to seek medical attention if they are feeling the effects of the heat because they will be charged $100 if they do. As noted in UTMB's affidavit, this is also false. (Appx. 537-539)

[14] It should be noted here that Plaintiffs were afforded an opportunity to submit rebuttal expert testimony, but did not.

Dr. McGeehin's report suffers from many of the same flaws. (See D.E. 272-4) Dr. McGeehin offers no accounting for the protections provided by acclimatization and how it factors into the studied heat waves in northern cities and Europe. (Appx. 21) Though he has opined TDCJ's mitigation measures are insufficient, he has not interviewed the Plaintiffs or any other Pack Unit offenders. (See Note 8 at 26-27) He also relied on the false assumption that Pack Unit offenders are unable to access an air conditioned space if they request to do so. (See D.E. 272-4 at 18)

In fact, Dr. McGeehin's comments demonstrate the appropriateness of the TDCJ's heat mitigation strategy. In discussing municipal policies and action plans, Dr. McGeehin states:

> The best of these plans are activated by an early warning system based on a National Weather System advisory and contain elements that provide for effective communication with high-risk groups; coordination among government and private agencies; multiple personal contacts with elderly and ill people living alone; increased availability of, and transportation to, air conditioned safe areas; and increased awareness of heat-related signs and symptoms among emergency medical service units and other health care personnel. Every major city in the United States that has suffered the impacts of an extreme heat event has a societal adaption in the form of an emergency heat response plan. Every such plan includes a sufficient number air conditioned cooling centers, and measures to transport vulnerable community members to those cooling centers during an extreme heat event. (D.E. 272-4 at 19, para. 79-80)

Perhaps without realizing it, Dr. McGeehin described many of the components of the TDCJ's heat mitigation efforts. "Coordination among…agencies" occurs in the coordination between TDCJ and the medical providers to identify vulnerable offenders, provide evaluation, triage, and care (if needed) for offenders who request access to a respite area, and is also captured in the coordination that occurs at the higher levels of administration to evaluate and review the efficacy of the measures provided. "Multiple personal contacts with elderly and ill people living alone" is accomplished through the well-check procedures where TDCJ staff check on heat-sensitive

offenders every 30 minutes. "Increased availability of, and transportation to, air conditioned safe areas" is accomplished through access to respite areas identified on the unit, including the notice to the offenders of their availability and how to access them. The Pack Unit has provided "sufficient number air conditioned cooling centers" by identifying multiple respite areas, and have not had any issues with not being able to accommodate a request for respite. Finally, "increased awareness of heat-related signs and symptoms among emergency medical service units and other health care personnel" is accomplished by the formal training provided to both officers and offenders alike, and the near constant emphasis placed on that training in daily shift briefings. The lone variance between Dr. McGeehin's ideal response and TDCJ's mitigation activities is that TDCJ's actions are not triggered by "a National Weather System advisory." While TDCJ closely monitors temperatures and conditions to provide additional protections when and where needed, the core of its mitigation measures remain in full effect each and every day of the summer months, regardless of any weather advisories. By Dr. McGeehin's standards, TDCJ is taking appropriate action.

While Dr. Vassallo's and Dr. McGeehin's reports contain explanations of the precise mechanism for heat-related injury, and physiological descriptions of how certain conditions and medications can lead to susceptibility, they offer no analysis that would explain why this occurs so rarely in the Texas prison system, specifically at the Pack Unit. Defendants' experts provide the answers. The benefits of acclimatization when combined with education, monitoring and remedial measures effectively protect the offender population from heat-related illness. (See generally, Appx. 1-238) Further, Drs. Vassallo and McGeehin's reports rely heavily on theoretical knowledge derived from scholarly studies, but much of the scientific literature comes from studies

done on the results of heat waves on non-acclimated populations. (Appx. 21-22) The fundamental difference between acclimated and un-acclimated populations as well as the efficacy of TDCJ's mitigation measures demonstrates why Plaintiffs' experts dire predictions fail to materialize in reality at the Pack Unit.

**4. The named Plaintiffs are not at a substantial risk of harm from heat.**

Minor incidents of headaches, dizziness, or shortness of breath are part of the experience of summer for free and imprisoned people alike. These sorts of symptoms do not cause lasting impact, and can be appropriately treated by medical staff. (Appx. 162) In addition to prompt treatment for heat-related illness, medical care is an important component in managing and controlling certain medical conditions that can affect heat tolerance.

The Eighth Amendment does not require perfect prisons, nor prisons where no offender ever suffers minor heat-related symptoms. While the Fifth Circuit held in *Blackmon* that the plaintiff's claims of headaches, nausea, shortness of breath, and blurred and dimmed vision would constitute more than a *de minimis* physical injury, this holding should be limited to the facts at issue in *Blackmon v. Garza*, 484 F. App'x 866, 874 (5th Cir. 2012). Blackmon contended the temperatures and the *lack of mitigation measures* affected him on daily basis for a long period of time. *Id.* at 871-72. He claimed his headaches and dizziness were "almost constant," he was light headed and nauseated "often," his vision blurred and dimmed "frequently," and he "often" had difficulty catching his breath. *Id.* at 872. The Court's holding that this stated a Constitutional injury must factor in not just the severity of the symptoms, but, also, their duration.

This is consistent with Eighth Amendment jurisprudence, where the severity of a particular condition is considered along with its duration, and discomfort and minor physical symptoms

common to the season will not state a Constitutional claim. *See e.g., Decker v. Dunbar*, 633 F.Supp.2d 317, 343 (E.D.Tex. 2008), aff'd 358 Fed.Appx. 509, 2009 WL 5095139 (5th Cir. December 21, 2009), cert. denied, —– U.S. ——, 131 S.Ct. 96, 178 L.Ed.2d 60 (2010) (dehydration and lightheadedness after being placed in a hot holding cell did not state a constitutional claim); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (hurt ears and numb hands, feelings of frostbite do not state a claim because they are the nothing more than “the usual discomforts of winter.”); *Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 879 (S.D. Ill.2009) (cold because of low cell temperatures was insufficient to state a claim where the offender received medical treatment for the cold); *Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill.1996) (holding the absence of any ailment other than colds or sore throats militates against characterizing the cold conditions in the plaintiff’s cell as objectively serious).

