United States District Court
Southern District of Texas
**ENTERED**
January 22, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **KEITH COLE**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-1698** |
| | § | |
| **BRAD  LIVINGSTON**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Inmates in the Wallace Pack Unit, operated by the Texas Department of Criminal Justice (TDCJ), bring this lawsuit to challenge TDCJ's alleged policies and practices of exposing the inmates to extreme heat conditions in their housing areas during the summer months.  Plaintiffs contend that, without climate control or adequate mitigation measures, Defendants are failing to protect the inmates from the harmful and potentially fatal effects of prolonged exposure to such high temperatures.   Before the Court is Plaintiffs' Amended Motion for Class Certification. (Doc. No. 272.)  Plaintiffs have asked the Court to certify one General Class and two subclasses. For the reasons stated below, this Court finds that the Motion for Class Certification should be granted.

## I.      BACKGROUND

The named Plaintiffs are seven inmates who live in the Wallace Pack Unit, a medical and geriatric prison operated by the Texas Department of Criminal Justice.  Plaintiffs claim that the conditions inside the Pack Unit—in particular, the lack of climate control leading to the prisoners' prolonged exposure to extreme heat during the summer months—violate their Eighth

and Fourteenth Amendment rights to be free from cruel and unusual punishment.  They also bring claims under the Americans with Disabilities Act and the Rehabilitation Act, alleging that TDCJ has refused to make reasonable accommodations for prisoners with disabilities that make them especially vulnerable to the effects of extreme heat.  Defendants are Brad Livingston, the executive director of TDCJ; Roberto Herrera, the warden of the Pack Unit; and TDCJ itself.

Plaintiffs allege that "sweltering temperatures inside buildings where [TDCJ] houses inmates," including the Wallace Pack Unit, have caused at least twelve prisoners in the Texas prison system to die from heat stroke and hundreds more prisoners to suffer from heat-related illnesses since 2011.  (Compl., Doc. No. 1 at 1.)  They allege that Defendants have done nothing to lower the temperatures inside the housing areas.  (*Id.*)  They ask the Court to "[r]emedy ongoing violations of the law and the Constitution by granting declaratory and injunctive relief, as set out in [the] Complaint, on behalf of Plaintiffs, and the class" and to "[p]ermanently enjoin Defendants to abate the risk of serious harm described above by taking steps including, but not limited to, maintaining a heat index of 88 degrees or lower inside the Pack Unit's housing areas." (Compl. 35.)

Plaintiffs seek to certify a class and two subclasses for injunctive and declaratory relief under the Eighth and Fourteenth Amendments.  Plaintiffs also seek to certify one of the two subclasses for injunctive and declaratory relief under the Americans with Disabilities Act and the Rehabilitation Act.  The proposed General Class is defined as:

> **All inmates who currently are, or in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas.**

The first proposed subclass is the "Heat-Sensitive Subclass," defined as:

> **All people who are incarcerated at the Pack Unit, or in the future will be, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index**

**temperatures in the housing areas, and either: (1) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or, (2) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or (3) are over age 65.**

The second proposed subclass is the "Disability Subclass," defined as:

**All people incarcerated at the Pack Unit, or who will be in the future, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas and suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.**

(Am. Mot. to Certify Class, Doc. No. 272 at 2.)

The named plaintiffs are Keith Cole, Ray Wilson, Jackie Brannum, Dean Mojica, Richard King, Fred Wallace, and Marvin Ray Yates.  Keith Cole is a 60-year-old inmate who has Type II diabetes, coronary arterial disease, high blood pressure, and high cholesterol.  (Doc. No. 272 at 30.)  According to TDCJ records, Mr. Cole experienced an episode of heat exhaustion in June 2012.  (Doc. No. 272-22 at 3.)  Ray Wilson is a 78-year-old inmate who has chronic obstructive pulmonary disease (COPD), hypertension, coronary artery disease, emphysema, chronic bronchitis, and degenerative arthritis.  (Doc. No. 272-15 at 1.)  Jackie Brannum is a 61-year-old inmate who has hypertension, high cholesterol, type II diabetes, schizoaffective disorder, and chronic pain.  (Doc. No. 272-14 at 1.)   Dean Mojica is a 49-year-old inmate who has no medical conditions that would affect his sensitivity to extreme heat.  (Doc. No. 272-3 at 25; Doc. No. 272-17 at 1.)  Richard King is a 68-year-old inmate who has hypertension, obesity, and diabetes. (Doc. No. 272-16 at 1.)  Fred Wallace is a 72-year-old inmate who is obese and has depression and high blood pressure.  (Doc. No. 272-13 at 1.)  Marvin Ray Yates is a 69-year-old inmate who has hypertension and COPD with emphysema and bronchitis.  (Doc. No. 272 at 30.)

