UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM, RICHARD KING, LAVAR SANTEE, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated, | § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 4:14-cv-1698 |
| | § | |
| v. | § | |
| | § | |
| BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § § § | |
| | § | |
| Defendants. | § | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Since 2011, at least twelve prisoners have died from heat stroke because of the sweltering temperatures inside buildings where the Texas Department of Criminal Justice houses inmates. Hundreds more have suffered heat-related illnesses, many of whom were among the elderly and disabled inmates housed at the Wallace Pack Unit.

Despite this, TDCJ has done nothing to lower the temperatures inside the housing areas at the Pack Unit. As this inflicts needless suffering on prisoners, and exposes them – many of whom are sick, elderly, and disabled – to serious risk of harm, Plaintiffs ask the Court to enjoin TDCJ from continuing this dangerous practice.

## STATEMENT OF THE CASE

1.    Plaintiffs, on behalf of themselves and those similarly situated, bring this lawsuit because the Texas Department of Criminal Justice (TDCJ) refuses to cool inmate housing areas, despite the cruel and dangerously hot indoor temperatures prisoners are forced to live in.

2.      TDCJ operates the Wallace Pack Unit ("Pack Unit"). The Pack Unit is a medical and geriatric prison where the indoor inmate housing areas are not climate controlled with refrigerated air (commonly called "air conditioning"). As a result, during the hot Texas summers the apparent temperatures routinely exceed 100 degrees inside inmate housing areas, threatening the health and welfare of all inmates living there, especially the elderly, sick, and disabled.

3.      TDCJ knowingly subjects Plaintiffs and the Class to extremely hot apparent temperatures inside prisoners' housing areas in violation of the Eighth and Fourteenth Amendments to the Constitution.

4.      TDCJ is acutely aware of the health risk that extreme heat poses, especially to prisoners with heat-sensitive medical conditions and disabilities. Nevertheless, TDCJ refuses to make reasonable accommodations for these prisoners with disabilities, in violation of the Americans with Disabilities Act and Rehabilitation Act.

5.      Injunctive and declaratory relief are the only means to address TDCJ's studied indifference to the fact that extremely hot, indoor apparent temperatures constitute cruel and unusual punishment to prisoners. Plaintiffs ask the Court to order Defendants to keep indoor apparent temperatures below dangerous levels, and mechanically lower the indoor apparent temperatures to a safe level (such as 88 degrees or lower).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act).

7.      Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

**A.     PLAINTIFFS**

~~9.~~8.     Keith Cole is 61 years old and incarcerated at the Pack Unit. He is not expected to be released from custody.

~~10.~~9.     Jackie Brannum is 61 years old and incarcerated at the Pack Unit. He will not be eligible for parole until 2017.

~~11.~~10.  Richard Elvin King is 68 years old and incarcerated at the Pack Unit. He is not expected to be released from custody.

~~12.~~11.  Lavar Santee is 34 years old and incarcerated at the Pack Unit. He will not be eligible for parole until 2017, and is not expected to be released from custody until 2027.

~~13.~~12.  Fred Wallace is 72 years old and incarcerated at the Pack Unit. He is not expected to be released from custody.

~~14.~~13.  Marvin Ray Yates is 69 years old and incarcerated at the Pack Unit. He is not expected to be released from custody until 2019.

**B.     DEFENDANTS**

~~15.~~14.  Brad Livingston is the executive director of the Texas Department of Criminal Justice. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

16.15.  Robert Herrera is the warden of the TDCJ Pack Unit. At all times described herein, he was acting under color of state law. As the warden of the Pack Unit, he is responsible for ensuring constitutional conditions of confinement exist at the Pack Unit. He is sued in his official capacity for declaratory and injunctive relief.

17.16.  Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TEX. GOV'T CODE § 493.004. At all relevant times, it operated the Pack Unit, a public facility with programs and services Plaintiffs and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds.

## FACTS

**A.      The Pack Unit Houses Sick, Elderly Prisoners**

18.17.  The Pack Unit is a TDCJ prison complex located in Navasota, Texas, in Grimes County.

19.18.  Most prisoners assigned to the Pack Unit are minimum-custody inmates.

20.19.  The Pack Unit began operating in September 1983. It presently has the capacity to house 1,478 inmates. The prison typically operates at or near capacity.

21.20.  Like most prisons, the population of the Pack Unit is fluid, as new prisoners arrive and prisoners who have completed their sentences are released. Likewise, prisoners are frequently transferred between TDCJ prisons.

22.21.  Despite the frequent transfer of prisoners in to and out of the Pack Unit, the population's general characteristics (such as average age, percentage with disabilities, and percentage with heat-sensitive medical conditions) remains fairly consistent.

23.22.  The Pack Unit is a medical facility, and houses many geriatric prisoners, prisoners with disabilities, and prisoners with chronic medical problems.

24.23.  The Pack Unit is one of the few TDCJ facilities that has wheelchair-accessible housing.

25.24.  As of October 2014, the Pack Unit housed 188 men over the age of 65, 335 men over the age of 60, and 514 men over the age of 55. Approximately half the men at the Pack Unit are over the age of 50. These numbers are a typical age distribution for the Pack Unit.

**B.     The Pack Unit's Inmate Housing Is Not Air Conditioned**

26.25.  The majority of prisoners at the Pack Unit, including Plaintiffs, are housed in inmate dormitories. The dorms do not have air conditioning, or any other form of climate control technology that mechanically lowers the indoor temperatures or humidity during the summer.

27.26.  The ventilation system at the Pack Unit cannot lower the indoor heat index below the outdoor heat index, and cannot ensure that temperatures inside the housing areas are safe and do not exacerbate numerous prisoners serious medical conditions. Rather, the ventilation system just brings in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning.

28.27.  Upon information and belief, TDCJ chose not to air condition the Pack Unit with refrigerated air for political and financial reasons.

29.28.  As a consequence of the lack of air conditioning, TDCJ Executive Director Brad Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

30.29.  TDCJ's top physicians have noted that indoor apparent temperatures can actually be dramatically higher than the outdoor temperatures: "A few years ago, [a top TDCJ executive]

found that when the temperature was 98 degrees outside, we had dorms with temps up to 110 inside. It seems like the [prisoners] in that case were better off outside."

31.30. Upon information and belief, Dr. Lannette Linthicum, M.D., the head of TDCJ's Health Services Division, and Brad Livingston were aware of this at the time the observation was made. Moreover, they are certainly aware the indoor summer temperatures can be hotter than the outdoor summer temperatures now.

32.31. Some inmates routinely sleep on the concrete floor because the concrete is marginally cooler than laying in their bunks.

33.32. The windows in some of the inmate dormitories are sealed shut.

34.33. In the dorms where the windows do open, the temperature is not appreciably cooler when the windows are open in the summer.

