UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM, RICHARD KING, LAVAR SANTEE, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated, | § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 4:14-cv-1698 |
| | § | |
| v. | § | |
| | § | |
| BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § § § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move for a preliminary injunction, on behalf of themselves and the putative class members, to stop the Texas Department of Criminal Justice from exposing them to the combination of dangerously high temperatures "mitigated" primarily by water poisoned with arsenic.

TABLE OF CONTENTS ...................................................................................................II

TABLE OF AUTHORITIES ........................................................................................... III

I.   ISSUES TO BE RULED UPON BY THE COURT ........................................................... 1

II.  NATURE & STAGE OF THE PROCEEDING – THE PACK UNIT'S INDOOR
     TEMPERATURES ARE UNBEARABLY HOT, AND TDCJ'S HEAT MITIGATION PLAN
     RELIES ON POISONED WATER. ............................................................................... 2

     A.   The Heat Inside the Pack Unit is Dangerous. ........................................... 2

     B.   The Drinking Water at the Pack Unit is Poisonous. ................................ 7

III. STANDARD OF REVIEW ...................................................................................... 11

IV.  ARGUMENT AND AUTHORITIES – THE COURT SHOULD ORDER PRELIMINARY
     RELIEF TO PROTECT THE INMATES THIS SUMMER. .................................................. 12

     A.   Plaintiffs Will Likely Succeed on the Merits. ......................................... 13

          i.   Plaintiffs Will Prove Heat and Arsenic-Laden Water are Deliberately Indifferent
               to Inmates' Serious Medical Needs. ............................................................ 13

          ii.  Plaintiffs Will Prove Heat and Arsenic-Laden Water Violate Contemporary
               Standards of Decency ................................................................................. 16

     B.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief. ................. 18

     C.   Plaintiffs Meet the Other Requirements for Preliminary Injunctive Relief ... 23

          i.   The Cost of Injunctive Relief Does Not Justify Violating Plaintiffs' Constitutional
               Rights ..................................................................................................... 23

          ii.  Protecting Plaintiffs' Rights is in the Public Interest. ....................................... 25

          iii. As Indigent Prisoners Vindicating Constitutional and Civil Rights, Plaintiffs
               Need Not Post Bond. ................................................................................. 26

V.   CONCLUSION .................................................................................................... 26

**Cases**

*Amegy Bank Nat'l Assn. v. Monarch Flight II, LLC*,
    2011 WL 4948986 (S.D. Tex. Oct. 18, 2011).................................................... 19

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012)......................................................................... 25

*Canal Authority of State of Florida v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ........................................................................... 23

*Lyon v. Kohler Co.*,
    2006 WL 1712665 (S.D. Tex. June 21, 2006) .................................................. 15

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)........................................................................................... 1

*Clean-Up '84 v. Heinrich*,
    582 F. Supp. 125  (M.D. Fla. 1984).................................................................. 12

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*,
    569 F.2d 300 (5th Cir. 1978) ........................................................................... 26

*Gordon v. City of Houston, Texas*,
    2015 WL 138115 (S.D. Tex. January 9, 2015).................................................. 26

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989).......................................................................................... 14

*Farmer v. Brennan*,
    511 U.S. 825 (1994).............................................................................. 13, 14, 17

*Gates v. Cook*,
    376 F.3d 323 (5th Cir. 2004) ................................................................. 14, 18, 22

*Graham v. Florida*,
    560 U.S. 48 (2010)...................................................................................... 16, 17

*Hare v. City of Corinth*,
    74 F.3d 633 (5th Cir. 1996) (en banc) .............................................................. 14

*Helling v. McKinney*,
    509 U.S. 25 (1993)................................................................................. 14, 22, 23

*Henderson v. Stadler*,
    112 F.Supp.2d 589 (E.D. La. 2000).......................................................... 23, 25

*Hoover v. Morales,*
    164 F.3d 221 (5th Cir. 1998) ............................................................ 11

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ........................................................................... 16

*Howe v. Varity Corp.,*
    896 F.2d 1107 (8th Cir. 1990) .......................................................... 12

*Hudson v. McMillian,*
    503 U.S. 1 (1992) ............................................................................... 17

*Illinois League of Advocates for the Developmentally Disabled v. Illinois Dep't of Human*
    *Servs.*, 2013 WL 3287145 (N.D. Ill. June 28, 2013) ..................... 12, 13

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
    882 F.2d 797 (3d Cir. 1989) ............................................................. 26

*Jackson Women's Health Org. Ctr. v. Currier,*
    760 F.3d 448 (5th Cir. 2014) ....................................................... 11, 25

*Lakedreams v. Taylor,*
    932 F.2d 1103 (5th Cir. 1991) .......................................................... 13

*Ligon v. City of New York,*
    925 F. Supp. 2d 478 (S.D.N.Y. 2013) ............................................. 12

*Meis v. Sanitas Serv. Corp.,*
    511 F.2d 655 (5th Cir. 1975) ............................................................ 13

*Moore v. Woodford,*
    2008 WL 4561154 (N.D. Cal. Sept. 30, 2008) ................................ 14

*Robinson v. Page,*
    170 F.3d 747 (7th Cir. 1999 .............................................................. 14

*Roper v. Simmons,*
    543 U.S. 551 (2005) ........................................................................... 17

*Rufo v. Inmates of Suffolk Co. Jail,*
    502 U.S. 367 (1992) ........................................................................... 23

*Texas v. United States,*
    86 F. Supp.3d 591 (Feb. 16, 2015) ................................................... 13

*Thomas v. Johnston,*
    557 F. Supp. 879 (W.D. Tex. 1983) ............................................. 12, 13

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ....................................................... 13

*Walker v. Hickenlooper*,
    627 Fed. Appx. 710 (10th Cir. Oct. 8, 2015) ...................... 14

*Wilkerson v. Utah*,
    99 U.S. 130 (1879) ......................................................... 17

*Wilkins v. Gaddy*,
    559 U.S. 34 (2010) ......................................................... 17

*Wilson v. Seiter*,
    501 U.S. 294 (1991) .................................................. 15, 18

**Statutes**

18 U.S.C. § 3626 ................................................................. 25

**Treatises**

3 NEWBERG ON CLASS ACTIONS § 9:45 (4th ed.2002) ...................... 12

WRIGHT & MILLER, 11A FED. PRAC. & PROC. CIV. 3d § 2947 ....................................... 11

## I.    ISSUES TO BE RULED UPON BY THE COURT

Two mutually re-enforcing conditions make the Pack Unit unconstitutionally dangerous: 1) extremely hot indoor temperatures, and 2) drinking water with between 200% and 450% the maximum arsenic levels mandated by the Environmental Protection Agency. Though Plaintiffs contend that no amount of even pristine drinking water makes the high indoor temperatures at the Pack Unit constitutionally permissible, a solution that creates a new constitutional problem is "not a remedy," as it is a solution which our "national policy forbids." *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 519-20 (1989) (Kennedy, J., concurring) (race segregation context).

