# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. : No. 4:14-cv-1698

BRAD LIVINGSTON, in his Official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
JACKIE L. BRANNUM
SEPTEMBER 16, 2015

****************************************

ORAL AND VIDEOTAPED DEPOSITION of JACKIE L. BRANNUM, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 16, 2015, from 2:13 p.m. to 3:51 p.m., before PHYLLIS WALTZ, RPR, CRR, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

A P P E A R A N C E S

COUNSEL FOR PLAINTIFFS:
Mr. Scott Medlock
THE SINGLEY LAW FIRM, P.L.L.C.
4131 Spicewood Springs Road, Suite O-3
Austin, Texas 78759
Tel: (512) 334-4302
Fax: (512) 727-3365
E-mail: mike@singleylawfirm.com

COUNSEL FOR DEFENDANTS:
Ms. Lori Erwin
Mr. Daniel C. Neuhoff
Ms. Ariel Wiley
ASSISTANT ATTORNEY
LAW ENFORCEMENT DEFENSE DIVISION GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel: (512) 463-2080
Fax: (512) 936-2109
E-mail: lori.erwin@texasattorneygeneral.gov
cynthia.burton@texasattorneygeneral.gov
daniel.neuhoff@texasattorneygeneral.gov
ariel.wiley@texasattorneygeneral.gov

VIDEOGRAPHER:
Mr. Kevin Schaefer, Attorney General's Office

ALSO PRESENT:
Warden Robert Herrera
Mr. Derek Kammerlocher

INDEX

PAGE
Appearances . . . . . . . . . . . . . . . . . . . . 2

JACKIE L. BRANNUM
Examination by Mr. Neuhoff . . . . . . . . . 4
Examination by Mr. Medlock . . . . . . . . . 73

Signature and changes . . . . . . . . . . . . . . 75
Reporter's Certificate . . . . . . . . . . . . . . 77

EXHIBITS

PAGE
BRANNUM EXHIBIT NO. 1 . . . . . . . . . . . . . . 7
Defendants' Amended Notice of Deposition of Jackie L. Brannum, four pages

BRANNUM EXHIBIT NO. 2 . . . . . . . . . . . . . . 8
Documents produced by Mr. Brannum, 60 pages

BRANNUM EXHIBIT NO. 3 . . . . . . . . . . . . . . 43
Health Summary for Mr. Brannum, BAILEY 53590

BRANNUM EXHIBIT NO. 4 . . . . . . . . . . . . . . 60
Declaration of Jackie Brannum, four pages

**take them?**

A. From 7:00 to 9:00, somewhere in that area.

**Q. Do you take any of the cool-down showers?**

A. Yes, sir.

**Q. About how often would you say you take the cool-down shower?**

A. Just about every afternoon.

**Q. So what time would that be?**

A. From 7:00 to 9:00.

**Q. 7:00 to 9:00. So you say you take that just about every afternoon?**

A. Yes, sir.

**Q. And do you find that that kind of helps cool you down at night?**

A. Yes, sir.

**Q. Now, after you take the cool-down shower, I imagine you go back to your dorm?**

A. Yes, sir.

**Q. What kind of do you do just at night?**

A. Mostly go to bed.

**Q. Just go to bed, yes, sir.**

**Okay. So you've taken advantage of the cool-down showers that are being offered, right?**

A. Yes, sir.

**Q. Now, do you drink water a lot?**

A. Yes, sir.

**Q. About how many cups of water -- how many times a day do you drink water?**

A. Well, I figured it up one time. I drank about 5 gallons a day.

**Q. About 5 gallons a day. That's a lot of water. I should probably be doing that. And so do you have kind of a -- a cup or a bottle that you use?**

A. Yes, sir.

**Q. Okay. Is it kind of just like a normal water bottle, like a 12-ounce water bottle?**

A. Yes, sir.

**Q. And so in your dorm B5, are there sinks you can use to fill it up occasionally?**

A. Yes, sir.

**Q. So do you use those sinks when you need to?**

A. Yes, sir.

**Q. What other kind of water do you have on the dorm?**

A. We got a ice jug.

**Q. And that's a ice jug in -- in the dorm?**

A. It's -- yes, sir. In the catwalk there, sir.

**Q. Okay. And that's filled with ice water?**

A. Yes, sir.

**Q. And how often do you use that ice cooler?**

A. All -- just about all the time.

**Q. And have you ever had any problems, you know, getting water out of that ice jug?**

A. It runs out every once in a while.

**Q. Okay. So about how often would it -- do you -- would you say it runs out?**

A. Two or three times a day.

**Q. And does it get refilled?**

A. Yes, sir.

**Q. And about, kind of how quickly would you say it gets refilled?**

A. Sometime it takes 30 minutes, sometime it takes about two hours.

**Q. Okay. But is that kind of a rare occurrence for it to take longer?**

A. Yes, sir.

**Q. So, generally, it doesn't take very long to get it filled back up?**

A. No, sir.

**Q. So you've -- have you ever had any problems where you haven't been able to get water for long periods of time?**

A. Not lately, sir.

**Q. Okay. And what do you mean by "not lately"?**

A. Well, a year ago we did.

**Q. Okay.**

A. They only filled it up -- the jug once in the morning, once at night.

**Q. Okay. But right now it's pretty frequent?**

A. Yes, sir.

**Q. Okay. So you haven't had any problems, you know, drinking your 5 gallons of water each day?**

A. No, sir.

**Q. Okay. Now, what else can a -- can you do to help relieve yourself from the heat? What do you personally do?**

A. Most of the time, we line up to the craft shop, take a T-shirt and get it wet, sit underneath the fan.

**Q. All right. So do you have a personal fan?**

A. Yes, sir.

**Q. And about how long have you had your personal fan?**

A. Since 2003 -- or '13.

**Q. And so you use that fan quite frequently?**

A. Yes, sir.

**Q. And does that fan help you?**

A. Yes, sir.

**Q. And I've heard, like, some offenders take their shirts or towels and wet them and put them in**

**Q. So like last year or this year?**

A. Last year and this year.

**Q. Okay. About how many times have you requested to go to medical for heat-related issues?**

A. I don't remember.

**Q. Is it, like, one to five times, or are you able to give me kind of a range of how many?**

A. No, sir.

**Q. Okay. Okay. Now, do you wear -- what kind of clothing do you wear when you're in your dorm during the summer?**

A. T-shirt and gym shorts.

**Q. Okay. And can you wear those in the dayroom and your bunk? Where can you wear those?**

A. Dayroom. Anywhere in the dorm.

**Q. Okay. And does wearing, you know, lighter clothing help you in the summer?**

A. A little bit.

**Q. Now, what other kind of posters are posted up in the dorms regarding the heat?**

A. Drink plenty of water.

**Q. Any other kind of -- any other posters that you can remem- -- remem- -- remember?**

A. One in there telling you what your urine looks like when you're dehydrated.

**Q. When you were talked to about heat precaution, kind of just give me a rundown of what they -- you would be told.**

A. They describe what the illness is and then they didn't tell us to go to the infirmary or anything. They said just sit down and drink plenty of water.

**Q. Okay. Now, have you observed any inmates going to the infirmary for heat-related issues?**

A. Yes, sir.

**Q. About -- and about how many times would you say?**

A. I don't remember, sir.

**Q. Now, do you take -- do you take insulin or anything of that nature?**

A. Yes, sir.

**Q. So you have to go to the medical facility for that?**

A. Yes, sir.

**Q. And so how many times a day would you take insulin?**

A. Twice a day, sir.

**Q. So you -- you're in and out of the infirmary pretty much every day, correct?**

A. Yes, sir.

**Q. One minute, please.**

**Now, let's go back to kind of the chow hall. How often -- do you try to go to the chow hall all -- as much as you can?**

A. Yes, sir.

**Q. And have you ever had to -- have you ever skipped any meals?**

A. Yes, sir.

**Q. About how often, would you say?**

A. About once a month.

**Q. And do you get to go to the commissary?**

A. Yes, sir.

**Q. Okay. Have you bought, you know -- what kind of food do you buy from the commissary?**

A. Mostly hygiene items.

**Q. Okay.**

A. And coffee.

**Q. Hygiene items and coffee?**

A. Yes, sir.

**Q. Nothing else?**

A. Pea soup.

**Q. Okay. So do you buy any other food items from the commissary?**

A. Once in a while.

**Q. Once in a while. Okay. Have you ever bought water at the commissary?**

A. Yes, sir.

**Q. And do you kind of buy the individual water bottles, or do you buy kind of bulk water?**

A. Individual.

**Q. Individual bottles?**

A. Yes, sir.

**Q. And are those bottles cold?**

A. No, sir.

**Q. Now, is there anything else from the commissary that you kind of buy on a regular basis?**

A. Stamps and that's -- that's about all I can remember right off the bat that I most generally get.

**Q. What was that?**

A. That's what I most generally get.

**Q. Okay. Now, do you ever go to the law library?**

A. Very seldom, sir.

**Q. And have you ever put in a request to the law library and, you know, not been received for it?**

A. No, sir.

**Q. So have you ever been to the normal library?**

A. Yes, sir.

**Q. About how often would you say you go to the normal library?**

A. Very seldom.

**Q. Now, are both -- is the law library air**

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, PHYLLIS WALTZ, a Certified Shorthand Reporter, Texas Certified Realtime Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, JACKIE L. BRANNUM, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 30TH day of SEPTEMBER, 2015.

Phyllis Waltz

PHYLLIS WALTZ, RPR, CRR
TEXAS CSR, TCRR NO. 6813
Expiration Date: 12/31/15
LOUISIANA CCR NO. 2011010
Expiration Date: 12/31/15

Integrity Legal Support Solutions
Firm Certification No. 528
3100 Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. No. 4:14-cv-1698

BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

ORAL AND VIDEOTAPED DEPOSITION OF

KEITH COLE

AUGUST 26, 2015

ORAL AND VIDEOTAPED DEPOSITION of KEITH COLE, produced as a witness at the instance of the Defendants, duly sworn, was taken in the above-styled and numbered cause on the 26th day of August, 2015, from 9:50 a.m. to 3:49 p.m., before JANE COPELAND, RMR, CRR, Certified Shorthand Reporter and Notary Public in and for the State of Texas, reported by Machine Shorthand, at the offices of Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A. I can't tell you. I don't -- I don't have a temp -- thermometer. I don't know.

**Q. Do you drink water during the day?**

A. Boy, I tell you what, like a elephant. Camel, like a camel.

**Q. What -- how many glasses of water each day do you drink?**

A. I make it a point -- I have a little container that I -- if I'm not mistaken, I think it's 14 or 16 ounces. I try to drink at least ten of those every single day religiously. And in the chow hall, I -- I make it a point -- even after I finish my meals, I make it a point to drink at least a half of pitcher of water every single meal that I go to.

**Q. Now, is there wat -- then there's enough water at the chow hall then to --**

A. Oh, ev -- we have never had a problem with water in the chow hall. We've always had ice water in the chow hall.

**Q. Do you buy any other kinds of drinks from the commissary?**

A. I might buy one or two Cokes at -- when we go to commissary, but I really don't drink a lot of Cokes because of my diabetes.

**Q. Do you buy any other kind of drinks at the**

**commissary?**

A. Yes, ma'am. I buy these sports drinks that -- that -- that you have to add water to like most offenders. One of them is a sports drink that replaces the potassium and -- and -- and electrolytes into your body, and it's a hundred percent vitamin C. I buy quite a few of those because it's the type of thing that helps rehydrate you. And I also buy little Hawaiian Punch drinks. They're powdered, also. You add them to your water.

**Q. All right. And do they have a -- any kind of other items at the commissary that would assist you in dealing with the heat?**

A. Well, ice cream, which I don't buy a lot of because of my diabetes. They had popsicles for a few minutes. I don't buy those at all because it's just sugar and water. No, there's -- not -- not anything that could immediately cool me down, no, not that I know of, no.

**Q. Do you own -- did you buy an official pair of TDCJ shorts?**

A. Yes, ma'am. I have two pair.

**Q. Okay. And do you wear those during the day?**

A. Every day.

**Q. Where all are you allowed to wear your shorts?**

A. The only place I'm allowed to wear my shorts is in my cubicle on the dorm and I'm also allowed to wear them in the dayroom. I -- I pretty much can wear them anywhere I want to in my living area.

**Q. Okay. And then what do you wear when you leave your living area?**

A. You have to put on this heavy white uniform (indicating).

**Q. All right. And you pointed to your offender uniform, correct?**

A. Yes, ma'am.

**Q. And it's a white uniform?**

A. Yes, ma'am.

**Q. Okay. Do you take any other steps during the summer with regard to the summer conditions?**

A. When you say other steps, I'm -- I'm confused.

**Q. Okay. That's good. I'm glad you told me that. You said you drink what, eight to ten glasses of water a day?**

A. Yes, ma'am.

**Q. You make an effort to do that. You buy the special drinks from the commissary?**

A. Yes, ma'am.

**Q. You own two pair of shorts?**

A. Yes, ma'am.

walk by every offender has a bottle -- drinking bottle on their tables. You can easily verify what I'm saying. The vast majority of them have these.

Now, the bottle I use is a barbecue sauce bottle because it has a deal this big where you pour -- put the water in. So I'm able to get my water without ever having to touch the faucet. See what I'm saying?

**Q. (BY MS. BURTON) Okay.**

A. So I -- yes, cups definitely need to be -- be an option for us.

**Q. All right. So you're saying then in your dorm, at least, there's not cups for the water?**

A. There's not cups in any of them.

**Q. And -- and how do you know that there's not cups in any of them?**

A. I'm just assuming if we don't have them, nobody else is going to have them.

**Q. Are you familiar with the posters that are hanging around the unit that talk about how much water to drink and what to do --**

A. Right. Those were put up after the lawsuit was filed, yes, ma'am.

**Q. Okay. You're -- there were no posters prior to the lawsuit?**

A. Oh, no, ma'am, none.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated, Plaintiffs,

VS. No. 4:14-cv-1698

BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants.

REPORTER'S CERTIFICATION
DEPOSITION OF KEITH COLE
TAKEN AUGUST 26, 2015

I, JANE COPELAND, RMR, CRR, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, KEITH COLE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to CYNTHIA L. BURTON;

That a copy of this certificate was served on all parties and/or the witness shown herein on September 8, 2015.

I further certify that pursuant to FRCP No. 30(e)(2) that the signature of the deponent:

XXX was requested by the deponent or a party before the completion of the deposition and that the

signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 2nd day of September, 2015.

JANE COPELAND, CSR, RMR, CRR
Notary Public in and for the State of Texas
Commission Expires: 4/29/2016

Business Address:
Integrity Legal Support Solutions
Firm Registration No. 528
3100 W. Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (fax)

# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. : No. 4:14-cv-1698

BRAD LIVINGSTON, in his Official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
RICHARD ELVIN KING
SEPTEMBER 16, 2015

****************************************

ORAL AND VIDEOTAPED DEPOSITION of RICHARD ELVIN KING, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 16, 2015, from 9:21 a.m. to 2:06 p.m., before PHYLLIS WALTZ, RPR, CRR, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

A. Yes.

**Q. -- during the summer months?**

A. Yes, I drink -- I drink a lot of fluid most of the time.

**Q. About how much water would you say you drink per day?**

A. I don't know. Probably at least a gallon, cup- -- two or three quarts, anyway.

**Q. And when you drink water, do you have your own bottle that you put the water in or your own cup? What do you --**

A. Yes, I have a little bottle just like that. Mainly I just keep refilling it, yes.

**Q. You're pointing to a water bottle that's on the table?**

A. Yes.

**Q. So is it a --- do you know what size your water bottle is?**

A. I think it's 12 or 13 ounces.

**Q. And it's a plastic water bottle?**

A. Yes.

**Q. And when you drink water out of your water bottle, where do you get the water from?**

A. We have water fountains, you know, hydrants. There's water coolers that have ice and, you know, and

water in them.

