**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KEITH COLE, *et al.*,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-1698** |
| | § | |
| **BRAD LIVINGSTON, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

### MEMORANDUM AND ORDER

Inmates in the Wallace Pack Unit, operated by the Texas Department of Criminal Justice (TDCJ), bring this lawsuit to challenge TDCJ's alleged policies and practices of exposing the inmates to extreme heat conditions in their housing areas during the summer months. The Wallace Pack Unit is a prison located in Navasota, Texas. Plaintiffs contend that, without climate control or adequate mitigation measures, Defendants are failing to protect the inmates from the harmful and potentially fatal effects of prolonged exposure to such high temperatures. Before the Court is Plaintiffs' Amended Motion for Class Certification. (Doc. No. 272; Doc. No. 413.) Plaintiffs have asked the Court to certify one General Class and two subclasses. An evidentiary hearing was held on the matter on May 27, 2016, June 1, 2016, and June 2, 2016, during which time the Court heard from four expert witnesses. After considering the evidence and the arguments and briefs from counsel, this Court finds that the Motion for Class Certification should be granted.

### I.  BACKGROUND

The named Plaintiffs are six inmates who live in the Wallace Pack Unit, a medical and

geriatric prison operated by the Texas Department of Criminal Justice. Plaintiffs claim that the conditions inside the Pack Unit—in particular, the lack of climate control leading to the prisoners' prolonged exposure to extreme heat during the summer months—violate their Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment. They also bring claims under the Americans with Disabilities Act and the Rehabilitation Act, alleging that TDCJ has refused to make reasonable accommodations for prisoners with disabilities that render them especially vulnerable to the effects of extreme heat. Defendants are Brad Livingston, the executive director of TDCJ; Roberto Herrera, the warden of the Pack Unit; and TDCJ itself.

Plaintiffs allege that "sweltering temperatures inside buildings where [TDCJ] houses inmates," including the Wallace Pack Unit, have caused at least twelve prisoners in the Texas prison system to die from heat stroke and hundreds more prisoners to suffer from heat-related illnesses since 2011. (Compl., Doc. No. 1 at 1.) They allege that Defendants have done nothing to lower the temperatures inside the housing areas. (*Id.*) They ask the Court to "[r]emedy ongoing violations of the law and the Constitution by granting declaratory and injunctive relief, as set out in [the] Complaint, on behalf of Plaintiffs, and the class" and to "[p]ermanently enjoin Defendants to abate the risk of serious harm described above by taking steps including, but not limited to, maintaining a heat index of 88 degrees or lower inside the Pack Unit's housing areas." (Compl. 35.)

Plaintiffs seek to certify a class and two subclasses for injunctive and declaratory relief under the Eighth and Fourteenth Amendments. Plaintiffs also seek to certify one of the two subclasses for injunctive and declaratory relief under the Americans with Disabilities Act and the Rehabilitation Act. The proposed General Class is defined as:

> **All inmates who currently are, or in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate**

2

**high indoor heat index temperatures in the housing areas.**

The first proposed subclass is the "Heat-Sensitive Subclass," defined as:

> **All people who are incarcerated at the Pack Unit, or in the future will be, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas, and either: (1) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or, (2) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or (3) are over age 65.**

The second proposed subclass is the "Disability Subclass," defined as:

> **All people incarcerated at the Pack Unit, or who will be in the future, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas and suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.**

(Am. Mot. to Certify Class, Doc. No. 272 at 2.)

The named plaintiffs are Keith Cole, Jackie Brannum, Lavar Santee, Richard King, Fred Wallace, and Marvin Ray Yates. Keith Cole is a 60-year-old inmate who has Type II diabetes, coronary arterial disease, high blood pressure, and high cholesterol. (Doc. No. 272 at 30.) According to TDCJ records, Mr. Cole experienced an episode of heat exhaustion in June 2012. (Doc. No. 272-22 at 3.) Jackie Brannum is a 61-year-old inmate who has hypertension, high cholesterol, type II diabetes, schizoaffective disorder, and chronic pain. (Doc. No. 272-14 at 1.) Lavar Santee is a 34-year-old inmate who has no medical conditions that would affect his sensitivity to extreme heat. (Doc. No. 413-1.) Richard King is a 68-year-old inmate who has hypertension, obesity, and diabetes. (Doc. No. 272-16 at 1.) Fred Wallace is a 72-year-old inmate who is obese and has depression and high blood pressure. (Doc. No. 272-13 at 1.) Marvin Ray Yates is a 69-year-old inmate who has hypertension and COPD with emphysema

and bronchitis.  (Doc. No. 272 at 30.)