*Blackmon* must not be misinterpreted to hold that *any* time an offender suffers symptoms like dizziness, lightheadedness, headaches or nausea, a Constitutional claim is stated. While symptoms such as these can be caused or exacerbated by heat, the training provided to officers and offenders, wellness checks, and ultimately the provision of respite care and medical care are sufficient to remedy the instances in which they occur. Indeed, nearly all of the heat-related incidents that have been reported at the Pack Unit required nothing more than the offender to spend time resting in the air-conditioned medical department and drinking cool water. (Appx. 831 to 1038) Part of any appropriate mitigation effort includes the provision of medical care for the few instances in which the temperatures cause ill effects. The Eighth Amendment does not mandate a prison where these kinds of symptoms never occur. So long as the prison provides education to offenders and officers to identify them, takes measures to mitigate the effect of the heat, and

provides appropriate medical care in the few instances when they occur, the prison system meets its Constitutional obligations. TDCJ and the Pack Unit do so.

Each of the named Plaintiffs is acclimatized to the summer temperatures. Despite having many comorbidities and/or taking many of the medications that can effect heat tolerance, the named Plaintiffs continue to pass summer after summer without significant heat incident. (See Attachment 1) None have had an incident in which their temperatures were measured above normal levels, indicating that they are able to maintain thermoregulation. (*Id.*)

Plaintiffs' expert, Dr. Vassallo, who reviewed the medical records of each Plaintiff, confirms this and can point to very little in terms of actual, or even possible, heat related illness in the named Plaintiffs. (D.E. 272-3 at 18-25) For Plaintiffs King, Wilson, and Mojica, she identified no particular incident. (D.E. 272-3 at 20-21, 23) For Plaintiffs Brannum and Wallace, she identified an incident where Brannum had "lightheadedness" on a 90 degree day, and an instance in 2011 where Wallace appeared "physically exhausted," but nothing more. (D.E. 272-3 at 21-22) For Plaintiffs Cole and Yates, she was able to identify certain instances where minor symptoms such as shortness of breath, "sweating a lot," lightheadedness, or nausea and vomiting, but nothing that she defined as a definitive heat-related illness.[15] Further, where Dr. Vassallo claimed an offender's chronic condition such as asthma or hypertension was exacerbated during the summer months, this has been affirmatively disproven by Dr. Means. (Appx. 41-132)

As for the named Plaintiffs' medical claims, when an offender alleges a serious medical need either for treatment or to avoid certain conditions, the offender's bare assertion of a serious medical condition is insufficient without medical evidence verifying that the condition exists.

[15] Many of these non-descript symptoms can be caused by other issues or medications regardless of the season. (*See* Appx. 41-132)

*Althouse v. Roe*, 542 F. Supp. 2d 543, 573 (E.D. Tex.2008) (citing *Aswegan v. Henry,* 49 F.3d 461, 465 (8th Cir.1995); *accord, Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir.1994) (prisoner's self-diagnosis alone will not support a medical conclusion)). *See also*, *Decker*, 633 F.Supp.2d at 342. While it is certainly within the offender's capacity to testify about the discomforts of the heat or the way it makes them feel, their self-diagnosis of either their own health conditions or their cause will not suffice to create a fact issue, nor will testimony that they witnessed some other offender suffer what they believe to be a heat-related illness.

Even if Plaintiffs' claims could be considered to raise fact questions, their admitted non-compliance with the available heat mitigation measures also negates their claim for relief here. Like common-law tort plaintiffs, §1983 plaintiffs are required to take reasonable steps to mitigate their damages. *See Gladden v. Roach*, 864 F.2d 1196, 1200 (5th Cir.1989); *See also,* 1B Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 16.08 (4th ed. 2006) "Whether an injured person has mitigated [her] damages requires a factual assessment of the reasonableness of his conduct." *Hill v. City of Pontotoc, Miss.*, 993 F.2d 422, 427 (5th Cir.1993). To be entitled to summary judgment, the Defendants must establish beyond peradventure that the Plaintiff failed to use reasonable diligence. *Barrow v. Greenville Indep. Sch. Dist.*, 2005 WL 39086, at *6 (N.D. Tex. Jan. 7, 2005) aff'd, 2007 WL 3085028 (5th Cir. Oct. 23, 2007). Defendants have timely raised this defense. (D.E. 265 at 108)

To the extent the named Plaintiffs are alleged to have suffered heat-related injuries, their records show they have failed to appropriately mitigate any harm caused by the heat by their failure to seek medical care (e.g. Mojica), their failure to request access to respite areas (all named Plaintiffs except Mojica) and differing levels of compliance with medical advice. Protection from

the heat does involve a certain level of personal responsibility. (Appx. 167-68, 214) To the extent that the Court finds that any named Plaintiff has suffered a cognizable injury, the Court should also find each has in some way failed to use reasonable diligence to prevent it.

**III. The Court should decline to order any injunctive relief.**

Plaintiffs seek to reform the law rather than to redress actual ongoing constitutional violations at the Pack Unit. But, the desire to reform must be accompanied by sufficient evidence to demonstrate a constitutional violation. Here, the conditions of confinement at Pack Unit are constitutional: mitigation measures are being implemented, the measures are effective, and medical care is readily available to all offenders at Pack Unit. (See Section II.A., *infra*) Air conditioning, therefore, is not required to meet the minimal necessities of human life nor evolving standards of decency. (*See* Section IV., *supra*)

A district court's injunctive relief is reviewed for an abuse of discretion. *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 63 F.3d 690, 693 (5th Cir.1995) . Demands for injunctive relief present mixed questions of law and fact. *Id.* Findings of fact are reviewed for clear error and the conclusions of law are subject to *de novo* review. *Id*. It is well-settled that a suit against a state employee in his official capacity is the same as a suit against the state agency. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In general, state agencies are entitled to Eleventh Amendment immunity from suits brought under §1983. *See generally Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240 (1999). An exception to a state official's Eleventh Amendment immunity exists, however, for prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Kentucky*, 473 U.S. at 167 n.14; *Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974). Before granting injunctive relief against a state official, however, the court must make a straightforward inquiry into whether

there is an ongoing violation of federal law. *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645-46, 122 S.Ct. 1753, 1760 (2002). The past breach of a legal duty on the part of a defendant state official does not fall under the *Ex Parte Young* exception to the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 668-669 (1974).

Since there is no ongoing violation of federal law and the TDCJ has not implemented unconstitutional policies, this Court cannot properly grant any injunctive relief, much less the overbroad relief of requiring air conditioning. Additionally, the Fifth Circuit has pointed out that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place. *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001). Plaintiffs' request for injunctive relief seeks relief which is in excess of their authority. *See Response to Motion for Class Certification* at D.E. 307 at 10-11 (incorporated herein as if fully set forth by this reference).