3

## II.    LEGAL STANDARDS

The requirements for class certification under Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable [numerosity];

(2) there are questions of law or fact common to the class [commonality];

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed. R. Civ. P. 23(a).   "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)."  *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).   Plaintiffs seek certification under Rule 23(b)(2), which allows for certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Plaintiffs, as the party seeking certification, bear the burden of proving that the proposed class satisfies the requirements of Rule 23.  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").   It is well established that a federal district court must conduct a rigorous analysis of the Rule 23(a) prerequisites before certifying a class.  *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir. 1996).   Currently, the courts must follow the enhanced contours of

"rigorous analysis" as announced by the Supreme Court in *Wal–Mart*.  *Perry*, 675 F.3d at 837.

Under *Wal–Mart,* "[w]hat matters to class certification . . . is not the raising of common

'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation."  131 S.Ct. at 2551 (emphasis in

original).  The Supreme Court requires the district court to look to the *dissimilarities* among the

proposed class members, as these "are what have the potential to impede the generation of

common answers."  *Wal–Mart,* 131 S.Ct. at 2551.  Thus, as noted in *Perry*, the commonality test

is no longer met when the proposed class does nothing more than establish that there is "at least

one issue whose resolution will affect all or a significant number" of the putative class members.

*Perry*, 675 F.3d at 840.  Instead, Rule 23(a)(2) requires that all of the class members' claims

depend on a common issue of law or fact whose resolution "will *resolve* an issue that *is central*

*to the validity* of each one of the class member's claims in one stroke."  *Id.* (citing *Wal–Mart*,

131 S.Ct. at 2551) (original emphasis).

This heightened analysis under *Wal–Mart* will "[f]requently . . . entail some overlap with

the merits of the plaintiff's underlying claim."  *Id.*  However, Rule 23 does not require a showing

that the questions common to the class "will be answered, on the merits, in favor of the class."

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).  "Rule 23

grants courts no license to engage in free-ranging merits inquiries at the certification stage.

Merits questions may be considered to the extent—but only to the extent—that they are relevant

to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at

1194–95.

## III.   PRELIMINARY MATTERS

Before analyzing the Rule 23 prerequisites, the Court must consider Defendants'

preliminary arguments regarding (1) ascertainability and (2) the limitations imposed by the Prison Litigation Reform Act.

### A. Ascertainability

"The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). A "precise class definition is necessary to identify properly those entitled to relief, those bound by the judgment, and those entitled to notice." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004).

Defendants do not dispute the ascertainability of the General Class, but they dispute the existence of ascertainable subclasses. Defendants argue that "[b]y including the catchall 'but not limited to' language, the [heat sensitive] sub-class definition is expanded with unknown dimensions to include unknown medical conditions. Further, the [heat sensitive] sub-class definition is contingent on the physiological condition actually placing the inmate at increased risk of heat-related illness, injury, or death." (Defs.' Resp., Doc. No. 307 at 40.) Defendants also claim that "[t]he disability sub-class is defined by the subjective and fact based inquiry of whether a condition is substantially limiting a major life activity and at the same time placing the inmate at increased heat-related risk. Either inquiry would once again devolve into a person-by-person inquiry to determine who is in or out of the sub-class because it is based on subjective criteria that only a medical provider could define." (*Id.*)