35.34. Moreover, in the dormitories where the windows do open, opening the windows allows biting insects, like mosquitos, into the dormitories. Thus, as a practical matter, they often remain closed.

36.35. As a result, and as TDCJ and its officials well know, there is little difference between the indoor and outdoor temperatures at the Pack Unit.

37.36. Defendants also know very few parts of the prison accessible to prisoners have air conditioning, and inmates' time in these places is strictly limited. The law library, for example, has air conditioning, but inmates can only go there a few times per week, and the law library is only large enough to hold a few dozen inmates. The education building has air conditioning, but only inmates enrolled in educational programming can go there, and it is only large enough to accommodate 25-30 prisoners at any time. The visitation building is also air conditioned, but

inmates can only go to visitation one time per week, and only if they have a visitor there to see them, and only if they are eligible to receive visitors.

38.37. Thus, Plaintiffs are rarely allowed to go to air-conditioned portions of the prison during the summer.

39.38. In stark contrast, Warden Herrera's office is air conditioned, as are all the administrative offices in the prison, and even the prison's armory.

**C.      The Vast Majority of TDCJ's Inmate Housing is Not Climate Controlled**

40.39. In fact, though TDCJ imprisons over 150,000 prisoners system-wide, there are only 551 beds available with air conditioning for inmates with medical conditions system-wide. These extremely limited beds are reserved for the patients at the most extreme risk of heat-related illness (such as advanced-stage cancer patients), and are not available even for patients with multiple conditions that make them more susceptible to heat-related illness, injury, or death – like Plaintiffs Cole, King, Brannum, Wallace, and Yates. TDCJ's medical providers have testified before the Texas Legislature that these beds are filled by inmates who are so sick that they will never recover, and will likely die in them.

41.40. TDCJ's medical provider, the University of Texas Medical Branch, has testified there simply are not enough beds system-wide to accommodate even the prisoners with serious medical conditions who are at greater risk of heat-related illness, injury, or death.

42.41. Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness in the heat stroke wrongful death litigation, testified as follows:

> Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?
>
> A: Pretty much. That's a fair description.
>
> Q: Do you know how many of those triage beds or cells you're talking about?

A: How many are there?

Q: Yeah.

A: Absolutely … there were 471 [in 2011]. We now have 481.[1]

Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?

A: No, but it's all we have.

Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?

A: Essentially, yes.

~~43.~~ 42.  In other words, TDCJ knows it does not have enough air-conditioned beds to safely house prisoners at risk of heat-related illness, injury or death.

~~44.~~ 43.  At the Pack Unit, there are only twelve air-conditioned beds available for prisoners with serious medical conditions. These beds are located in the infirmary, and are typically reserved for inmates who are very sick.

~~45.~~ 44.  In other litigation, TDCJ has admitted it "knows of the high temperatures within its prisons and regard[s] it as a potential risk to the health and safety" of prisoners.

~~46.~~ 45.  Likewise, Livingston has admitted knowing "TDCJ ha[s] no written [policy] to address high temperatures in prisoner housing areas."

~~47.~~ 46.  There is no penological purpose behind refusing to provide prisoners with climate-controlled housing.

---

[1] Dr. Adams testified about the beds available to the University of Texas Medical Branch, which provides healthcare to the majority of TDCJ prisoners. The Texas Tech University Health Science Center, which also provides care to TDCJ inmates, has additional beds available. Together, the UTMB and Texas Tech beds total 551. The Pack Unit is served by UTMB.

48.47. In fact, the State of Texas requires county jails to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE § 259.160.

49.48. Indeed, TDCJ even air conditions limited portions of inmate housing areas – such as administrative segregation and solitary confinement cells, including Death Row – at other TDCJ prisons. But decisions to place prisoners in these cells are made for security, not medical, reasons.

50.49. The only doctor who works at the Pack Unit has testified that air conditioning inmate living areas "would be beneficial" to protect inmates from the dangers of extreme temperatures.

51.50. The doctor also specifically acknowledged that extreme heat – like that commonly experienced at the Pack Unit – placed Plaintiffs at increased risk of harm.

52.51. Most maximum-security federal prisons in hot climates, like Texas, are routinely air conditioned. Even the prison housing terrorism suspects in Guantanamo Bay, Cuba, is air conditioned.

53.52. In fact, the comment to the American Correctional Association standards instructs prisons to be able to "mechanically lower" temperatures in inmate housing areas. TDCJ deliberately violates this instruction as indoor apparent temperatures at the Pack Unit cannot be mechanically lowered.

54.53. Most TDCJ prisons, including the Pack Unit, were built after air conditioning became common in public buildings in Texas.

55.54. Indeed, TDCJ officials made an intentional decision not to air condition the prisoner housing areas at the Pack Unit. And, upon information and belief, they did so for political and financial reasons.

56.55. Moreover, despite their knowledge of numerous heat-related injuries occurring indoors, all of which would be prevented with air conditioning, TDCJ, including Brad Livingston and the Texas Board of Criminal Justice, has intentionally decided to continue exposing prisoners to extremely high indoor apparent temperatures at the Pack Unit despite acknowledging these high indoor apparent temperatures put inmates at risk of heat-related illness, injury, and death.

**D.     Temperatures Inside the Pack Unit are Dangerously High During the Summer**

57.56.  TDCJ routinely records the outdoor apparent temperatures at the Pack Unit during the summer. According to TDCJ's own records, the outdoor apparent temperatures at the Pack Unit routinely exceed 100 degrees during the summer.

| Year | # Days: High Over 100 | # Days: High 90-99 | # Days: High 80-89 | # Days: High Below 80 |
|------|------------------------|---------------------|---------------------|------------------------|
| 2011 | 75 | 16 | 1 | 0 |
| 2012 | 45 | 43 | 2 | 0 |
| 2013 | 73 | 16 | 3 | 0 |
| 2014 | 34 | 47 | 9 | 2 |

58.57.  This comes as no surprise to Texans, given the brutal summer temperatures and high humidity in the Houston area.

59.58.  Pursuant to TDCJ policy and practice, Warden Herrera reviews this data daily during the summer, and knows that apparent temperatures at the Pack Unit are dangerous.

60.59.  Despite this, Warden Herrera has not even looked into costs associated with ways to cool even a single indoor housing area.

61.60. Likewise, Director Livingston is aware that apparent temperatures inside TDCJ prisons are hazardous during the summer. Even so, Director Livingston and the Health Services Division took no steps to bring the dangerous temperatures down in any TDCJ facility. They did not even order a study to determine the cost before several heat-related deaths in 2011 and 2012, and being sued for injunctive and declaratory relief in this case.

62.61. According to the National Weather Service (NWS), summer temperatures in the future will not be lower than temperatures from 2011–2014. In fact, temperatures will likely increase in the future.