Because TDCJ admits the temperatures inside the Pack Unit "can create a risk of harm," but relies on arsenic-laden drinking water as its "number one remedial measure," the Court should grant preliminary injunctive relief to protect Plaintiffs and the putative class members from further danger. Without preliminary injunctive relief, Plaintiffs and the putative class members will spend another hot Texas summer baking in the heat and relying on poisoned drinking water to protect their health.

Therefore, Plaintiffs respectfully request the following:

(1) In light of the ongoing health and safety risk to the putative class members, the Court should schedule a hearing on this motion as soon as practicable;

(2) The Court should find that TDCJ's heat-mitigation plan at the Pack Unit is eliberately indifferent to ongoing constitutional violations which causing irreparable harm to Plaintiffs and members of the putative class; and,

(3) The Court should order immediate relief to protect the health and safety of the men at the Pack Unit during the summer of 2016.

## II. NATURE & STAGE OF THE PROCEEDING – THE PACK UNIT'S INDOOR TEMPERATURES ARE UNBEARABLY HOT, AND TDCJ'S HEAT MITIGATION PLAN RELIES ON POISONED WATER.

### A. The Heat Inside the Pack Unit is Dangerous.

It is undisputed that the housing areas inside the TDCJ Pack Unit, a geriatric prison, are not air conditioned. *See* Doc. 326, TDCJ's Motion for Summary Judgment, pp. 12, 13. As a result, during the summer, apparent temperatures, or the "heat index,"[1] are consistently hotter than 90° F inside the Pack Unit, meeting the threshold for "Heat exhaustion possible" in the Defendants' own policy.[2] Defendants' official heat stress policy incorporates a graded warning system, similar to the National Weather Service,[3] and their training materials state that people exposed to these apparent temperatures become at risk of heat stroke at 91° F – and face "an imminent danger" at 95° F.[4] The Pack Unit's Risk Manager testified TDCJ officers are trained that people "can begin to

---

[1] As explained in Prof. Thomas Sager's, Dr. Susi Vassallo's, Dr. Michael McGeehin's, and Dr. Linda Mearns' reports, the heat index is a measure of how hot the air "feels" – and is the metric that both the Defendants and the National Weather Service use in their heat precaution guidelines. Ex. 1, Prof. Sager's Expert Report, Appx. 3-4 § 7; Ex. 2, Dr. Vassallo's Expert Report, Appx. 26 ¶ 21; Ex. 3, Dr. McGeehin's Amended Expert Report, Appx. 55 ¶ 34; Ex. 4, Dr. Mearns' Amended Expert Report, Appx. 86; Ex. 5, *The Heat Index Equation*, National Weather Service, http://www.wpc.ncep.noaa.gov/html/heatindex_equation.shtml (last accessed Dec. 17, 2015), Appx. 117.

[2] The National Weather Service promulgates a heat index chart with similar warnings. Doc. 1, at 18; Ex. 6, National Weather Service Heat Index Chart (showing "Extreme caution" for heat index above 90° F), Appx. 120; *see also* Ex. 3, Dr. McGeehin's Expert Report, Appx. 55 ¶ 34 ("The CDC relies on this chart to assess the health risk of extreme heat and advise other governmental agencies about their responses to extreme heat.").

[3] *See* Ex. 7, Administrative Directive 10.64 rev. 7, "Extreme Temperature Conditions in the TDCJ" (2015), Appx. 133; Ex. 43, Correctional Managed Health Care D-27.2 "Heat Stress" (2015), Appx. 403-404; *see also* Ex. 6, National Weather Service Chart, Appx. 120.

[4] Ex. 8, TDCJ Risk Management, Hot Weather Training Circular (May 2013), Appx. 139.

feel the effects of heat exhaustion in temperatures as low as 80 degrees."[5] Likewise, TDCJ trains officers "risks for heatstroke begin at 90 degrees,"[6] and "at 95 degrees there can be an imminent danger of developing heatstroke."[7] Defendants' training concedes the heat "can pose serious health and safety issues."[8]

These temperatures exist constantly during summers inside the Pack Unit. In August – October 2014, TDCJ placed temperature and humidity monitors inside the Pack Unit's housing areas. This is the only time TDCJ has ever recorded temperatures and humidity indoors.[9] Prof. Thomas Sager's analysis of the monitor data includes graphs summarizing the temperature and humidity records created by Defendants over the 42-day monitoring period.[10] Using the NWS formula, Prof. Sager calculated the heat index, as summarized in the following graph.[11]

---

[5] Ex. 9, Deposition of Allison, Appx. 146:11-24. *Compare with* Ex. 6, National Weather Service Heat Index Chart, Appx. 120.

[6] Ex. 9, Deposition of Allison, Appx. 147:20-24.

[7] *Id.*, Appx. 147:25-148:8.

[8] Ex. 8, TDCJ Risk Management, Hot Weather Training Circular (May 2013), Appx. 136.

[9] Prior to this lawsuit, TDCJ was not taking accurate measures of indoor temperatures at the Pack Unit. *See* Ex. 9, Deposition of Allison, Appx. 150:22-151:13. And after the temperature monitors were removed in October 2014, TDCJ stopped taking temperature measurements indoors. *See id*, at Appx. 152:10-153:3.

[10] Ex. 1, Prof. Sager's Expert Report, Appx. 10-19.

[11] Ex. 10, Prof. Sager's Supplemental Report, Appx. 159, 165; *see also* Ex. 1, Prof. Sager's Expert Report, Figures 5-7, Appx. 12-13 (showing the same information with a blue line on three separate graphs, one for each Dorm).

**Table 1 – Heat Index Inside the Pack Unit (Actual Temperature/Humidity Monitor Data, 2014)**



The Defendants' recorded temperature and humidity show that the heat index routinely exceeded the 90° F threshold inside the Pack Unit during the 42 day period when the readings were taken, with indoor heat indexes reaching 105° F, and over 100° F even after October 1. In fact, the average inmate spent a total of more than 320 hours in 90° F or above during that one-and-a-half month period – more than 32% of their time.[12] And inmates spent more than 17% of their time in 95° F heat index or above.