**Q. About how many times a day would you say you fill up your water bottle with water, on average, during the summer months?**

A. Many. I -- I don't know. 12, 15. I drank two since I've been up this morning, so...

**Q. So you said you fill it 12 to 15 times a day?**

A. Probably, yeah.

**Q. And where are you filling it with water? You said there's water fountains and water coolers. Where are they located?**

A. In the locations.

**Q. In your dorm?**

A. Yes.

**Q. What about anywhere else that you fill your water bottle up with water from?**

A. In the craft shop we have, you know, water cooler.

**Q. So let's talk about the water coolers. You said there's -- there's some in the craft shop?**

A. There's -- well, it's an Igloo type of -- of cool -- of cooler.

**Q. And how many are in the craft shop?**

A. Just -- just one.

**Q. So you have one there and then there's some in**

meal is over.

**Q. But you said that's not most of the time, though --**

A. No.

**Q. -- that's just sometimes.**

**Do you typically get enough water to drink when you're at a meal in the chow hall?**

A. Probably sufficient for most people, yes.

**Q. Is it sufficient for you?**

A. Most of the time not. I -- I -- I drink lots of liquid.

**Q. Have you ever complained that you need more water while you're in the chow hall with your meals?**

A. No.

**Q. Have you ever requested a refill and they've said no, you can't have one?**

A. No.

**Q. So, then, after dinner you said you would go back to your dorm. And tell me what you said you do in your dorm in the evenings.**

A. I just -- just watch the news, if I get in in time. Write a letter, read, wait for mail call, make a phone call or two.

**Q. What time of day is this, approximately?**

A. Well, from 5:30 until 10:30 at night. After

I, RICHARD ELVIN KING, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________________
RICHARD ELVIN KING

STATE OF T E X A S )
COUNTY OF ___________ )

Before me, ___________________________, on this day personally appeared RICHARD ELVIN KING, known to me, or proved to me under oath or through ____________________) (description of identity card or other document)), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _____ day of ________________, _____.

________________________________
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires: _______________________

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, PHYLLIS WALTZ, a Certified Shorthand Reporter, Texas Certified Realtime Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, RICHARD ELVIN KING, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 30TH day of SEPTEMBER, 2015.

Phyllis Waltz

PHYLLIS WALTZ, RPR, CRR
TEXAS CSR, TCRR NO. 6813
Expiration Date: 12/31/15
LOUISIANA CCR NO. 2011010
Expiration Date: 12/31/15

Integrity Legal Support Solutions
Firm Certification No. 528
3100 Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. : No. 4:14-cv-1698

BRAD LIVINGSTON, in his Official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
DEAN ANTHONY MOJICA
SEPTEMBER 3, 2015

****************************************

ORAL AND VIDEOTAPED DEPOSITION of DEAN ANTHONY MOJICA, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 3, 2015, from 3:00 p.m. to 4:51 p.m., before PHYLLIS WALTZ, RPR, CRR, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

A. No, I -- I've tried to self -- I guess, heal myself by drinking more water, but I think it's for lack of potassium. I don't really know.

**Q. Did you buy any of the drinks at the commissary that have electric- --**

A. Yes.

**Q. Okay. Let me finish my question.**

A. I'm sorry.

**Q. That's okay -- that have the electrolytes in them?**

A. Yes.

**Q. Okay. And how much water do you drink during the day?**

A. Quite a bit.

**Q. Could you give me an estimate of how many cups of water?**

A. At least two quarts.

**Q. All right. And do you do anything else or take anything else? We talked about the fan, the showers, you drink water. Anything else that you do?**

A. No.

**Q. How often are you experiencing muscle cramps?**

A. Maybe sometimes once a week and they usually hit me at nighttime and sometimes once a week and sometimes twice a week. You know, it just depends on, I

guess, whatever -- how -- how hot it gets over there when I'm sitting in -- in -- in the -- the dorm.

**Q. Does it happen any other time of year?**

A. No, I don't have -- I don't have cramps during the wintertime.

**Q. Is it warm there during the wintertime?**

A. No, it's cold.

**Q. All right. So what -- when you have those cramps, do you drink more water then or --**

A. Yes, I do.

**Q. Okay. But have you had any dizziness or like what happen --**

A. Yes.

**Q. Okay. When do you have that?**

A. Usually when I have the cramps, I'll -- I'll get dizzy, feel nauseated. And at one point I feel -- I've thrown up before and -- but it's usually -- when I have the cramps is when I feel -- I'm laying there on the floor.

**Q. But it hasn't been serious enough that you felt you should talk to the doctor?**

A. Well, I -- like I said, I just try to -- I'm thinking maybe it's just -- if I drink more water, it'll be all right, everything will be all right. And I'm thinking maybe it's just because I'm getting older. I

**Q. Okay. Do you agree that a person should take care of themselves during the heat by drinking water and getting in a cool place, if they need to?**

A. I believe that they should, if it's available, you know, if it's -- if it is available.

**Q. So do they -- does a person have a personal responsibility to help take care of themselves?**

A. Depending on the -- I guess, depending on the conditions. You know, I mean, there's some conditions that you can't take care of yourself. You can't monitor the heat or regulate the heat.

**Q. But could -- but if they have access to water, do they have a personal responsibility to drink water?**

A. Yes, you do.

**Q. And do they have a personal responsibility to let someone know if they need to go somewhere and cool off?**

A. Yes.

**Q. And do they have a personal responsibility to seek medical attention, if necessary?**

A. Yes.

**Q. Now, are you currently on any medication?**

A. No.

**Q. Do -- other than your back, do you have any other medical conditions that you're concerned about?**

I, DEAN ANTHONY MOJICA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________________
DEAN ANTHONY MOJICA

STATE OF T E X A S )
COUNTY OF ___________ )

Before me, ___________________________, on this day personally appeared DEAN ANTHONY MOJICA, known to me, or proved to me under oath or through ____________________) (description of identity card or other document)), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _____ day of ________________, _____.

________________________________
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires: _______________________

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, PHYLLIS WALTZ, a Certified Shorthand Reporter, Texas Certified Realtime Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, DEAN ANTHONY MOJICA, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 18TH day of SEPTEMBER, 2015.

PHYLLIS WALTZ, RPR, CRR
TEXAS CSR, TCRR NO. 6813
Expiration Date: 12/31/15
LOUISIANA CCR NO. 2011010
Expiration Date: 12/31/15

Integrity Legal Support Solutions
Firm Certification No. 528
3100 Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690

# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. : No. 4:14-cv-1698

BRAD LIVINGSTON, in his Official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
FRED LEONARD WALLACE
SEPTEMBER 17, 2015

****************************************

ORAL AND VIDEOTAPED DEPOSITION of FRED LEONARD WALLACE, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 17, 2015, from 9:12 a.m. to 2:25 p.m., before PHYLLIS WALTZ, RPR, CRR, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

**spring?**

A. Summer.

**Q. Do you remember what the temperature was that day?**

A. No, ma'am.

**Q. When you went in and sought medical treatment, did you go in and complain of the heat and feeling that you were having problems related to heat?**

A. No. I just told them I was sick.

**Q. Okay. You mentioned dehydration. Do they give you any instructions with regard to drinking more water?**

A. Yes.

**Q. What do they tell you?**

A. Drink water.

**Q. That day and the -- say roughly the day before you went in two years ago with these complaints and had the low blood pressure, do you recall whether or not you had been regularly drinking water?**

A. Normally.

**Q. You mean drinking like you normally do?**

A. Yes.

**Q. So what do -- how much do you normally drink in a day? How much water or liquid do you take in?**

A. Six, eight cups.

**Q. So is that six to eight -- is that a cup, you're talking about, like the --**

A. Yes.

**Q. -- an 8-ounce cup?**

A. A cup. The cups that we have.

**Q. So what cup do you have?**

A. They're issued to us by the State. It's just a standard cup.

**Q. You said you typically drink about six to eight of those a day?**

A. Yes.

**Q. And the day of these symptoms with the low blood pressure, you drank about the same that day?**

A. Yes.

**Q. Did the medical staff tell you anything else that you should do besides taking in more fluids?**

A. No.

**Q. And you said your diagnosis on that day was what? What would you -- did you get a diagnosis? Did they tell you what was wrong?**

A. No.

**Q. Did anyone tell you you had heat stroke or heat exhaustion --**

A. No.

**Q. -- anything like that?**

just felt better.

**Q. Did they check to see if your hydration levels were better at that time?**

A. They never did check to see if my hydration level were up or down. They don't have any method of check hydration level.

**Q. Nothing that you know of; is that fair?**

A. That's fair.

**Q. So you said your cramps were gone and you were feeling better?**

A. Yes.

**Q. Did you have any pains at that time?**

A. No.

**Q. Did you have any complaints when you went back in at 11:00 the next morning?**

A. No.

**Q. And what did the medical providers tell you in the infirmary that next morning when you went in?**

A. Continue to drink water.

**Q. All right. And how long were you in the infirmary that next morning?**

A. Very short period of time.

**Q. 10 minutes, 30 minutes, can you give us a ballpark?**

A. 10 minutes.

**Q. -- a complaint to your officers that were in your dorm and said, I need to go to medical?**

A. Same thing.

**Q. And did they promptly get you to the medical infirmary?**

A. Yes, ma'am.

**Q. And any complaints about those officers and their response to your complaints on the --**

A. None at all -- none at all.

**Q. Let's talk about when you got to the medical infirmary a second time with these same complaints. What did you tell the nurse or the person who saw you?**

A. Same thing, I was having the problems.

**Q. And did you make any complaints about the heat at that time?**

A. No.

**Q. Do you recall what the temperature was then?**

A. No.

**Q. Do you recall the time of year it was?**

A. Not really.

**Q. And what kind of treatment did you get when you went to the infirmary --**

A. Drink --

**Q. -- for the second time?**

A. Drink water.

**Q. Did they check your blood pressure?**

A. Yes.

**Q. And they told you it was high?**

A. Yes.

**Q. What blood pressure medications were you on at that time?**

A. I don't know the name of it. I really -- I don't.

**Q. Was it one or more than one?**

A. It's the same one, as far as I know.

**Q. So it's the same pill that you're currently taking?**

A. Yes, ma'am.

**Q. Did they adjust your medications at all --**

A. No.

**Q. -- that second time?**

A. No.

**Q. If you can, wait until I'm through with the question, just so we can --**

A. Sorry.

**Q. -- get an accurate -- thank you. No problem.**

**So other than drinking water, did they tell you anything else that you needed to do?**

A. No.

**Q. At that time, the second incident, did you --**

Fred Wallace - 9/17/2015

been in here.

**Q. And where have you seen them taking temperature measurements?**

A. In the dorm, on the ceiling.

**Q. Just on the ceiling --**

A. No.

**Q. -- or anywhere else?**

A. On the ceiling is all I've seen.

**Q. And do you know who it was that was doing it?**

A. No, ma'am.

**Q. Do you know how they were taking the temperature readings?**

A. Had some kind of a device that shot at the ceiling.

**Q. These posters that you said are put up throughout the unit about heat and drinking water and that sort of thing; is that correct?**

A. Yes, ma'am.

**Q. And you've read those, you said?**

A. Yes, ma'am.

**Q. Have you read the posters that give you recommendations on what to look out for for heat-related illnesses?**

A. Yes, ma'am.

**Q. And precautions to take to avoid problems with**

**the heat?**

A. Yes, ma'am.

**Q. Do you try to follow those precautions?**

A. Yes, ma'am.

**Q. Have you seen a poster that talks about you can look at the color of your urine --**

A. Yes, ma'am.

**Q. -- to see if you're properly hydrated?**

A. Yes, ma'am.

**Q. And do you ever do that?**

A. Yes, ma'am.

**Q. Have you ever had an occasion where you saw the color of your urine that indicated to you maybe you have a problem with hydration?**

A. No.

**Q. On those three occasions that we were talking about earlier when you went to medical, do you know whether or not you checked your urine anywhere before or after you -- any of those times?**

A. I don't know.

**Q. Do you recall if the medical department took any urine samples from you on any of those three visits?**

A. They did not.

**Q. Have they ever taken urine samples from you in the medical department?**

I, FRED LEONARD WALLACE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
FRED LEONARD WALLACE

STATE OF T E X A S )
COUNTY OF __________ )

Before me, ________________________, on this day personally appeared FRED LEONARD WALLACE, known to me, or proved to me under oath or through __________________) (description of identity card or other document)), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _____ day of ______________, _____.

____________________________
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires: ____________________

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, PHYLLIS WALTZ, a Certified Shorthand Reporter, Texas Certified Realtime Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, FRED LEONARD WALLACE, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 30TH day of SEPTEMBER, 2015.

Phyllis Waltz
PHYLLIS WALTZ, RPR, CRR
TEXAS CSR, TCRR NO. 6813
Expiration Date: 12/31/15
LOUISIANA CCR NO. 2011010
Expiration Date: 12/31/15

Integrity Legal Support Solutions
Firm Certification No. 528
3100 Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. : No. 4:14-cv-1698

BRAD LIVINGSTON, in his Official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
RAY WILSON
SEPTEMBER 17, 2015

****************************************

ORAL AND VIDEOTAPED DEPOSITION of RAY WILSON, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 17, 2015, from 1:40 p.m. to 3:30 p.m., before PHYLLIS WALTZ, RPR, CRR, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

**Q. (BY MR. NEUHOFF) That's okay. You're doing a good job. I do that sometimes, too. Sometimes I talk over, you know, people when we kind of know what the other person's saying.**

A. I'm sorry.

**Q. It's perfectly fine.**

**Okay. Have you heard of a chill towel?**

A. Yes, sir.

**Q. Have you bought one of those from the commissary before?**

A. No, sir.

**Q. Why haven't you bought one of those?**

A. $6.50 and they're not really effective.

**Q. Okay.**

A. We can use our regular -- we have a towel -- oh, I'm sorry.

**Q. No, go ahead.**

A. We have a towel to wash down. You can do basically the same thing with it. You know, you can wet it down or you can get some cold water and pour on it and all like that; and it's about as effective as what that is, at least I find that out and...

**Q. Let me go back a little bit to the ice water. Does the ice water help you throughout the day?**

A. Yes, sir.

**Q. Okay.**

A. Yes, sir.

**Q. About -- I forgot to ask this one: About how much water do you drink during, kind of, a normal day?**

A. I try to at least get a gallon and a half.

**Q. That's probably a lot better than I do.**

**Have you seen any posters about the heat around the dorms?**

A. Yes, sir.

**Q. What kind -- what kind of posters are posted up?**

A. They have a tricolor poster that shows images for those who have a difficult time with English or Spanish, to more or less lay it out, you know, what to do and so forth, establishes color on urine to let you know what -- where -- where you're at, if you're getting dehydrated and so forth.

**Q. With that poster, have you ever kind of checked the color of your urine to make sure?**

A. Sir?

**Q. With that tricolor poster, have you ever used kind of that, I guess it would be diagram, to check the color of your urine before?**

A. Yep.

**Q. Have you found it to be in the more yellow**

**range?**

A. In the yellow range, yeah. Yes, sir.

**Q. About how often do you say you're in the yellow dehydration range?**

A. It's hard to say. I couldn't -- couldn't answer that.

**Q. Okay, that's fine. What other posters do they have up in the dorms about heat and hydration?**

A. There was a black-and-white one talking about, you know, watch out for dehydration, so forth like that.

**Q. And do they have any posters up in the dorms about, like, places that are air conditioned?**

A. Yes, sir. That started about -- don't quote me, but I think it's about two months ago.

**Q. And that --**

A. Three months ago, maybe.

**Q. What areas are listed on that poster?**

A. We have the -- the barber shop. We have the lieutenant's office. We have the education office; the law library; even the ODR, the officers dining room. And I think they list some administrative offices, also.