## II.    LEGAL STANDARDS

The requirements for class certification under Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable [numerosity];

(2) there are questions of law or fact common to the class [commonality];

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed. R. Civ. P. 23(a).  "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)."  *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).  Plaintiffs seek certification under Rule 23(b)(2), which allows for certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Plaintiffs, as the parties seeking certification, bear the burden of proving that the proposed class satisfies the requirements of Rule 23.  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").  It is well established that a federal district court must conduct a rigorous analysis of the Rule 23(a) prerequisites before certifying a class.  *Castano v. Am.*

*Tobacco Co.,* 84 F.3d 734, 740 (5th Cir. 1996). Currently, the courts must follow the enhanced contours of "rigorous analysis" as announced by the Supreme Court in *Wal–Mart*. *Perry*, 675 F.3d at 837. Under *Wal–Mart,* "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 131 S.Ct. at 2551 (emphasis in original). The Supreme Court requires the district court to look to the *dissimilarities* among the proposed class members, as these "are what have the potential to impede the generation of common answers." *Wal–Mart,* 131 S.Ct. at 2551. Thus, as noted in *Perry*, the commonality test is no longer met when the proposed class does nothing more than establish that there is "at least one issue whose resolution will affect all or a significant number" of the putative class members. *Perry*, 675 F.3d at 840. Instead, Rule 23(a)(2) requires that all of the class members' claims depend on a common issue of law or fact whose resolution "will *resolve* an issue that *is central to the validity* of each one of the class member's claims in one stroke." *Id.* (citing *Wal–Mart*, 131 S.Ct. at 2551) (original emphasis).

This heightened analysis under *Wal–Mart* will "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." *Id.* However, Rule 23 does not require a showing that the questions common to the class "will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194–95.

## III.     SUMMARY OF THE EVIDENCE

At the hearing, Plaintiffs presented two expert witnesses: Dr. Michael McGeehin, an epidemiologist and the former Director of the Division of Environmental Hazards and Health Effects at the Centers for Disease Control and Prevention (CDC), and Dr. Susi Vassallo, a physician who is board certified in Emergency Medicine and Medical Toxicology and is a clinical professor of emergency medicine at the New York University School of Medicine/Bellevue Hospital Center.  Defendants also presented two expert witnesses: Dr. Dean Reiger, a physician who is board certified in Preventive Medicine and Public Health and, until recently, was the Deputy Chief Clinical Officer for Correct Care Solutions, a company that provides patient care services to jail and prison populations, and Dr. Kathryn Means, a physician who is board certified in Hospice and Palliative medicine and was the Director of Quality Monitoring and Compliance at TDCJ from 2009 to 2015.  Dr. Means worked at TDCJ in the summer of 2011 when ten inmates died from heat stroke, and she was still working there when this litigation began.

### A.     Dr. McGeehin's Testimony

Dr. McGeehin was the lead scientist for the CDC on health effects from extreme heat and heat waves for more than fifteen years, the author of numerous peer-reviewed articles related to heat, and a consultant to both local and national governments on heat wave response plans.  As such, Dr. McGeehin could speak to both the effects of heat on populations and to the potential effectiveness of mitigation measures.  He testified that heat is, in fact, the number one cause of weather-related deaths in the United States, although it is rarely recognized as such because unlike other natural disasters, heat waves do not destroy infrastructure.  (Tr. of May 27, 2016 Hearing, p. 29-30.)  He testified that 43% of all deaths from heat in the U.S. are in the South, and

33% in the West, which caused "consternation among some people because it was always felt that the populations in those two areas were acclimatized and didn't suffer the impacts of heat as much as people in the Northeast and Midwest do." (*Id.* at 33.) Dr. McGeehin explained the impacts of heat on the human body, and noted that it was "well accepted" that to count only hyperthermia or heatstroke deaths as being heat-related deaths would severely undercount the actual number of heat-related deaths in a population. (*Id.* at 92.)