If there is the necessary finding of an ongoing violation of Federal law, "[A] plaintiff seeking a permanent injunction must ... demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay-Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A plaintiff must allege "specific facts" to support a finding of irreparable injury. *See ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008). The Fifth Circuit has cautioned that an injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transportation Inc. v. Fort Worth & Western Railroad Co.*, 418 F.3d 535, 545 (5th Cir.2005) (citations omitted). In a case like this that raises prison conditions, the

Prison Litigation Reform Act (the "PLRA") imposes additional restrictions on the authority to grant an injunction. The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In particular, the PLRA prohibits an order granting prospective relief or a preliminary injunction unless the court first finds that such relief is: (1) narrowly drawn; (2) extends no further than necessary to correct the harm; and (3) is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. §§ 3626(a)(1)(A), 3626(a)(2). In considering a prisoner's request for prospective relief, the reviewing court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" caused by the relief and shall respect the certain principles of comity where state or local law is concerned. *See* 18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2).

At the outset, Plaintiffs' primary request for relief – air conditioning the entire unit – is overbroad within the meaning of the PLRA as specifically applied to climate control in *Ball*.[16] Such an order would be overbroad in goal, scope, and method for the very reasons explained in *Ball*. 18 U.S.C. §3626(a)(1)(A); *also see Defendants' Response to the Motion for Class Certification* at D.E. 307 at 6-11 (incorporated herein as if fully set forth). Uncontroverted evidence establishes that each of the named Plaintiffs have acclimated to the summertime temperatures and can thermo-regulate. Under the PLRA and *Ball*, it would be overbroad to order protective measures (beyond those already in place) for offenders absent a demonstration they are,

[16] While semantically phrased as a request to lower the heat index to 88 degrees, Plaintiffs' request for relief is a request for air-conditioning. The *Ball* court recognized this at oral argument and the *Ball* opinion reflects this reality. Further, while there are vast differences in their detail and cost analysis, both the Defendants' and Plaintiffs' experts have opined that air conditioning would be required to meet this proposed maximum indoor apparent temperature. (Appx. 245-386)

indeed, at substantial risk of harm. Should this Court believe that further intervention is necessary, that analysis must begin with mitigation remedies as opposed to air-conditioning.

The policy decision on whether to make the Pack Unit more "comfortable" with air conditioning is a policy determination better left to the state legislature and prison administrators. "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Broad discretionary authority is afforded to prison administrators because the administration of a prison is "at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566, (1974). Here, prison administrators have determined that the costs of retrofitting Pack Unit with air conditioning (see Appx. 245- 386) and the substantial hardship in moving prisoners out of Pack Unit for the construction are not justified by the medical needs of the offenders. (Appx. 793-798). The state legislature has chosen not to require TDCJ to maintain a specific temperature in its prisons. (*See* Section IV, *infra*) An order to air condition the entire Pack Unit, therefore, is not justified under the PLRA's mandated deference to state prison administrators, nor the public interest prong of the test for injunctive relief.

With regard to the Plaintiffs' chart of offender deaths pled in every pending heat case, none are alleged by Plaintiffs as having occurred at the Pack Unit. (D.E. 245, p. 18) The TDCJ acknowledges each one has been determined by autopsy to be correlated with hyperthermia. (D.E. 265, para. 93) Mr. Livingston testified that the leaders of the TDCJ have continued to make changes to their procedures and the concerns about these incidents have not been ignored. (Appx.

673-76; Appx. 1102:11-25 to 1103:1-3) Further, the 10 mortalities in 2011 occurred during an extremely unusual and unexpected heat event which is likely not to be repeated. (Appx. 411-414)

Plaintiffs' climatologist, Dr. Mearns, acknowledged the Defendants' climatologist, Dr. Neilson-Gammon, likely has more expertise in looking at observational data and the observations related to Texas as the State Climatologist. (Appx. 1172:9 to 1173:9) As such this Court can properly rely on his report. Dr. Mearns also admitted there are many different meanings of extreme heat. (Appx. 1166:20-23, 1167:11-16) She agreed, that under certain definitions, historical temperature records are required to determine what actually constitutes extreme heat in a specific location. (Appx. 1168:13 to 1169:17; 1170:5-17) The heat index chart cited by Plaintiffs (D.E. 245, p. 20) is only one of many definitions of extreme heat. (Appx. 1167:11-16) And this is important, because by any standard, what Texans experienced in 2011 was "very extreme." (Appx. 1171:13-15;) And, such an event was not predicted in advance. (Appx. 409- 411) Nor is it an event with a high likelihood of occurring again. (Appx. 409- 413) It is further worth noting that even under the extreme conditions of 2011, no heat-related illnesses were reported from the Pack Unit to TDCJ Health Services. (Appx. 811) Under these circumstances, expensive infrastructure changes to the Pack Unit is not warranted where the Unit has a good record of maintaining the safety of its offender population and an event like 2011 is very unlikely to re-occur.

The parties have stipulated that the Court should deny any petitions to intervene by offenders who are not housed at the Pack Unit. This Court, accordingly, has entered orders denying the petitions of all proposed intervenors. (*See e.g.* D.E. 147 noting that "[t]he Court is also persuaded by Plaintiffs and Defendants that permitting intervention would cause undue delay and prejudice to the existing parties.") As such, operational issues at other units with regard to the

other pending heat cases are well outside the scope of this litigation, which by stipulation, is limited to the Pack Unit. Further, this litigation involves a request only for injunctive relief and not damages. (*See generally Plaintiffs' Amended Complaint*, D.E. 245) Due to operational differences and location, such an inquiry into the details and defenses of every pending heat case within the confines of the Pack Unit case would greatly expand this litigation, possibly prejudice the progress and outcome of the other heat cases (especially for the Defendants), and add complexity to this case. For these reasons, the Court should decline to consider the chart in its resolution of the issues presented in this case.

## IV. Evolving standards of decency do not mandate air-conditioned prisons.

The text of the Eighth Amendment states "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII. However, no definition or explanation of the meaning or extent of those terms is provided in the Constitution. As a result, the requirements of the Eighth Amendment have largely been shaped by the courts for more than two hundred years. Specifically, the Eighth Amendment definition of "cruel and unusual punishment" in the prison context has evolved overtime—it is a progressive prohibition which for more than the past half-century has looked to the "evolving standards of human decency that mark the progress of a maturing society" to determine whether a constitutional violation has occurred. *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) . Thus, the standards of the Eighth Amendment change with the moral and social consciousness of society. John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment As A Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1741 (2008).