Defendants' arguments are not frivolous. However, with regard to the heat-sensitive subclass, the Court finds it significant that TDCJ itself uses similar criteria to determine work assignments and other restrictions. (Correctional Managed Health Care Policy Manual, Doc. No. 272-9 at 7–9.) The fact that "only a medical provider" could determine which conditions place people at increased risk for heat-related illness, injury, or death does not make the subclass

unascertainable.   For an inmate to belong in the heat-sensitive subclass, he must (1) have a diagnosed physiological condition that medical providers understand may negatively "affect heat tolerance" (Doc. No. 272-9 at 9); or (2) be prescribed a drug that medical providers—including the University of Texas Medical Branch (UMTB), TDCJ's healthcare provider—consider to be "associated with heat stress," namely, an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic (Doc. No. 272-9 at 7); or (3) be over the age of 65.   In the Health Care Policy Manual, the University of Texas Medical Branch lists the following physiological conditions as possibly affecting heat tolerance: "Cardiovascular Disease; Cirrhosis of the Liver; Chronic Obstructive Pulmonary Disease/Asthma; Cystic fibrosis; Diabetes; Psychiatric conditions; Sjogren's syndrome; Sweat gland dysfunction; Thyroid dysfunction; Age > 65."   The Court is hesitant, however, to limit the qualifying physiological conditions to those on the UTMB list.   As Dr. Vassallo explains in her expert report, spinal cord injuries, which are not on the list, may affect the ability to thermoregulate by impairing signals sent from the brain to the body.   (Doc. No. 272-3 at 15.)   Moreover, both Plaintiffs' and Defendants' experts agree that obesity can increase a person's sensitivity to extreme heat, but obesity is not on the UMTB list.   (*Id.* at 9; Doc. No. 309 at 16.)

As TDCJ already keeps an only slightly more limited list of inmates who are heat sensitive and thus subject to certain restrictions, and the subclass is defined by an inmate's diagnosed physiological condition, prescribed medication, or age, rather than the inmate's individual sensitivity to heat, the Court finds that the heat-sensitive subclass is ascertainable for the limited purpose of injunctive relief.   It should be emphasized that, with regard to the first of the three prongs, the inquiry need not and should not involve an examination of the inmate's actual risk of heat-related illness—it is only necessary for an inmate to establish that the inmate

has a physiological condition that is known in the medical community to negatively affect thermoregulation, thereby making the inmate's risk higher than it would be without the medical condition.  Any inmate with obesity is a member of this subclass, as is any inmate with sweat gland dysfunction or any of the other conditions listed.  According to both parties' experts, holding all other factors equal, a person who has sweat gland dysfunction is at higher risk of heat-related illness than that person would be without sweat gland dysfunction.  An inmate with a spinal cord injury would likewise be a member of the subclass, as he would "have a physiological condition that places [him] at increased risk of heat-related illness, injury, or death."

The disability subclass is also ascertainable.  Courts regularly certify classes of inmates who are disabled, even if they do not have the same disability.  *See, e.g.*, *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015) (certifying a subclass of inmates with disabilities, defined as "all individuals who are now or will be in the future in the Jail and who have a disability, as defined by federal and California law"); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 454 (E.D.N.C. 2011) (certifying class of prisoners who are disabled under the Americans with Disabilities Act and the Rehabilitation Act).  As in the heat-sensitive subclass, the inquiry regarding the disability subclass will focus not on the individual risk of heat-related illness, but on whether the inmate has a type of disability that is known to affect thermoregulation or takes a type of medication that is known to affect thermoregulation in order to treat the inmate's disability.

### B.  The Prison Litigation Reform Act

One of Defendants' primary arguments as to why this Court should deny class certification—that "[the Prison Litigation Reform Act (PLRA)] and binding precedent preclude

Plaintiffs' primary claim for relief[,] . . . across the board air-conditioning"—should also be addressed before the Court reaches the Rule 23(a) requirements.  (Doc. No. 307, at 6.)  Even if it that statement were true, and the PRLA did in fact preclude an injunction requiring across the board air-conditioning, that would not defeat class certification for two reasons.

First, as this Court noted in its Memorandum and Order denying Defendant Herrera's Motion to Dismiss, "[w]hile the heat index injunction is admittedly the 'backbone' of the relief that Plaintiffs seek, it is not the only relief they seek."  (Doc. No. 276, at 5.)  It would be premature for this Court to decide now, before trial, which remedies would be available to Plaintiffs if a Fourteenth Amendment violation were found in the conditions of the Pack Unit. But, under *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004), it is clear that *some* remedy would indeed be available to address unconstitutional conditions of confinement.  In *Gates*, a prisoner class action, the Fifth Circuit upheld an injunction directing the Mississippi Department of Corrections "to provide fans, ice water, and daily showers when the heat index is 90 degrees or above, or alternatively to make such provisions during the months of May through September." *Id.* at 339.  *Gates* does not define the maximum relief available for inmates complaining of exposure to extreme heat; it does, however, indicate that comparable types of relief could be available to Plaintiffs even if air-conditioning were not.