**E.      The Extreme Temperatures at the Pack Unit Threaten Illness, Injury and Death.**

*A.      Extreme Heat Can Injure or Kill People*

63.62. According to the NWS, "heat is the number one weather-related killer in the United States." Over a hundred people die from exposure to extreme heat each year, and thousands are injured. On average, heat kills more people in the United States each year than hurricanes, tornadoes, floods, or lightning combined.

64.63. According to the NWS, the American Medical Association, the Environmental Protection Agency (EPA), and the Center for Disease Control and Prevention (CDC), "[m]aintaining a consistent internal body temperature, generally 98.6° [Fahrenheit], is essential to normal physical functioning." Excessive heat can "stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

65.64. High temperatures and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin,

in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

66.65.  Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

67.66.  Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

68.67.  Indeed, the doctor who cares for all prisoners at the Pack Unit has testified that ambient temperatures above 85 degrees Fahrenheit can be hazardous to prisoners' health.

69.68.  Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

70.69.  **Heat Exhaustion:** Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

71.70.  According to the Mayo Clinic and TDCJ's own training materials, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly.

72.71.  The doctor who cares for all prisoners at the Pack Unit has testified that heat exhaustion by itself is a serious health condition that puts prisoners at a serious health risk.

73.72. **Heat Cramps:** Heat cramps can consist of "[m]uscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

74.73. Heat cramps are extremely painful. The doctor who cares for all prisoners at the Pack Unit has testified that heat cramps can result in severe pain.

75.74. Even TDCJ's own medical policy recognizes that pain from heat cramps "may be quite severe."

76.75. **Heat Stroke:** NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published online by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

77.76. In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness … increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

78.77. The doctor who cares for all prisoners at the Pack Unit has testified that heat stroke can come on suddenly, and heat stroke is possible at apparent temperatures as low as 90 degrees.

79.78. Indeed, even TDCJ's own medical policies and training materials recognize heat stroke is "a medical emergency," that "the onset is often sudden," and that "death may occur."

80.79. Upon information and belief, virtually all prisoners at the Pack Unit, regardless of underlying medical conditions, suffer at least some symptoms of heat-related illness or injury caused by or exacerbated by the high indoor apparent temperatures each summer. Typical symptoms include: headaches, dizziness, nausea, lightheadedness, elevated temperature, and heavy sweating.

B.    *People with Medical Conditions that Impair Cooling are at Additional Risk*

81.80. Though all people suffer in the heat, people with physiological conditions that impair their bodies' ability to cool are at increased risk of suffering heat-related illness, injury, or death.

82.81. TDCJ policy recognizes inmates with certain "underlying medical condition[s] . . . place them at increased risk," including: "cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, asthma, cystic fibrosis, diabetes, psychiatric conditions, Sjogren's syndrome, sweat gland dysfunction, [and] thyroid dysfunction." Heat tolerance weakens, and the risk of heat-related illness increases, for people who suffer from these conditions. TDCJ policies and procedures recognize prisoners with these conditions are at greater risk of heat-related illness, injury, and death.

83.82. Similarly, TDCJ's policies state the risk of heat-related illness increases for individuals who use "anticonvulsants, anticholinergics, antihistamines, antipsychotics, antidepressants, beta blockers, [and] diuretics." Typically, these drugs impair the body's ability to cool itself. These medications are used to treat a wide range of illnesses and disabilities common to prisoners at the Pack Unit, including hypertension, allergies, depression, and bipolar disorder. TDCJ policies and procedures also recognize these medications increase prisoners' risk of heat-related illness and death, and that these prisoners "should not be allowed to work or

recreate in environments where the apparent temperature is 95 degrees or higher." Brad Livingston and Lannette Linthicum are actually aware of these policies and the risks they identify.

~~84.~~83.  TDCJ also acknowledges people with the following medical conditions and disabilities are at heightened risk of heat-related illness: obesity, diabetes, hypertension, cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction.

~~85.~~84.  UTMB, the medical provider at the Pack Unit, has informed TDCJ of this danger on numerous occasions.

~~86.~~85.  TDCJ identifies approximately 448 prisoners at the Pack Unit as having medical conditions that prohibit them from working in "extreme temperatures." The prisoners' medical conditions place them at increased risk of heat-related illness, injury, or death, or are prescribed the medications TDCJ identifies as putting people at increased risk of heat-related illness, injury, or death.

~~87.~~86.  This list is under-inclusive, as it did not include Plaintiffs Cole, King, or former Plaintiff Wilson, as recently as the summer of 2015 even though they also take many of the medications and suffer from heat-related disabilities TDCJ recognizes put inmates at increased risk of heat-related injury. Likewise, upon information and belief, it does not include other prisoners who suffer from heat-sensitive medical conditions, or take prescription medications that increase their risk of heat-related illness, injury, or death.

~~88.~~87.  TDCJ also acknowledges other factors that increase the risk of heat-related illness, such as age (particularly for people over 65).

89. 88. According to the CDC, heat stroke mortality rate increases with age. For example, the rate of heat stroke deaths doubles between ages 35 and 55. The CDC also recognizes that people over the age of 65 are more prone to heat stress.

90. 89. Yet no accommodations are made relating to the extreme heat for prisoners based on age, even though it is known to be associated with increased risk of heat-related illness, injury, and death.

91. 90. TDCJ is well-aware that it houses inmates with disabilities (like Plaintiffs Cole, Wallace, Brannum, King, and Yates) who require reasonable accommodations because their disabilities are impacted by exposure to extremely high indoor apparent temperatures. As TDCJ's policies identify these prisoners as being at additional risk of heat-related illness, injury, or death, their need for an accommodation is obvious.

92. 91. Upon information and belief, prisoners at the Pack Unit with these heat-sensitive disabilities experience symptoms of heat-related illness more frequently or more intensely than able-bodied prisoners. These prisoners with disabilities are also at greater risk of heat-related illness, including heat exhaustion, heat cramps, and heat stroke.

C.      *Heat in Texas Prisons is Deadly*

93. 92. Since 1998, at least twenty TDCJ prisoners in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in the table below.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diurectics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
|  |  |  |  |  |  |  |

| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
|---|---|---|---|---|---|---|
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

94.93. Moreover, it is likely far more TDCJ prisoners were actually killed by heat because hyperthermia is an underreported cause of death by medical examiners.

95.94. The twenty men in the chart above all shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at much greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension.[2]

96.95. Unsurprisingly, in a 2012 email, two of TDCJ's top physicians discussed how "the majority of heat-related deaths involve prescription drugs known to increase the risk."

97.96. Many prisoners at the Pack Unit, including Plaintiffs Cole, Brannum, King, Wallace, and Yates, suffer from one or more of the above conditions, or take one or more of the heat-sensitive medications.