Likewise, Prof. Sager extrapolated the apparent temperature indoors for the entire 2014 summer, as summarized in the following graphs (readings above the red line

---

[12] Ex. 1, Prof. Sager's Expert Report, Appx. 10-19; Ex. 10, Prof. Sager's Supplemental Report, Appx. 159-160.

illustrate the 90+° F "heat exhaustion possible" zone).[13]

**Table 2 – Heat Index Inside the Pack Unit (Backcast from Heat/Humidity Data, 2014)**



During this mid-June to late-August 2014 period, inmates spent more than 43% of their time enduring a heat index of 90° F or above while indoors—totaling more than 700

---

[13] Ex. 10, Prof. Sager's Supplemental Report, Appx. 162; *see also* Ex. 1, Prof. Sager's Expert Report, Figures 14-16, Appx. 16-17 (showing the same information as the red line on three separate graphs, one for each Dorm).

hours per inmate.[14] On 28 of these days, the heat index inside never went below 80° F –
where the Pack Unit's risk manager says heat exhaustion is possible – even late at night.
In the entire 71 day period, inmates had less than 14% of their time with heat index below
80° F. To summarize how heat index changed through the day and night inside the Pack
Unit during the 2014 summer, the following graph shows the median extrapolated heat
index.[15]



Thus, Defendants concede that "the heat in the Pack Unit housing area can create

[14] Ex. 1, Prof. Sager's Expert Report, Appx. 10-19; Ex. 10, Prof. Sager's Supplemental
Report, Appx. 162-163.

[15] Ex. 1, Prof. Sager's Expert Report, Appx. 10-19; Ex. 10, Prof. Sager's Supplemental
Report, Appx. 163-164. The "median" is simply the halfway point in a set of numbers. In
this context, for example, the median of 97° F at 3:00 PM for Dorm C means that – on at
least half of the days between June 17 and August 27 – the heat index was 97° F or above
in Dorm C at 3:00 in the afternoon. Ex. 1, Prof. Sager's Expert Report, Appx. 10-19; Ex.
10 Prof. Sager's Supplemental Report, Appx. 163, 167 (explaining the mathematical
mean and showing a Dorm C median of 97.404 for 3:00 PM).

a risk of harm to offenders who live there."[16]

### B. The Drinking Water at the Pack Unit is Poisonous.

To mitigate the heat, TDCJ encourages inmates to drink water. It is undisputed that drinking water is the single most important heat-mitigation measure TDCJ takes. *See, e.g.*, Doc. 326, Defendants' Summary Judgment Motion, p. 15 ("access to … water is the *number one remedial measure* that can be implemented during times of high temperature") (emphasis added).

For this reason, the Plaintiffs and other prisoners drink immense quantities of water during the summer. Ex. 11, Deposition of Brannum, Appx. 176:4-8 (drinks "about five gallons a day"); Ex. 12, Deposition of Cole, Appx. Appx. 186:3-14 (drinks "like [an] elephant" – "at least 10" bottles of water "every single day religiously"); Ex. 13, King Deposition, Appx. 194:5-8 ("probably at least a gallon"); Ex. 14, Deposition of Mojica, Appx. 201:12-17 (drinks "quite a bit," "at least two quarts" daily); Ex. 15, Deposition of Wallace, Appx. 208-209 (drinks "Six, eight cups" per day, discussing that medical instructed him to drink more); Ex. 16, Deposition of Wilson, Appx. 219:3-6 (drinks "at least" "a gallon and a half" daily); Ex. 17, Deposition of Yates, Appx. 226:3-16 (drinks "seven or eight" sixteen-ounce bottles of water daily).[17]

TDCJ unreservedly encourages this high water consumption. Since 2012, TDCJ

---

[16] *See* Doc. 326 at 30 ("No one within TDCJ disputes that, absent protective mitigation measures, the heat in the Pack Unit housing area can create a risk of harm to offenders who live there."); *see also* at 7 ("TDCJ recognizes the potential for danger that comes with housing offenders in an un-air-conditioned environment … .").

[17] Notably, when evaluating the safety of the Pack Unit's drinking water, TDCJ's expert relied on Centers for Disease Control surveys showing water consumption of only 3 liters per day (or 0.8 gallons), far less water than the Plaintiffs actually drink during the summer, and less than half of what TDCJ tells inmates to drink. Ex. 18, Deposition of Bojes, Appx. 274:4-8.

has posted notices in the inmate housing areas to "daily, drink 1 gallon of water" but when "extreme heat hits" "daily drink 2 gallons of water." Ex. 19, "Stay Hydrated" Poster, Appx. 292, 294;[18] *see also* Ex. 20, TDCJ Water Posters ("Survival Guide: Drink Water Often"; "Refresh, Rehydrate, Replenish" – "drink water even if you aren't thirsty every 15 minutes"; "WATER – prevent heat related illness"), Appx. 297-300. TDCJ's policy is summarized in a poster hung in all inmate housing areas: "When it's hot, drink a lot. When it's hotter, drink more water!" Ex. 21, TDCJ Drinking Water Poster, Appx. 302.

Other remedial measures – like cold showers – also rely on safe water. Ex. 11, Brannum Deposition, Appx. 175:3-15 (takes "cool down" shower "just about every afternoon"); Doc. 326, pp. 18-19 (describing increased access to showers during the summer).

But the drinking water at the Pack Unit is extremely unsafe – especially when consumed in such large quantities. The water is full of arsenic: a poison and known human carcinogen. *See*, *e.g.*, Ex. 18, Deposition of Dr. Heidi Bojes, Ph.D., Appx. 240:15-23; 282:11-13 ("long-term exposure to arsenic has been shown to cause lung, skin, liver, [and] kidney cancer. It's pretty clear"). It increases the risk of cardiovascular disease and diabetes, can damage lung and heart cells, can disrupt or burst blood vessels, cause nerve damage, and increase blood pressure. Ex. 18, Deposition of Bojes, Appx. 267:1-7; 281:15-21; 282:14-19; Ex. 22, Deposition of Dr. Fausto Avila, M.D., Appx. 306:17-20, 309:18-22, 310:8-10. Populations like the elderly – i.e. many of the inmates at the Pack Unit – are especially "sensitive" to high arsenic levels. Ex. 18, Deposition of Bojes, Appx. 268:3-14. The World Health Organization describes arsenic as "highly toxic," and

_____

[18] The poster tells inmates that a gallon of water is "16 cups." Ex. 19, Appx. 294.

one of ten "chemicals of major public concern."[19]

Drinking water at the Pack Unit has **arsenic levels between two and four-and-a-half times greater** than the EPA-mandated maximums. Ex. 18, Deposition of Bojes, Appx. 242:9-25.[20] The maximum amount of arsenic allowed in drinking water (the "maximum contaminate level," or MCL), according to the EPA, is 10 parts per billion. *See* 40 C.F.R. § 141.23(a)(4)(i); *see also* Ex. 18, Deposition of Bojes, Appx. 242:3-8. Arsenic exposure above these levels increases the risk of skin, lung, bladder, and kidney cancer. Ex. 18, Deposition of Bojes, Appx. 243:16-25.