**Q. Okay. And have you -- since that poster has been up, have you requested to go to any of those respite areas?**

A. No, sir, I haven't.

I, RAY WILSON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________________
RAY WILSON

STATE OF T E X A S )
COUNTY OF ___________ )

Before me, ____________________________, on this day personally appeared RAY WILSON, known to me, or proved to me under oath or through ____________________) (description of identity card or other document)), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _____ day of ________________, _____.

________________________________
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My Commission Expires: _______________________

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, PHYLLIS WALTZ, a Certified Shorthand Reporter, Texas Certified Realtime Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, RAY WILSON, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 30TH day of SEPTEMBER, 2015.

PHYLLIS WALTZ, RPR, CRR
TEXAS CSR, TCRR NO. 6813
Expiration Date: 12/31/15
LOUISIANA CCR NO. 2011010
Expiration Date: 12/31/15

Integrity Legal Support Solutions
Firm Certification No. 528
3100 Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Plaintiffs,

VS. : No. 4:14-cv-1698

BRAD LIVINGSTON, in his Official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
MARVIN RAY YATES
SEPTEMBER 3, 2015

****************************************

ORAL AND VIDEOTAPED DEPOSITION of MARVIN RAY YATES, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 3, 2015, from 9:32 a.m. to 2:36 p.m., before PHYLLIS WALTZ, RPR, CRR, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

**cooler. Do you -- do you drink that water?**

A. Yes, ma'am.

**Q. About how much water do you drink per day?**

A. Well, when the -- there is water in it, if you can get some before it runs out. I try to drink about seven or eight of those little bottles like that a day.

**Q. And just so -- for the record, I'm going to -- are you referring to the bottle I have here? Is that what you're talking about?**

A. Yes, ma'am, same -- same amount.

**Q. Okay. About that size there?**

A. Yes, ma'am.

**Q. Okay. And so, for the record, this is about -- I think this says about 16 ounces. Is that about the size of your bottle?**

A. Yes, ma'am.

**Q. And you said you try to drink about seven to eight of those per day?**

A. (Nodding head.)

**Q. Is that a "yes"?**

A. Yes, ma'am.

**Q. Okay. And do you fill it up from the cooler?**

A. If'n there's water in it.

**Q. And the cooler in the water, is that ice water, colder water?**

**top of it says, "NOTICE TO OFFENDERS." Is that something that you reviewed in preparation for this deposition; is that right?**

A. Ma'am, this is not really worth the paper it's written on because they won't let you go to these unless you go to the infirmary and get -- verify it through them. They won't let you into any of these areas.

**Q. Okay. I'm going to ask you a little bit about it. So this "NOTICE TO OFFENDERS" paper that you're talking about, have you seen this before?**

A. Yes.

**Q. Where have you seen this?**

A. They put it in the rest room in print much finer than this. You might need a magnifying glass to read it, but they put it up there in very, very fine print.

**Q. It's been posted in the rest rooms, you've said. Anywhere else that you've seen it?**

A. No.

**Q. Have you seen posters that have been posted around the unit anywhere discussing heat-related illnesses, how to prevent them, and what to do if you have a heat-related illness?**

A. They come in here, put some of those little things up in the dorm that said drink more water.

**Q. So you've seen the posters?**

A. (Nodding head.)

**Q. Is that a "yes"?**

A. That -- that particular one, the one about drinking water.

**Q. Have you seen the one that suggests that you can look at the color of your urine to determine if you're drinking enough water?**

A. Yes, they have that. They have -- I believe that one still might be in the -- in the rest room, because I -- I did that very same thing. I followed its little instructions to check myself, make sure I was -- it's really easy to become dehydrated in here because that it's so hot. And there's something wrong with that water, that it doesn't quench your thirst. It's real bitter tasting.

**Q. Other than it being bitter tasting, is there anything else that you're complaining about about the water?**

A. Well, we've been told that it's got arsenic in it and there's supposed to be paperwork out on, but I haven't really seen it.

**Q. Who's told you that?**

A. I heard it ever since I got to this unit. I heard they had it posted out here for the visitors. I

know the guards don't drink the water.

**Q. Let me stop you for a second. You said you've heard it was posted out here somewhere?**

A. Yes, ma'am.

**Q. Did --**

A. We heard there were bulletins out here about it.

**Q. Have you seen any documents?**

A. I believe it's notated somewhere in some of this paperwork in the law library.

**Q. Have you seen it in there?**

A. Not myself, but I believe others -- I've heard others talk about it.

**Q. So, sitting here today, is there any document that you've seen that indicates there is arsenic in the water that you drink here?**

A. No, ma'am, not in my -- not to my personal knowledge.

**Q. And you said the officers don't drink it. Are you --**

A. No, ma'am, they do not.

**Q. Are you claiming the officers don't drink the same water that you're provided?**

A. No, ma'am, they do not.

**Q. And how do you base -- what -- what's that**

**based on?**

A. They drink strictly bottled water.

**Q. So it's your testimony you've never seen an officer here drink water out of a cup?**

A. None of -- none of the water that we drink at all, huh-uh.

**Q. How do you know where the water comes from that they're drinking?**

A. I don't know. I don't know where it comes from. I see them drink bottled water. I never see them getting any water out of the tap or out of the water jugs. I see them bring water to work with them.

**Q. And this water bottle here, for example, could be refilled from tap water, right?**

A. Oh, they could.

**Q. And that's what you drink out of, is you said a water bottle like this, that you refill from tap water, correct?**

A. Yes, ma'am.

**Q. So if you see an officer using a bottle, you don't know where the water inside that bottle came from, do you?**

A. No. We just see them bring them in when they come in for work.

**Q. Have you ever seen anyone come around and**

**provide water to the officers?**

A. No, ma'am. All -- they bring their own bottles of water with them to work.

**Q. You said that -- I think you said that you were supposed to be provided some kind of documentation on the arsenic or something like that. Did I -- did I hear you right? You were waiting for some information on it?**

A. No, ma'am.

**Q. No, okay.**

**Have you been provided any information that indicates there is arsenic in the water here that you're drinking?**

A. No, ma'am.

**Q. Okay. So is it fair to say that your belief that there's arsenic in the water is based on hearsay, of what you've heard from other inmates?**

A. I've heard it from guards and maintenance workers, inmates. I've heard it from the day I got to this farm.

**Q. What --**

A. So I've never bothered to delve off into it to -- to verify it for myself. No, I haven't.

**Q. What guards have you heard tell you that?**

A. Just got to pick out one down the hall. I've

heard the maintenance guys talking about it.

**Q. And what are the names of the maintenance guys that you've heard talk about it?**

A. I don't know their names, ma'am.

**Q. Are these inmate maintenance workers or guard maintenance workers?**

A. Just inmates and guards alike, talking to the guards.

**Q. Have you ever had --**

A. About putting -- the guards talking to the inmates about putting something in the -- wherever they doctor that water up. They've got a purifying system around here somewhere, and they were talking about the chemicals they put in it. That's all I know about it.

**Q. When you say "the chemicals they put in it," are you talking about arsenic? Is that what you understand it to mean?**

A. I don't know. It's something they do to try to stabilize that water or make it better or something.

**Q. And you don't know what the chemical or what the --**

A. No.

**Q. -- substance is they're putting in the water?**

A. No, I don't know what they put in.

**Q. Have you ever had anyone -- any medical**

I, MARVIN RAY YATES, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________________

MARVIN RAY YATES

STATE OF T E X A S )
COUNTY OF ___________ )

Before me, ___________________________, on this day personally appeared MARVIN RAY YATES, known to me, or proved to me under oath or through ____________________) (description of identity card or other document)), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _____ day of ________________, _____.

________________________________

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires: _______________________

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, PHYLLIS WALTZ, a Certified Shorthand Reporter, Texas Certified Realtime Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, MARVIN RAY YATES, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 18TH day of SEPTEMBER, 2015.

Phyllis Waltz

PHYLLIS WALTZ, RPR, CRR
TEXAS CSR, TCRR NO. 6813
Expiration Date: 12/31/15
LOUISIANA CCR NO. 2011010
Expiration Date: 12/31/15

Integrity Legal Support Solutions
Firm Certification No. 528
3100 Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690

# Exhibit 18

1

Heidi K. Bojes, Ph.D. - 1/22/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KEITH COLE, JACKIE BRANNUM, RICHARD KING, DEAN ANTHONY MOJICA, RAY WILSON, FRED WALLACE, AND MARVIN RAY YATES, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED

Plaintiffs,

VS. — CIVIL ACTION NO. 4:14-cv-1698

BRAD LIVINGSTON, IN HIS OFFICIAL CAPACITY, ROBERTO HERRERA, IN HIS OFFICIAL CAPACITY, AND THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE,

Defendants.

******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

HEIDI K. BOJES, Ph.D.

JANUARY 22, 2016

******************************************************

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363**

Plaintiffs' Preliminary Injunction
Appendix 236

8
Heidi K. Bojes, Ph.D. - 1/22/2016

(Deposition Exhibit No. 1 marked.)

THE VIDEOGRAPHER: We are on record at 9:33 a.m., January 22nd, 2016, with the start of DVD number one.

You may swear in the witness.

HEIDI K. BOJES, Ph.D.

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. EDWARDS:

Q. Good morning. Would you kindly state your name for the record.

A. Heidi Bojes.

Q. My name is Jeff Edwards and I'm one of the lawyers that represent a putative class of plaintiffs in the -- relating to prison conditions at the Pack Unit. Do you understand that?

A. Yes.

Q. Okay. And I understand that you're here to testify principally about arsenic in the water at the Pack Unit. Is that your understanding as well?

A. Yes.

Q. And are all of your opinions contained in the expert report that is before you, entitled Expert Report of Heidi Bojes, Ph.D.?

A. Yes.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 237

20
Heidi K. Bojes, Ph.D. - 1/22/2016

anything to do with the Pack Unit?

A. No.

Q. Okay. Did you speak with Doctor Villanacci?

A. I spoke to him about it, because he -- about the case -- or about whether I -- we should do the evaluation.

Q. What did you guys talk about or decide?

A. And he said, yes, we should do it because that's what we did -- do. And I told him a little bit about what it was about. Yeah.

Q. Okay. I take it you did this as part -- did you do this as part of your job with the State?

A. Yes.

Q. Okay. You weren't provided any extra compensation?

A. No.

Q. But you are, nevertheless, all of your compensation is paid by the State of Texas. Correct?

A. Right. The State of Texas pays me. Correct.

Q. Okay.

A. My salary.

Q. No, no. That's fine.

Have you ever given a deposition before?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 238

22
Heidi K. Bojes, Ph.D. - 1/22/2016

that soil or groundwater?

A. Yes.

Q. And what was the opinion that you came to?

A. I don't remember the details on that.

Q. Okay. Did you -- do you consider the EPA to be an agency that would provide guidance to you in evaluating the safety of contaminant levels?

A. EPA is one source that we review. Their documents is one source of information we use when we do these sort of health assessments.

Q. I appreciate that. But do you consider the EPA to be a reliable agency and provide guidance on the safe levels of contaminants in water?

A. Yes.

Q. Okay. Do you consider -- well, do you know what IARC is?

A. It's the International Agency of Research Council, I believe.

Q. Okay. Do you know -- are you aware if it's a leading cancer agency?

A. I believe it is.

Q. Okay.

A. A leading cancer agency, and it's an EPA.

Q. Well, are you aware that it's one of the most respected agencies --

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 239

24
Heidi K. Bojes, Ph.D. - 1/22/2016

as opposed to nodding your head, it'll just make it easier for us --

A. All right. I'll do my best. But I may forget, so you'll have to say, you're nodding.

Q. That is more than reasonable.

A. Okay.

Q. More than reasonable.

A. Got it.

Q. Okay. Did you consult the IARC prior to doing your report?

A. Yes.

Q. And you consulted the EPA guidelines prior to doing your report?

A. Yes.

Q. And are you aware -- well, are you aware that the IARC classifies arsenic as a known human carcinogen?

A. Yes.

Q. Okay. And are you aware that, according to the IARC, it's that arsenic is a human carcinogen, a Group 1 human carcinogen, and it has the highest classification of a compound for carcinogenicity?

A. Yes, I am.

Q. And you're aware that drinking water is one of the two principal exposure pathways that led to

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 240

this classification?

A. Yes.

Q. What is the other principal exposure pathway?

A. Inhalation.

Q. Okay. What is the -- what is the current standard in parts per billion, according to the EPA, for arsenic -- for safe arsenic levels in drinking water?

A. The -- the maximum contaminant level which EPA sets, which is the allowable water drinking -- level of arsenic in the water, is ten parts per billion.

Q. Right.

A. Or .01 milligrams per liter, which would be ppm. Right.

Q. And I appreciate that because I know your report uses milligrams per liter, and I -- you're a scientist and I'm sure that's how they do it. To the extent I kind of --

A. You do ppm?

Q. Just to -- I'm going to try to make it as easy for me to understand --

A. That's fine.

Q. -- frankly, but if you need to -- just try

26
Heidi K. Bojes, Ph.D. - 1/22/2016

to help me at different points. Okay?

A. Yes.

Q. And I appreciate what you said, because I think what I heard you say is, according to EPA, the allowable level of arsenic in a system that provides drinking water to people is ten parts per billion or .01 milligrams per liter?

A. Correct.

Q. Okay. Do you know if the Pack Unit is far above that level?

MR. GREER: Objection. Form.

A. Based on the 38 sampling results that I reviewed -- excuse me -- it is -- it is above that ten -- level of ten micrograms per liter. Anywhere from twice above that, and there was one sample that was 45 micrograms per liter.

Q. (BY MR. EDWARDS) And I think, if you look at the numbers that you looked at, the average would be about 250 percent higher than the allowable EPA level. Right?

A. 250 percent higher? So the allowable level is ten, and then the maximum one that I remember seeing was 45, so wouldn't that be four times higher?

Q. Yeah, that's right.

A. Or 4.5 times higher?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 242

27
Heidi K. Bojes, Ph.D. - 1/22/2016

Q. Exactly. And I'm just trying --
A. Okay. Maybe we're saying the same thing --
Q. -- when you look over the --
MR. EDWARDS: No, no. You're fine.
MR. GREER: I think the question was average.
Q. (BY MR. EDWARDS) There have been readings at the Pack Unit of arsenic levels 450 percent higher than the EPA allows. Right?
A. There has been -- I'm not -- yeah. I -- so four times higher.
Q. Four and a half times higher than the maximum that the EPA allows. Right?
A. The EPA allows ten -- right. Correct.
Q. Okay. Well, do you know that -- well, please tell the jury what the risks are from exposure to arsenic at levels that high.
A. The -- the EPA determined -- well, the risk that they're protecting for, the -- what they're aiming for is cancer.
Q. Any particular types of cancer?
A. Skin.
Q. Lung cancer?
A. Skin, lung, bladder, kidney, primarily.
Q. Those are very serious diseases to

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 243

encounter. Fair?

A. Absolutely.

Q. No State agency should intentionally subject people in its care to levels as high as the arsenic levels at the Pack Unit. Correct?

A. So that seems like you're asking my personal opinion, so...

Q. Well, what is --

A. I think --

Q. Let me -- let me -- I'll reask it in a minute.

What is your job again?