When presented with TDCJ's Correctional Managed Health Care Policy Manual (Def. Exh. 5), which listed "Common Comorbidities That May Affect Heat Tolerance,"[1] Dr. McGeehin testified that individuals with the conditions on the list have "been found in multiple studies to have increased relative risk or odds ratios of dying or being hospitalized or coming to an emergency room for various health outcomes in extreme heat events." (*Id.* at 61.) He noted that those increased risks cannot, however, be used to predict individual health outcomes, nor is it possible to predict individual health outcomes from the heat index alone. (*Id.* at 122.) But when asked the question, "You cannot compare the risks from one population to any population, right? They have to be specific populations that you are comparing it to?" Dr. McGeehin responded, "No, no, no. I mean, if that were the case, epidemiology would fail. These risks that we're talking about here have been consistent[] on different continents and different populations over two decades ... of time. This is how human beings react to heat and humidity. This can definitely be applied across the board. Absolutely applied across the board." (*Id.* at 123-24.)

Dr. McGeehin testified as to the effectiveness of various practices in reducing the risk from heat. For example, he stated that drinking water cools the body. (*Id.* at 42.) He stated that above a 95 degree heat index, there is no evidence that fans cool the body, and that they may

---

[1] Those conditions include cardiovascular disease, diabetes, psychiatric conditions, and being over the age of 65.

even do further damage. (*Id.* at 37-41.) Dr. McGeehin testified that cold showers are an effective short-term means of reducing body temperature, but that they have no lasting effect. (*Id.* at 45.) He stated unequivocally that air-conditioning is the most effective intervention he has ever seen for environmental heat exposure. (*Id.* at 35-36.)

If people in a hot environment were experiencing symptoms like dizziness, sweating, and headaches, Dr. McGeehin testified, "every public health person I know would be alarmed." (*Id.* at 34.) He explained: "If you are saying these people are exposed to these temperatures and they are experiencing symptoms in the normal flow of symptoms that lead to heat exhaustion and heatstroke and death or impacting on other systems that may already be compromised, like their cardiovascular or respiratory system, of course that's alarming." (*Id.* at 35.)

### B. Dr. Vassallo's Testimony

Dr. Vassallo has practiced medicine, with a focus on thermoregulation, for nearly 30 years and is a prominent expert in the field. She explained to the Court the concept of a "heat load," and how as the heat load increases, it can override the body's coping mechanisms. (Tr. of June 1, 2016 Hearing at 35, 51.) Dr. Vassallo testified as to how various comorbidities impact a body's ability to thermoregulate, and how certain medications (including antihistamines, antidepressants, and beta-blockers) similarly hamper a body's capacity for dealing with extreme heat. (*Id.* at 61-69.) She testified that the temperatures in the Wallace Pack Unit during the summer "pose a substantial risk to the health of any individual under any circumstances held in these kinds of temperatures for prolonged periods of time." (*Id.* at 70.) Dr. Vassallo pointed to numerous scientific studies showing that, above a certain heat index threshold, ranging from 86 to 89 degrees Fahrenheit, scientists have observed a steep increase in morbidity and mortality. (*Id.* at 75-76, 88-89.) She testified, based on both her clinical experience and the scientific

literature, that even young, healthy individuals are at risk from the heat.  (*Id.* at 123.)

C.    **Dr. Reiger's Testimony**

Dr. Reiger was the medical director for multiple prisons in Michigan and has extensive experience as both a physician and an administrator for prison systems.  Dr. Reiger testified that, absent proper mitigation measures, all the inmates at the Pack Unit would be at substantial risk of harm from the heat.  (Tr. of June 2, 2016 Hearing at 52.)  He agreed with the Plaintiffs' experts that various comorbidities are known to interfere with thermoregulation, but also pointed out that every individual, even with the same diagnosis, faces an individual level of risk from heat exposure.  (*Id.* at 47-49.)