While courts rely on several indicators in making an Eighth Amendment determination, the primary indicators of evolving standards of decency are objective indicators of national consensus on the social acceptability of a given punishment, best evidenced by the actions taken by State and Federal legislatures. *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989). Furthermore, though this creates some fluidity in the law, a Court may not simply overrule binding precedent because it may believe that evolving standards have changed. *Tamayo v. Perry*, 553 F. App'x 395, 400-01 (5th Cir.2014). "Evolving standards of decency" is not a ground upon which a Court can disregard prior precedent unless or until a higher (or *en banc*) Court overrules that existing precedent. *Id.*

**A. Air conditioned living quarters is not recognized by the federal or state governments as a necessity or universal right.**

Many people within the United States, including within the State of Texas, do not have or do not use the luxury of air conditioning. According to recent United States Census data, 55,000 new homes were built in 2014 that did not have air conditioning of any kind. (Appx. 681) While most of the un-air conditioned homes were sold outside of Texas or the Southern Census region, a considerable number of Texas homes do not have, or choose not to use, air conditioning. Approximately 100,000 Texas homes are not equipped with air conditioning of any kind (Appx. 710) An additional 200,000 "have but do not use Air Conditioning." (Appx. 710) 1,200,000 Texans with central air conditioning, and an additional 400,000 Texans with wall or window units air condition their living spaces "only a few times when needed." (Appx. 710, 713) According to these numbers, 300,000 Texans currently go without air conditioning, and an additional 1,600,000 use their air conditioning units sparingly, presumably during the peak of the summer. (Appx. 710,

713) This data demonstrates that any consensus about the use of air conditioning, even in hot climates, comes from a desire for comfort rather than any moral or social principle.

There is no law at the state or federal level requiring air conditioning. The United States has a long standing national ethic of providing at least the minimum amount of support necessary to ensure the wellbeing of its citizens. Examples of this national belief include Food Stamps or the Federal Housing Choice Voucher Program (formerly the "Section 8" housing program). As the Food Stamps program ensures low-income individuals have the sustenance necessary to live their lives, the Housing Choice Voucher Program, administered through the United States Department of Housing and Urban Development ("HUD"), ensures low income individuals are adequately housed. (Appx. 717- 718) HUD has developed minimum housing quality standards, designed to ensure "decent, safe, and sanitary housing." (Appx. 719) Many elements of a housing situation play a role in determining if housing is "decent, safe, and sanitary," including the "Thermal Environment." (Appx. 719- 721) The "Thermal Environment" performance requirement for the housing choice voucher program housing is "the dwelling must be able to provide a thermal environment that is healthy for the human body," a standard which does not require air conditioning.[17] (Appx. 720) Defining "a healthy living environment" for the local climate is left up to the local Public Housing Authority—air conditioning is not mandated in Public Housing at the Federal level. (Appx. 720)

[17] "Minimum Criteria for meeting this standard include 1) There must be a safe system for heating the dwelling unit, such as electric baseboard, radiator, or forced air systems. In order to ensure a healthy living environment appropriate for the climate the system must be able to provide adequate heat either directly or indirectly to each room, and 2) ***if*** present, the air conditioning system or evaporative cooler, must safely provide adequate cooling to each room (emphasis added)." (Appx. 720)

Public Housing Authorities ("PHAs") in Texas do not consider air conditioning as a requirement for "decent, safe, and sanitary housing," or a "healthy living environment. Through the power delegated to them by HUD, Texas PHAs could require air conditioning in Housing Choice Voucher Choice Program eligible properties, as they are charged with determining a thermal environment that is healthy for the local climate. (Appx. 720) However, a significant number of PHA's in Texas do not require air conditioning, and thus do not consider climate control as necessary for a healthy living environment. The Houston Housing Authority and the Housing Authority of the City of Austin require a "safe cooling system *where* present."[18] (Appx. 769; Appx. 729) The Housing Inspection checklist for the Public Housing Authority with jurisdiction in Harlingen, Texas requires "[T] he unit has adequate ventilation and cooling by means of either openable windows *or* a working cooling system (emphasis added) (Appx. 739) Similarly, the Housing Authority of Bexar County, with jurisdiction in San Antonio requires "Some windows that open, *or* some working ventilation system (emphasis added). (Appx. 735) These standards demonstrate that air conditioning is not seen as a moral or social imperative by those charged with ensuring a decent, safe, sanitary, and healthy living environment to low income Texans.

The Federal Government not only does not require air conditioning in low income housing, it also does not subsidize any of the cost associated with operating an air conditioner. To help lessen the cost of living, HUD provides a utility allowance to low income individuals, determined by the local PHA as the reasonable cost of utilities for the area. (Appx. 741- 742) The cost of operating an air conditioner, however, is explicitly excluded from the utility allowance. (Appx. 741- 742) If air conditioning is present in a Housing Choice Voucher Program Home and the air

[18] Note that this clearly tracks the minimum requirement on the Federal level—air conditioning systems must be functional *if* present. (Appx. 720)

conditioning unit use is metered, the resident is required to pay for the cost of using air conditioning. (Appx. 741- 742) If the air conditioning present in a program home is not metered, the resident is surcharged for the cost of using the air conditioner. (Appx. 741- 742) Similarly on the State level, the Texas Legislature recently significantly curtailed the State's utility subsidy to low income individuals. The System Benefit Fund was a legislative creation, designed to fund significant portions of low income families' utility bills. Tex. S.B. 7, 76th Leg., R.S. (1999). The program, however, was defunded and marked for termination no later than September 1, 2017. *See* Tex. Util. Code § 39.903 (m); Tex. Util. Code § 39.903.

The Federal Government does not subsidize the cost of air conditioning for the elderly. Air conditioning is not a covered cost by Medicare, the social insurance program for the health of the elderly, because Medicare only covers "Durable Medical Equipment." (Appx. 744- 745) In order to be considered "durable medical equipment," the equipment must be primarily medical in nature. (Appx. 744- 745) The Centers for Medicare & Medicaid Services has stated that if someone sought to have the cost of air conditioning covered by Medicare, coverage would be denied, as air conditioning is not considered primarily medical in nature. (Appx. 744- 745)

The lengths that Federal and State Government have gone to in ensure they do not subsidize the cost associated with using an air conditioner demonstrates the proposition that air conditioning is a luxury, not a moral or social imperative. Evolving standards of decency, therefore, do not require this Court to impose air conditioning as the living standard for Texas prisoners.