Second, class certification is not dependent on Plaintiffs' future success on the merits of their claim.  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). There may be no Eighth or Fourteenth Amendment violations in this case.  The PLRA may preclude some or all of the Plaintiffs' requested remedies.  However, as in *Gates*, the policies and practices that create the conditions in the Pack Unit are either constitutional or not, and the remedies are either precluded by the PLRA or not.  The class of inmates in the Pack Unit "will

prevail or fail in unison." *Amgen*, 133 S. Ct. at 1191.  To deny class certification based on the speculative availability or unavailability of a remedy—to the class as a whole—would be unfounded.

## IV.   RULE 23(a) REQUIREMENTS

Because Defendants' arguments regarding ascertainability and the PRLA do not bar class certification, the Court will now address each of the Rule 23(a) requirements.

### A.  Numerosity

To satisfy the numerosity requirement under Rule 23(a)(1), the proposed class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The proposed General Class contains over 1,400 members, and there is "a constant flux of inmates into and out of the Pack Unit," so joinder of all the proposed class members would be impracticable if not impossible.  (Doc. No . 272, at 4-5.)  The proposed heat-sensitive subclass contains over 400 members, as identified by TDCJ on the "Medical Heat Restriction List" (Doc. No. 272 at 5; Doc. No. 272-8, at 25-47).

Plaintiffs do not estimate how many members might fit into the disability subclass, but they note that "there are 728 inmates at the Pack Unit diagnosed with hypertension, each of whom is likely taking a diuretic or other medication identified by TDCJ's medical policy as putting inmates at risk of heat-related illness.  There are similarly unwieldy numbers for each of the conditions that TDCJ identifies as putting inmates at risk of heat-related illness—212 patients with diabetes, 142 with coronary artery disease, 111 with obesity, 53 with a psychiatric condition, 22 with cirrhosis of the liver, 84 with COPD, 113 with asthma, and 189 with thyroid dysfunction." (Doc. No. 272, at 13.)  While Defendants challenge the subclass's ascertainability (*see infra* Part III.A), they do not contend that the disability subclass is too small to fulfill the

numerosity requirement.

Defendants argue that "Plaintiffs fail to satisfy the elements of numerosity in light of the PLRA's exhaustion requirement and there is no significant history of serious heat related illnesses." (Doc. No. 307 at 38.)  It is not, however, necessary for each class member to have satisfied the exhaustion requirement.  *See Gates*, 376 F.3d at 330 ("Russell was the only class member who had [exhausted the administrative remedy]. . . .  [T]his is enough to satisfy the requirement for the class.").  Defendants' argument regarding "no significant history of serious heat related illnesses" is unclear, but the Court finds as a factual matter that there is such a history within the Pack Unit, and that it is not necessary for each member of the class actually to have experienced a heat related illness—the class is defined by exposure to risk, not by past illnesses.  The Court finds that the General Class and both subclasses are sufficiently numerous to satisfy Rule 23(a)(1).

## B.  Commonality

"To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims."  *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014).  As the Fifth Circuit has explained, however, "this contention need not relate specifically to the damages component of the class members' claims.  Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'"  *Id.*

Plaintiffs claim that the actions and inactions of TDCJ in subjecting the class and subclass members to extremely high temperatures provide the basis for satisfying the 23(a)(2) requirement.  (Doc. No. 272, at 20.)  According to Plaintiffs, excessive heat constitutes a

condition of confinement that poses a substantial risk of serious harm to the health of all the inmates. (*Id*. at 21-22.) Furthermore, to prove an Eighth Amendment violation, Plaintiffs will need to prove that officials were deliberately indifferent to the risk posed to the prisoners; the issue of deliberate indifference can be resolved, Plaintiffs contend, "in one stroke." (Doc. No. 272, at 22.) In support of their contention that all Pack Unit inmates are subjected to a substantial risk of harm by TDCJ policies, Plaintiffs submit evidence of the summer temperatures inside the Pack Unit as well as copious evidence of the effects that such high temperatures have on the well-being of both healthy individuals and individuals with heat sensitivity.