98.97. Heat can also cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

---

[2] Six wrongful death lawsuits brought by the families of eight of these men are currently pending. *See McCollum v. Livingston*, No. 4:14-cv-3253 (S.D. Tex.); *Adams v. Livingston*, 4:14-cv-3326 (S.D. Tex.); *Webb v. Livingston*, 4:14-cv-3302 (S.D. Tex.); *Togonidze v. Livingston*, 4:14-cv-3324 (S.D. Tex.); *Martone v. Livingston*, 4:13-CV-3369 (S.D. Tex.); *Hinojosa v. Livingston*, 4:14-cv-3311 (S.D. Tex.).

99.98.  The CDC, NWS, and EPA recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

100.99.  As all Texans know, however, it is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt" by the human body. The NWS publishes a chart which illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:

**NOAA's National Weather Service**

**Heat Index**

**Temperature (°F)**

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution   ☐ Extreme Caution   ☐ Danger   ☐ Extreme Danger

101.100.  The NWS correlates heat index ranges to risk levels:

    a.    Caution (light yellow; heat index 80-90° F) - "Fatigue possible with prolonged exposure and/or physical activity."

   b.  Extreme Caution (mustard yellow; heat index 91-104$^o$ F) - "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

   c.  Danger (orange; heat index 105-125$^o$ F) - "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

   d.  Extreme Danger (red; heat index >126$^o$ F) - "Heat stroke likely."

~~102.~~101.  The NWS warns that exposure to heat index greater than 105$^o$ F "may cause increasingly severe heat disorders with continued exposure or physical activity."

~~103.~~102.  TDCJ incorporates a version of the NWS chart into its policies and training materials, and is well aware of the facts described by the NWS. That chart is included as an Appendix to the TDCJ policy entitled "Temperature Extremes in the TDCJ Workplace," dated November 10, 2008. The policy and chart are made available to every TDCJ warden, including Warden Herrera.

~~104.~~103.  Like the NWS chart, TDCJ's version recognizes that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90 degrees (a typical occurrence inside the Pack Unit during the summer), according to TDCJ, "heat exhaustion" becomes "possible." Above 105 degrees, "heat stroke" becomes "possible." Above 130 degrees, heat stroke is "imminent."

~~105.~~104.  Importantly, the NWS and TDCJ charts are designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. These charts predict the risk to "healthy" people (like Plaintiff Santee), not people who have an increased risk of heat-related illness or injury due to medical conditions, medications or age.

106.105.    Both the NWS and TDCJ charts show that prisoners living in the Pack Unit are exposed to indoor heat indexes that put inmates at risk of heat exhaustion, and heat cramps virtually every day of the summer.

107.106.    Though TDCJ's policies recognize that escalating extreme temperatures put prisoners at increased danger, TDCJ's policies do nothing to provide additional protections to inmates in the extremely hot housing areas as apparent temperatures go up.

108.107.    In fact, TDCJ has no formal, written policy to protect prisoners from extreme temperatures in the indoor inmate housing areas.

109.108.    TDCJ has no policy to lower indoor temperatures in inmate housing areas.

110.109.    No mitigation measures short of climate control or a policy to re-locate inmates to cooler housing areas can adequately protect people from these extreme temperatures. So long as housing areas are dangerously hot, prisoners will inevitably suffer heat-related illnesses and injuries, and be placed at increased risk of death.

111.110.    Indeed, TDCJ's primary mitigation measure – water intake – creates a new hazard at the Pack Unit. The Environmental Protection Agency has found the arsenic and fecal coliform[3] levels in the water at the Pack Unit are more than twice the recommended level under federal law and regulations. The doctor treating inmates at the Pack Unit testified arsenic in drinking water can cause bladder cancer, skin cancer, and harm the nervous system.

112.111.    Dr. Charles Adams, M.D., the medical director supervising medical care provided at multiple TDCJ prisons, stated what should be obvious to anyone: "they need cooling."

---

[3] Fecal coliform is a bacterial contaminate found in feces, and typically enters the water supply through agricultural run-off created by manure.

~~113.~~112.	TDCJ ignored this observation, and still has not provided any "cooling" at the Pack Unit.

**F.	Inmates and Officers at the Pack Unit Routinely Suffer Heat-Related Injuries During the Summer**

114.	Every summer, inmates at the Pack Unit suffer heat-related injuries.

115.	Internal emails from July 2012 state that, at the Pack Unit, "the trend has been noted that the [inmates suffering from heat-related illness] are primarily in housing" – as opposed to prisoners working outside.

116.	TDCJ's medical provider has admitted being "particularly concerned" about the conditions at the Pack Unit. In a four-day period in 2012, twelve prisoners were seen in the prison's infirmary for heat-related illnesses. Seven of these prisoners were taking medications that placed them at increased risk of heat-related illnesses.

117.	Upon information and belief, three of the prisoners treated for heat-related illness in June 2012 at the Pack Unit were *not* taking any medication that put them at increased risk, and did *not* have any medical condition that put them at increased risk of heat-related illness. Despite the absence of any additional heat-related risk factors, these prisoners were still injured by the high apparent temperatures.

118.	Each summer, inmates at the Pack Unit are treated by medical staff for heat-related illnesses and injuries caused by the hot indoor apparent temperatures.

119.	Upon information and belief, it is likely that many additional prisoners are not reporting their heat-related illnesses.

120.	Because of the miserable conditions created by the heat, many prisoners simply languish during the summer. Many spend their summer days avoiding any exertion that could

bring on heat-related illness (including walking to the chow hall for meals), drinking arsenic-laced water, and spraying themselves with water to endure the incessant heat.

121.    Even prisoners without medical conditions that make them more vulnerable to the heat, like Santee, suffer intensely during the summer because of the high indoor apparent temperatures.

122.    Likewise, correctional officers who work in the inmate housing areas also routinely suffer in the heat. Officers routinely sweat through their uniforms, and have to towel sweat off their faces when leaving the inmate dormitories.

123.    In fact, during a recent summer a 57-year-old correctional officer at the Pack Unit was taken to the emergency room after becoming dizzy. She was diagnosed with heat exhaustion and dehydration.

124.    Thus, in a rare development, the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperature lawsuits brought against TDCJ.

125.    The correctional officer's union has made numerous public requests for the prison housing areas to be air conditioned, but TDCJ routinely ignores these requests for safe working conditions.

126.    Major newspapers, including the *New York Times*, *Houston Chronicle*, and *Austin American-Statesman*, have editorialized that TDCJ should end the practice of failing to air condition inmate housing areas.

127.    While TDCJ knows about and ignores the hazards to prisoners and correctional officers, TDCJ officials (including Brad Livingston) approved installing climate controlled hog barns to protect the welfare of TDCJ's agricultural products. TDCJ's detailed policies require

that pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs' "health," and "some form of cooling" is required above this "critical limit." High-ranking TDCJ officials even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke. TDCJ has no similar policies to protect humans.

128.     Even former TDCJ Institutional Division Director Rick Thaler acknowledged this is unacceptable, and that human prisoners deserve more protections than swine raised for slaughter.