According to TDCJ's own expert, "there is a risk of drinking this water that is more than the risk they … would have drinking just at the MCL." Ex. 18, Deposition of Bojes, Appx. 257:14-24. "[T]o not have that risk, you should not drink the water." Ex. 18, Deposition of Bojes, Appx. 258:19-21. "You shouldn't provide this water because it does cause an increase in risk." Ex. 18, Deposition of Bojes, Appx. 279:18-19. Defendants' own expert agreed that "members of the public [should] not drink water containing levels of arsenic between 10 parts per billion and 50 parts per billion" – the levels at the Pack Unit – "or us[e] such water for food preparation over the long term."

---

[19] WORLD HEALTH ORGANIZATION, FACT SHEET: ARSENIC (Dec. 2012) (available at http://www.who.int/mediacentre/factsheets/fs372/en/). *See also* Gustave Flaubert, MADAME BOVARY: PROVINCIAL MATTERS, 366-69 (1892, translated from the original French); *CSI: Crime Scene Investigation: House of Hoarders* (CBS Television Studios/Jerry Bruckheimer Productions Oct. 21, 2010).

[20] *See also* Ex. 23, TCEQ Drinking Water Watch, Water System Detail Information for TDCJ W. Pack Unit, Arsenic Sample Results, Appx. 317, *available at* http://dww2.tceq.texas.gov/DWW/JSP/NonTcrSampleResultsbyAnalyte.jsp?tinwsys_is_number=2080&tinwsys_st_code=TX&wsnumber=TX0930034%20%20%20&DWWState=TX&tsaanlyt_is_number=5&tsaanlyt_st_code=HQ&history=1&counter=0 (Retrieved May 21, 2016) (42 Arsenic readings from the Pack Unit since 2006, all but two of which exceed the maximum of 10 parts per billion. The average of the readings is more than twice that maximum. The highest reading is "0.045 MG/L," or 45 parts per billion.).

Ex. 18, Deposition of Bojes, Appx. 285:16-23.

TDCJ has known about these extraordinarily high levels of arsenic in the Pack Unit's water **since at least 2006**.[21] But TDCJ never thought to mention this danger to the **doctor** at the Pack Unit, Dr. Fausto Avila. Ex. 22, Deposition of Avila (vol. 1), Appx. 309:20-22, 310:20-311:18. It does not post the MCL Violation notices in the inmate housing areas, where all inmates could see them. And despite knowing about this obvious danger for over a decade, TDCJ has not fixed the problem.

Instead, TDCJ makes the intentional choice to abate the risk caused by the heat with the risk caused by poisoned water.

> Q:     That means the principal measure in which this Pack Unit prison is taking to deal with the extreme heat is to intentionally expose the inmates to elevated levels of arsenic, in violation of EPA standards, correct?
>
> A:     By providing water, ice water, and if it's from their groundwater … and they're drinking more of it, they would be exposed to more arsenic.
>
> Q:     And the more water they drink, the higher the risk of developing cancer, correct?
>
> A:     Correct.
>
> Q:     Do you know how the Pack Unit justifies having a practice that focuses on exposing upwards of 1,400 inmates intentionally to higher than permissible levels of a known carcinogen?
>
> A:     I don't know how to answer that.
>
> Q:     How on earth could you justify exposing inmates to a carcinogen intentionally at higher levels than EPA allows?

[21] Ex. 18, Deposition of Bojes, Appx. 245:8-19, 251:10-17; Ex. 23, TCEQ Drinking Water Watch, Appx. 317 (indicating the water was non-compliant in 2006); Ex. 24, Deposition of Herrera, Appx. 322:6-15; Ex. 25, TCEQ Letter to TDCJ (September 19, 2013), Appx. 329; Ex. 26,; Ex. 27, MCL Violation Notice, June 2013, Appx. 335; Ex. 28, MCL Violation Notice, 2015, Appx. 337; Ex. 29, TDCJ Letter to TCEQ (October 7, 2014), Appx. 329.

A:     [I]f I'm understanding it, you're asking me how – what their justification is?

Q:     Well, do you know their justification?

A:     I don't know their justification.

Q:     Can you think of any?

A:     I don't know. I don't know.

Ex. 18, Deposition of Bojes, Appx. 264:23-266:9 (objections by counsel omitted). TDCJ's own expert concedes, as a public health matter, "I don't think anyone should expose anybody to something that is harmful." Ex. 18, Deposition of Bojes, Appx. 278:16-18. TDCJ's former chief nursing officer agrees: "Q: Do you believe … that inmates at prison units should be drinking water with levels of arsenic that is two to three to four times the level the EPA recommends? A: I would say no." Ex. 55, Deposition of George Crippen, 290:17-18, Appx. 669.

### III.  STANDARD OF REVIEW

Courts should grant a preliminary injunction to a plaintiff who faces irreparable injury before the Court can enter judgment on the merits of his claim. WRIGHT & MILLER, 11A FED. PRAC. & PROC. CIV. 3d § 2947. To protect Plaintiffs from irreparable injury during pending litigation, the Court should enter a preliminary injunction upon finding a (1) substantial likelihood of the plaintiff's success on the merits, (2) a substantial likelihood that the plaintiff will suffer irreparable harm, (3) that the harm to the plaintiff outweighs the cost of the injunction, and (4) that the injunction "does not disserve the public interest." *Jackson Women's Health Org. Ctr. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)).

It is well-settled that a District Court may issue a preliminary injunction granting class-wide relief prior to certification of the class. *See, e.g., Howe v. Varity Corp.*, 896 F.2d 1107, 1112 (8th Cir. 1990); *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013); *Clean-Up '84 v. Heinrich*, 582 F. Supp. 125, 127 (M.D. Fla. 1984); *Thomas v. Johnston*, 557 F. Supp. 879, 917 fn. 29 (W.D. Tex. 1983). "The lack of formal class certification does not create an obstacle to class-wide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons." *Illinois League of Advocates for the Developmentally Disabled v. Illinois Dep't of Human Servs.*, 2013 WL 3287145 at *3 (N.D. Ill. June 28, 2013) (citing 3 NEWBERG ON CLASS ACTIONS § 9:45 (4th ed.2002)).

Procedurally, the court may grant such relief either by exercise of its general equity powers, or by the mechanism of conditional certification for the limited purpose of awarding preliminary injunctive relief:

> It appears to be settled, however, that a district court may, in its discretion, award appropriate class-wide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers.

*Thomas v. Johnston*, 557 F. Supp. 879, 917 fn. 29 (W.D. Tex. 1983) (citing 3 NEWBERG ON CLASS ACTIONS § 4100 (1977 & Supps.1980 & 1982)); *accord Ligon,* 925 F. Supp. 2d at 539; *Illinois League of Advocates for the Developmentally, Disabled*, 2013 WL 3287145, at *3. District Courts in civil rights cases have previously entered class-wide preliminary injunctive relief prior to the resolution of class certification. *Ligon,* 925 F. Supp. 2d at 539; *Illinois League of Advocates for the Developmentally Disabled,* 2013

WL 3287145 at *3; *see also Thomas v. Johnston*, 557 F. Supp. 917 fn. 29 (Medicaid reimbursement rates for class of disabled Plaintiffs).