A. I'm a -- a manager, director of an epidemiology toxicology registry unit.

Q. Okay. And a registry unit for the -- for Health and Human Services here in Texas?

A. For the Department of State Health Services.

Q. Okay. And the point of having a Department of Health services in the State of Texas is to protect the citizenry from known dangers of potential contaminants, or at least that's one of them. Right?

A. That's one of them, right, to improve public health.

Q. And you would agree, would you not, that inmates at the Pack Unit are members of the public

that the State of Texas is duty bound to protect. Right?

A. Correct.

Q. Just because they're in prison doesn't mean they should be subjected to dangerous arsenic levels. Right?

A. Correct.

Q. Okay. According to the numbers that you evaluated, levels far in excess of what the EPA believes is safe or what the IARC believes is safe have been present at the Pack Unit for -- since at least 2005. Right?

A. I -- the data I reviewed goes back to 2006.

Q. So since 2006, these arsenic levels at the Pack Unit have been far in excess of the safe level according the EPA and the IARC. Right?

MR. GREER: Objection. Form.

A. I would say that they've been two times and up to four times as high as the MCL.

Q. (BY MR. EDWARDS) Do you believe that that is far in excess of the acceptable level?

MR. GREER: Objection. Form.

Answer if you can.

A. So I would -- so part of my charge was to, I guess, evaluate that question. And the way I did it

31
Heidi K. Bojes, Ph.D. - 1/22/2016

A. I would think someone six feet tall, too. 5'11" is tall. Okay.

Q. Well, you're talking about, at the Pack Unit, a significant difference between the acceptable level of arsenic in the drinking water and what actually is in the drinking water at the Pack Unit. Right?

A. Right.

Q. Okay. Now, are you aware of technology that exists to correct this problem?

A. Yes.

Q. Okay. Is that -- has that technology been invented yesterday or has that been around for a long, long time?

A. I think it's been around for a while.

Q. Okay. If a school district had 45 parts per billion levels of arsenic in its drinking water, or 25 parts per billion in its drinking water, would you recommend that the school system do everything it can to bring those levels down to the safe EPA standard?

MR. GREER: Objection. Form.

MR. EDWARDS: What's the basis?

MR. GREER: Incomplete hypothetical.

Q. (BY MR. EDWARDS) You can answer my question.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 246

32
Heidi K. Bojes, Ph.D. - 1/22/2016

A. So I don't make any recommendations in this report. I wasn't -- that wasn't what I was charged to do. All I was charged to do is to determine what the health risks were. And the health risks would -- I would have the same conclusions for a school -- for school children as I would for this -- for the inmates.

Q. Well, would you tell the school to fix the problem?

A. I would tell the school and the prison the same thing, that the risk is what it is, and that to avoid arsenic levels, you shouldn't drink the water or you should lower it.

Q. Okay. Well, one important part of a State agency that's protecting the people of Texas is not just doing the research, but it's telling people what to do because of the research. Right?

A. Right.

Q. Okay. So again, you know, for the benefit of the court, if this were a school system, I assume -- did I hear you correctly? You would tell the school system, you need to fix this to bring these down to the levels that the EPA recommends. Is that fair?

A. If they -- if I was making a recommendation

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 247

to the school system, I would say, yes.

Q. Okay. And you would make that same recommendation to the Pack Unit. Right?

A. Sure.

Q. Okay.

A. If someone asked me, yeah. Like you are.

Q. Like I am. And you would have made that recommendation in 2006. Right?

A. Uh-huh. Yes.

Q. Yeah. I mean, we're looking at a --

A. Yeah.

Q. If these numbers are to be believed, and you have no reason to disbelieve them. Right?

A. I have no reason to disbelieve them.

Q. Okay. Now, you didn't personally see the samples. Right?

A. I did not.

Q. You don't know who collected the samples, do you?

A. I do not.

Q. You don't know if they were collected by like a correctional officer or someone qualified to collect them, or do you?

A. I do not. I'm -- yeah, I do not.

Q. Okay. Do you know how they're collected? I

35
Heidi K. Bojes, Ph.D. - 1/22/2016

an elevated risk of multiple cancers, don't you?

A. It -- it presents an elevated risk, but that risk is a low risk, so -- it is a low risk.

Q. It depends on the -- how long the exposure is. Right?

A. Correct.

Q. It depends on how much water you're drinking. Right?

A. Correct.

Q. Okay. And it is statistically significant and elevated. Right?

A. I'm not sure if it's statistically significant. It is elevated. And you're right, it does depend on how much water you consume, how long you consume it. Right. And the risk would obviously go up the more you consume, the longer you consume.

Q. Shouldn't the State of Texas, when it knows about a problem in its prison system that increases the risk of multiple cancers, solve that problem as quickly as it can?

A. So since it is -- there is an increased risk, I believe that the problem should be fixed. But it isn't -- I would not regard this as an imminent threat.

Q. That's because it takes some time for the

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 249

cancer to develop. Right?

A. Well, because it does take time for cancer to develop, but the -- the risk levels are low.

Q. Why did the EPA -- the EPA changed its standard from 50 parts per billion to ten parts per billion. Correct?

A. Yes.

Q. Do you know why?

A. They -- they 50 -- they didn't think 50 was protective enough.

Q. They thought it had to be -- and many scientists think it needs to be lower than ten parts per billion. Are you aware of that?

A. Yes.

Q. Many scientists think, once you're above three parts per billion, there is a problem. Right?

A. Correct. Well, zero is the goal, is the MCL goal with cancer-causing agents like arsenic, because they don't know how arsenic causes -- the mechanism by which it causes cancer. The only -- they -- the only way -- they say, no level is good enough.

Q. And that's because arsenic is a very dangerous substance. Right?

MR. GREER: Objection. Form.

A. The reason why they set the MCL G, the

37
Heidi K. Bojes, Ph.D. - 1/22/2016

MCL -- maximum contaminant level to zero is because they don't know how arsenic works, the mechanism of how it works. So if they could develop -- if they knew a level below which no effects would occur, then they could set it at that level.

Q. All right. Do you know if the Pack Unit has fixed its arsenic levels such that they comply with the EPA?

A. I -- I don't know. I don't think they have.

Q. So if we believe this data, the Texas Department of Criminal Justice has known since 2006 that its arsenic levels are above the acceptable standard set by the EPA. Is that correct?

A. I don't know if the criminal justice -- I'm assuming they would know because these are their results. But, yes, since 2006 the level has been above ten -- the MCL. Correct.

Q. What is it today? What day is it today?

A. The 22nd, 2016.

Q. Okay. So that's almost ten years ago. Right?

A. 11? Is it 11 years -- ten years -- yes.

Q. What on -- is that acceptable, according to -- I mean -- well, strike that.

Do you know of any -- do you know

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 251

38
Heidi K. Bojes, Ph.D. - 1/22/2016

personally of any reason why this problem could not have been fixed in the last ten years?

MR. GREER: Objection. Form.

A. I don't know why it could not have been fixed.

Q. (BY MR. EDWARDS) Okay. Do you know if there are plans to even fix it, to bring it down to acceptable EPA levels, prior to this summer?

A. I don't know --

MR. GREER: Excuse me.

Objection. Assumes facts not in evidence.

MR. EDWARDS: It's a question.

MR. GREER: Okay. I've made my objection.

Go ahead.

A. From what Matt has told me, that they do have plans to install a filter system to reduce the arsenic levels to meet ten.

Q. (BY MR. EDWARDS) In the winter -- in next year. Right? January 2017. Right?

A. Right.

Q. And this information comes from Mr. Greer?

A. Correct.

Q. Okay. That means that these dangerously

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363**
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 252

39
Heidi K. Bojes, Ph.D. - 1/22/2016

high arsenic levels, inmates will continue to be exposed to them. Right?

MR. GREER: Objection. Form.

A. The inmates will be exposed to levels twice to four times. Right.

Q. (BY MR. EDWARDS) Okay. Let me reask that.

That means that this summer, inmates will once again be exposed to between two and four times the acceptable level, according to the EPA. Right?

A. They can if these levels are consistent.

Q. And even higher if you take the tack that any trace element -- any trace percentage of arsenic in your water may lead to health problems. Right?

A. I'm not following that. Even higher?

Q. Well, do you know -- is there arsenic in everyone's drinking water?

A. I don't -- I can't answer that either. There may be.

Q. Okay. If I buy a bottle of Ozarka bottled water, should that have arsenic in it?

A. I don't -- I don't know about bottled water, the regulations for bottled water. I don't think they're are even any. There could be. It depends where you get that water, if you get it --

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 253

40
Heidi K. Bojes, Ph.D. - 1/22/2016

Q. I just -- on the label, I've never seen arsenic on a label for bottled water.
A. Well --
Q. Has your agency ever tested bottled water randomly to determine whether or not there are arsenic levels?
A. No, they have not.
Q. If the arsenic levels in bottled water were at the levels of the Pack Unit, would you allow that water to be sold?
A. Would I?
MR. GREER: I'm going to object to the form.
A. I would make the same recommendation I would make here.
Q. (BY MR. EDWARDS) You would tell them to stop it. You would rely on the powers that be who govern the provision of bottled water to take your recommendation seriously. Right?
A. Yes.
Q. Okay. Have you made your recommendation to fix this problem to anyone besides Matt Greer?
A. No, I have not.
Q. Did you talk to -- was it Doctor John --
A. Villanacci.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 254

Q. Yeah, did you talk to him about this issue?
A. Yes.
Q. What did you talk to him about?
A. I told him about the situation. The...
Q. What did he say?
A. He -- we -- I don't remember exactly what we talked about. We talked about how we would approach this problem.
Q. What did he say?
A. What did he say?
Q. And when you say, approach this problem, you mean analyze the problem?
A. Yes. Analyze it. Right.
Q. You're the agency that the Texas Department of Criminal Justice can turn to if it wants to analyze how much risk it is because there is lots of arsenic in its water at the Pack Unit. Right?
MR. GREER: Objection. Form.
A. Right. One of the things we do -- my group does is evaluate the health risk of environmental chemicals.
Q. (BY MR. EDWARDS) TDCJ has known that there has been arsenic in its water at the Pack Unit for almost ten years. Right?
A. I'm not sure how -- when they first --

Q. At least ten years. Right?
A. I don't know --
MR. GREER: Answer if you can, Doctor.
A. Yeah, I don't know when they found out about it. I know...
Q. (BY MR. EDWARDS) Okay. Well --
A. Oh, wait. Wait. I'm sorry. So did you say TD -- the prison?
Q. Yeah.
A. The prison, yeah, I'm assuming they know because they sampled the results. Correct.
Q. I mean, if they didn't know and they just threw these results into a desk drawer --
A. Yeah.
Q. -- you would find that problematic?
A. I misunderstood you. Uh-huh. Got it.
Q. Did your agency get a call in 2006 about evaluating these levels?
A. Not that I'm aware of.
Q. 2007?
A. I -- I wasn't at that agency then, but not that I know of.
Q. Okay.
A. This is --
Q. At any point until you were retained in this

43
Heidi K. Bojes, Ph.D. - 1/22/2016

lawsuit, was your agency ever consulted about the problems of arsenic levels in its water at the Pack Unit?

A. Not that I know of, so, no.

Q. Okay. Do you know if the inmates at the Pack Unit have been told that there are levels of arsenic in the water that they're drinking that elevate their risk of multiple cancers?

A. I don't -- I don't know if they've been told.

Q. Do you think that they ought to be told?

A. Yes.

Q. Why?

A. Because there is a risk of drinking this water that is more than the risk they would -- more than the risk they would have drinking just at the MCL. And it's their right, so they can have the choice of whether to drink the water or not.

Q. Okay. They should have the choice -- they should have a choice to drink safe water. Right?

MR. GREER: Objection. Form.

A. They -- they should have the choice to decide -- they -- I believe that they should know what the results are of their drinking water.

Q. (BY MR. EDWARDS) Do you know if there is an

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 257

44
Heidi K. Bojes, Ph.D. - 1/22/2016

alternative source of water for the inmates to drink at the Pack Unit?

A. I don't -- I don't remember that. I don't know if they're providing bottled water or not.

Q. Well, should there be an alternative source of water that doesn't have these elevated levels of arsenic and that doesn't elevate the risk of eventually developing lung cancer, bladder cancer, or kidney cancer?

MR. GREER: Let me object as outside the scope of her opinions. And my objection is under Rule 701 through 704.

Go ahead and answer if you can, Doctor.

A. So to -- can you repeat the question?

Q. (BY MR. EDWARDS) Sure. Yeah, I mean, should there be an alternative source of water that doesn't have two to four times the level of arsenic that is appropriate, according to the EPA?

A. So -- so from the calculations, there is an increased risk. It's a small increased risk. But to not have that risk, you should not drink the water. So, yes.

Q. Okay. And so you could bring in bottled water which didn't -- which wasn't laced with the levels of arsenic that do increase your risk of

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 258

cancer. That's a possibility. Right?

A. Yes.

MR. GREER: Same objection previously asserted under Article 7, I'll say, of the Rules of Evidence.

Q. (BY MR. EDWARDS) One would solve that problem, the provision of safe bottled water, simply by buying it and bringing it into the prison. Right?

MR. GREER: Same objection.

Q. (BY MR. EDWARDS) It could. Right?

A. Drinking water without arsenic would lower their risk.

Q. That would be better for the prison population. Right?

MR. GREER: Objection, same previously asserted.

A. Their risk would be less.

Q. (BY MR. EDWARDS) Yeah.

A. Than they have now.

Q. There is going to be testimony in this case from an epidemiologist, a doctor, and all likelihood a former director of a prison system that you ought to provide drinking water that is safe and below the arsenic levels recommended by the EPA. Do you have any reason to disagree with that?

MR. GREER: Objection. Assumes facts not in evidence. In other words, that I think only one of the three people mentioned mentions anything about that in their report. So I'll object to that point of the question.

But answer if you can, Doctor.

A. So you're asking me if these experts, if they -- their recommendation is to drink safe water, am I disagreeing with that?

Q. (BY MR. EDWARDS) Yes.

A. No. I think people should drink --

Q. Some of them are softballs, and I appreciate that, Doctor. Okay.

Do you know about the -- the problems of extreme heat inside the Texas prison system during the summer months?

MR. GREER: Let me object under Rule 601, 602 and 701 through 704.

You can answer if you can, Doctor.

A. I don't know.

Q. (BY MR. EDWARDS) Do you know if the housing areas at the Pack Unit are air conditioned?

MR. GREER: Same objection.

A. I don't think they're air conditioned because that's what this whole thing is about.

Q. (BY MR. EDWARDS) And I'll represent to you that they're not air conditioned and that there is no climate control mechanism in which the temperature can be raised or lowered mechanically. Okay?

A. Yes.

Q. Okay. Have you been told anything differently than the representation I gave you?

MR. GREER: Same objections.

A. No.

Q. (BY MR. EDWARDS) Okay. Were you told anything about the subject matter of this lawsuit by anyone from TDCJ or the Attorney General's Office?

MR. GREER: Same objections.

A. I was told that the -- the lawsuit is regarding the living conditions of the prisoners, that there isn't air conditioning -- yeah.

Q. (BY MR. EDWARDS) They're living in temperatures that are above 90 degrees all the time during the summer months.

MR. GREER: Objection. Mischaracterizes the evidence and --

MR. EDWARDS: Let me reask it.

MR. GREER: -- same objections as -- go ahead.

Q. (BY MR. EDWARDS) Are you aware that the

inmates are living in temperatures above 90 degrees for a significant period of every day in the summer?

MR. GREER: Objection. Assumes facts not in evidence. Also object under Rule 601, 602 and 701 through 704. This is very far afield of anything this expert is being qualified for or offered for in this case.

Go ahead, Doctor.

A. I can imagine living in Texas without air conditioning is really -- would be really difficult and very, very hot and uncomfortable. Yeah. That would be...