Dr. Reiger testified that, with his understanding of the heat mitigation measures in place at the Pack Unit, the risk to the inmates was "quite reasonable."  (*Id.* at 59.)  However, he admitted on cross-examination to having incorrectly remembered details about certain mitigation measures, including the inmate's beliefs regarding their ability to access respite areas on request. (*Id.* at 99-101.)  He appeared confused when emails sent by TDCJ were referred to as a "policy," stating: "the existence of the policies still would have preceded the e-mails. So I don't think it's a fair statement to say that the e-mail is the policy. The e-mail may quote the policy, but the policy exists in advance of a reminder e-mail that goes out."  (*Id.* at 93-94.)[2]

D.    **Dr. Means' Testimony**

Dr. Means worked for TDCJ from 2009 through 2015.  She claims to have reviewed over 400 articles related to thermoregulation and acclimatization.  (Tr. of June 2, 2016 Hearing at 152.)  Over the course of her testimony, Dr. Means painstakingly distinguished each study relied upon by the Plaintiffs from the inmates at the Pack Unit, and attempted to point out why all

---

[2] As far as the Court can ascertain, the policy or practice of allowing inmates to access respite areas is only stated in an email, and cannot be found in a separate policy.

scientific findings averse to TDCJ's positions were illegitimate. She testified: "If I at any point had any credible scientific evidence that air-conditioning would be helping these offenders, I would be advocating for that." (*Id.* at 216.)

Dr. Means herself is a defendant, along with TDCJ, in related individual prisoner wrongful death cases. She began reviewing the over 400 scientific articles only after those cases were filed, and has made over $200,000 as an expert in this case. (*Id.* at 227-28, 231.) On the stand, she was unable to directly answer most of the questions by Plaintiffs' counsel, and was even nonresponsive to questions posed by this Court.[3] Unlike all the other experts presented over the course of the hearing, Dr. Means appeared incapable of admitting to anything she did not view as helpful to her side's case. This Court found her to be biased and, frankly, unbelievable, and cannot credit any part of her testimony.

## IV.    ANALYSIS

### A.  Ascertainability

"The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). A "precise class definition is necessary to identify properly those entitled to relief, those bound by the judgment, and those

---

[3] June 2, 2016 Tr. at 137-38:

> THE COURT: Aren't the chances of survival and good health much higher with air-conditioning than without air-conditioning? That's not a hard question, is it?
> THE WITNESS: Well, I mean, I'm thinking of all the studies I have read to support that. … I know that there were some studies in nursing home deaths where there were working air-conditioning that the power went out.
> THE COURT: But that's not really responsive. Healthy people do drop dead in nice homes. But aren't the chances of avoiding death and avoiding illness much better with a working air-conditioner than without?
> THE WITNESS: Your Honor, the studies are also showing that showers and respite air-conditioning are just as beneficial as a working air-conditioning.

entitled to notice." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004).

Defendants do not dispute the ascertainability of the General Class, but they dispute the existence of ascertainable subclasses. Defendants argue that "[b]y including the catchall 'but not limited to' language, the [heat sensitive] sub-class definition is expanded with unknown dimensions to include unknown medical conditions. Further, the [heat sensitive] sub-class definition is contingent on the physiological condition actually placing the inmate at increased risk of heat-related illness, injury, or death." (Defs.' Resp., Doc. No. 307 at 40.) Defendants also claim that "[t]he disability sub-class is defined by the subjective and fact based inquiry of whether a condition is substantially limiting a major life activity and at the same time placing the inmate at increased heat-related risk. Either inquiry would once again devolve into a person-by-person inquiry to determine who is in or out of the sub-class because it is based on subjective criteria that only a medical provider could define." (*Id.*)