**B. Air-conditioned prisons are not the societal norm.**

Prison systems throughout the south do not have air conditioning, yet continue to house offenders in constitutionally sound facilities. This includes every southern Gulf-Coast state.

Plaintiffs state: "In the modern South, 'contemporary standards require air conditioning.' " (D.E. 321 at 11). This is false. In Alabama, there is no air conditioning in offender housing areas according to Department of Corrections Commissioner Jefferson Dunn.[19] The Florida Department of Corrections has made an effort to correct the misconception that its prisons are air conditioned, stating only ten of the more than seventy state-managed prisons have any air conditioning in offender housing areas.[20] Both Mississippi and Louisiana, respectively, have been sued for a lack of air conditioning in offender housing areas, and, in both cases, the Fifth Circuit declared air conditioning was not constitutionally required. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. The same is true of Guantanamo Bay, which, despite Plaintiffs' misleading claims, air-conditioning is not universally provided. [21]

Within Texas, Defendants admit that county jails are regulated by the Texas Commission on Jail Standards ("TCJS"), a state agency created by the Texas Legislature. The policies adopted by the TCJS, however, are not "legislative enactments" which set a standard to be implemented by the TDCJ. Plaintiffs cite, in their First Amended Complaint, 37 TEX. ADMIN. CODE § 259.160 (D.E. 245, para. 45) This is a cite not to a "legislative enactment," but, rather to the policies of the TCJS filed with the Secretary of State. Unlike most other sections of the Texas Code, the Administrative Code does not reflect the actions of the State legislature. The

[19] Ashley Thompson, *Ahead of Second Special Session, Alabama's Prisons in Crisis*, ALABAMA NEWS (Sep. 7, 2015, 5:05 PM), http://www.alabamanews.net/home/top-stories/Ahead-of-the-Second-Special-Session-Alabamas-Prisons-in-Crisis-325492141.html (last visited Nov. 15, 2015).

[20] *Misconceptions About Florida Prisons*, FLORIDA DEPARTMENT OF CORRECTIONS, http://www.dc.state.fl.us/oth/myths.html (last visited Nov. 15, 2015).

[21] Plaintiffs statement "[e]ven prisons that primarily house the most dangerous offenders—such as the Federal Super-max facility in Florence, Colorado, or the military prison for terrorism suspects in Guantanamo Bay, Cuba—have air conditioning" is misleading. (Doc. No. 321, p.12). Guantanamo Bay is not entirely air conditioned. (Doc. No. 51-4, p. 17- 18). Guantanamo Bay has air conditioning for "*some* of the most compliant detainees," while other portions of the facilities are not air conditioned. (Doc. No. 51-4, p. 18).

Administrative Code, instead, was designed by the legislature to require the Secretary of State to compile and publish in one place, an organized set of agency policy for various state agencies. (www.sos.state.tx.us/tac/; Tex. Govt. Code §§ 2002.051- 2002.056). Within the Texas Administrative Code, both the TDCJ and the TCJS have filed certain of each agency's policies under the title "Public Safety and Corrections." (*See* Admin. Code Title 7 part 6; Admin. Code Title 7 part 9). The TCJS did file its policies that requires temperature levels to be maintained between 65 degrees and 85 degrees Fahrenheit within pretrial detainee housing areas in the Administrative Code because the TCJS adopted such a policy in 1994. (See e.g., Admin. Code §259.160)

The state legislature has passed, however, specific legislative enactments governing the TDCJ. In fact, the Government Code has a subchapter devoted to "Inmate Welfare." *See* Tex. Govt. Code § 501. Several changes have been made to this section of the Code within the past several years, including changes to how lost or damaged offender property is dealt, disclosure of volunteer organizations operating within each individual prison, and verification of offender veteran status. (Acts 2011, 82nd Leg., R.S., Ch. 1083 (S.B. 1179), Sec. 8, eff. June 17, 2011; Acts 2013, 83rd Leg., R.S., Ch. 1406 (S.B. 345), Sec. 1, eff. September 2013; Acts 2013, 83rd Leg., R.S., Ch. 261 (H.B. 634), Sec. 1, eff. June 14, 2013). Further, within the "Inmate Housing" subchapter, no legislation has been enacted or amended since 1993, which is a date before the TCJS adopted its policy of climate control within pretrial detainee housing. (See. Admin. Code §259.160; Govt. Code §§501.111- 501.113). The fact that the legislature has not enacted a statutory requirement of climate control within the State's prisons, despite multiple legislative changes and despite the policies filed in the Administrative Code by the TCJS, demonstrates that the state

legislature has chosen not to adopt the jail standards on temperature control as the standards applicable to the TDCJ prisons. (*See* Appx. 1096:4- Pg. 89, Ln. 1097:17) This is not to say, however, that the Legislature could not require the TDCJ to provide climate control within the State's prisons. The Legislature has the authority to require certain actions be undertaken by the TDCJ by passing legislation and codifying that legislation within the Government Code. This, the Legislature has not done. The policies adopted by the TCJS for jail facilities should not be considered a proper comparison as to actual statutory standards applicable to the TDCJ prisons.

### C. TDCJ's purchase of pig barns has been factually misrepresented by Plaintiffs, and is irrelevant to the issues here.

Upon examination, Plaintiffs' repeated references to TDCJ's purchase of swine barns is shown to be rife with misstatements, hyperbole, and, ultimately, irrelevant to the issues here. TDCJ operates one of the largest integrated agricultural operations in the country. (Appx. 1040) The production of swine is but one component of that operation. The process is entirely integrated within TDCJ, from growing and processing of corn for feed, to the shipment of finished pork to the units where it is prepared and served to the inmates. (Appx. 1040, 1087-88) The Eastham Unit is one of the units that participates in the raising of baby pigs. (Appx. 1041)