Defendants respond by arguing that Plaintiffs have "failed to prove that even the healthiest and most acclimatized offenders at the Pack Unit are at substantial risk of harm of heat related illness." (Doc. No. 307, at 23.) On this point, Plaintiffs' and Defendants' experts disagree. Plaintiffs' experts assert that above a certain heat index, "[a]ll of the inmates at the Wallace Pack Unit, including young healthy men with no known medical problems, are at substantial risk for serious heat-related disorders during periods of persistent exposure." (Report of Dr. Vassallo, Doc. No. 272 Exh. 3, at 10; Report of Dr. Michael A. McGeehin, Doc. No. 272 Exh. 4, at 20.) Defendants' experts say, on the other hand, that there is "[n]o problem at [the] Pack Unit with regard to summer heat conditions." (Report of Dr. Means, Doc. No. 39 at 35.)

Dr. Means, who was employed by TDCJ between 2009 and 2015, bases her opinion in large part upon a logical fallacy. She emphasizes the fact that "there were no statistically significant variations in the TDCJ mortality rate by temperature related period (i.e. summer or winter) from 2004 to 2014." (Report of Dr. Means, Doc. No. 309 at 35; *see also id.* at 27.) Given the total number of deaths each year in the Texas prison system—over 219,000—there

would have to be a staggering number of heat-related deaths in order to cause a statistically significant variation between the seasons. Perhaps even more disturbing, however, is the fact that the table in Dr. Mean's expert report compares the number of deaths per 1,000 people in a five-month long "summer" period to the number of deaths per 1,000 people in a seven-month long "winter" period. (*Id.* at 27.) One would expect to see significantly *more* deaths in a seven-month period than in a five-month period, if temperature variations were in fact unimportant. But, according to Dr. Means, there is no such disparity between the two unequal periods. The fact that no statistically significant variation is shown in the table does nothing to support Defendants' contentions; but the fact that Dr. Means relies on such data dampens her credibility as an expert in the eyes of this Court.

Defendants' experts also appear to believe that a determination of risk is necessarily an individual inquiry, no matter what external conditions exist. According to Dr. Puerini, even inmates with the same medical diagnosis do not have the same exact level of risk when exposed to extreme heat. (Report of Dr. Puerini, Doc. No. 309 at 169.) "Similarly, those with treated chronic illness, including hypertension, cardiovascular disease, and obesity are not at nearly equal risk of harm from heat sensitivity. . . . Everyone is not at equal risk, and so stratification is important." (*Id.* at 169–170.) By Defendants' reasoning, no class of inmates could ever be certified in relation to heat exposure: no two people face exactly the same amount and type of risk from exposure to extreme heat. *Gates* refutes such reasoning. The law is clear that a class of inmates can be certified despite individual differences in risk factors, so long as every inmate is exposed to "substantial" risk due to their conditions of confinement. *Gates*, 376 F.3d at 340; *see also Parsons v. Ryan*, 754 F.3d 657, 662 (9th Cir. 2014).

Dr. Puerini begins with the assumption that "benign" injuries caused by heat, such as heat

cramps and syncopal episodes (fainting spells), are not serious enough to establish a substantial risk of harm and are therefore "not relevant" to his analysis.  (Report of Dr. Puerini, Doc. No. 309 at 162.)  The Fifth Circuit has held, however, that minor heat-related injuries or illnesses caused by extreme temperatures can be enough to demonstrate an Eight Amendment violation. *Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012) (holding that plaintiff's headaches, dizziness, nausea, difficulty breathing, and blurred and dimmed vision could demonstrate substantial risk of harm).  Dr. Puerini's opinions are based on a false assumption, and they improperly discount much of Plaintiffs' evidence.

By contrast, the Court finds Dr. Vassallo's report, offered by Plaintiffs, to be well-reasoned and persuasive.  (Doc. No. 272 Exh. 3.)  Dr. Vassallo is an expert in heat-related disorders and thermoregulation.  Her report explains the harmful effects of persistent exposure to extreme heat on all the inmates at the Pack Unit.  (*Id.* at 10.)  The conclusions in Dr. Vassallo's report are corroborated by the report of epidemiologist Michael A. McGeehin, as well as by the anecdotal affidavits of the named Plaintiffs themselves.  (Doc. No. 272 Exh. 4, 7, 11-18.)