**G.     Many Plaintiffs' Disabilities Put them at Increased Risk of Heat-Related Injury or Death.**

*A.     Cole Suffers from Heat-Related Disabilities and is at Increased Risk*

129.     Keith Cole suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he suffers from diabetes and hypertension. He also has a history of chronic cardiovascular disease, and has had two stents placed in his body.

130.     Cole's diabetes requires treatment with Glipizide. He takes a diuretic (hydrochlorothiazide), a beta blocker (Metoprolol), a calcium channel blocker (Amlodipine), an angiotensin receptor blocker (Losartan), and a statin (Atorvastatin), to control his hypertension and cardiovascular disease. He is also prescribed Nitrostat tablets to use "as needed" should he feel any chest pains.

131.    These disabilities and medications impair Cole's thermoregulatory system.

132.    Cole's diabetes causes his body to constantly fight to stay hydrated. He cannot pump enough blood to his skin to cool his body, and his ability to sweat is extremely limited.

133.    Cole has other major life activities that are impaired as well by his disabilities, and which become more severely limited by heat. He cannot stand, walk, lift, or otherwise exert himself physically without feeling chest pain and fatigue, especially during the summer when the indoor apparent temperatures are very high.

134.    Because of his diabetes, the heat will make Cole feel dizzy and he cannot walk or stand properly—on some days, he can have difficulty concentrating, thinking, or reading. His diabetes also interferes with the operation of several of his major bodily systems, including his circulatory system, endocrine system and digestive system.

135.    When his cardiovascular disease is uncontrolled, Cole suffers from difficulty breathing and chest pains in the high temperatures. His cardiovascular disease and hypertension impair his respiratory, circulatory, and cardiovascular systems.

136.    Cole has been treated for heat exhaustion at the Pack Unit. Officers have had to take Cole to the infirmary in a wheelchair because heat illness prevented him from walking there on his own to receive treatment during the heart of the summer.

137.    During previous summers, Cole has tried to spend extra time in the air-conditioned infirmary after receiving treatment for his disabilities. On at least one occasion, although nurses encouraged him to spend extra time in the infirmary, Warden Herrera ordered him out of the infirmary and to return to his blazing hot dormitory.

### B.    *Brannum Suffers from Heat-Related Disabilities and is at Increased Risk*

138.     Jackie Brannum suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension and diabetes, and is prescribed antidepressant and psychotropic drugs to treat schizoaffective disorder, a serious mental illness.

139.     Brannum takes Amlodipine (a calcium channel blocker), Lisinopril (an ACE inhibitor), Pravastatin (a statin), and Propranolol (a beta blocker) to treat his hypertension and coronary artery disease.

140.     Brannum is an insulin-dependent diabetic, and receives insulin injections twice a day to control his blood sugar levels.

141.     Brannum suffers from chronic back pain, and takes Carbamazepine and Nortriptyline to treat his pain. (Nortriptyline is an antidepressant that also has pain-relieving properties.) He uses a walker to assist with mobility.

142.     To control his schizoaffective disorder, Brannum takes Prozac (an antidepressant), and Risperidone (a psychotropic drug). When he is not taking his psychiatric medications, Brannum hears voices, and has thoughts of hurting himself. In the summer, his psychiatric medications make him feel dizzy and lightheaded because of the heat.

143.     These disabilities impair Brannum's thermoregulatory system. Heat aggravates hypertension, and has caused Brannum to experience extreme fatigue and dizziness in the past during the summer. He often feels fatigue and nausea over the summers, and he has become lightheaded many times. Brannum has also felt his heart race and had difficulty breathing when he has to move in the heat.

144.     On more than one occasion during the summer, Brannum has told medical providers at the Pack Unit he fell due to dizziness.

145.     Brannum has been treated in the infirmary at the Pack Unit during the summer for symptoms like severe dizziness. In September 2014, for example, Brannum had to be taken to the infirmary in a wheelchair when he "over did it" while "cleaning his dorm." A physician at the Pack Unit stopped his prescription for a diuretic medication used to treat his hypertension because it caused him to become dizzy during the summer.

146.     In May 2015, Brannum was taken to the infirmary in a wheelchair after experiencing dizziness and shortness of breath.

147.     Brannum has also experienced blurred vision and "excessive sweating" during the summer, requiring treatment in the infirmary.

148.     On several occasions, Brannum has experienced severe headaches during the summer months, and been treated in the infirmary.

149.     Though Brannum tries to stay hydrated by drinking extra water during the summer, he has required treatment in the infirmary due to dehydration. In May 2014, he became painfully constipated and suffered from serious dizziness because he could not stay hydrated in the extreme indoor temperatures at the Pack Unit.

150.     During the summer, Brannum has great difficulty sleeping due to the heat and his disabilities. The headaches caused by the heat and his disabilities cause him to have problems concentrating and thinking. Though he used to perform forced labor in the prison's kitchen, due to his heat-sensitive disabilities, he is no longer allowed to work in the prison.

C.     *King Suffers from Heat-Related Disabilities and is at Increased Risk*

151.     Richard King suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. King has hypertension, obesity, and diabetes.

152.    King takes hydrochlorothiazide (a diuretic), Atenolol (a beta blocker), Lisinopril (an ACE inhibitor), and Terozsin to treat his hypertension. He receives insulin injections twice a day and takes Metformin to control his diabetes.

153.    King's conditions impair his ability to regulate his body temperature, which, in turn, interferes with his basic, everyday activities. The heat makes it difficult for King to sleep; specifically, he gets so hot at night that his mattress always seems soaked through with sweat. Compounding the strain from sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted. King feels so exhausted in the heat that he is unable to perform simple tasks like standing or walking for long periods of time. The short walk to the chow hall becomes so unbearable he will skip meals.

154.    The heat will make King feel dizzy. He has difficulty walking during the summer, and feels like he will lose his coordination and fall over.

155.    King also feels he is unable to perform basic tasks during the summer due to exhaustion from the heat and discomfort from excessive sweating. In fact, TDCJ's medical provider has determined that King cannot perform forced labor at the prison due to his medical conditions. Yet he gets no protection from the indoor heat or humidity.

   D.    *Wallace Suffers from Heat-Related Disabilities and is at Increased Risk*

156.    Fred Wallace suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension, obesity, and major depression.

157.    Wallace takes an antidepressant (Prozac) to treat his major depression, an antihistamine (Diphenhydramine), and several medications to treat his hypertension (Gemfibrozil, Lisinopril (an ACE inhibitor), and Terazosin (an alpha blocker)).

158.     These disabilities and medications impair the function of Wallace's thermoregulatory system. TDCJ's medical provider determined Wallace cannot perform forced labor in "extreme temperatures" or "direct sunlight" due to his disabilities and/or prescriptions.