The overarching question is whether the probability of ultimate success on the merits outweighs the consequences of court intervention at an early stage. *Texas v. United States*, 86 F. Supp.3d 591, 646 (Feb. 16, 2015) (quoting *Meis v. Sanitas Serv. Corp.,* 511 F.2d 655, 656 (5th Cir. 1975)).

Critically, a plaintiff is not required to demonstrate a *certainty* of success on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasizing that a plaintiff "is not required to prove his case in full at a preliminary injunction hearing"); *see also Texas v. United States*, 86 F. Supp.3d at 645 (holding that "the plaintiff 'need not prove his case'" to obtain preliminary injunctive relief) (quoting *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991)).

Here, given the magnitude of the danger, Plaintiffs are likely to ultimately succeed on the merits, and the ongoing risk to their health outweighs any cost of granting preliminary relief.

### A. Plaintiffs Will Likely Succeed on the Merits.

> *i. Plaintiffs Will Prove Heat and Arsenic-Laden Water are Deliberately Indifferent to Inmates' Serious Medical Needs.*

The Eighth Amendment prohibits punishments that are "cruel and unusual." While convicts can be punished, inhumane prison conditions are "simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks and citation omitted). The Eighth Amendment imposes an affirmative duty on all prison officials to "provide humane conditions of confinement" for the people they imprison. *Id*. at 832; *DeShaney v.*

*Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–200 (1989) (describing state's "affirmative duty to protect" inmates it chooses to incarcerate). "The State's exercise of its power to hold detainees and prisoners … brings with it a responsibility under the U.S. Constitution to tend to the essentials of their wellbeing." *Hare v. City of Corinth*, 74 F.3d 633, 638-39 (5th Cir. 1996) (en banc) *reversed on other grounds by* 135 F.3d 320 (5th Cir. 1998).

To demonstrate TDCJ violates their Eighth Amendment rights, the Plaintiffs must prove two distinct elements: 1) that exposure to the heat and water is objectively serious, and 2) that TDCJ is deliberately indifferent to that risk. *Farmer*, 511 U.S. at 834.

First, as described above, the heat and the water at the Pack Unit are objectively dangerous. In *Helling v. McKinney*, 509 U.S. 25, 33 (1993) the Supreme Court held injunctive relief was appropriate where inmates could demonstrate the existence of "an unsafe, life-threatening condition in their prison." *Helling* involved a similar environmental hazard – secondhand tobacco smoke.

Either extremely high indoor temperatures or toxic water standing alone objectively violate the Eighth Amendment. *See, e.g., Ball v. LeBlanc*, 792 F.3d 584, 595-96 (5th Cir. 2015) (extreme temperatures violate Eighth Amendment); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (same); *Walker v. Hickenlooper*, 627 Fed. Appx. 710, 714 (10th Cir. Oct. 8, 2015) (inmate states a claim of deliberate indifference when prison water supply contaminated with uranium); *Robinson v. Page*, 170 F.3d 747, 748 (7th Cir. 1999) (Posner, J.) (same, for high lead levels); *Moore v. Woodford*, 2008 WL 4561154, *3 (N.D. Cal. Sept. 30, 2008) (same, for high nitrate levels).

No doubt Defendants will protest that extreme heat (when mitigated with

measures like drinking water) or arsenic-contaminated water are not always objectively dangerous. But here, the two dangerous conditions – high temperatures and poisoned water – reinforce each other. *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) ("conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces a single, identifiable human need"). To mitigate the heat, inmates must ingest very high levels of arsenic – the poisoned water is TDCJ's undisputed "number one remedial measure." Combatting the risk of heat-illness thus increases the risk of arsenic poisoning. *See supra* pp. 7-11. Both conditions, especially when combined, place Plaintiffs at a substantial risk of harm. "Two wrongs not only do not make a right but also do not make each wrong a lesser one." *Lyon v. Kohler Co.*, 2006 WL 1712665, at *1 (S.D. Tex. June 21, 2006) (Ellison, J.).

Second, despite knowing about this combination of hazards for over a decade, TDCJ has not remedied them, and will expose prisoners to this combination of hazards during the summer of 2016. This is the definition of "deliberate indifference" – knowledge "of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "draw[ing] the inference." *Ball*, 792 F.3d at 594. When a risk is "obvious," "a factfinder may conclude that a prison official knew of a substantial risk." *Id*. Here, TDCJ's expert witness, retained to testify about the hazards of arsenic in the water, confirmed the obvious – arsenic 200% to 450% above EPA-mandated limits "does cause an increase in risk." Ex. 18, Deposition of Bojes, Appx. 279:18-19. To date, TDCJ's unsuccessful long-term attempts to fix the water problem – building a new filtration system, purchasing water from the City of Navasota, etc. – have *never* included

simple, short-term protections for inmates' health while pursuing the long-term solutions.[22] Not even during the summer while telling inmates to "drink more water." Though TDCJ contends it has long-term plans to eventually remove the arsenic from the drinking water, it has *no plan* to provide safe drinking water this summer to mitigate the extreme heat.[23]

> ii. *Plaintiffs Will Prove Heat and Arsenic-Laden Water Violate Contemporary Standards of Decency*

"The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 58 (2010) (Kennedy, J.) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). "Punishments

---

[22] For example, though bottled water is available for purchase in the prison's commissary, TDCJ has never provided free bottled water to prisoners – not even during the summer. *See* Ex. 30, TDCJ Commissary Items List. Appx. 343. TDCJ has never trucked in potable water – not even during the summer.

Instead, years ago, when Mr. Cole made several attempts to ask Dr. Avila about drinking arsenic – the remedy suggested in the TCEQ notices posted at the medical department – his requests were denied. *See, e.g.*, Ex. 47 (step 1 and step 2 grievance, with responses, about the medical staff's lack of response), Appx. 427-430; Ex. 48, (I-60 form asking whether he should drink only bottled water, with a response from the Senior Practice Manager instructing Cole to submit a sick call if he experiences symptoms), Appx. 433-433. *See also* Ex. MCL Violation Notice, Aug. 2012, Appx. 333 ("if you have health concerns, you may want to talk to your doctor").

[23] TDCJ has represented to the EPA that construction of an adequate filtration system could be completed by January 2017. TDCJ has made similar promises before. *See* Ex. 25, TCEQ Letter to TDCJ (September 19, 2013), Appx. 329 (rejecting TDCJ's experimental "coagulation/filtration" pilot project in 2013 because it did not sufficiently reduce arsenic levels, actually unacceptably increased iron contamination); Ex. 29, TDCJ Letter to TCEQ (October 7, 2014), Appx. 340 (requesting an extension until April 1, 2016). But, taking them at their word – though they have not been able to back up their talk before – bottled water for a single summer may be appropriate relief depending on the scope of the evaluation.