Q. (BY MR. EDWARDS) It would -- would it -- based on your knowledge of epidemiology and the human body, it's harder for people who are elderly or who have health conditions to live in those periods of extreme heat. Right?

MR. GREER: Same objections. This expert has not been qualified on this subject, so the objection is under 601, 602, and 701 through 704. It's not in her report and it also calls for speculation.

Go ahead and answer.

A. So, right, I'm not an expert on any of these things, but, yes, the elderly tend to have a harder

49
Heidi K. Bojes, Ph.D. - 1/22/2016

time dealing with extreme heat.

Q. (BY MR. EDWARDS) Okay. And you know that how?

A. Pardon me?

Q. How do you know that the elderly have a more difficult time dealing with extreme heat?

MR. GREER: Same objection.

A. They -- they are just not as -- they're not as young. Their metabolism, their heating, cooling mechanisms. They might have other conditions that make it harder, heart conditions or --

Q. (BY MR. EDWARDS) Sure. And --

A. -- all that.

Q. That would be fairly obvious to anyone who has lived in the state of Texas. Right?

A. Correct.

MR. GREER: Same objections.

Q. (BY MR. EDWARDS) And it certainly would be obvious to anyone who has a scientific background and who has a Ph.D. in epidemiology. Right?

MR. GREER: Same objections.

Q. (BY MR. EDWARDS) Anybody. Anybody who has lived in Texas with your background, you have a Ph.D. in epidemiology. Right?

A. No, it's not in epidemiology.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 263

Q. (BY MR. EDWARDS) Do you know of a single medication?

MR. GREER: Same objections.

A. I can't --

Q. (BY MR. EDWARDS) If you don't, you don't. That's okay. No?

A. I don't think so.

Q. Okay. All right.

Are you aware that the State of Texas, the prison system, has adopted mitigation -- alleged mitigation measures to deal with the extreme heat?

MR. GREER: Same objections.

A. The only thing that I know about that is from Matt.

Q. (BY MR. EDWARDS) Uh-huh. And what did he tell you?

A. And he said that the way this unit does that, mitigates the high temperature, is by providing water, ice water.

Q. Okay. Would you tell -- well, would you tell the court what problems there could be if this measure -- well, strike that.

That means that the principal measure in which this Pack Unit prison is taking to deal with the extreme heat is to intentionally expose the

inmates to elevated levels of arsenic, in violation of EPA standards. Correct?

MR. GREER: Same objections.

Go ahead.

A. By providing water, ice water, and if it's from their groundwater, they would be -- and they're drinking more of it, they would be exposed to more arsenic.

Q. (BY MR. EDWARDS) And the more water they drink, the higher the risk of developing cancer. Correct?

A. Correct.

Q. Do you know how the Pack Unit justifies having a practice that focuses on exposing upwards of 1400 inmates intentionally to higher than permissible levels of a known carcinogen?

MR. GREER: Objection. Form.

A. I don't know how to answer that.

Q. (BY MR. EDWARDS) Well, how on earth could you justify exposing inmates to a carcinogen intentionally at higher levels than the EPA allows?

MR. GREER: Same objection.

A. You're -- the question, if I'm understanding it, you're asking me how -- what their justification is?

Q. (BY MR. EDWARDS) Well, do you know their justification?

A. I don't know their justification.

Q. Can you think of any?

MR. GREER: Objection. Calls for speculation.

Q. (BY MR. EDWARDS) No way to speculate, but can you think of any?

A. I don't know -- I don't know.

Q. I can't think of any.

A. I don't want to talk on behalf --

MR. GREER: Same objection.

A. -- of the prison unit.

Q. (BY MR. EDWARDS) All right. Okay.

Do you know if chronic low dose exposure to arsenic has been implicated in respiratory problems in children and adults?

MR. GREER: Let me object to the form, if you can define the dosage you're talking about.

Q. (BY MR. EDWARDS) Would you answer my question?

A. Yeah. I don't -- I know -- so via inhalation, arsenic, depending on the dose, I think it does cause some respiratory issues. It can also lead to lung cancer.

54
Heidi K. Bojes, Ph.D. - 1/22/2016

Q. Okay. And also by drinking the water, it can -- it's been implicated in -- well, is it associated with elevated risks of cardiovascular disease, diabetes, cancers of the skin, cancers of the bladder, and lung cancer.

MR. GREER: Same objection.

A. Yes.

Q. (BY MR. EDWARDS) And are you aware that trace amounts of arsenic in the body interfere with tumors suppressing glucocorticoid hormones?

MR. GREER: Same objection.

A. I wasn't aware of that.

Q. (BY MR. EDWARDS) Okay. Do you know that arsenic interferes with the normal function of immune cells?

MR. GREER: Same objection.

A. Yeah, I wasn't aware of that either.

Q. (BY MR. EDWARDS) Do you know that arsenic can damage lung cells and cause inflammation of cells in the heart?

MR. GREER: Same objection.

Go ahead.

A. Yes.

Q. (BY MR. EDWARDS) Okay. Do you know that researchers at the University of Chicago found that

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 267

levels would take into -- into account sensitive individuals like people who have -- who are sick.

Q. (BY MR. EDWARDS) Okay. Do you know who -- what would you describe as a sensitive subpopulation with regards to arsenic in drinking water at these levels at the Pack Unit?

A. So the definition or what I regard as sensitive subpopulations are the young -- well, so it would be, in general --

Q. Well, fortunately, we don't have any young people at the Pack Unit that I'm aware of.

A. Right. So elderly, anyone who is sick or immunocompromised, those are all sensitive individuals. Older people.

Q. So for older or elderly people, would that be above 60, above 65?

A. It would -- it would depend. There are some very hardy 80 year-olds and some sickly 50 year-olds.

Q. And I appreciate. But you're an epidemiologist and you have to take groups and try to figure out risks. Right?

A. Correct.

Q. There is always going to be a super healthy 88 year-old, but most 88 year-olds aren't super healthy. Right?

64
Heidi K. Bojes, Ph.D. - 1/22/2016

about -- I don't remember.

Q. Okay. All right. Let me take a look at it. Okay.

(Deposition Exhibit No. 2 marked.)

Q. (BY MR. EDWARDS) Let me hand you a document from the Natural Resources Defense Council pulled off the Internet, entitled Arsenic in Drinking Water. Would you take a moment to look at that, please.

A. Okay.

Q. What does that appear to be to you?

A. It appears to be a -- information, a fact sheet about arsenic in drinking water.

Q. Okay. Would that be helpful for the court to learn about facts that are relevant to what arsenic can or does do when it's contained in your drinking water?

MR. GREER: Objection. Form.

A. I'm not sure where -- how to answer that -- it contains information about arsenic in drinking water. It can be used as a resource.

Q. (BY MR. EDWARDS) Fair enough.

A. I didn't use it, but it can be.

Q. Okay. There is a chart, it says, arsenic level in tap water in parts per billion, or ppb, approximate total cancer risk assuming two liters

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 269

68
Heidi K. Bojes, Ph.D. - 1/22/2016

A. That is according to this paper and these researchers.

Q. Of course.

A. Right.

Q. Of course. Now, if we go up to 25 parts per billion, we're going to increasing the chances by one in 200 according to this chart?

A. According to that chart.

Q. So that's like a half a percent of the time. Right?

A. According to this chart.

Q. And if we get up to 50, one time in a hundred you're going to develop one of these cancers. Right?

A. I can't see that far.

Q. Sure.

A. Yes. According to this chart.

Q. According to this chart. So if that chart is accurate, that would -- would that suggest to you that arsenic levels in between ten and 50 pose a very real elevated risk of someone developing cancer?

A. If this chart is accurate. I don't know what -- I don't know how they came up with these numbers.

Q. Those numbers, nevertheless, are consistent

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 270

with your understanding of the elevated risks of developing the cancers we talked about, though. Right?

MR. GREER: Objection. Form. Mischaracterizes her prior testimony and her report.

A. I came up -- we did the same thing -- we determined -- I did.

Q. Right.

A. One of the things I evaluated was cancer risk. Right.

Q. And you found that the cancer risks became elevated. Right?

A. Yes.

Q. Okay. And I believe, in your report -- and I'll let you see it. Do you have your report?

A. It's right here.

Q. Okay. In your report, you look at, you know, the difference between the .10 level and the levels -- the average levels at the Pack Unit. Right?

MR. GREER: Have you marked that as an exhibit, or --

MR. EDWARDS: No, we're not marking that as an exhibit.

MR. GREER: Okay.

MR. EDWARDS: It's got writing on it,

Matt.

MR. GREER: Okay. Well, do you want a blank one?

MR. EDWARDS: For now, what I want to do is ask questions about it. Okay?

MR. GREER: Well, if you're going to ask questions about it, let's get a blank one so she can review it.

Q. (BY MR. EDWARDS) Are you comfortable talking about your report, the report you prepared, without reading it right now? In verbatim? Are you comfortable talking about it?

A. Yes.

Q. Okay. Because you prepared it and it's your expertise. Right?

A. Correct.

Q. Okay. If you need to reference that for any reason, feel free. Okay? But you're not incompetent or incapable of talking about the opinions that you -- that you have made without reading it -- the five pages right now, are you?

A. I can talk about my -- the work I did, the report I did without looking at it. I may not know -- remember --

Q. Of course.

A. -- every number.

Q. Of course. Of course. Did you analyze the -- the elevation of risk between the .10 parts or the ten parts per billion standard and what was at the Pack Unit?

A. Right. I compared the risk that the -- the risk of -- the risk with the elevated arsenic level in the groundwater to what the risk would be with arsenic at ten parts per billion. Correct.

Q. And what was that opinion that you have -- that you determined?

A. That there is a risk when you drink at ten parts per billion. The risk is less than the risk -- the -- it's a little bit less than what you -- what I determined for people who drink the water at the Pack Unit, for both three and nine years.

Q. Okay. It's significantly less. Right?

MR. GREER: Objection. Form.

Q. (BY MR. EDWARDS) Take a look at your report.

MR. GREER: You just asked her to look at her report. Can we not mark it as an exhibit?

MR. EDWARDS: Not right now.

A. I don't know if I would say it's significantly less.

73
Heidi K. Bojes, Ph.D. - 1/22/2016

A. He did not determine three liters a day.
Q. You did?
A. I determined three liters a day.
Q. And why did you choose three liters a day?
A. I knew three liters a day is on the high end of what adults, children drink.
Q. Okay.
A. According to CDC's and Haynes' survey.
Q. Okay.
A. So...
Q. And it would be much higher in a prison where the temperatures are sweltering and the only fluid you're capable of drinking is water contained with these arsenic levels. Right?
MR. GREER: Objection. Form.
MR. EDWARDS: What is the basis?
MR. GREER: The objection is that it calls for speculation and it also assumes facts not in evidence.
Q. (BY MR. EDWARDS) Were you ever told that the inmates' only means of hydration is arsenic-laced water at the Pack Unit?
MR. GREER: Objection. Assumes facts not in evidence.
A. I was never told that.

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363**
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 274

Q. (BY MR. EDWARDS) Okay. If the only water that is available to inmates in the housing areas -- nonair-conditioned hot housing areas in the summer is arsenic-laced well water, these inmates would be drinking, I guess, many liters of arsenic-laced well water?

MR. GREER: Objection. Form.

Q. (BY MR. EDWARDS) Would that be your expectation?

MR. GREER: Objection. Form.

A. I don't know how much they would be drinking.

Q. (BY MR. EDWARDS) Okay.

A. In these calculations, we assumed three liters per day.

Q. All right. Okay. Was there any questioning between you and Mr. Greer about how many liters a day the prison system observed inmates drinking water?

A. No.

Q. Were there any discussions or questions about whether or not water was always provided to the inmates?

A. It was my recollection from conversations that one way the prison was compensating or mitigating the high temperatures was by providing ice water,

so...

Q. And would be -- okay. They were attempting to mitigate through the provision of ice water. That's what you were told?

A. Correct. Uh-huh. Yes.

Q. All right. You -- all right. And you did this analysis, and tell me what you -- what you determined.

A. So we looked at -- I looked at a nine-year interval.

Q. Uh-huh.

A. To take into account from 2000 time period where there was elevated arsenic in the groundwater that we know about, and then this two year period. So if you start from now until approximate time when they're going to put in a filtration system, those were the two --

Q. Now, to be fair, you don't know if there was arsenic in the groundwater in 2003, do you?

A. I do not.

Q. 2004? 2005?

A. Correct.

Q. Okay. Given that there were 37 parts per billion in 2000 -- 5 is it? Or 6?

A. The first --

77
Heidi K. Bojes, Ph.D. - 1/22/2016

Okay. Now, in addition to drinking the water, these inmates would also be exposed to these high levels of arsenic when they're showering. Right?

MR. GREER: Objection. Form.

MR. EDWARDS: Are you quibbling with "high levels of arsenic"?

MR. GREER: Yeah. She's testified numerous times that she doesn't believe that the levels -- she would call them high.

Q. (BY MR. EDWARDS) Do you think 37 parts per billion is a high level of arsenic in water?

A. I -- I don't think it's high enough to cause noncancerous adverse health effect in -- and it does increase cancer, but the level at which it increases is very low.

Q. Well, it still increases the risk of cancer. Right?

A. It does.

Q. That's not something someone should purposefully do. Right? If they have a conscience, a heart, or a brain?

MR. GREER: I'll object to the form.

You can answer if you can, Doctor.

A. Okay. So my personal opinion?

Q. (BY MR. EDWARDS) Yeah. Given that you have

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 277

78
Heidi K. Bojes, Ph.D. - 1/22/2016

a conscience. Correct?

A. Yes.

Q. And a heart?

A. Yes.

Q. And a brain?

A. Yes.

Q. Okay. In your person opinion, is that something someone -- any agency should do, purposefully expose inmates to levels of arsenic that you found at the Pack Unit for a period of eight, nine or ten years?

MR. GREER: Same objection as previously asserted. And let me also add, 601 through 602 and 701 through 704.

Go ahead, Doctor.

A. Again, this is my personal opinion. I don't think anyone should expose anybody to something that is harmful.

Q. (BY MR. EDWARDS) Well, and it's even worse when you can easily prevent it. Right?

MR. GREER: Objection. Definitely mischaracterizes the evidence.

Q. (BY MR. EDWARDS) Right?

A. So are there -- there are -- I don't know if it's worse or not. I mean...

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 278

80
Heidi K. Bojes, Ph.D. - 1/22/2016

(The requested text was read back.)

MR. GREER: And I will assert the same objections.

Go ahead.

A. I was going to say, can you repeat that again? No.

So -- I guess I just want to repeat that -- so based on these levels, I don't anticipate that there would be any noncancer adverse health effects. There is a slight increase in cancer risk with the assumptions I used, you know, drinking three liters a day over a nine-year period and over a three-year period. So above what you would expect if you just drank at the MCL, which also there is also a risk. And so I don't -- I wouldn't regard these levels as any kind of imminent health threat, but -- but I don't think it should be left alone either, you know. The water -- you shouldn't provide this water because it does cause an increase in risk.

Q. (BY MR. EDWARDS) And when you used the word "imminent," you mean immediate. Right?

A. Immediate.

Q. Okay. And when I hear you say that, that you don't think there is an imminent health risk of cancer, you're saying, look, if you drink this water

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 279

81
Heidi K. Bojes, Ph.D. - 1/22/2016

for 30 days or something, it's not like you're destined to get cancer. Right?

MR. GREER: Objection. Mischaracterizes her testimony.

But go ahead and answer, Doctor.

A. By imminent risk, I don't think there is any risk of drinking this water that would cause noncancer health effects or cancer -- would increase your cancer risk, but at a very, very low level.