Defendants' arguments are worth careful consideration. However, with regard to the heat-sensitive subclass, the Court finds it significant that TDCJ itself uses similar criteria to determine work assignments and other restrictions. (Correctional Managed Health Care Policy Manual, Doc. No. 272-9 at 7–9.) The fact that "only a medical provider" could determine which conditions place people at increased risk for heat-related illness, injury, or death does not make the subclass unascertainable. Based on the testimony of the experts presented at the hearing (with the exception of Dr. Means, whose testimony has been discredited), the medical community appears to be in substantial agreement as to what those conditions are. For an inmate to belong in the heat-sensitive subclass, he must (1) have a diagnosed physiological condition that medical providers understand may negatively "affect heat tolerance" (Doc. No. 272-9 at 9); or (2) be prescribed a drug that medical providers—including the University of Texas Medical Branch (UMTB), TDCJ's healthcare provider—consider to be "associated with heat stress,"

namely, an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic (Doc. No. 272-9 at 7); or (3) be over the age of 65. In the Health Care Policy Manual, the University of Texas Medical Branch lists the following physiological conditions as possibly affecting heat tolerance: "Cardiovascular Disease; Cirrhosis of the Liver; Chronic Obstructive Pulmonary Disease/Asthma; Cystic fibrosis; Diabetes; Psychiatric conditions; Sjogren's syndrome; Sweat gland dysfunction; Thyroid dysfunction; Age > 65." The Court is hesitant, however, to limit the qualifying physiological conditions to those on the UTMB list. As Dr. Vassallo explained in her report, spinal cord injuries, which are not on the list, may affect the ability to thermoregulate by impairing signals sent from the brain to the body. (Doc. No. 272-3 at 15.) Moreover, both Plaintiffs' and Defendants' experts agree that obesity can increase a person's sensitivity to extreme heat, but obesity is not on the UMTB list. (*Id.* at 9; Testimony of Dr. Reiger, Tr. of June 2, 2016 Hearing at 44; Doc. No. 309 at 16.)

TDCJ already keeps an only slightly more limited list of inmates who are heat sensitive and thus subject to certain restrictions. As the subclass is defined by an inmate's diagnosed physiological condition, prescribed medication, or age, rather than the inmate's individual sensitivity to heat, the Court finds that the heat-sensitive subclass is ascertainable for the limited purpose of injunctive relief. It should be emphasized that, with regard to the first of the three prongs, the inquiry need not and should not involve an examination of the inmate's actual risk of heat-related illness. It is only necessary for an inmate to establish that the inmate has a physiological condition that is known in the medical community to negatively affect thermoregulation, thereby making the inmate's risk higher than it would be without the medical condition. Any inmate with obesity is a member of this subclass, as is any inmate with sweat gland dysfunction or any of the other conditions listed. According to both parties' experts,

holding all other factors equal, a person who has sweat gland dysfunction is at higher risk of heat-related illness than that person would be without sweat gland dysfunction. An inmate with a spinal cord injury would likewise be a member of the subclass, as he would "have a physiological condition that places [him] at increased risk of heat-related illness, injury, or death."

The disability subclass is also ascertainable. Courts regularly certify classes of inmates who are disabled, even if they do not have the same disability. *See, e.g.*, *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015) (certifying a subclass of inmates with disabilities, defined as "all individuals who are now or will be in the future in the Jail and who have a disability, as defined by federal and California law"); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 454 (E.D.N.C. 2011) (certifying class of prisoners who are disabled under the Americans with Disabilities Act and the Rehabilitation Act). As in the heat-sensitive subclass, the inquiry regarding the disability subclass will focus not on the individual risk of heat-related illness, but on whether the inmate has a type of disability that is known to affect thermoregulation or takes a type of medication that is known to affect thermoregulation in order to treat the inmate's disability.

### B. Rule 23(a) Requirements

#### 1. Numerosity

To satisfy the numerosity requirement under Rule 23(a)(1), the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The proposed General Class contains over 1,400 members, and there is "a constant flux of inmates into and out of the Pack Unit," so joinder of all the proposed class members would be impracticable if not impossible. (Doc. No . 272, at 4-5.) The proposed heat-sensitive subclass

contains over 400 members, as identified by TDCJ on the "Medical Heat Restriction List" (Doc. No. 272 at 5; Doc. No. 272-8, at 25-47).