In reality, the alleged "air conditioned pig barns" do not contain "air conditioning" as the term is commonly used. (Appx. 1041, 1077, 1080) Further, the barns at issue are a tiny fraction of TDCJ's massive state-wide swine production operation. (Appx. 1040-41) They are simply 8 single-wide trailers that contain an evaporative cooler on one end, which Plaintiffs' expert explicitly rejected as a viable cooling option for offenders. (Appx. 1081; D.E. 272-10 at 11-12) They do not contain an HVAC system, an a/c compressor, or a chiller system. (Appx. 1041) At the rear of the trailer is a cardboard grate. (Appx. 1077, 1080) Water drips over the grate and a

fan blows air over the wet grate. (*Id.*) The air blows into a small room at the back of the trailer. Outward blowing fans at the front of the trailer create a negative air flow from the back to the front, which draws the air from the back room through a vent and distributes it throughout the trailer. (Appx. 1079) This type of system is commonly referred to as an evaporative cooler or swamp cooler. Pursuant to state law procurement procedures, the cheapest option proved to be a purchase of modular barns manufactured by Art's Way. (Appx. 1042-72) The barns are single wide trailer facilities designed to be transported to their site in one piece and put into use with little construction required. TDCJ has eight such barns, and they represent only nine weeks of the pig rearing process, and a very small part of the facilities in use at the Eastham unit. (Appx. 1073-76, 1085-86)

Moreover, the trailers were not selected because of the evaporative cooler system. When considering different alternatives, these trailers proved to be cheapest and most cost effective option. (Appx. 1041) The project could have been completed with new brick and mortar buildings that continued to use water, air flow, and fans, but it would have been more expensive, and disruptive to unit operations. (Appx. 1055, 1075-76, 1085-86) One of the benefits of the Art's Way trailers is that they could be transported to the site, put into place and be made operational with far less effort that traditional construction. (Appx. 1041, 1045) These factors led to their selection. (*Id.*) Regardless of any other emotional considerations, state procurement regulations require state agencies to select the most cost effective solution when purchasing capital equipment. Given the cost of buying pork on the open market as opposed to raising their own, the cost savings to TDCJ means that the trailers will pay for themselves in approximately 2.25 years. (Appx. 774-776)

Finally, and perhaps most importantly, the cooling mechanism the trailers use was explicitly rejected by Plaintiffs' expert as a viable cooling mechanism for the offender housing areas. (D.E. 272-10 at 11-12) Installing evaporative coolers would be "futile" at the Pack Unit according to Plaintiffs' experts' report. (*Id.*) Upon examination, this issue has been misrepresented and distorted wildly beyond its reality, and in the end, was entirely about a cooling system that the Plaintiffs have explicitly rejected.

### D. Pack Unit's Building Structure Comports with *Ruiz* and Contemporary Standards.

In accordance with the *Ruiz* stipulations, the Pack Unit does not have refrigerated air conditioning supplied to the dorm areas. (Appx. 632, 653, 648-654, 665) Plaintiffs' contention, however, that the stipulation only "incidentally" discusses ventilation is demonstrably false. While the document's title unartfully references "crowding," the stipulation goes well beyond this topic. (See *Bailey v. Livingston*, 4:14-cv-01698, Appx. 645-656). The stipulations specify a host of matters in minute detail. Among these are the amount of cubic feet of fresh air exchange per hour (Appx. 649; 12.5 cfm per prisoner and 15 complete air exchanges per hour), the spacing of the grill vents which provide the fresh air (*Id.*; one grill per 20 feet of width), the use of alternate air supply measures if windows are not available (Appx. 649), and the specific temperature at which the ventilation system must be activated. (Appx. 653; any time the temperature is over 78 degrees). And this system has been improved over time. (Appx. 667- 672).

The Pack Unit renovations were intended to exist long after the completion of the *Ruiz* litigation for the benefit of "past, present, and future inmates." *Ruiz v. Estelle*, *et al.*, 503 F.Supp. 1265, 1274 (S.D. Tex.1980). To that end, the *Ruiz* court retained jurisdiction to enforce the 1985

*Ruiz* crowding stipulations[22] until 2001. *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 996 (S.D. Tex. 2001) (terminating its jurisdiction of continued oversight over these provisions).

Not only did *Ruiz* set the constitutional minimum standard for building air-flow design, but, it also set the standard for the reasonable duties that can be expected of prison officials in this deliberate indifference analysis related to summer heat conditions and building design. Renovations and building structures were determined under *Ruiz* by the court, plaintiffs, defendants, and special master --- not just the TDCJ. And, the renovations and newly built prisons were intended to last beyond the 2001 date when the *Ruiz* court relinquished jurisdiction. The lack of cooling in the prisoner housing areas of Pack Unit in light of *Ruiz*, *Gates*, and *Ball* cannot be deemed "deliberate indifference" in this case. Further, taking into account the *Ruiz* stipulations, the ACA standards on ventilation, Federal and State standards on public housing, air conditioning is not required to meet the community standards for the minimum necessities of life. The building design at Pack Unit, therefore, meets constitutional standards.

**V. Plaintiffs' ADA and Rehabilitation Act claims fail as a matter of law.**

Undisputed facts and Plaintiffs' pleading negate their claims under the Americans' with Disabilities Act and Section 504 of the Rehabilitation Act. To state a claim under the ADA, a plaintiff must allege that (1) he is a qualified individual; (2) who was excluded from participation in or denied the benefits of services, programs, or activities of a public entity; and (3) that the exclusion, denial, or discrimination was because of his disability. *See Blanks v. Swn. Bell Comm'ns*, 310 F.3d 398, 400 (5th Cir.2002). One difference between the ADA and the RA lies in their respective causation requirements. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th

[22] Please see D.E. 23-1.

Cir.2005) (citing *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. §794(a) (emphasis added). By contrast, under Title II of the ADA, "discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff. *Soledad*, 304 F.3d at 503–04 (quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996)).

A disability is "a physical or mental impairment that substantially limits one or more major life activities; a record of such an impairment; or . . . being regarded as having such an impairment." *Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009) (citing 42 U.S.C. § 12102(1)). Major life activities are "those activities that are of central importance to most people's everyday lives." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007). Although the current definition of disability expresses the intention of Congress to broaden the definition and coverage of the term 'disability,' to include major bodily functions, it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination." *Ball*, 792 F.3d at 598 (*citing Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir.2013). ). "[N]either the Supreme Court nor [the Fifth Circuit] have recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff must adduce evidence of an impairment that has actually and substantially limited the major life activity on which [s]he relies." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir.2011). Standing alone, the diagnosis of a condition such as high blood pressure, without any evidence

that it substantially affects one or more major life activities, is insufficient to trigger the protections of the ADA. *Oswalt v. Sara Lee Corp.*, 74 F.2d 91, 92 (5th Cir.1996) (quotation omitted). "[C]ourts are to make an individualized determination of whether an individual's impairment constitutes a disability, taking into consideration measures taken by the individual to mitigate the effects of the impairment." *Griffin*, 661 F.3d at 222 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, (1999)). Courts should consider " '(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.' " *Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011). The ADA Amendments Act of 2008 ("ADAAA") "directs that 'substantially limits' should not be as strictly construed as some courts have required in the past and should not require 'extensive analysis.' " *Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F.Supp.2d 528, 529 (S.D.Tex.2011). But "a plaintiff must still show substantial limitation" under the ADAAA. *Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 410 (5th Cir. 2013). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Hoffman v. Baylor Health Care System*, 2014 WL 772672 (N.D.Tex. 2014) (*quoting Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (*en banc*) (citations omitted)).