Furthermore, the Court finds it significant that TDCJ policies regarding heat stress use a "Heat and Humidity Index" table provided by the U.S. National Weather Service, which applies to all inmates—and, in fact, all people— regardless of their health conditions.  (Doc. No. 272 Exh. 9, at 5.)  The table charts the danger of heat exhaustion and heat stroke at varying air temperatures and humidity levels.  The cells in the table are color-coded to show when "heat exhaustion [is] possible," "heat stroke [is] possible," and "heat stroke [is] imminent."  For example, at 95 degrees and 80% humidity, heat stroke is "imminent."

Plaintiffs' expert Dr. Thomas W. Sager, a professor of statistics at the University of Texas at Austin, graphed the temperatures and humidity levels in three housing areas of the

14

Wallace Pack Unit from August 27, 2014 through October 8, 2014 and estimated the temperatures and humidity levels from June 17, 2014 through August 26, 2014 (when actual data was unavailable).  Even in late August and September, when the temperature and humidity levels were measured instead of estimated, the graphs show that the temperatures and humidity combinations ("the heat index") more than once put all the inmates in danger of imminent heat stroke, according to the National Weather Service table.

The Court finds that Plaintiffs have demonstrated commonality with regard to the General Class.  They raise the common contentions that excessive heat constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all the inmates, and that TDCJ officials were deliberately indifferent to the risk posed to the inmates.  The Court also finds that commonality has been established with regard to the subclasses.  The heat-sensitive subclass has the same common contentions as the General Class, but the subclass must only prove a substantial risk of serious harm, and deliberate indifference, to the inmates with heat sensitivity.  One additional common contention of the disability subclass is that TDCJ officials failed to provide reasonable accommodations to inmates suffering from disabilities that may impact (or that cause the inmates to take medication that may impact) their ability to withstand extreme heat.

### C.  Typicality

"Rule 23(a) requires that the named representatives' claims be typical of those of the class." *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007).  The analysis focuses on whether the named representative's claims are typical, not whether the representative is.  *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002).  Before *Wal–Mart*, the test for typicality was "not demanding."  *Mullen v. Treasure Chest Casino, LLC*, 186

F.3d 620, 625 (5th Cir. 1999).  The analysis was "less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims."  *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986).  The extent to which *Wal–Mart* changed the threshold for typicality is unclear.  The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." 131 S.Ct. at 2551 n.5. As this Court has described it,

> "typicality is commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim, the validity of which can be determined on a classwide basis.  Typicality requires showing that, in fact, the proposed representatives have that claim."

*M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013).  The typicality requirement also overlaps with the adequacy requirement.  *See In re American Medical Sys.*, 75 F.3d 1069, 1083 ("The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members.").  The claims of all class members need not be identical.  *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001).  But typicality demands that claims "arise from a similar course of conduct and share the same legal theory."  *Id.*

The TDCJ policies and practices related to heat exposure affect all the inmates in the Wallace Pack Unit, including the named Plaintiffs.  The named Plaintiffs' claims arise from the same conduct of TDCJ and share the same legal theory as the rest of the class.  In addition, Plaintiffs Cole, Wilson, King, Brannum, Wallace, and Yates bring claims that are typical of both the heat-sensitive subclass and the disability subclass.  This Court finds that Plaintiffs have met the typicality requirement for both the General Class and the subclasses.

### D.  Adequacy of Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest

between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). To meet the adequacy requirement, "the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). Counsel must be both competent and zealous in representing class interests. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005).

Defendants do not contend that there is a conflict of interest between the named Plaintiffs and the other members of the General Class or subclasses. Nor do they challenge the adequacy of class counsel who, collectively, have extensive experience litigating class actions, prisoner civil rights, and conditions of confinement claims and who have shown themselves to be both competent and zealous in this case. Defendants do, however, contend that the named Plaintiffs are insufficiently involved in the litigation to be adequate representatives. They rely on a line of class action securities cases beginning with *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001). In *Berger*, the Fifth Circuit held that "in complex class action securities cases governed by the [Private Securities Litigation Reform Act (PSLRA)], the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases." *Id.* at 484. In *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005), another securities case, the Fifth Circuit held that the standard defined in *Berger* is broadly applicable, even to cases that are not governed by the PSLRA:

> We have identified a "generic standard" for the adequacy requirement, noting that "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger I*, 257 F.3d at 482–83. We have also noted that "the PSLRA raises the standard adequacy threshold" with its "requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Id.* at 483.