159.     Likewise, Wallace's depression prevents him from engaging in multiple major life activities. Before he went to prison (and began taking Prozac), he would not leave his house or go to work when he was depressed. His depression prevents him from sleeping, causes him to have "low energy," and suffer from thoughts like "I'd be better off dead." Thus, his depression impaired his major life activities or working, thinking, concentrating, and caring for himself.

160.     His obesity and hypertension also interfere with major life activities. Wallace cannot climb into a top bunk due to his obesity, and TDCJ has been instructed by doctors to only assign him a lower bunk. He has been seen in TDCJ's sleep clinic for chronic insomnia related to his obesity and depression.

161.     During previous summers, Wallace has been taken to the infirmary in a wheelchair when suffering from dizziness and dehydration.

E.     *Yates Suffers from Heat-Related Disabilities and is at Increased Risk*

162.     Marvin Yates suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension, chronic obstructive pulmonary disease (COPD), coronary artery disease, asthma, diabetes, arthritis, and is a cancer survivor. His body mass index is also over thirty, making him medically obese.

163.     Yates takes a calcium channel blocker (Amlodipine), a blood thinner (Clopidogrel), an ACE inhibitor (Enalapril), a diuretic (Furosemide), a statin (Pravastain), and a beta blocker (Metoprolol) to treat his hypertension. His COPD requires treatment with albuterol, a steroid inhaler, and a nebulizer treatment for infections.  His coronary artery disease requires

treatment with a beta blocker, pravastatin, Plavix, and stents in his heart. Finally, his asthma requires treatment with medications including albuterol and a nebulizer for severe attacks, and antihistamines to control his allergies (which exacerbate his asthma).

164. These disabilities and medications impair Yates's thermoregulatory system. He cannot sweat normally to cool himself down, and the blood flow to his skin is limited. It is also difficult for Yates to perform any manual task. He cannot lift objects, perform work, walk, or even stand for an extended period of time. Yates's blood sugar regulation is impaired by his diabetes. He needs to carry candy with him at all times to treat himself when his blood sugar level drops, and his diabetes ultimately impairs his ability to stay hydrated. His breathing is impaired: he becomes short of breath after walking short distances, like from his dormitory to the chow hall. He avoids outdoor recreation because his arthritis makes it too painful to undress and dress as fast as the guards require for the "shakedown" before he can go outside. Yates's medications also impair his ability to think and concentrate, because they cause him to get nervous very easily. Anxiety, exhaustion, or sometimes lying down to sleep cause his bronchial tubes to constrict, making it hard to breathe. Yates's breathing problems generally make it more difficult to get food, recreate, and sleep at the prison—and they are worsened by hot temperatures.

165. These impairments are aggravated in the summer due to high indoor apparent temperatures at the Pack Unit. During previous summers at the Pack Unit, he has experienced several symptoms of heat-related illnesses, including dizziness, painful muscle cramps, fatigue, blurred vision, and headaches. He has trouble sleeping in the extreme heat because he cannot catch his breath.

*F.      Other Prisoners at the Pack Unit are at Increased Risk of Heat-Related Injuries*

166.    Cole, Wallace, Brannum, King, and Yates's medical conditions are typical of other inmates at the Pack Unit. Like these Plaintiffs, many other prisoners at the Pack Unit suffer from physiological conditions that place them at increased risk of heat-related illness, injury, or death. Like these Plaintiffs, many other prisoners at the Pack Unit are prescribed anticonvulsants, anticholinergics, antipsychotics, antihistamines, antidepressants, beta blockers, and diuretics. And, like King and Yates, many other prisoners at the Pack Unit are over age 65.

167.    Because TDCJ classifies the Pack Unit as a "Chronic Care I" facility, the Unit houses a disproportionate number of prisoners with chronic health needs.  There are more than 700 prisoners housed there who suffer from physiological conditions or take medications that increase their risk of heat-related illness.

168.    Plaintiffs take their medications because the prescriptions are necessary to protect their health from their disabilities.

*G.      Cole, Wallace, Brannum, King, Yates, and Many Others at Pack Suffer from Qualifying Heat-Related Disabilities*

169.    There are hundreds of otherwise-qualified prisoners with heat-sensitive disabilities housed at the Pack Unit, including the following:

*i.      Hypertension*

170.    Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.

171.     Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

172.     As a consequence, TDCJ policy recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

173.     Hypertension can substantially limit a patient's ability to walk, stand, and breathe, and limit the operation of his respiratory, circulatory, and cardiovascular systems, especially when the patient is exposed to extreme temperatures.

174.     Hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature. Thus, a patient with hypertension will be at additional risk of heat-related injuries, and suffer additional pain and punishment above and beyond what an able-bodied inmate at the Pack Unit experiences.

175.     The doctor who cares for all prisoners at the Pack Unit has testified that hypertension increases the risk of heat-related illness.

176.     TDCJ is aware that hypertension increases patients' risk of heat-related illness.

177.     Approximately 728 prisoners at the Pack Unit suffer from hypertension.

     *ii.     Asthma*

178.     Asthma is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest

tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the respiratory system.

179.    Heat and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

180.    TDCJ's medical provider recognizes that asthma is a condition that places patients at increased risk of heat-related illnesses.  The doctor who cares for all prisoners at the Pack Unit has testified that asthma increases the risk of heat-related illness.

181.    TDCJ is aware that asthma places patients at increased risk of heat-related illness.

182.    Approximately 113 prisoners at the Pack Unit suffer from asthma.

        iii.    *Diabetes*

183.    Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

184.    Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

185.    Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

186.    The doctor who cares for all prisoners at the Pack Unit has testified that diabetes increases the risk of heat-related illness.

187.     TDCJ is aware that diabetes increases the risk of heat-related illness.

188.     Approximately 212 prisoners at the Pack Unit suffer from diabetes.

　　　　*iv.*     *Chronic Obstructive Pulmonary Disease (COPD)*

189.     COPD is a disease that makes it difficult to breathe. It includes chronic bronchitis and emphysema.

190.     COPD causes frequent coughing, shortness of breath, and tightness in the chest, among other symptoms.

191.     COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

192.     Heat exacerbates COPD, because the body needs to breathe in additional oxygen to help cope with the heat. This requires additional breathing, which is impaired by COPD.

193.     The doctor who cares for all prisoners at the Pack Unit has testified that COPD increases the risk of heat-related illness.

194.     TDCJ is aware that COPD increases the risk of heat-related illness.

195.     Approximately 84 prisoners at the Pack Unit suffer from COPD.

　　　　*v.*     *Schizoaffective Disorder*

196.     Schizoaffective disorder is a chronic mental illness in which a person suffers from both symptoms of schizophrenia and a mood disorder (such as major depression or bipolar disorder). Symptoms include paranoia, delusions, hallucinations, severe depression, mania, and thoughts of suicide.

197.     Schizoaffective disorder requires treatment with psychotropic drugs.

198.     Schizoaffective disorder impairs the operation of the brain.

199. Schizoaffective disorder limits patients ability to think, concentrate, work, care for themselves, see, hear, and sleep.