Though the Pack Unit has a facility-specific "Extreme Temperature Plan," it simply parrots the system-wide plan addressed above, and does not mention the arsenic in the water. *See* Ex. 31, Appx. 329.

of torture, for example, are forbidden." *Id*. (citing *Wilkerson v. Utah*, 99 U.S. 130 (1879)). "Prison conditions may be restrictive and even harsh," but still must comply with "evolving standards of decency." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (internal citations omitted).

Thus, an Eighth Amendment violation is not determined only by a substantial risk of serious harm, but also when prison conditions fail to provide a "minimal civilized measure of life's necessities." *Blackmon*, 484 Fed. Appx. 866, 869 (5th Cir. 2012) (citing *Farmer*, 511 U.S. at 834 (1994)). *See also*, *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (violations of "contemporary standards of decency" do not require some quantum of injury, because otherwise "the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury"). "[D]eprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also Blackmon*, 484 Fed. Appx. at 869 (high indoor temperatures in TDCJ prisons). A "sufficient national consensus" can "label a particular punishment cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 562 (2005).

Contemporary standards of decency prohibit the combination of high indoor temperatures and arsenic-laden water. The EPA clearly articulated a "national consensus" on permissible arsenic levels in drinking water – the MCL of 10 parts per billion. *See supra*, at p. 9. TDCJ provides Plaintiffs water with arsenic levels between twice and four-times the MCL. Likewise, the NWS – in its heat-stroke chart adopted by TDCJ – articulates a maximum safe apparent temperature: 90° F. *See supra*, n. 2 at p. 2. Above 90° F, heat-illness becomes "possible" (especially when one cannot safely drink large

amounts of water). Temperatures in the Plaintiffs' housing areas regularly exceed 90° F during the summer. *See supra* at pp. 2-6. *See also Gates v. Cook*, 376 F.3d 323, 340 (5th Cir. 2004) (affirming injunctive relief as "justified by an Eighth Amendment violation" when temperatures indoors exceed 90° F); *Blackmon v. Garza*, 484 Fed. Appx. 866, 870 (5th Cir. 2012); *Hinojosa v. Livingston*, 807 F.3d 657, 664 (5th Cir. Nov. 18, 2015); *Webb v. Livingston*, 618 Fed. Appx. 201, 207-208 (5th Cir. 2015); *Ball v. LeBlanc*, 792 F.3d 584, 596 (5th Cir. 2015).

Even if one of these conditions – heat or arsenic – did not violate contemporary standards of decency alone, they certainly do in combination when TDCJ relies on the unsafe water to combat the unsafe temperatures. *See, e.g.*, *Wilson*, 501 U.S. at 304-305 ("combination" of conditions can violation the constitution, even when isolated condition alone does not – such as "a low cell temperature at night combined with a failure to issue blankets").

### B. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

Each of the Plaintiffs routinely suffers in the summer temperatures inside the Pack Unit, and will continue to suffer until conditions improve.

- Fred Wallace, 72, feels a "throbbing, aching pain" in his head, gets "dizzy and want[s] to throw up," feels "terrible cramps" in his legs that are "excruciatingly painful," "sweat[s] so much that my shirt is soaked through," and has "to strip down to nothing but my boxers in order to sleep at night."[24]

- Richard King, 69, experiences the "heat drain[] [his] energy," making him "feel tired all the time." "I am constantly sweating during the summer months. The sweat pools in my eyes and stings. I often wake up in the middle of the night drenched in sweat, like when you would have a high fever." He "sweat[s] so much during the summer that [he] wake[s] up with standing water on [his] [plastic] mattress." He will "crawl down onto the

---

[24] Ex. 32, 2nd Declaration of Wallace, Appx. 354.

floor of my dormitory to sleep on the floor because it feels cooler lying there than on my bed."[25]

- Keith Cole, 62, reports the heat makes it "hard to breathe. I feel like I'm suffocating and can't catch my breath." His "heart rac[es] all the time." He feels "nauseated and disoriented," and will see "black flashes in front of my face and cannot concentrate enough to read the captions on the TV screen." He goes "hours and hours without being able to sleep" each night, and feels "drained and dizzy due to dehydration."[26]

- Marvin Yates, 71, also has difficulty breathing, making the heat "feel[] like being in a dust storm." He has "throbbing headaches, much more severe than normal" during the summer. The heat makes him feel "nauseated" and "give[s] [him] dizzy spells where [he] rock[s] back and forth, and feel[s] like the room is moving around [him]." He loses his appetite, and spends the summer "feeling exhausted and drowsy."[27]

- Jackie Brannum, 61, has migraines during the summer that "are much, much worse than other times of the year, and feel like the top of my head is going to blow off." "The heat makes me feel dizzy, like I will throw up." In summer 2014, he vomited due to the heat. "On the hot days … I feel lightheaded and lose my ability to focus and see. I often have trouble breathing, as if there is something really tight around my chest." He gets "terrible" "cramps on the back of [his] legs." "I sweat constantly and the sweat drips into my eyes and mouth."[28]

- Lavar Santee, 34, despite his good health, "sweat[s] constantly," feels "nauseous," and has "a hard time sleeping" and will wake up sweating in the middle of the night during the summers. He feels exhausted, even when not exerting himself, and experiences occasional "muscle spasms" due to the heat.[29]

"[A] harm is irreparable where there is no adequate remedy at law." *Amegy Bank*

*Nat'l Assn. v. Monarch Flight II, LLC*, 2011 WL 4948986, *5 (S.D. Tex. Oct. 18, 2011)

---

[25] Ex. 33, 2nd Declaration of King, Appx. 363.

[26] Ex. 34, 2nd Declaration of Cole, Appx. 367.

[27] Ex. 35, 2nd Declaration of Yates, Appx. 371.

[28] Ex. 36, 2nd Declaration of Brannum, Appx. 375.

[29] Ex. 37, Declaration of Santee, Appx. 382.

(Rosenthal, J.). These symptoms, without anything more, are constitutionally significant injuries justifying preliminary relief. *See Blackmon*, 484 Fed. Appx. at 872 (headaches, dizziness, nausea, lightheadedness, difficulty catching breath, and blurred vision, even without medical documentation of the symptoms, are sufficient injuries). Plaintiffs' suffering in these conditions has no adequate legal remedy.