Q. (BY MR. EDWARDS) Is it 3.4 cases per 100,000 and 1.5 cases per 10,000 people for a two- and nine-year exposure period?

A. Is what I wrote?

Q. Yeah.

A. Then, yes, that's what I determined.

Q. Okay. Which would be a big deal to the person that develops cancer. Right?

MR. GREER: Objection. Form.

Go ahead.

A. Right. I would -- cancer is a big deal to anyone who gets it.

Q. (BY MR. EDWARDS) Okay.

A. Absolutely.

Q. In addition to exposure through drinking water, inmates at the Pack Unit would necessarily get

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 280

studies that suggest that dermal contact with arsenic-laced water can cause skin problems and skin lesions? If you're not, that's fine, but are you aware?

A. So arsenic -- ingestion of arsenic can lead to skin problems. That's one of the hallmark facts of drinking a lot of -- of drinking arsenic at very high levels, it causes skin problems.

Q. What kind of skin problems?

A. For example, it can lead to keratosis, which is this hardening, darkening color of the skin. Blackfoot disease.

Q. Anything else?

A. Those are the two things that come to mind.

Q. You also note vascular complications. Would you explain that to the court, please?

A. One adverse health effect that you -- that has been shown following arsenic exposure is impacts to the cardiac system. So it can disrupt -- impacts the vessels, blood vessels, and can lead to them disrupting or bursting.

Q. That would seem to be -- to have a more deleterious effect or negative effect on someone suffering from hypertension. Would you agree with that?

Q. Okay. It looks like you looked at this appendix right here? Or that was in the file that was provided by your lawyers. Is that something --

A. Yeah, it was in my file. Correct.

Q. Okay. Do you agree that long-term exposure to smaller amounts of arsenic is more common and can increase the risk of developing cancer of the bladder, lungs, skin, liver, kidney, or prostate?

A. So it doesn't say what smaller amounts are.

Q. Okay.

A. Long-term exposure to arsenic has been shown to cause lung, skin, liver, kidney cancer. It's pretty clear.

Q. Okay. Other health effects may include high blood pressure, narrowing of the blood vessels, nerve damage, anemia, diabetes, stomach upset, and skin changes?

A. Those are some of the adverse health effects you can -- correct.

Q. Do you know -- no one knows why it contributes to diabetes. Is that correct?

A. That is correct. That's actually something that is very new that they've just found out.

Q. They've found that -- that arsenic levels, even at the rates that the Pack Unit is exposed, may

contribute to the development of diabetes. Isn't that correct?

MR. GREER: Objection. Mischaracterizes her testimony --

A. I don't know -- I don't remember what the levels are in that study.

Q. (BY MR. EDWARDS) Okay. Do you remember reading the study?

A. I remember coming across the study, I remember reading about the study. Right.

Q. Okay. Do you know how many people have diabetes at the Pack Unit?

A. I do not.

Q. Do you know how many people have high blood pressure at the Pack Unit?

A. I do not.

Q. Do you know how many people suffer from hypertension at the Pack Unit?

A. I do not.

Q. Do you know how many people are elderly at the Pack Unit?

A. I do not.

Q. I believe that -- without being too repetitive, you would agree with this sentence, but I want to make sure.

98

Heidi K. Bojes, Ph.D. - 1/22/2016

More exposure to arsenic increases the likelihood that health problems will occur. Reducing exposure reduces the risk.

Is that something that you agree with?

A. Okay. I'm going to break that up into two parts.

Q. Sure.

A. No exposure, you'll have no risk.

Q. Okay.

A. The only way you can have risk is if you're exposed. Okay? What your risks are or what the adverse health effects are following exposure depends on a lot of factors. Right? How much, how often, who you are, what form you're exposed.

Q. Do you agree with the sentence in this appendix that you provided us: More exposure to arsenic increases the likelihood that health problems will occur.

A. I would say that it would be true for cancer because it does increase the risk of cancer. But it may or may not increase the risk of noncancer effects.

Q. Okay. Do you agree with this: If your water contains between ten parts per billion and 50 parts per billion arsenic, your chance of developing health problems increases.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 284

100
Heidi K. Bojes, Ph.D. - 1/22/2016

preparation over the long term.

Did I read that correctly?

A. You read that correctly.

Q. Do you agree with that?

A. So I think the key point in that sentence is "long term."

Q. What do you consider long term?

A. So I want to -- long term -- so I think the -- the -- again, the long term, so -- you know, from the report I did, three to nine years at these levels, I agree that there will be an increased risk, but I don't think there would be any noncancer risk.

MR. EDWARDS: And I say this respectfully, that I have to object as nonresponsive to that question.

Q. (BY MR. EDWARDS) Do you agree, as someone who works for an agency that identifies water problems, with the recommendation from the State of Washington that its -- the members of its public not drink water containing levels of arsenic between ten parts per billion and 50 parts per billion or using such water for food preparation over the long term?

A. I would agree with that statement.

Q. Okay. Now, in the -- it also has advice, how can I reduce my exposure to arsenic from my well.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 285

Correct?

A. Yes.

Q. And one such -- one such way to reduce the exposure is to use bottled water, according to the State of Washington. Correct?

A. I can barely see it, but, correct.

Q. Okay.

A. Yes. It says, use bottled water.

Q. That's one option. To the best of your knowledge, the Pack Unit does not use that option. Right?

MR. GREER: Objection. Assumes facts not in evidence.

A. I don't know what the Pac Unit does.

Q. (BY MR. EDWARDS) Are you aware of any evidence or suggestion that they use bottled water during the summer months?

MR. GREER: Same objection.

Q. (BY MR. EDWARDS) At the Pack Unit?

A. I'm not aware. I don't even know --

Q. Another way they recommend is to treat the well water.

A. Could I see --

Q. Do you see that?

A. Yes, I see it. Treat the well water.

111

Heidi K. Bojes, Ph.D. - 1/22/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KEITH COLE, JACKIE BRANNUM, RICHARD KING, DEAN ANTHONY MOJICA, RAY WILSON, FRED WALLACE, AND MARVIN RAY YATES, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED §

Plaintiffs, §

VS. § CIVIL ACTION NO. 4:14-cv-1698

BRAD LIVINGSTON, IN HIS OFFICIAL CAPACITY, ROBERTO HERRERA, IN HIS OFFICIAL CAPACITY, AND THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, §

Defendants. §

* * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
HEIDI K. BOJES, Ph.D.

JANUARY 22, 2016

* * * * * * * * * * * * * * * * * *

I, BRENDA J. WRIGHT, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363**
1678ad13-6e59-40ad-8431-8e6ea4f4d91c

Plaintiffs' Preliminary Injunction
Appendix 287

That the witness, HEIDI K. BOJES, Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as well as Rule 30(e)(2) that the signature of the deponent:

__X__ was requested by the deponent and/or a party before completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Corrections and Signature pages contain any changes and the reasons therefor;

_____ was not requested by the deponent and/or a party before the completion of the deposition.

That $_______________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS;

That pursuant to information given to the deposition officer at the time said testimony as taken, the following includes all parties of record:

113
Heidi K. Bojes, Ph.D. - 1/22/2016

For the Plaintiffs:
Mr. Jeff Edwards
THE EDWARDS LAW FIRM
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
512-623-7727/512-623-7729 (fax)
jeff@edwards-law.com
lindsey@edwards-law.com
sean@edwards-law.com
scott@edwards-law.com

For the Defendant(s) Texas Department of Criminal Justice, et al.:
Mr. Bruce R. Garcia
-and-
Ms. Cynthia L. Burton
Assistant Attorney General
Law Enforcement Defense Division
P.O. Box 12548
William P. Clements Building
300 West 15th Street
Seventh Floor
Austin, Texas 78701
512-463-2080/512-936-2109 (fax)
bruce.garcia@texasattorneygeneral.gov
cynthia.burton@texasattorneygeneral.gov
daniel.neuhoff@texasattorneygeneral.gov
matthew.greer@texasattorneygeneral.gov
james.rheams@texasattorneygeneral.gov
mara.kauff@texasattorneygeneral.gov

I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken;

Further, I am not a relative nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 289

114
Heidi K. Bojes, Ph.D. - 1/22/2016

Certified to by me this 15TH day of FEBRUARY, 2016.

BRENDA J. WRIGHT, Texas CSR No. 1780
Expiration Date: 12-31-16
WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
Expiration Date: 12-31-17
1250 S. Capital of Texas Highway
Building 3, Suite 400
Austin, Texas 78746
512-474-4363/512-474-8802 (fax)
www.wrightwatson.com

JOB NO. 160122BJW

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
1678ad13-6e59-40ad-8431-8e6ea4f4d91c
Plaintiffs' Preliminary Injunction
Appendix 290

# Exhibit 19

**From:** Brady, Pamella J.
**Sent:** Tuesday, July 24, 2012 8:02 AM
**To:** jeff.pringle@tdcj.state.tx.us
**Cc:** carol.cozart@tdcj.state.tx.us
**Subject:** FW: RE:
**Attachments:** Hydration.docx

Warden Pringle,

Please see attached flyer related to the importance of drinking water. Dr. Adams has received permission from Dr. Lithicum to distribute this to all units. I would like your permission to post this in the housing areas. Thanks.

Pam Brady, MSW
Practice Manager
Hutchins State Jail
UTMB Correctional Managed Care
(972)225-1304 ext 6264

Confidentiality Notice: This email transmission contains confidential or legally privileged information that is intended for the individual party or entity named in the email address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or reliance upon the contents of this email is strictly prohibited. If you have received this email transmission in error, please reply to the sender and delete the message from your system. Thank you.
--------------------------------------------------------------------------------

---

From: Jarrett, W. E.
Sent: Monday, July 23, 2012 9:59 AM
To: Tribble, Curtis; Stewart, Jeanette F.; Easter, Vicky; McGowan, Rebecca; Outlaw, Patricia A.; Iredell, Debra L.; Buro, Angie M.; Turner, Darlene B.; Gloor, Debra L.; Mott, Khari S.; Martisek, Rudy A.; Stokes, Corrine B.; Sauceda, Denise I.; Freeman, Jackie D.; Saulter, Julia E.; McLearen, Kimberly S.; Davis, Nedra; Brady, Pamella J.; Ogden, Paula M.; Romine, Rachel B.; Pollard, Valencia A.; Stalinsky, Drew E.
Cc: Robison, Justin R.; Saenz, Hilario; Simental, Joe A.; Robison, Jerri D.; Brown, Paul V.; Reinecke, Scott E.; Morris, Susan M.
Subject: FW: RE:

Team,

Please review Dr. Adams' e-mail below about posting the Hydration memo and comply if you have not already done so.

Thanks

W. EARL JARRETT
Region 1, Operations Manager
University of Texas Medical Branch
(512) 268-0079 X135
wejarret@utmb.edu

---

From: Adams, Charles D.

Sent: Monday, July 23, 2012 9:03 AM
To: Morris, Susan M.; Moultrie, Jane M.; Vincent, Bobby M.; Brown, Paul V.; Robison, Jerri D.; Jarrett, W. E.; Saenz, Hilario; Chavers, Jason L.; Dalecki, Robert E.
Subject: FW: RE:

Good Morning,
Please remind your units to place this hydration memo in the housing areas, after getting the unit warden's permission to do so. I have learned that some units have put it in the clinic but not in the housing/dorm areas.
If a warden does not allow this, please let me know.
Thanks,
Danny

Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division UTMB-CMC

---

From: Adams, Charles D.
Sent: Friday, July 13, 2012 12:52 PM
To: Moultrie, Jane M.; Morris, Susan M.; Vincent, Bobby M.; Wright, Gary G.; Chavers, Jason L.; Dalecki, Robert E.; Jarrett, W. E.; Eubank, Gary J.; Smock, Stephen R.; Robison, Justin R.
Cc: Abke, Sarah J.; Adams, Glenda M.
Subject: FW: RE:

Good Afternoon,
This attachment was created by PM Sarah Abke (Pack, Luther, and Hamilton units). It has been approved by Dr. Lannette Linthicum, to be posted in the clinic and housing areas (maybe the dining room, too). I believe that this is a very good thing to do, especially in the summer.
I am always amazed how little water our patients drink and what they consider enough water/day (usually something like 4 or 5 glasses a day). Anyway, every little bit helps....
Thank you, Ms. Abke.
Please post this ASAP.
Thanks,
Danny

Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division UTMB-CMC

# Stay Hydrated

Daily, drink 1 gallon of water

If extreme heat hits or you are working in the heat, daily drink 2 gallons of water

How much is a gallon of water?

**16 cups**

*****Unless medically instructed to limit fluid intake*****

# Este Hidratado

Cada dia tome uno (1) galon de agua

Si el calor es extreme o esta trabajando en el calor tome dos (2) galones de agua

Cuanto es un galon de agua?

**16 tazas**

*****A menos listed tiene limitados liquidos ordenados por medico *****

# Exhibit 20

**AFFIDAVIT**

THE STATE OF TEXAS §
§
COUNTY OF GRIMES §

BEFORE ME, the undersigned authority, personally appeared **Donald Bilnoski,** known to me to be a credible person over the age of 18 years, who, being duly sworn by me, did depose and say that the following is true and correct:

"My name is **Donald Bilnoski,** I am of sound mind; capable of making this affidavit; and I am authorized to make this affidavit in the capacity herein stated. I am personally acquainted with the facts herein stated.

"I am employed as **Assistant Warden;** for the Texas Department of Criminal Justice ("TDCJ") Pack Unit located in Navasota, Texas, and do hereby certify that I am the custodian of records maintained in the regular course of business of the TDCJ.

"I have reviewed the records you have requested; in connection with **D. Bailey, et al v. B. Livingston, et al, cause number 4:14-CV-1698**; and hereby certify that the attached copies of documents are true and correct copies of the original records now on file in my custody. I further certify that the records attached hereto are maintained in the usual and regular course of business at the TDCJ. The entries made and/or documents created were created at or about the time of the occurrence, or reasonable soon thereafter, by an employee or representative of TDCJ with knowledge of the act, event, condition, opinion, or diagnosis reflected in the records, and that such records are maintained on each and every offender confined here.

"Attached are copies of **all signs posted for officers and offenders warning of high temperature, heat related symptoms, and what to do for relief; heat card carried by officers telling them physical symptoms, and what to do for relief; and job assignments for the offenders who deliver ice and/or water.**

Donald J. Bilnoski

**Donald Bilnoski**, Affiant

SWORN TO AND SUBSCRIBED BEFORE ME on September 8, 2014, by the said **Donald Bilnoski** to certify which, witness my hand and seal of office:

JOHN DAVID SEIGLE
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXPIRES 10-28-2015
"NOTARY WITHOUT BOND"

John David Seigle

Notary Public in and for the State of Texas
John D. Seigle

# SURVIVAL GUIDE

# GUIA DE SUPERVIVENCIA

REFRESH. REHYDRATE. REPLENISH.

REFRESCAR. REHIDRATAR. REPONER.