Plaintiffs do not estimate how many members might fit into the disability subclass, but they note that "there are 728 inmates at the Pack Unit diagnosed with hypertension, each of whom is likely taking a diuretic or other medication identified by TDCJ's medical policy as putting inmates at risk of heat-related illness. There are similarly unwieldy numbers for each of the conditions that TDCJ identifies as putting inmates at risk of heat-related illness—212 patients with diabetes, 142 with coronary artery disease, 111 with obesity, 53 with a psychiatric condition, 22 with cirrhosis of the liver, 84 with COPD, 113 with asthma, and 189 with thyroid dysfunction." (Doc. No. 272, at 13.) While Defendants challenge the subclass's ascertainability (*see infra* Part III.A), they do not contend that the disability subclass is too small to fulfill the numerosity requirement.

Defendants argue that "Plaintiffs fail to satisfy the elements of numerosity in light of the PLRA's exhaustion requirement and there is no significant history of serious heat related illnesses." (Doc. No. 307 at 38.) It is not, however, necessary for each class member to have satisfied the exhaustion requirement. *See Gates*, 376 F.3d at 330 ("Russell was the only class member who had [exhausted the administrative remedy]. . . . [T]his is enough to satisfy the requirement for the class."). Defendants' argument regarding "no significant history of serious heat related illnesses" is unclear, but the Court finds as a factual matter that there is such a history within the Pack Unit, and that it is not necessary for each member of the class actually to have experienced a heat related illness—the class is defined by exposure to risk, not by past illnesses. The Court finds that the General Class and both subclasses are sufficiently numerous to satisfy Rule 23(a)(1).

### 2. Commonality

"To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). As the Fifth Circuit has explained, however, "this contention need not relate specifically to the damages component of the class members' claims. Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'" *Id.*

Plaintiffs claim that the actions and inactions of TDCJ in subjecting the class and subclass members to extremely high temperatures provide the basis for satisfying the 23(a)(2) requirement. (Doc. No. 272, at 20.) According to Plaintiffs, excessive heat constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all the inmates. (*Id*. at 21-22.) To prove an Eighth Amendment violation, Plaintiffs will also need to prove that officials were deliberately indifferent to the risk posed to the prisoners; the issue of deliberate indifference can be resolved, Plaintiffs contend, "in one stroke." (Doc. No. 272, at 22.) In support of their contention that all Pack Unit inmates are subjected to a substantial risk of harm by TDCJ policies, Plaintiffs submitted evidence of the summer temperatures inside the Pack Unit as well as copious evidence of the effects that such high temperatures have on the well-being of both healthy individuals and individuals with heat sensitivity. The testimony at the hearing was particularly helpful on this point. Dr. McGeehin, Dr. Vassallo, *and* Dr. Reiger agreed that, absent proper mitigation measures, all of the inmates at the Wallace Pack Unit are at substantial risk of harm from prolonged exposure to extreme heat. They agreed that inmates with a comorbidity described in the heat sensitive subclass are at greater risk from heat. No two

individuals have the exact same risk, but this Court does not believe that that obvious fact destroys commonality. The evidence calls into serious question the adequacy of TDCJ's mitigation measures—as applied in practice—in reducing the heat risk for all the inmates, and particularly for those inmates with comorbidities that diminish their ability to thermoregulate. For example, although TDCJ claims that the inmates have access to air-conditioned respite areas at any time, on request, affidavits from the named Plaintiffs indicate that respite areas are in fact *not* consistently available to any of the inmates.

The Court finds that Plaintiffs have demonstrated commonality with regard to the General Class. They raise the common contentions that excessive heat constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all the inmates, and that TDCJ officials were deliberately indifferent to the risk posed to the inmates. The Court also finds that commonality has been established with regard to the subclasses. The heat-sensitive subclass has the same common contentions as the General Class, but the subclass must only prove a substantial risk of serious harm, and deliberate indifference, to the inmates with heat sensitivity. One additional common contention of the disability subclass is that TDCJ officials failed to provide reasonable accommodations to inmates suffering from disabilities that may impact (or that cause the inmates to take medication that may impact) their ability to withstand extreme heat.