**A. Plaintiffs have not shown that they cannot thermo-regulate.**

The Court's opinion in *Ball* provides significant insight and clarification as to what must be proven in the particular subject of heat-related illness. The operative inquiry looks to whether the individual, due to their particular health conditions actually has difficulty maintaining thermoregulation; that is, maintaining a body temperature within "half a degree or so" of 98.6° F.

Evidence of some other health limitation does not suffice to establish a heat related disability unless that limitation actually affects the individual's ability to thermoregulate. *Ball*, 792 F.3d at 597-598. Further, the evidence adduced at trial in *Ball* exclusively focused on the risk that plaintiffs might, at some point in the future, have elevated body temperature, but no evidence was presented that they ever actually had difficulty maintaining thermoregulation. *Id.* This was fatal to their claim, the Court held. It is not enough to prove that person's major bodily function *could be* impaired at some time in the future to establish that they are disabled in the present. In this case, the Plaintiffs each have documented ability to perform all other major bodily functions and complete all basic tasks of daily living. (Appx. 47-48, 64, 80-81, 86, 94-95, 101-102, 110-114) Though they may have diagnoses of certain medical conditions, none of the named Plaintiffs have ever had an issue maintaining normal thermoregulation, which is the operative inquiry under the ADA or RA as set out in *Ball*. (Appx. 41-132)

**B. Plaintiffs have not identified a program or service from which they have been excluded.**

Plaintiffs fail to identify any programs or services, from which their clients are excluded, but, instead, generally refer to the Pack Unit and its housing areas as a service. Only they do not claim they are excluded from this service. Their claims are predicated on an inclusion, not exclusion from this service. Laid bare, the claims are based on TDCJ's alleged failure to make its housing safe for, not available to, Plaintiffs.

Plaintiffs' claims fail for the precise reason articulated by the Fifth Circuit in its recent holding in *Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363 (5th Cir.2013). In *Estate of A.R.*, a child was enrolled in a public school-operated enrichment program that included swimming activities. The child suffered from hearing impairment as well as a seizure disorder. *Id.* The child suffered a

seizure during the pool activities, fell into the pool, and drowned. *Id.* The parents filed an ADA claim asserting intentional discrimination. *Id.* They argued that "[the child]'s safe and meaningful access to the program was interrupted because of her disability" and "pointed out many things the school could have done to make the situation safer for her in the pool area: additional lifeguards, different types of alarm devices, and so on." *Id.* The Fifth Circuit held that this failed to state an ADA claim. *Id.* Though there were measures the school *could have* implemented, this only stated a claim for negligence. *Id.* This was so even where there were fact issues with regard to extent and level of the knowledge of the supervising teachers as to the child's level of impairment and medical issues, as well as fact issues with regard to how long the child was in the water and how fast the supervising safety personnel responded. *Id.* The Court held that the child was in no way denied access to services, programs, and activities of the school, and the parents' claim that program was not made safe, sounded in negligence, not discrimination. *Id.*

In the correctional context, the Fifth Circuit has been likewise reluctant to extend ADA and RA liability to claims where offenders claim poor treatment or inadequate facilities, but where they fail to show discrimination by reason of the offender's disability. The ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012). In, *Nottingham*, the Plaintiff, a TDCJ offender had a weakened right side that limited his ability to walk. *Id.* He claimed that while he was being transported in a TDCJ van, he was not transported in a van that was handicapped-accessible and that he fell off the bench on which he was seated. *Id.* He claimed that he was unable to get up and was left on the floor for the fourteen-hour drive, even when the officers

stopped to eat and use the restrooms. *Id.* The Court rejected these facts as stating an ADA claim that he was discriminated against and not given safe transit as a disabled person. The Court held:

> That claim, however, does not establish discrimination based on disability: The ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." (internal citations omitted) There is no evidence that the allegedly improper action of leaving Nottingham on the floor of the transit van had any connection to his alleged disability. There is no indication that he was treated differently because of his disability. He thus has not established a claim under the ADA."

*Id.* at 377; *see also, Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) (disabled offender Plaintiff failed to show "by reason of" discrimination in claim regarding overcrowding in the showers where all offenders were subjected to the same conditions).

Also, in *Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012), the plaintiff filed suit under the ADA and RA against the TDCJ, among others, alleging that he had several disabilities and chronic diseases, as well as a lack of natural teeth, and that he had been denied the provision of dentures by the TDCJ. *Id.* at 413, 418. The Fifth Circuit held that the district court properly dismissed the plaintiff's claims under the Rehabilitation Act and the ADA because he failed to claim "that this alleged discrimination was by reason of his disabilities, and such a claim [was] not supported by any evidence in the record." *Id.* at 418 (*citing Hale*, 642 F.3d at 499; *Tuft*, 410 Fed. Appx. at 775). *See also, Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004) (rejecting an ADA regarding treatment for Hepatitis because the complained of treatment decision were not made *because of* any alleged disability). Texas Courts also have cited approvingly to other jurisdictions that have reached identical conclusions: "The ADA prohibits discrimination *because of* disability, not *inadequate treatment for* disability." *Cheek v. Nueces County Tex.*, 2013 WL 4017132 at *18 (S.D.Tex.2013); (quoting *Simmons v. Navajo County*, 609 F.3d 1011, 1022

(9th Cir. 2010)); *See also*, *Lee v. Valdez*, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 at *13 (N.D. Tex. May 20, 2009).

Here, Plaintiffs' claims are not based on differential treatment or access. Indeed, the very nature of their claim is that they are *not* treated differently from other offenders by being housed in the same conditions. As held by the Court in *Tuft*, where disabled and non-disabled offenders are subjected to the same conditions, an ADA or RA claim is not stated.