Although we noted that the PSLRA raises the adequacy threshold, we have "not, however, created an additional requirement under rule 23(a)(4) that . . . the putative class representative possess[ ] a certain level of experience, expertise, wealth or intellect, or a level of knowledge and understanding of the issues, beyond that required by our long-established standards for rule 23 adequacy of class representatives." *Berger v. Compaq Computer Corp.,* 279 F.3d 313, 313–14 (5th Cir.2002) [*Berger II*]. The "long-established standard" for the adequacy determination on which we principally relied in *Berger I* requires " 'an inquiry into [1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]' " *Berger I,* 257 F.3d at 479 (quoting *Horton v. Goose Creek Independent School Dist.,* 690 F.2d 470 (5th Cir.1982)). In addition to determining the proposed class counsel's zeal and competence and the proposed class representative's willingness and ability, the district court's "adequacy inquiry also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.' " *Id.* at 479–80 (quoting *Amchem Prods.,* 521 U.S. at 625, 117 S.Ct. at 2236).

*Feder*, 429 F.3d at 129–30.

Thus, this Court must evaluate "the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Id.* at 130. The named Plaintiffs are prisoners.  Like most class representatives, they cannot be expected to have a sophisticated understanding of the legal intricacies involved in class action lawsuits such as this one.  However, they can be expected to show a willingness take an active role in, and control, the litigation.   Although the record before this Court is limited on this point, the Court finds that such willingness has been established.

In a deposition, named Plaintiff Keith Cole described his view of the Eighth Amendment claim, saying: "I feel that's an Eighth Amendment violation because of [the] extreme heat condition[s]," which he believes constitute "cruel and unusual punishment."  (App. to Defs.' Resp., Doc. No. 309 at 684.)  Named Plaintiff Richard King, when asked what he wanted from the lawsuit, answered that he wanted "[t]o live, you know, . . . in a safe temperature."  (*Id.* at 709.)  Mr. King had "perused" the Complaint, after joining the lawsuit, and he understands that the lawsuit seeks what he desires, namely, "relief from the excessive heat."  (*Id.* at 709, 711.)

Named Plaintiff Fred Wallace agreed to participate in the lawsuit because he "want[s] [the Wallace Pack Unit] to have a safer situation. . . . [I]t's too hot in here and . . . we need it to be safer." (*Id.* at 735.)  Ray Wilson said he got involved in the lawsuit in February 2014 because "I felt that if my time here, if I can contribute something, then I would do it."  He reviewed the complaint multiple times.  (*Id.* at 747.)  Although Plaintiffs' counsel selected the named Plaintiffs, and not the other way around, that is not uncommon in this kind of impact litigation nor does it negate the named Plaintiffs' demonstrated willingness and ability to represent the class.  The Court finds that the adequacy requirement of Rule 23(a)(4) has been met.

## V.     APPOINTMENT OF CLASS COUNSEL

Plaintiffs request that their current attorneys be appointed class counsel pursuant to Federal Rule of Civil Procedure 23(g).  Under this Rule, "a court that certifies a class must appoint class counsel" and, in so doing, must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A)(i-iv). The Rule also requires that "[c]lass counsel must fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).

The Court finds that counsel for the named Plaintiffs fulfill the requirements of Rule 23(g).  The record shows that the attorneys currently representing Plaintiffs have investigated the case, have engaged in voluminous discovery, and have experience litigating similar cases in this and other jurisdictions.  The proposed class counsel, which includes attorneys from Edwards Law, the Law Offices of Mike Singley, and the Texas Civil Rights Project, have extensive experience handling complex litigation and class actions.  Plaintiffs' counsel have demonstrated,

as evidenced by the pleadings before the Court, their familiarity with the applicable law.  They have also shown they will devote substantial resources to representing the classes and pursuing this litigation.  In sum, the Court concludes that counsel for named Plaintiffs will fairly and adequately represent the interests of the class. The Court, therefore, will appoint them as class counsel for both the general class and the subclasses certified by this order.

## VI.    CONCLUSION

Plaintiffs' Amended Motion for Class Certification is hereby **GRANTED**.  The General Class, the heat-sensitive subclass, and the disability subclass, as defined in Part I, are certified.

**IT IS SO ORDERED.**

**SIGNED** on this the 22nd day of January, 2016.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

20