200. According to TDCJ's medical policies, psychotropic drugs increase a patient's vulnerability to heat-related medical conditions, like heat exhaustion, and heat stroke.

201. TDCJ is aware that schizoaffective disorder (and the medications used to treat it) increase the risk of heat-related illness.

202. Approximately 66 prisoners at the Pack Unit take some type of psychotropic drug.

   *vi.*    *Major Depression*

203. Major depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, and problems concentrating.

204. Depression is a physiological condition affecting body systems, including the brain.

205. The doctor treating patients at the Pack Unit testified patients with depression may experience difficulty caring for themselves. TDCJ does not dispute this.

206. TDCJ's medical provider identifies antidepressant medications, like Prozac, as putting patients at much higher risk of heat-related illness. In fact, when a patient is prescribed an antidepressant, the physician informs the patient that these medications "can affect the manner in which the body relates to excessive heat especially in the summer." The patient is told to "contact nursing/security if they [feel] dizzy, confused, or over heated" so their vital signs can be checked. The patient is warned "excessive heat can cause life threatening conditions" and told to "drink plenty of water when the heat is extreme." Despite this explicit warning, TDCJ does

nothing to protect inmates taking such medications from the extreme temperatures inside the housing areas.

207.    TDCJ is aware that depression (and the medications used to treat it) increase the risk of heat-related illness.

*I.    Though Plaintiff Santee Does Not Suffer from Heat-Related Disabilities, He Still Experiences Symptoms of Heat-Related Illness Each Summer*

208.    Lavar Santee has not been diagnosed with any medical conditions that make him sensitive to the heat. He also does not take any "heat-sensitive" medications.

209.    Nevertheless, Santee suffers from the heat inside his dorm during summers at the Pack Unit. He reports sweating excessively during most summers, even at rest. He also reports feeling exhausted far more easily, and difficulty sleeping, during the summer.

210.    Santee has suffered from painful heat cramps while incarcerated at the Pack Unit.

211.    Thus, even prisoners without heat-sensitive medical conditions suffer at the Pack Unit due to the high indoor apparent temperatures and cruel conditions.

## CLASS ACTION

212.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

213.    Plaintiffs propose to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas. Each Plaintiff is typical of class members.

214.    Plaintiffs also seek to represent the following sub-classes of people who 1) are currently incarcerated at the Pack Unit (or will be in the future), 2) are subjected to TDCJ's

policy and practice of failing to regulate high apparent indoor temperatures in the housing areas, and either:

3a. **Heat-Sensitive Subclass:** (i) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction); or, (ii) are prescribed an anticonvulsant, anticholinergic, antipsychotics, antihistamines, antidepressants, beta blockers, or diuretic; or, (iii) are over age 65. Cole, Wallace, Brannum, King, and Yates are typical members of this subclass.

3b. **Disability Subclass:** suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability. Cole, Wallace, Brannum, King, and Yates are typical members of this subclass.

215. **Numerosity**: The joinder of each class member would be impracticable because each class is so numerous. The approximate number of class members exceeds 1,400 as the Pack Unit houses over 1,400 inmates and many other inmates could potentially be housed at the Pack Unit during some point during this litigation, or in the future. Joining all members of the class is impracticable due to the minimum 1,400 person size and the fluctuating population of the Pack Unit.

216. The subclasses are also sufficiently numerous to satisfy Rule 23(a). Because the Pack Unit is a "Chronic Care I" facility, more than 700 inmates incarcerated there suffer from at least one medical condition or disability that would make them a class member. TDCJ itself identifies over 400 inmates who have "heat restrictions" on their forced labor assignments due to their vulnerability to "extreme temperatures," though this number is under-inclusive. Likewise, upon information and belief, TDCJ houses a high number of inmates with qualifying disabilities at the Pack Unit.

217. Approximately 200 prisoners over age 65 live at the Pack Unit. Joining all 200 prisoners over age 65 would be impracticable.

218. Identifying every inmate at the Pack Unit who is a subclass member would require interviewing hundreds of prisoners, and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

219. **Commonality**: Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.

A. The common questions of law and fact for the proposed **General Class** are:

1) Are all prisoners at the Pack Unit exposed to high apparent temperatures inside the inmate housing areas?

2) Does exposing prisoners to the high apparent temperatures in the housing areas at the Pack Unit violate the Eighth Amendment, by denying prisoners safe housing and shelter from the elements?

3) Are the members of the General Class entitled to declaratory and injunctive relief?

B. Further, the common questions of law and fact for the subclasses are:

1) For the **Heat-Sensitive Subclass**:

 a) Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high apparent temperatures in housing areas of the Pack Unit?

 b) Does exposing members of the Heat-Sensitive Subclass to the high apparent temperatures in the housing areas at the Pack Unit violate their Eighth Amendment rights to safe housing conditions and shelter from the elements?

 c) Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

2) For the **Disability Subclass**:

 a) Do the members of the Disability Subclass a) suffer from a disability that substantially limits one or more of their major life activities and b) *either* suffer from a disability that increases the risk of heat-related illness, injury, or death *or* receive any medical treatment necessary to treat their disability that increases the risk of heat-related illness, injury or death?

 b) Does TDCJ provide reasonable accommodations to prisoners with heat-related disabilities exposed to high apparent temperatures in the housing areas at the Pack Unit?

 c) Is TDCJ immune from claims for injunctive and declaratory relief brought under the ADA and Rehabilitation Act?

 d) Are members of the Disability Subclass entitled to declaratory and injunctive relief?

220. **Typicality:** Plaintiffs' claims are typical and representative of each class and sub-class member's claims against Defendants, as identified above. The claims of Plaintiffs and the Class all arise from the same conduct by Defendants (exposing them to unsafe temperatures in the housing areas at the Pack Unit), are based not only on identical legal theories, and also seek identical remedies (injunctive and declaratory relief requiring Defendants to lower the temperatures at the Pack Unit to safe levels). The Pack Unit's housing areas all reach roughly the same temperature levels; the high indoor apparent temperatures threaten all inmates' wellbeing. Plaintiffs' interest in reducing the danger of heat-related illness, injury, or death is identical to every other inmate's interest. All members of the class are similarly injured by Defendants' wrongful conduct.

221. **Adequacy of Class Counsel:** Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests contrary to those of class members. Plaintiffs' counsel includes a non-profit law firm, the Texas Civil Rights Project (TCRP), whose mission is to protect the civil rights of low-income Texans. TCRP has prosecuted many class actions, or multi-plaintiff cases that obtained class-like injunctive and declaratory relief. Likewise, Plaintiffs' class counsel, Edwards Law, has litigated complex commercial and civil rights cases, including class actions against multinational corporations and governmental entities. Edwards Law has extensive experience in heat-related temperature litigation against TDCJ, as Plaintiffs' counsel represent the families of eight men who died of heat stroke in TDCJ prisons, and one other man who suffered a non-fatal heat stroke.

222. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class members is impracticable. Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating

this case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

223.    Plaintiffs do not seek damages, except as may be incidental to declaratory or injunctive relief.

## CAUSES OF ACTION

I.    EIGHTH AND FOURTEENTH AMENDMENT: CONDITIONS OF CONFINEMENT
        (Against Defendants Livingston and Herrera in their Official Capacities)

224.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

225.    Pursuant to 42 U.S.C. § 1983, Livingston and Herrera, in their official capacities, are deliberately indifferent to the substantial risk of serious harm to prisoners at the Pack Unit caused by their choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and wantonly cause the Plaintiffs pain.

226.    The high indoor apparent temperatures at the Pack Unit pose an unreasonable risk to prisoners' health.

227.    Defendants are aware that extreme heat in their facilities' housing areas poses substantial risk of serious injury to inmates, including Plaintiffs. Defendants' knowledge is demonstrated by TDCJ policies and practices, as well as the well-documented history of injuries to inmates and employees at the Pack Unit. Defendants remain indifferent to the risk, failing to take obvious steps to mitigate it.

228.    In light of the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy, knowledge of TDCJ's medical providers, and the history of inmate and staff injuries, Defendants know of the risk of heat-related illness, injury, or death that exists at the Pack Unit.

229. Defendants are acting with deliberate indifference to Plaintiffs' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect inmates from exposure to extreme heat, and which annually cause injuries to prisoners.

230. Defendants' deliberate indifference to Plaintiffs' risk of serious medical problems puts Plaintiffs at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

231. Defendants' policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendments, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

232. As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Plaintiffs and class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

## II.    THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT
### (Against Defendant TDCJ)

240. For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Plaintiffs Wallace, Brannum, King, Yates, and Cole, and other similarly situated prisoners, are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities.

241. TDCJ fails to reasonably accommodate prisoners with heat-sensitive disabilities. These disabilities (such as asthma, COPD, hypertension, obesity, diabetes, depression, and mental illnesses treated with psychotropic medications) place prisoners at increased risk of heat-related illness, injury, or death, and cause them to suffer more pain and punishment than able-bodied prisoners.

242.    TDCJ acknowledges in internal documents that people with certain disabilities (like diabetes, hypertension or cardiovascular disease), or who take certain medications to treat their disabilities (like psychotropics, antihistamines, antidepressants, or diuretics), are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death from heat.

243.    Plaintiffs Cole, Wallace, Brannum, Yates, and King, as well as other similarly situated prisoners, suffer from these heat-sensitive disabilities.

244.    TDCJ has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

245.    Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and has the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq*.

246.    Title II of the ADA and the ADA Amendments Act protects prisoners with disabilities because exposure to extreme temperatures also actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

247.    The Pack Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Plaintiffs Cole, Wallace, Brannum, King, and Yates, and similarly situated prisoners with disabilities, are presently qualified to participate in programs, activities and services in TDCJ facilities at the Pack Unit, such as incarceration in the inmate housing areas.

248. Defendants know that Brannum, Wallace, King, Yates, and Cole, and other similarly situated prisoners with disabilities, suffer from heat-sensitive disabilities, and were prescribed medications to treat their disabilities. Despite their knowledge, TDCJ's officers intentionally discriminated against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures.

249. As alleged above, TDCJ fails and refuses to reasonably accommodate Brannum, Wallace, King, Yates, and Cole, and other similarly-situated prisoners with disabilities, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.

250. As shown above, TDCJ failed, and refused, to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Brannum, Wallace, King, Yates, and Cole's disabilities, as well as similarly situated prisoners.

## INJUNCTIVE AND DECLARATORY RELIEF

251. Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983, the ADA, ADAAA, and Rehabilitation Act against Defendants, for themselves and the class, to require TDCJ to provide safe housing conditions at the Pack Unit.

252. Without permanent injunctive relief, Defendants will continue their same perilous practices and conduct, disregarding federal legal mandates, and endangering the lives and the welfare of current and future prisoners at the Pack Unit, causing every prisoner to suffer each summer.

253. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein.

254. Plaintiffs ask that the Court enjoin Defendants to maintain a safe indoor apparent temperature (e.g. maintaining a heat index of 88 degrees or lower) inside each of the Pack Unit's

housing areas (calculated using the NWS heat index table), or enter other injunctive relief sufficient to protect the health and safety of the prisoners at the Pack Unit.

255.    Plaintiffs request an order declaring the conditions under which they are housed are unconstitutional.

256.    Plaintiffs Cole, Yates, King, and Brannum request an order declaring TDCJ violates the Americans with Disabilities Act and Rehabilitation Act by failing to reasonably accommodate inmates with disabilities.

257.    Plaintiffs and members of the class are entitled to injunctive and declaratory relief to end this unlawful discrimination.

258.    Plaintiffs do not seek damages.

## ATTORNEYS' FEES

259.    Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205 Plaintiffs are entitled to recover attorneys' fees, litigation expenses, and court costs, including expert costs.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

A.  Certify this action as a class action, as described above;

B.  Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this First Amended Complaint, on behalf of the Plaintiffs, and the class;

C.  Permanently enjoin Defendants to abate the risk of serious harm described above by taking steps including, but not limited to, maintaining a heat index of 88 degrees or lower inside the Pack Unit's housing areas (calculated using the NWS heat index table);

D. Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses;

E. Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

Date: May 6, 2016

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
      Tel.   512-623-7727
      Fax.   512-623-7729

By    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
David James
State Bar No. 24092572
Federal ID No. 2496580

Michael Singley
State Bar No. 00794642
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Rd., Ste. O-3
Austin, Texas 78759
      Tel.   (512) 334-4302
      Fax.   (512) 727-3365

Jeremy Doyle
REYNOLDS FRIZZELL LLP
State Bar No. 24012553
Federal ID No. 24559
Nathan Smith
State Bar No.: 24053060
Federal ID No. 1075505
Andrew "Drew" Pennebaker
State Bar No.: 24083645
Federal ID No. 2621125

1100 Louisiana
Suite 3500
Houston, Texas 77002
    Tel.    (713) 485-7200
    Fax.    (713) 485-7250

Abigail Frank
State Bar No. 24069732
Southern District No. 1076613
Wayne Krause Yang
State Bar No. 24032644
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, TX 78751
    Tel.    (512) 474-5073
    Fax.    (512) 474-0726

Wallis Nader
State Bar No. 24092884
Southern District No. 2609150
wallis@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT—
HOUSTON
2006 Wheeler Ave
Houston, TX 77004
    Tel.    (832) 767-3650
    Fax.    (832) 554-9981

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case File System of the Southern District of Texas.

/s/ Jeff Edwards
JEFF EDWARDS