But the heat not only causes these injuries to the Plaintiffs – it also puts them at significant risk of life-threatening medical conditions. Plaintiffs Cole, Brannum, King, Wallace, and Yates each suffer from chronic medical conditions TDCJ identifies as "heat sensitive." Mr. Cole is diabetic, and has hypertension.[30] Mr. Brannum suffers from depression, schizoaffective disorder, diabetes, and hypertension.[31] Mr. King is obese, a diabetic, and has hypertension.[32] Mr. Wallace is obese, and takes medications to treat his hypertension and depression.[33] Mr. Yates has hypertension, COPD, asthma, diabetes, and is also obese.[34] Plaintiffs' medical conditions are summarized in Dr. Susi Vassallo, M.D.'s report.[35]

TDCJ's written policies concede these conditions put these Plaintiffs – and

---

[30] Ex. 38, 1st Declaration of Cole, Appx. 382; Ex. 34, 2nd Declaration of Cole, Appx. 367; *see generally* Ex. 53, Cole Medical Records, Appx. 642.

[31] Ex. 39, 1st Declaration of Brannum, Appx. 385; Ex. 36, 2nd Declaration of Brannum, Appx. 375; *see generally* Ex. 49, Brannum Medical Records, Appx. 435-528.

[32] Ex. 40, 1st Declaration of King, Appx. 390; Ex. 50, King Medical Records, Appx. 530.

[33] Ex. 41, 1st Declaration of Wallace, Appx. 393-394 ¶¶ 5-7; Ex. 32, 2nd Declaration of Wallace, Appx. 360 ¶ 3; *see generally* Ex. 51, Wallace Medical Records, Appx. 539-637.

[34] Ex. 42, 1st Declaration of Yates, Appx. 396 ¶ 2; Ex. 52, Yates Medical Records, Appx. 639-640.

[35] Ex. 2, Dr. Vassallo's Expert Report, Appx. 37-44 (summarizing Plaintiffs' medical conditions).

hundreds of other putative class members – at increased risk of heat-related illness. TDCJ's formal written policy "Extreme Temperature Conditions in the TDCJ" policy emphasizes the danger to people generally.[36] Heat exhaustion symptoms include "[p]rofuse perspiration, weakness, rapid pulse, dizziness, and headaches," as well as "nausea, [or] vomiting" – the same symptoms the named Plaintiffs routinely experience during the summer.[37] Without treatment or mitigating measures – such as clean drinking water – these symptoms can progress to a life-threatening heat stroke (which TDCJ's policies recognize is a "medical emergency").

Likewise, the policies of TDCJ's medical provider, the Correctional Managed Health Care Committee (which contracts with the University of Texas Medical Branch to provide care at the Pack Unit), identifies the increased danger to people with Plaintiffs' medical conditions.[38] "Comorbidities that may affect heat tolerance" include:

1. Cardiovascular disease,
2. Chronic Obstructive Pulmonary Disease/Asthma,
3. Diabetes,
4. "Psychiatric Conditions," and
5. "Age > 65"

Plaintiffs suffer from these conditions, and Mr. King, Mr. Wallace, and Mr. Yates are each over 65 years old.

The policy also lists prescription drugs, and classes of drugs – many of which the Plaintiffs take – that are "associated with heat stress."[39] Many of the medicines "have specific warnings from the manufacturer to avoid excessive heat and dehydration." The

[36] Ex. 7, Administrative Directive 10.64 rev. 7 (2015), Appx. 127.

[37] Ex. 7, Administrative Directive 10.64 rev. 7 (2015), Appx. 127.

[38] Ex. 43, Correctional Managed Health Care D-27.2 "Heat Stress" (2015), Appx. 408.

[39] Ex. 43, Correctional Managed Health Care D-27.2 "Heat Stress" (2015), Appx. 405.

policy also specifically states that inmates "on antipsychotic drugs" – like Mr. Brannum – "should not be allowed to work or recreate in environments where the apparent air temperature is 95° F or higher" – which would include the housing areas on multiple summer days.[40]

But even if the Plaintiffs had never suffered a heat-related injury – though they have – exposure to the heat-risk itself is the irreparable injury requiring preliminary relief. As the Fifth Circuit explained in *Ball*:

> First, that no one at [the prison], including these plaintiffs, has ever had a heat-related incident and that these prisoner's medical records do not show signs of heat-related illness are insufficient. To prove unconstitutional prison conditions, **inmates need not show that death or serious injury has already occurred**. *See Helling,* 509 U.S. at 33, 113 S.Ct. at 2481 ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition."). **They need only show that there is a "substantial risk of serious harm."** *Gates,* 376 F.3d at 333. Further, Dr. Vassallo provided a reasonable explanation for the lack of past harm to these plaintiffs: "heat stroke is a failure of thermoregulation which is dramatic and catastrophic. It occurs suddenly.... People can suffer suddenly from heat stroke without ever having complained about the weather." As a result, the district court plausibly concluded that the Plaintiffs here are at a substantial risk of serious harm.

*Ball*, 792 F.3d at 593-4 (emphasis added). Dr. Vassallo offers the same testimony regarding risk, thermoregulation, and heat stroke here,[41] which supports the same finding of substantial risk of serious harm.

Likewise, Plaintiffs do not need to develop arsenic-related cancer to be entitled to protection from unsafe drinking water. As the Supreme Court noted in *Helling*, "a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

---

[40] *Id*.

[41] *See* Ex. 2, Expert Report of Dr. Susi Vassallo, Appx. 23-36.

Though it is far from certain the *Helling* inmates would develop lung cancer from inhaling secondhand smoke, they were still entitled to protection from the well-known danger.[42] *Ball* and *Helling* make it clear that Plaintiffs suffer irreparable harm from the substantial risk posed by the heat and arsenic-laden water even if they had never suffered any heat-related illness, or become stricken with cancer.

### C. Plaintiffs Meet the Other Requirements for Preliminary Injunctive Relief

#### i. The Cost of Injunctive Relief Does Not Justify Violating Plaintiffs' Constitutional Rights.

No matter what the cost of any preliminary injunctive relief may be, monetary cost cannot justify abridging constitutional rights. *See, e.g.*, *Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 396 (1992) ("the lack of resources can never excuse a failure to obey constitutional requirements"); *Henderson v. Stadler*, 112 F.Supp.2d 589, 602 (E.D. La. 2000) *overruled on other grounds* 287 F.3d 374 (5th Cir. 2002) (injury to constitutional rights outweighs monetary costs).

Preliminary relief, however, for the short term until this litigation is resolved, could include measures less burdensome than a final injunction might require. An injunction is an equitable remedy, subject to continuing modification by the district court. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 579 (5th Cir. 1974). Plaintiffs recognize the costs involved for some proposed relief – such as air conditioning the entire facility – may only be appropriate for Defendants to incur after a final

---

[42] Notably, while tobacco-company funded "studies" disputed the hazard of secondhand smoke for decades, there has long been a scientific consensus that arsenic is extremely hazardous. *See, e.g.*, Ex. 46, A. Vahidnia, et al., *Arsenic Neurotoxicity: A Review*, 26 HUMAN AND EXPERIMENTAL TOXICOLOGY 823 (2007) *available at* https://www.researchgate.net/profile/Frederik_De_Wolff/publication/5822288_Arsenic_n eurotoxicity_-_A_review/links/0c96053387d2c179b5000000.pdf/download?version=vrp, Appx. 416 ("Arsenic is one of the oldest poisons known to man").

judgment.[43] But there are inexpensive measures available that would reduce, without eliminating, the risk to Plaintiffs during the summer of 2016. TDCJ must be required to undertake these measures now.