DRINK TOMA WAT3R AGUA

- **Drink water often**
  *BEBER AGUA CON FRECUENCIA*
- **Rest in the shade**
  *DESCANSAR EN LA SOMBRA*
- **Report heat symptoms early**
  *REPORTAR TEMPRANO LOS SINTOMAS DE CALOR*
- **Know what to do in an emergency**
  *SABER QUE HACER EN UNA EMERGENCIA*



REFRESH. REHYDRATE. REPLENISH
REFRESCAR. REHIDRATAR. REPONER.
Heat Related Illness Prevention
PREVENCION DE ENFERMEDAD RELACIONADA AL CALOR
Water
Drink water even if you aren't thirsty every 15 minutes.
Toma agua cada 15 minutos aun si no tienes sed.
Rest in the shade.
Descansa en la sombra
Look out for one another.
Cuidarse uno al otro.
Dehydration Urine Color Chart
Tabla de Color de Orina por Deshidratacion
The following Dehydration Urine Color Chart will help you use your urine color as an indicator of your level of dehydration and what actions you should take to help return your body back to a normal level of hydration.
Doing ok. You're probably well hydrated. Drink water as normal.
You're just fine. You could stand to drink a little water now, maybe a small glass of water.
Drink about 1/2 bottle of water (1/4 liter) within the hour, or drink a whole bottle (1/2 liter) of water if you're outside and/or sweating.
Drink about 1/2 bottle of water (1/4 liter) right now, or drink a whole bottle (1/2 liter) of water if you're outside and/or sweating.
Drink 2 bottles of water right now (1 liter). If your urine is darker than this and/or red or brown, then dehydration may not be your problem. See a doctor.
DRINK
TOMA
WAT3R
AGUA

WATER
PREVENT HEAT RELATED ILLNESS
PREVENIR ENFERMEDAD RELACIONADA AL CALOR
DRINK WAT3R
TOMA AGUA
Agua
REFRESH. REHYDRATE. REPLENISH.
REFRESCAR. REHIDRATAR. REPONER.

Plaintiffs' Preliminary Injunction
Appendix 299

BAILEY 032007





PREVENT HEAT RELATED ILLNESS
PREVENIR ENFERMEDAD RELACIONADA AL CALOR
WATER
DRINK WAT3R
TOMA AGUA
Agua
REFRESH. REHYDRATE. REPLENISH.
REFRESCAR. REHIDRATAR. REPONER.

SURVIVAL GUIDE
GUIA DE
REFRESH. REHYDRATE. REPLENISH.
REFRESCAR. REHIDRATAR. REPONER.
SUPERVIVENCIA
Drink water often
BEBER AGUA CON FRECUENCIA
DRINK TOMA WAT3R AGUA
Rest in the shade
DESCANSAR EN LA SOMBRA
Report heat symptoms early
REPORTAR TEMPRANO LOS SINTOMAS DE CALOR
Know what to do in an emergency
SABER QUE HACER EN UNA EMERGENCIA

Plaintiffs' Preliminary Injunction
Appendix 300

BAILEY 032008

# Exhibit 21

**From:** Adams, Charles D.
**Sent:** Tuesday, May 06, 2014 9:43 AM
**To:** Thompson, Jill A.
**Subject:**
**Attachments:** Heat-Related%20Illnesses%202011[1].ppt; Regional20Medical%20Director%20Duties[1].doc; TDCJ blanket content.pdf; TDCJ Blankets.pdf; WATER.docx

Jill,
You may want to keep some of these to share with Dr. Smith and my replacement.

Charles D. (Danny) Adams, MD, MPH
Senior Medical Director - Outpatient Services
UTMB-CMC

**Confidentiality Notice: This email transmission contains confidential or legally privileged information that is intended for the individual party or entity named in the email address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or reliance upon the contents of this email is strictly prohibited. If you have received this email transmission in error, please reply to the sender and delete the message from your system. Thank you.**

# WHEN IT'S HOT, DRINK A LOT.

# WHEN IT'S HOTTER, DRINK MORE WATER!

# Exhibit 22

1
Fausto Avila, M.D. - 3/5/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,

Plaintiffs,

v.

BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Defendants.

CIVIL ACTION NO. 4:14-cv-1698

*****************************************************************

ORAL DEPOSITION OF

FAUSTO AVILA, M.D.

March 5, 2015

Volume I

*****************************************************************

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363**

Plaintiffs' Preliminary Injunction
Appendix 305

A. He has Parkinson, yes.

Q. So that warning for him really isn't all that helpful, is it?

A. No.

Q. Now, for those healthy patients where water -- well, one of the solutions, I suppose.

Do you know what the EPA is?

A. The EPA?

Q. Yeah.

A. No.

Q. Have you ever heard of the Environmental Protection Agency of the United States of America?

A. Yes.

Q. Okay. Are you familiar with what their job is as an agency?

A. No.

Q. Okay. Do you know what arsenic is?

A. It's a metal, yes.

Q. Is it something that you should drink?

A. No.

Q. Okay. Are you aware that the Environmental Protection Agency has determined that the level of arsenic in the water at the Pack Unit is nearly twice times -- two times it's recommended safe level?

A. No, I have not.

185
Fausto Avila, M.D. - 3/5/2015

Q. Okay. Nobody from Texas Department of Criminal Justice has ever told you that the drinking water here is twice the level of what the EPA recommends as safe?

MS. BURTON: Objection as to time and place.

Q. (BY MR. EDWARDS) Ever.

A. No.

Q. Okay. Would you agree with me that when you're telling people "Hydration is the key," you ought to have safe drinking water?

A. Yes.

Q. Okay. You don't give bottles of water out here to the prisoners, do you?

A. No.

Q. Do you know if TDCJ gives Ethos water at Starbucks or Nice other water at some grocery store to prisoners?

A. No.

Q. They drink out of the tap, right?

A. Yes.

Q. Do you know where that tap water comes from at the Pack Unit?

A. From Navasota, I suppose.

Q. Now, to be fair, to your knowledge, does UTMB have anything to do with the well water that's provided to the prisoners at the Pack Unit?

A. No.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
4eb62001-dc21-4599-a399-c660e21aa7d5
Plaintiffs' Preliminary Injunction
Appendix 307

Q. Do you know that arsenic in drinking water causes bladder, lung, and skin cancer and may cause kidney and liver cancer?

MS. HANEY: Objection to the extent it's compound.

Q. (BY MR. EDWARDS) Would you like me to break it down disease by disease? Let's do it that way.

Do you know if arsenic in drinking water can cause bladder cancer?

A. Yes.

Q. It can, can't it?

A. Yes.

Q. Do you know if arsenic in drinking water can cause lung cancer?

A. No.

Q. You have no idea, one way or the other. Fair?

A. Yes.

Q. Okay. Do you know if arsenic in drinking water can cause skin cancer?

A. Yes.

Q. It can, correct?

A. That's correct.

Q. Do you know if arsenic in drinking water can cause kidney cancer?

A. No.

187
Fausto Avila, M.D. - 3/5/2015

Q. Okay. You just don't know, to be fair, correct?

A. I don't know.

Q. Do you know if arsenic in drinking water can cause liver cancer?

A. No.

Q. To be fair, you just don't know, correct?

A. I don't know.

Q. Okay. Do you know if arsenic in drinking water can harm the central and peripheral nervous systems?

A. Yes.

Q. Okay. Do you know if arsenic in drinking water can harm the heart --

A. No.

Q. -- or blood vessels?

A. No, I don't know.

Q. Okay. And I assume, since you know it can cause skin cancer, you know that it can also cause serious skin problems, right?

A. Yes.

Q. You ever seen a big warning about what the EPA says about the drinking water at the Pack Unit ever?

A. No.

Q. Assuming that the Environmental Protection Agency of the United States of America has something to do with regulating the amount of toxic contents in water, don't you

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
4eb62001-dc21-4599-a399-c660e21aa7d5
Plaintiffs' Preliminary Injunction
Appendix 309

188
Fausto Avila, M.D. - 3/5/2015

think that the medical department at the Pack Unit ought to be brought up to speed with whether or not the drinking water exceeds the EPA standard for arsenic levels?

MS. HANEY: I'm going to object to the extent it calls for speculation by Dr. Avila.

MS. BURTON: And I'm going to object that it assumes facts not in evidence.

THE WITNESS: I think that the corporation has been addressed by the government.

THE REPORTER: I'm sorry? What was that?

THE WITNESS: If the function of this organization is to protect the people, the government should be certainly involved --

Q. (BY MR. EDWARDS) Yeah.

A. -- but I have not received any information to that point. I have been drinking this water for four years now.

Q. Perhaps you should stop.

MS. BURTON: Objection to the sidebar.

MR. EDWARDS: And I'll withdraw that.

Q. (BY MR. EDWARDS) Are you aware that this -- that Warden Herrera and the Texas Department of Criminal Justice have received multiple letters from the EPA regarding the levels of arsenic in the drinking water here?

A. No, I'm not.

Q. Are you aware that the Texas Department of Criminal

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
4eb62001-dc21-4599-a399-c660e21aa7d5
Plaintiffs' Preliminary Injunction
Appendix 310

189
Fausto Avila, M.D. - 3/5/2015

Justice or Warden Herrera has received any letter from any regulatory body concerning the arsenic levels in the water at the Pack Unit?

A. No, I am not.

Q. Are you aware of any attempts by Texas Department of Criminal Justice for Warden Herrera to fix this situation and repair the well so that the arsenic levels go down?

A. No, I don't.

Q. Now, I understand that you have no idea if what I'm telling you is true, okay, but if it is true, doesn't that impact the care and advice you need to give patients?

MS. HANEY: I object to the extent it calls for speculation.

THE WITNESS: I don't have an answer for that.

Q. (BY MR. EDWARDS) Okay. Well, wouldn't it obligate you to talk to Warden Herrera, "Hey, is this true?"

A. I don't see -- if the corporation for the government have this information, I think that action should be taken.

Q. An action --

A. Not exactly by me.

Q. Of course. Of course. Of course.

Again, I think we established that you don't have the power to divert the water to a different source, right?

A. That's correct.

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363**
4eb62001-dc21-4599-a399-c660e21aa7d5
Plaintiffs' Preliminary Injunction
Appendix 311

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated, )

Plaintiffs, )

v. )

BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE )

Defendants. )

CIVIL ACTION NO. 4:14-cv-1698

* * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
DEPOSITION OF DR. FAUSTO AVILA, M.D.
March 5, 2015
VOLUME I

* * * * * * * * * * * * * * * * * * * * * *

I, ABIGAIL L. GUERRA, Certified Shorthand Reporter, in and for the State of Texas, hereby certify to the following:

That the witness, DR. FAUSTO AVILA, M.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure (30)(e)(1)(A) and (B) as well as Rule (30)(e)(2) that the signature of the deponent:

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_X__ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript.

If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

____ was not requested by the deponent or a party before the completion of the deposition.

That $____________________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

249
Fausto Avila, M.D. - 3/5/2015

FOR THE PLAINTIFFS:
DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated,
Mr. Jeff Edwards
EDWARDS LAW
1101 East 11th Street
The Haehnel Building
Austin, Texas 78702
Phone: (512) 623-7727

FOR THE DEFENDANT:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Ms. Cynthia L. Burton
OFFICE OF ATTORNEY GENERAL
300 West 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

FOR THE WITNESS:
FAUSTO AVILA, M.D.,

Ms. J. Lee Haney
Ms. Shanna Molinare
Mr. Marcus Sanders
OFFICE OF ATTORNEY GENERAL
300 West 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties or attorneys to the action in which this deposition was taken;

Further, I am not a relative, nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
4eb62001-dc21-4599-a399-c660e21aa7d5
Plaintiffs' Preliminary Injunction
Appendix 314

Certified to by me this 24th day of March, 2015.

ABIGAIL GUERRA, Texas CSR 9059
Expiration Date: 12/31/15
WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
Expiration Date: 12-31-15
1250 S. Capital of Texas Highway
Building 3, Suite 400
Austin, Texas 78746
512-474-4363/512-474-8802 (fax)
www.wrightwatson.com

Job No. 150305AG

# Exhibit 23

| Texas Commission on Environmental Quality | Office of Water | Public Drinking Water Section |
|---|---|---|
| County Map of TX | Water System Search | Office of Compliance and Enforcement |

| Water System Detail | | | |
|---|---|---|---|
| Water System Facilities Source Water Assessment Results | Violations Enforcement Actions | TCR Sample Results | TTHM HAA5 Summaries |
| Sample Points | Assistance Actions | Recent Positive TCR Results | PBCU Summaries |
| Sample Schedules / FANLs / Plans | Compliance Schedules | Other Chemical Results | Chlorine Summaries |
| Site Visits Milestones | TOC/Alkalinity Results | Chemical Results: Sort by: Name Code | Turbidity Summaries |
| Operators All POC | LRAA (TTHM/HAA5) | Recent Non-TCR Sample Results | TCR Sample Summaries |
| Glossary | | | |

## Water System Detail Information

| Water System No.: | TX0930034 | Federal Type: | C |
|---|---|---|---|
| Water System Name: | TDCJ W PACK UNIT | Federal Source: | GW |
| Principal County Served: | GRIMES | System Status: | A |
| Principal City Served: | | Activity Date: | 01-01-1913 |

## Result List by Analyte

| Analyte Code | Analyte Name | Facility | Sample Point | Sample Collection Date | TCEQ Sample ID | Laboratory Sample ID | Concentration | Method | Detection Limit | Current Maximum Contaminant Level Allowed (MCL) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1005 | ARSENIC | EP001 | TRT-TAP | 02/08/2016 | 1627773 | AD22388 | **0.0124 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 10/26/2015 | 1534586 | AD11661 | **0.0148 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 09/21/2015 | 1534382 | AD07735 | **0.0241 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 05/14/2015 | 1534178 | AC91976 | **0.026 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 03/10/2015 | 1523070 | AC83421 | **0.0251 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 11/10/2014 | 1428852 | AC71597 | **0.0238 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 08/12/2014 | 1495641 | AC63052 | **0.024 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 05/02/2014 | 1428114 | AC52838 | **0.0238 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 01/29/2014 | 1428173 | AC40601 | **0.0213 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 11/13/2013 | 1327491 | AC35021 | **0.0224 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 09/04/2013 | 1327297 | AC29062 | 0.0084 MG/L | 200.8 | | 0.01 MG/L |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1005 | ARSENIC | EP001 | TRT-TAP | 05/22/2013 | 1327091 | AC20191 | **0.0214 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 03/11/2013 | 1326799 | AC12856 | **0.0205 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 12/27/2012 | 1291059 | AC07323 | **0.0209 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 09/12/2012 | 1229520 | AC00654 | **0.0299 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 04/18/2012 | 1229329 | AB87275 | **0.0288 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 02/02/2012 | 1212320 | AB80024 | **0.0214 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 11/17/2011 | 1167414 | AB74816 | **0.026 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 09/01/2011 | 1167228 | AB68849 | **0.0345 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 05/17/2011 | 1167044 | AB56952 | **0.0186 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 02/16/2011 | 1118740 | AB48161 | **0.0437 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 11/10/2010 | 1013501 | AB42267 | **0.0144 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 09/03/2010 | 1013502 | AB36842 | **0.0149 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 04/13/2010 | 1013504 | AB24952 | **0.0314 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 02/16/2010 | 1013503 | AB21055 | **0.045 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 10/30/2009 | 0914562 | AB14147 | **0.0273 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 08/19/2009 | 0914561 | AB09018 | **0.0357 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 06/01/2009 | 0914560 | AB02435 | **0.0287 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 03/09/2009 | 0914559 | AA93074 | **0.0366 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 11/04/2008 | 0816550 | AA82213 | **0.0319 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 08/25/2008 | 0816549 | AA73074 | **0.0233 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 06/23/2008 | 0816548 | AA65192 | **0.0248 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 03/13/2008 | 0816547 | AA54903 | **0.0264 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 12/31/2007 | 0715074 | AA47924 | **0.0256 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 08/28/2007 | 0715073 | AA29976 | **0.0207 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 04/25/2007 | 0715072 | AA11675 | **0.0309 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 02/22/2007 | 0715071 | AA08315 | **0.0272 MG/L** | 200.8 | | 0.01 MG/L |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1005 | ARSENIC | EP001 | TRT-TAP | 12/14/2006 | 0633655 | AA05090 | 0.0099 MG/L | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 08/03/2006 | 0633654 | EP616208 | **0.0265 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 05/16/2006 | 0633656 | EP610016 | **0.0277 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 03/22/2006 | 0605926 | EP606379 | **0.0365 MG/L** | 200.8 | | 0.01 MG/L |
| 1005 | ARSENIC | EP001 | TRT-TAP | 09/03/2003 | | 0309054-02 | Less than Detection Limit | 200.8 | 0.002 MG/L | 0.01 MG/L |

**Total Number of Records Fetched = 42**

**Notes:**
Analyte results are presented sorted by date then TCEQ Sample ID Number.
Single Sample MCL Violations are noted in **Bold Red** in the Concentration column.