### 3.    Typicality

"Rule 23(a) requires that the named representatives' claims be typical of those of the class." *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007). The analysis focuses on whether the named representative's claims are typical, not whether the representative is. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002). Before *Wal–*

*Mart*, the test for typicality was "not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). The analysis was "less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986). The extent to which *Wal–Mart* changed the threshold for typicality is unclear. The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." 131 S.Ct. at 2551 n.5. As this Court has described it,

> "typicality is commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim, the validity of which can be determined on a classwide basis. Typicality requires showing that, in fact, the proposed representatives have that claim."

*M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013). The typicality requirement also overlaps with the adequacy requirement. *See In re American Medical Sys.*, 75 F.3d 1069, 1083 ("The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members."). The claims of all class members need not be identical. *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001). But typicality demands that claims "arise from a similar course of conduct and share the same legal theory." *Id.*

The TDCJ policies and practices related to heat exposure affect all the inmates in the Wallace Pack Unit, including the named Plaintiffs. The named Plaintiffs' claims arise from the same conduct of TDCJ and share the same legal theory as the rest of the class. In addition, Plaintiffs Cole, King, Brannum, Wallace, and Yates bring claims that are typical of both the heat-sensitive subclass and the disability subclass. This Court finds that Plaintiffs have met the typicality requirement for both the General Class and the subclasses.

### 4. Adequacy of Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). To meet the adequacy requirement, "the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). Counsel must be both competent and zealous in representing class interests. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005).

Defendants do not contend that there is a conflict of interest between the named Plaintiffs and the other members of the General Class or subclasses. Nor do they challenge the adequacy of class counsel who, collectively, have extensive experience litigating class actions, prisoner civil rights, and conditions of confinement claims and who have shown themselves to be both competent and zealous in this case. Defendants do, however, contend that the named Plaintiffs are insufficiently involved in the litigation to be adequate representatives. They rely on a line of class action securities cases beginning with *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001). In *Berger*, the Fifth Circuit held that "in complex class action securities cases governed by the [Private Securities Litigation Reform Act (PSLRA)], the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases." *Id.* at 484. In *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005), another securities case, the Fifth Circuit held that the standard defined in *Berger* is broadly applicable, even to cases that are not governed by the PSLRA:

> We have identified a "generic standard" for the adequacy requirement, noting that "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger I,* 257 F.3d at 482–83. We have also noted that "the PSLRA raises the standard adequacy threshold" with its

"requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Id.* at 483. Although we noted that the PSLRA raises the adequacy threshold, we have "not, however, created an additional requirement under rule 23(a)(4) that . . . the putative class representative possess[ ] a certain level of experience, expertise, wealth or intellect, or a level of knowledge and understanding of the issues, beyond that required by our long-established standards for rule 23 adequacy of class representatives." *Berger v. Compaq Computer Corp.,* 279 F.3d 313, 313–14 (5th Cir.2002) [*Berger II*]. The "long-established standard" for the adequacy determination on which we principally relied in *Berger I* requires " 'an inquiry into [1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]' " *Berger I,* 257 F.3d at 479 (quoting *Horton v. Goose Creek Independent School Dist.,* 690 F.2d 470 (5th Cir.1982)). In addition to determining the proposed class counsel's zeal and competence and the proposed class representative's willingness and ability, the district court's "adequacy inquiry also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.' " *Id.* at 479–80 (quoting *Amchem Prods.,* 521 U.S. at 625, 117 S.Ct. at 2236).

*Feder*, 429 F.3d at 129–30.

Thus, this Court must evaluate "the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Id.* at 130. The named Plaintiffs are prisoners. Like most class representatives, they cannot be expected to have a sophisticated understanding of the legal intricacies involved in class action lawsuits such as this one. However, they can be expected to show a willingness to take an active role in, and control, the litigation. Although the record before this Court is limited on this point, the Court finds that such willingness has been established.