Several sister circuits have also addressed these issues and reached the same conclusions as the Fifth Circuit and Texas Courts. As the United States Court of Appeals for the Seventh Circuit, speaking through the eminent Judge Posner explained,

> [T]he Act [i.e., the ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled. His complaint is that he was not given special accommodation…[H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice…Even apart from the prison setting it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the Americans With Disabilities Act, whereas a sick or injured but not disabled person-a person suffering from an acute viral infection, perhaps, or who has broken his leg, or who has a hernia or an inflamed gall bladder-must be content with the remedy that the state law of medical malpractice provides. Moreover, the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners. We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act.

*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996). Several other Courts have found similarly. *See Carrion v. Wilkinson*, 309 F.Supp.2d 1007, 1016 (N.D.Ohio 2004) (dismissing diabetic prisoner's ADA claim based upon the denial of a diabetic diet); *see also Galvin v. Cook*, No. CV 00-29-ST, 2000 WL 1520231, at *6 (D.Or. Oct.3, 2000) (granting summary judgment on diabetic

prisoner's ADA claim where prisoner alleged that he was given improper doses of medication and given inadequate treatment).

Finally, the "more pain and punishment than non-disabled prisoners" standard created in *McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex.2006) is not a viable legal standard. The Fifth Circuit has not adopted this language, or the test that it implies.[23] The *McCoy* court appears to have been relying on *United States v. Georgia* for the "suffer more pain and punishment" language, but in so doing, took the comments by *United States v. Georgia* Court out of context. A close reading of the *US v. Georgia* Court's comments reveals that the liability under the ADA stems from the fact that the provision of services like hygiene and medical care are *"services, programs, or activities"* within the meaning of the ADA. The potential liability under the ADA stems from the denial of access to those *services and programs*, not based on a comparison of the lives of disabled with non-disabled offenders. The ADA does not mandate — nor could any government provide — an environment that will pose absolutely no challenges to a disabled person compared to a non-disabled person. The purported "more pain and punishment" standard seeks to do just that, which is far more than is required under the language of Title II or any other Court's interpretation of it.

**C. Plaintiffs receive reasonable accommodations.**

Plaintiffs' ADA and RA claims fail for the additional reason that TDCJ has provided them with reasonable accommodation to mitigate the effects of the heat. TDCJ's education, monitoring and mitigation activities are all "accommodations" within the meaning of the ADA. Both their

[23] Defendants recognize, and Plaintiffs will no doubt argue, that this Court and others in the related heat cases have upheld the language pulled from *McCoy* when ruling on motions to dismiss under Rule 12, but assert this argument in order to preserve it for appeal to the Fifth Circuit, which has not yet addressed this issue.

reasonableness and sufficiency for the named Plaintiffs is demonstrated by the fact that none of the named Plaintiffs have ever had a problem with thermoregulation. These measures are appropriate within the correctional context and effective for the named Plaintiffs. Further, these measures are reasonable by Plaintiffs' experts' own measure because they mirror measures implemented by major cities. (D.E. 272-4 at 79-80) In this regard, they are reasonable accommodations as a matter of law.

**D. TDCJ is immune from Plaintiffs' ADA claims.**

Because Plaintiffs failed to show a Constitutional violation, TDCJ is immune from their ADA claims. The ADA abrogates the states' Eleventh Amendment immunity to extent that the condition challenged is also a violation of Constitutional rights. *United States v. Georgia*, 546 U.S. 151 (2006). Because the ADA was passed pursuant to Congress' remedial power under Section 5 of the Fourteenth Amendment, states' eleventh amendment immunity remains intact except where a Constitutional violation has been shown. *Id.* In the Eighth Amendment context, a plaintiff must show that his ADA claim is predicated on an actual violation of the Eighth Amendment. For the numerous reasons listed above, the named Plaintiffs have failed to establish that they are at a substantial risk of harm, or that any defendant is deliberately indifferent to such a risk. Under *United States v. Georgia*, TDCJ is immune under the Eleventh Amendment.

**E. Plaintiffs' RA claims fail because they fail to show that they are excluded *solely* by reason of their disability.**

Plaintiffs' pleadings show the inapplicability of the Rehabilitation Act claims. As noted above, the chief difference between the ADA and the RA lies in their respective causation requirements. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir.2005) (citing *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)). Section 504 of the Rehabilitation Act

provides that "[n]o otherwise qualified individual with a disability in the United States shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. §794(a) (emphasis added). By contrast, under Title II of the ADA, "discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff. *Soledad*, 304 F.3d at 503–04 (quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996)). If the plaintiff's disability was not the sole factor behind his exclusion from a program that receives federal benefits, the RA claim fails. *Id.* A plaintiffs' RA claim can be dismissed where his own pleadings negate the notion that his exclusion from a program was based "solely" on his disability. *See Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 704 (N.D. Tex.2014) (dismissing RA claim where Plaintiff claimed he was fired due to animus toward his "disability and ethnicity" because by its terms, his claim failed to establish that his disability was the sole reason for his termination).

Here, Plaintiffs claims are asserted based on conditions applicable to every offender at the Pack Unit. They further claim that every offender is housed in conditions subjecting them to substantial risk of harm. If the "program" to which they are denied access is to be defined as "safe housing," by the terms of Plaintiffs' complaint, every offender is denied "safe housing" regardless of their disability status. Under the RA, Plaintiffs must show that they were denied access to federally funded programs "solely" on the basis of their disability. Plaintiffs' allegations negate their RA claims and summary judgment is warranted.

## VII. PRAYER FOR RELIEF

For the foregoing reasons, the Court should dismiss Plaintiffs' lawsuit in its entirety with prejudice.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in Charge
Texas Bar No. 24035455
Southern District ID No. 35273
cynthia.burton@texasattorneygeneral.gov

/s/Matthew J. Greer_____
**MATTHEW J. GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Southern District ID No. 1171775
matthew.greer@texasattorneygeneral.gov

**DANIEL C. NEUHOFF**
Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Southern ID No. 2374885
Daniel.neuhoff@texasattorneygeneral.gov

**NADINE PHILLPOTTS**
Assistant Attorney General
Co-Counsel
State Bar No. 24058045
Southern Dist. ID No. 939905
Nadine.Phillpotts@texasattorneygeneral.gov

Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX 78711
(512) 463-2080/Fax (512) 936-2109

**ATTORNEYS FOR BRAD LIVINGSTON, ROBERT HERRERA, and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

## NOTICE OF ELECTRONIC FILING

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have electronically submitted for a copy of the foregoing for filing in accordance with the Electronic Case Files system of the Southern District of Texas on November 16, 2015.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have served all counsel or *pro se* parties of record electronically or by another manner authorized by FED. R. CIV. P. 5 (b)(2).

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General