For example, if heat mitigated by access to safe water alone satisfies the constitution (though it does not), the Court could order TDCJ provide arsenic-free water to inmates during the summer, on days the indoor apparent temperature exceeds 90° F, until the arsenic levels are abated.[44]

If the apparent temperatures inside the Pack Unit violate the constitution even with TDCJ's fully implemented mitigation measures, the Court could require TDCJ to provide every inmate an opportunity to rotate through an air-conditioned space for three hours per day – similar to the opportunity TDCJ gives inmates to eat in the dining hall. This true "respite time" would be low cost, and similar to protections governmental agencies encourage during heat waves in the "free world" – like going to a public library,

---

[43] TDCJ's Rule 30(b)(6) witness on training suggested another, even more drastic remedy.

> Q: If it is true that the arsenic level is not safe … would the training change in any way at the Pack Unit with regard to measures to protect inmates from heat?
>
> A: If the arsenic level in the water was unsafe, *this unit would be shut down*. We would not be here. I drink the same water the inmates do. I drink it every day.

Ex. 54, Deposition of Allison, 171:19-25 (emphasis added). Of course, Ms. Allison brings in bottled water each day, and only drinks the tap water during lunch in the officer's dining room. *See id*. at 172:3-15, Appx. 662.

[44] For example, TDCJ could provide, at no cost to the inmates, the bottled water it currently sells prisoners from the prison's commissary. Ex. 30, TDCJ Commissary Items List, Appx. 343; *see also* Ex. 44, Excerpt from Administrative Directive 03.72 rev. 5 Attachment A (listing food as a category of "authorized offender property"), Appx. 411. If excess empty bottles are a concern, inmates could be required to turn their empty bottle in before receiving a new, full bottle.

shopping mall, or movie theater during the afternoon.[45] And it would guarantee TDCJ is

actually allowing inmates time to visit the purported "respite areas."

Some injunctive relief will be required no matter what the scope of the violations

occurring at the Pack Unit are. For example, TDCJ does not routinely measure the

apparent temperature inside the housing areas. Determining *when* the conditions require

injunctive relief will alone require TDCJ to actually take daily measures of the heat and

humidity inside.

When preliminary relief is ordered, the Court should require TDCJ to submit

within seven days a proposed compliance plan to eliminate the constitutional violations

the Court finds. *See* 18 U.S.C. § 3626(a); *Henderson v. Thomas*, 2012 WL 6681773, *39

(M.D. Ala. Dec. 21, 2012); *Ball v. LeBlanc*, 988 F.Supp.2d 639, 690-91 (M.D. La. Dec.

19, 2013) *reversed on other grounds* 792 F.3d 584 (5th Cir. 2015).[46] Until the Court has

determined the extent of any constitutional violations, it is difficult for any party to

definitely suggest narrowly-tailored relief that complies with the Prison Litigation

Reform Act's limitations on equitable remedies. *Id*.

### ii. *Protecting Plaintiffs' Rights is in the Public Interest.*

"It is always in the public interest to prevent the violation of a party's

constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9

(5th Cir. 2014) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) and

upholding injunction). Therefore, awarding injunctive relief will not "disserve the public

---

[45] *See* Ex. 45, Centers for Disease Control and Prevention, *Tips for Preventing Heat-Related Illness*, June 1, 2012 (available at: http://emergency.cdc.gov/disasters/extremeheat/heattips.asp), Appx. 413.

[46] Though the Fifth Circuit reversed the injunction in *Ball* as overbroad, it did not address the procedure the district court chose for implementing the flawed injunction – requiring the prison to submit a compliance plan to the district court.

interest" because it actually serves the public good.

### iii. As Indigent Prisoners Vindicating Constitutional and Civil Rights, Plaintiffs Need Not Post Bond.

Rule 65(c) of the Federal Rules of Civil Procedure requires the party moving for a preliminary injunction to post security "in an amount the Court considers proper" before the injunction may issue. The amount of any bond "is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 302-303 (5th Cir. 1978) (cited approvingly in *Gordon v. City of Houston, Texas*, 2015 WL 138115, at *16 (S.D. Tex. January 9, 2015)); *see also Instant Air Freight Co. v. CF Air Freight, Inc.*, 882 F.2d 797, 804 n.8 (3d Cir. 1989) (in certain non-commercial and public interest cases, courts dispense with requiring a bond). Here, Plaintiffs are indigent. Thus, the Court should waive the bond requirement, or require only a nominal bond.

## V.    CONCLUSION

Because the Plaintiffs will suffer irreparable injury from the combination of high summer temperatures and arsenic-contaminated drinking water, the Court should enter a preliminary injunction to protect Plaintiffs and the putative class.

Dated: May 23, 2016.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
        Tel.    512-623-7727
        Fax.    512-623-7729

By ____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406

Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
David James
State Bar No. 24092572
Federal ID No. 2496580

Michael Singley
Texas Bar No. 00794642

THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Rd., Ste. O-3
Austin, Texas 78759
        Tel.    (512) 334-4302
        Fax.    (512) 727-3365

Jeremy Doyle
State Bar No. 24012553
Federal ID No. 24559
Nathan Smith
State Bar No.: 24053060
Federal ID No. 1075505
Andrew "Drew" Pennebaker
State Bar No.: 24083645
Federal ID No. 2621125

REYNOLDS FRIZZELL LLP
1100 Louisiana
Suite 3500
Houston, Texas 77002
        Tel.        (713) 485-7200
        Fax.        (713) 485-7250

Abigail Frank
Texas Bar No. 24069732
Southern District No. 1076613
Wayne Krause Yang
State Bar No. 24032644
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, TX 78751
        Tel.    (512) 474-5073
        Fax.    (512) 474-0726

Wallis Nader
Texas Bar No. 24092884
Southern District No. 2609150

TEXAS CIVIL RIGHTS PROJECT—
HOUSTON
2006 Wheeler Ave
Houston, TX 77004
    Tel.   (832) 767-3650
    Fax.   (832) 554-9981

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

By    /s/ Jeff Edwards
JEFF EDWARDS


<u>CERTIFICATE OF CONFERENCE</u>

By my signature below, I certify that counsel for Plaintiffs conferred about the relief requested with counsel for Defendants, including Cynthia Burton, in person. Defendants are opposed to the relief requested. The parties are available for an in-person conference with the Court on May 26, 2016 and May 27, 2016, such as during a break in the currently scheduled class-certification hearing on those days.

By    /s/ Jeff Edwards
JEFF EDWARDS