# Exhibit 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated, Plaintiffs, VS. BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants. | ) | CIVIL ACTION NO. 4:14-cv-1698 |

********************************************************

ORAL DEPOSITION OF
ROBERTO HERRERA
JANUARY 14, 2015

********************************************************

ORAL DEPOSITION OF ROBERTO HERRERA, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on JANUARY 14, 2015, from 9:57 a.m. to 6:20 p.m., before Linda Rayburn, CSR, RPR, CLR in and for the State of Texas, reported by machine shorthand, at the Pack Unit, 2400 Wallace Pack Road, Navasota, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

A. No.

**Q. Does that concern you?**

A. Would what concern me?

**Q. If there were fights over access to water.**

A. Might think that there may be a problem.

**Q. Have you ever been told there's arsenic in the water at the Pack Unit?**

A. Yes.

**Q. When were you told that?**

A. I've been told it different times before I got to the unit --

**Q. Is it true?**

A. -- and when I got to the unit.

To what I understand it is. But the water has been tested and it's consumable. It's safe to drink.

**Q. Who tested it and determined it was safe to drink if it has arsenic in it?**

A. That was again done up above us.

**Q. Do you know who?**

A. No --

**Q. Do you know what --**

A. -- I don't know who does it.

**Q. I'm sorry.**

**Do you know what division it would be --**

A. Probably --

**Q. -- who we would talk to?**

A. Probably facilities.

**Q. Have inmates ever complained to you about the potential dangers of arsenic in the drinking water?**

A. Yes.

**Q. And what's your response?**

A. "It's been tested. It's safe."

**Q. Do the officers -- do you ever see the officers drinking the same water that the inmates drink?**

A. Yes.

**Q. Do the officers generally --**

A. Now, is it out of the same can; is that what you're asking me? Because we have cans -- we have cans for officers too down the hallway.

**Q. Okay. So the same water goes to the officers that goes to the inmates?**

A. Yes.

**Q. Is it your experience that most of the officers bring in bottled water or Gatorade?**

A. I let them bring in water.

**Q. Is it your experience that most of them bring in their own water?**

A. No, because they'll make the purchase in the commissary too.

**Q. Is it your experience that most of them drink**

 **the bottled water that they either purchase at the commissary or bring in on their own or that they drink this water that may or may not have arsenic in it?**

A. I've seen them do both, Jeff. And like I said, you know, I know that they bring in bottled water, but then like I said, I've seen people just get on the water fountains there and drink all they can.

**Q. Okay. Do you know how much the -- does your water bill go up in the summer, do you know?**

A. I don't know.

(Exhibit 13 marked for identification.)

MR. EDWARDS: I'll hand you Exhibit 13, sir.

THE WITNESS: Okay.

MR. EDWARDS: Cynthia.

MS. BURTON: Thank you.

**Q. (BY MR. EDWARDS) Did you ever try to buy water from City of Navasota?**

A. I know where you're going with this, and the answer to me is no. But I read an article in the newspaper and that's the extent of it. I don't know nothing else about it.

**Q. Who would know whether the -- someone from TDCJ tried to buy water from the City of Navasota instead of the water that it has in its wells here?**

I, ROBERTO HERRERA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted herein.

_________________________
ROBERTO HERRERA

THE STATE OF _________________ )
COUNTY OF ____________________ )

BEFORE ME, ___________________________, on this day personally appeared ROBERTO HERRERA, known to me (or proved to me under oath of _________________________ or through ______________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ________ day of _________________, 2015.

_________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ____________
Commission expires: _____

COUNTY OF HARRIS )
STATE OF TEXAS )

REPORTER'S CERTIFICATION

I, Linda Rayburn, Certified Shorthand Reporter in and for the State of Texas, hereby certify that the witness was duly sworn and that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, that I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 26th of January, 2015.

______________________________
LINDA RAYBURN, CSR
Integrity Legal Support Solutions
3100 W. Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (fax)

COUNTY OF HARRIS )
STATE OF TEXAS )

REPORTER'S SUPPLEMENTAL CERTIFICATE

I hereby certify that the witness was notified on ________________ that the witness has 30 days (_____ days per agreement of counsel) after being notified by the officer that the transcript is available for review by the witness and if there are changes in form or substance to be made, then the witness will sign a statement reciting such changes and the reasons given by the witness for making them;

That the witness signature was/was not returned as of ___________________________.

Subscribed and sworn to on this the _______ day of _______________, 2015.

___________________________________
LINDA RAYBURN, CSR
Integrity Legal Support Solutions
3100 W. Slaughter Lane, Suite A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (fax)

# Exhibit 25

Bryan Shaw, Ph.D., *Chairman*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*

PWS/0930034/CO/09-19-2013/Exception

# Texas Commission on Environmental Quality

*Protecting Texas by Reducing and Preventing Pollution*

September 19, 2013

Mr. Jayson Melcher, P.E.
Halff Associates, Inc.
12225 Greenville Avenue, Suite 200
Dallas, Texas 75243

Re: Exception Request to Use Innovative/Alternate Treatment
Pilot Study Report for an Arsenic Removal Treatment
Texas Department of Criminal Justice, Wallace Pack Unit - PWS No. 0930034
Grimes County, Texas

CN 601550650; RN 102314283

Dear Mr. Melcher:

On June 11, 2013, the Texas Commission on Environmental Quality (TCEQ) received your pilot study report with a cover letter, dated June 7, 2013, in support of an exception to use a coagulation/filtration process for arsenic removal at the Texas Department of Criminal Justice (TDCJ) Wallace Pack Unit. The proposed arsenic removal process is considered to be innovative/alternate treatment as defined in Title 30 of the *Texas Administrative Code* (30 TAC) §290.42(g). The protocol for this pilot study was approved by the TCEQ in a letter dated July 29, 2010. Based on the results of the pilot test, we are **unable to grant** your request to use the coagulation/filtration process at the above referenced public water system.

**Areas of Concern**

From our review of the pilot study results, the treatment process demonstrated arsenic removal to levels slightly above and slightly below the maximum contaminant level for arsenic. It may be possible to consistently achieve compliance with the maximum allowable arsenic levels with some adjustments to operating parameters. One possible solution would be adjustments in the blending ratio between Well No. 3 and Well No. 4 (this may also reduce the total dissolved solids levels). However, using the selected treatment process, post-treatment must be provided at this facility to provide water that is in compliance with minimum drinking water standards. As demonstrated during the pilot study, the optimum ferric chloride dose to provide the highest arsenic removal (1.35 milligrams per liter (mg/L)) also raised the iron levels in the effluent to above the maximum contaminant level for iron (0.3 mg/L). The effluent water from the pilot testing also revealed occasional elevated levels of manganese and total dissolved solids above the maximum secondary contaminant levels. While the pilot study was not designed to provide treatment for regulated contaminants other than arsenic, it was apparent that the ferric chloride addition was responsible for the elevated iron levels in the treated water.

**Options**

If the water system determines that the existing treatment equipment is still the best alternative for arsenic removal, we request that a new pilot study protocol be submitted to include post-treatment for iron/manganese removal. At a minimum, a successful pilot study must demonstrate consistent arsenic removal below the regulatory limit of 0.010 mg/L and also comply with the regulatory limits for iron and manganese of 0.3 and 0.05 mg/L, respectively, throughout the pilot study demonstration.

As an alternative, the water system may choose to evaluate other treatment options. Consideration should be given to elevated total dissolved solids at Well No. 3 (although it appears that compliance can be achieved through blending with Well No.4). For any future pilot study, regardless of the selected treatment, we request that a pilot study protocol be submitted to the TCEQ for review and approval prior to starting the pilot study.

**Compliance with TCEQ Regulations**
From our review of the pilot study report, we noted that the water system failed to comply with the following TCEQ requirements:

- The full-scale treatment equipment was installed at this facility without TCEQ approval as required by 30 TAC §290.39(j).
- Water was sent to the distribution system during the pilot study. The approved pilot study protocol, dated July 29, 2010, stated that water from the treatment unit could not be sent to the distribution system (Item No. 1, page 1 of the July 29, 2010 TCEQ Protocol approval letter).

Should you have any questions or concerns regarding this letter, please feel free to contact Mr. David Williams at 512 239-0945, or at the letterhead address.

Sincerely,

David A. Williams, P.E.
Technical Review and Oversight Team
Public Drinking Water Section, MC-155
Water Supply Division

Ada Lichaa, P.G., Manager
Plan & Technical Review Section
Water Supply Division
Texas Commission on Environmental Quality

AL/DAW

cc: Ms. Debra Daugette, Environmental Manager, Texas Department of Criminal Justice, P.O. Box 4011, Huntsville, TX 77342-4011
Mr. Mehdi Taheri, Water Enforcement Branch (6EN-W), U.S. EPA, Region 6, 1445 Ross Avenue, Suite 1200, Dallas, Texas 75202-2733

Mr. Jayson Melcher, P.E.
September 19, 2013
Page 3

bcc: TCEQ Region 9 (Waco)

Plaintiffs' Preliminary Injunction
Appendix 331

BAILEY 84929

# Exhibit 26

# Mandatory Language for a Maximum Contaminant Level Violation
## MCL, AVERAGE / ARSENIC

The Texas Commission on Environmental Quality (TCEQ) has notified the **TDCJ W PACK UNIT** water system that the drinking water being supplied to customers had exceeded the Maximum Contaminant Level (MCL) for arsenic. The U.S. Environmental Protection Agency (U.S. EPA) has established the MCL for arsenic at 0.010 milligrams per liter (mg/L) based on a running annual average, and has determined that it is a health concern at levels above the MCL. Analysis of drinking water in your community for arsenic indicates a compliance value **in quarter two 2012 of 0.028 mg/l for EP001**.

This is not an emergency. However, some people who drink water containing arsenic in excess of the MCL over many years could experience skin damage or problems with their circulatory system, and may have an increased risk of getting cancer.

You do not need to use an alternative water supply. However, if you have health concerns, you may want to talk to your doctor to get more information about how this may affect you.

We are taking the following action to address this issue: evaluation of the filtration system designed to remove arsenic from the drinking water supply below the MCL is underway; results to be discussed with the TCEQ.

Please share this information with all people who drink this water, especially those who may not have received this notice directly (i.e., people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.

If you have questions regarding this matter, you may contact

TDCJ Pack Unit Maintenance
936-825-3728
Posted / Delivered on: August 27, 2012

# Exhibit 27

## Mandatory Language for a Maximum Contaminant Level Violation
## MCL, AVERAGE / ARSENIC

The Texas Commission on Environmental Quality (TCEQ) has notified the **TDCJ W PACK UNIT** water system that the drinking water being supplied to customers had exceeded the Maximum Contaminant Level (MCL) for arsenic. The U.S. Environmental Protection Agency (U.S. EPA) has established the MCL for arsenic at 0.010 milligrams per liter (mg/L) based on a running annual average, and has determined that it is a health concern at levels above the MCL. Analysis of drinking water in your community for arsenic indicates a compliance value **in quarter one 2013 of 0.025 mg/l for EP001**.

This is not an emergency. However, some people who drink water containing arsenic in excess of the MCL over many years could experience skin damage or problems with their circulatory system, and may have an increased risk of getting cancer.

You do not need to use an alternative water supply. However, if you have health concerns, you may want to talk to your doctor to get more information about how this may affect you.

We are taking the following action to address this issue: Pilot Study on the Arsenic Removal System has been completed; results to be discussed with the TCEQ.

Please share this information with all people who drink this water, especially those who may not have received this notice directly (i.e., people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.

If you have questions regarding this matter, you may contact

TDCJ Pack Unit Maintenance
936-825-3728
Posted / Delivered on: June 20, 2013

# Exhibit 28

PWS_0930034_CO_PN

# Texas Commission on Environmental Quality

*Protecting Texas by Reducing and Preventing Pollution*

CERTIFICATE OF DELIVERY OF PUBLIC NOTICE TO CUSTOMERS

Public Water System (PWS) name: **TDCJ W PACK UNIT**
PWS ID (7-digit number required): **0930034**
Type violation: **ARSENIC MCL, AVERAGE**
Time Period of violation: **first quarter of 2015**

The PWS named above has distributed the Public Notice (PN) for the type of violation and time period listed above by:

**Mail or direct delivery, to bill-paying customers as required by 30 TAC §290.122(b)(2)(A) for community water systems; and**

The information contained in this public notification is correct and complies with required public notification content in accordance with 30 TAC §290.122

**and;** Make an adequate good-faith effort to reach non-bill-paying consumers by appropriate methods (check all below that apply):

______ Posting the PN on the internet at www.______________________
______ Mailing the PN to postal patrons within the service area that do not receive a bill
______ Advertising the PN in news media
______ Publication of PN in local newspaper
______ Posting the PN in public places
______ Delivery of multiple copies to single bill addresses serving several persons
______ Delivery to community organizations
______ Email notification

Date of Delivery to Customers ______________________

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations."

Certified by: Name (print):________________ Title: ________________
Phone: ________________ Email: ________________
Signature: ________________ Date Signed:________________

Mail a copy of this completed form and a copy of the Public Notice that was delivered to your customers to:

**TCEQ - Drinking Water Inventory & Enforcement Team**
**Attn: Public Notice (MC-155)**
**P. O. Box 13087**
**Austin, TX 78711-3087**

## Mandatory Language for a Maximum Contaminant Level Violation
## MCL, AVERAGE / ARSENIC

The Texas Commission on Environmental Quality (TCEQ) has notified the TDCJ W PACK UNIT TX0930034 that the drinking water being supplied to customers had exceeded the Maximum Contaminant Level (MCL) for arsenic. The U.S. Environmental Protection Agency (U.S. EPA) has established the MCL for arsenic to be 0.010 milligrams per liter (mg/L) based on running annual average (RAA), and has determined that it is a health concern at levels above the MCL. Analysis of drinking water in your community for arsenic indicates a compliance value in quarter one 2015 of 0.024 mg/L for EP001.

This is not an emergency. However, some people who drink water containing arsenic in excess of the MCL over many years could experience skin damage or problems with their circulatory system, and may have an increased risk of getting cancer.

You do not need to use an alternative water supply. However, if you have health concerns, you may want to talk to your doctor to get more information about how this may affect you.

We are taking the following actions to address this issue:

________________________________________

________________________________________

________________________________________

<corrective actions>

Please share this information with all people who drink this water, especially those who may not have received this notice directly (i.e., people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.

If you have questions regarding this matter, you may contact ____________________ at ____________________.

<water system official's name>

<area code + phone number>

Posted /Delivered on: __________

<Date Posted>

**Instructions for preparing the required Public Notice:**
Recopy the mandatory language above and insert the underlined information in the spaces indicated.

**Public Notice delivery timelines:**
The initial public notice shall be issued as soon as possible, but in no case later than 90 days after the violation was identified. Repeat public notice shall be issued every 90 days for as long as the violation persists. All notifications require the attached Certificate of Delivery due 10 days from the posting date of the above notice.

Refer to 30 TAC §290.122 for additional information on Public Notification.