In a deposition, named Plaintiff Keith Cole described his view of the Eighth Amendment claim, saying: "I feel that's an Eighth Amendment violation because of [the] extreme heat condition[s]," which he believes constitute "cruel and unusual punishment." (App. to Defs.' Resp., Doc. No. 309 at 684.) Named Plaintiff Richard King, when asked what he wanted from the lawsuit, answered that he wanted "[t]o live, you know, . . . in a safe temperature." (*Id.* at 709.) Mr. King had "perused" the Complaint, after joining the lawsuit, and he understands that

the lawsuit seeks what he desires, namely, "relief from the excessive heat." (*Id.* at 709, 711.) Named Plaintiff Fred Wallace agreed to participate in the lawsuit because he "want[s] [the Wallace Pack Unit] to have a safer situation. . . . [I]t's too hot in here and . . . we need it to be safer." (*Id.* at 735.) Although Plaintiffs' counsel selected the named Plaintiffs, and not the other way around, that is not uncommon in this kind of impact litigation nor does it negate the named Plaintiffs' demonstrated willingness and ability to represent the class. The Court finds that the adequacy requirement of Rule 23(a)(4) has been met.

### C.       RULE 23(b)(2) REQUIREMENTS

Rule 23(b)(2) allows for class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This case easily meets such a standard. The conditions of confinement, as created by Defendants, apply uniformly to the class of inmates as a whole (as well as to the subclasses). TDCJ has refused to equip the housing areas at the Wallace Pack Unit with air conditioning; it does not air condition some dorms and not others. Other mitigation measures, such as providing ice water and fans, and the availability or unavailability of respite areas, are similarly applied uniformly to all the inmates. Injunctive or declaratory relief, therefore, would be appropriate respecting the class as a whole if an Eighth Amendment violation were to be found. That holds true if the Plaintiffs establish that air-conditioning is indeed necessary to cure the violation, or if less drastic measures (such as ordering TDCJ to create and adhere to a more definitive policy regarding respite areas) are shown to suffice to remedy the violation.

### D.       THE PRISON LITIGATION REFORM ACT

Under the Prison Litigation Reform Act (PLRA), "Prospective relief in any civil action

with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C.A. § 3626(a)(1)(A).

The Court does not interpret the above language as prohibiting class-wide relief in this case; rather, it prohibits relief that is unnecessary to correct the alleged Eighth Amendment violation. If an Eighth Amendment violation is found, this Court will need to determine whether air-conditioning the housing areas is indeed the least intrusive means of correcting the violation, or whether augmenting the mitigation measures that are already in place at the Wallace Pack Unit would be sufficient to remedy the violation.

## VI. APPOINTMENT OF CLASS COUNSEL

Plaintiffs request that their current attorneys be appointed class counsel pursuant to Federal Rule of Civil Procedure 23(g). Under this Rule, "a court that certifies a class must appoint class counsel" and, in so doing, must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv). The Rule also requires that "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

The Court finds that counsel for the named Plaintiffs fulfill the requirements of Rule

23(g). The attorneys currently representing Plaintiffs have investigated the case, have engaged in voluminous discovery, and have experience litigating similar cases in this and other jurisdictions. The proposed class counsel have extensive experience handling complex litigation and class actions. Plaintiffs' counsel have demonstrated, as evidenced by the pleadings before the Court, their familiarity with the applicable law. They have also shown they will devote substantial resources to representing the classes and pursuing this litigation. In sum, the Court concludes that counsel for named Plaintiffs will fairly and adequately represent the interests of the class. The Court, therefore, will appoint them as class counsel for both the general class and the subclasses certified by this order.

## VI. CONCLUSION

Plaintiffs' Amended Motion for Class Certification is hereby **GRANTED**. The General Class, the heat-sensitive subclass, and the disability subclass, as defined in Part I, are certified.

For the reasons stated at the hearing, both Defendants' Motion Asserting *Daubert* and FRE 702 Challenges to Plaintiffs' Expert Testimony (Doc. No. 399) and Plaintiffs' Motion to Strike the Testimony of Dr. Kathryn Means (Doc. No. 453) are **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** on this the 14th day of June, 2016.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE