United States District Court
Southern District of Texas
**ENTERED**
June 21, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-1698 |
| | § | |
| BRAD LIVINGSTON, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER FOR PRELIMINARY INJUNCTION

Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. No. 434) was filed on May 23, 2016. The parties agreed to an expedited hearing schedule and, at the request of all parties, an evidentiary hearing began on May 26, 2016. The hearing continued on May 27, 2016, and concluded on June 1, 2016.

Plaintiffs allege that the Texas Department of Criminal Justice (hereafter "TDCJ") is subjecting the inmates at the Wallace Pack Unit, a facility which houses many elderly inmates and inmates with chronic medical conditions, to unconstitutionally dangerous conditions. Namely, Plaintiffs allege that the inmates are exposed to extremely high temperatures during the summer months, without air conditioning in the housing areas and with limited access to air conditioning elsewhere. According to Plaintiffs, the primary mitigation measure that TDCJ uses to lower the risk to inmates of heat-related injuries and deaths is encouraging the inmates to drink copious amounts of water; however, Plaintiffs complain that the water at the Wallace Pack Unit contains between two and four-and-a-half times the levels of arsenic permitted by the United States Environmental Protection Agency ("EPA"). Arsenic is a known human

1

carcinogen. Plaintiffs assert that, in a prison where a high percentage of inmates are over the age of 65 or have serious medical conditions, or both, the exposure to extreme heat, "mitigated" primarily through the provision of arsenic-laden drinking water, constitutes unconstitutional prison conditions. For the reasons stated below, this Court finds that the inmates at the Wallace Pack Unit are entitled to a preliminary injunction requiring the Texas Department of Criminal Justice to provide drinking water that comports with EPA maximum contaminant level requirements during the hottest part of the year.

## I. EVIDENCE PRESENTED

The parties have already briefed a Motion for Summary Judgment in this case, and the evidence submitted in conjunction with those briefings was admitted into evidence at the hearing on the requested Preliminary Injunction. Additional exhibits were admitted into evidence over the course of the hearing, as listed in Docket Entry 457. The Court also heard testimony from the following witnesses:

- Mr. Cody Ginsel, the Deputy Director of Management Operations in the Correctional Institutions Division of TDCJ;

- Dr. Michael Honeycutt, the Director of the Toxicology Division of the Texas Commission on Environmental Quality ("TCEQ");

- Dr. Heidi Bojes, an expert witness for the Defendants and the Director of Environmental Epidemiology Disease Registry Section of the Texas Department of State Health Services;

- Mr. Brian Carney, a project engineer at TDCJ;

- Dr. Michael McGeehin, an expert witness for the Plaintiffs who was a scientist for the Centers for Disease Control and Prevention ("CDC") for 33 years; and

- Dr. Susi Vassallo, an expert witness for the Plaintiffs who is a board-certified physician in Emergency Medicine and Medical Toxicology and is a clinical professor of emergency medicine at the New York University School of Medicine/Bellevue Hospital Center.[1]

## II.     FINDINGS OF FACT[2]

The evidence demonstrates that prisoners at the Wallace Pack Unit are exposed to extreme heat conditions during the summer, and that such exposure, without sufficient mitigation measures, would pose a substantial risk of serious harm to the prisoners. TDCJ does not dispute the dangerousness to prisoners of the hot summer temperatures in Texas, but claims that the prisons implement a number of mitigation measures that reduce the risk of heat to the inmates; those measures include providing and encouraging inmates to drink copious amounts of water. Defendants asserted in their Motion for Summary Judgment that "[f]rom a medical perspective, access to ice water and regular water is the number one remedial measure that can be implemented during times of high temperatures because hydration is the single most important factor in the prevention of heat related injury and effectiveness of thermoregulation." (Defendants' Mot. for Summary Judgment, Doc. No. 326, at 15.) TDCJ recommends that prisoners drink two gallons, or roughly 7.5 liters, of water per day on extremely hot days.

However, it is undisputed that, since 2006, the drinking water at the Wallace Pack Unit has contained between two and four-and-a-half times the amount of arsenic permitted by the EPA. The EPA lowered the maximum contaminant level (MCL) of arsenic in drinking water

---

[1] The Court holds Defendants' objection to the inclusion of Dr. Vassallo's testimony to be waived, since the objection was not asserted during the hearing. (Tr. of May 27, 2016 Hearing, at 158.)

[2] Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

from 50 parts per billion (ppb) to 10 ppb in 2001; the EPA mandated that water systems comply with the new standard by the year 2006. According to Brian Carney, in response to those events, "there was a filtration system put in place in about October of 2007. [TDCJ] tried troubleshooting it for years. [TDCJ] hired an outside consultant to have them troubleshoot it. No one could get it to work properly. So [TDCJ] finally reached the conclusion to replace it." (Tr. of May 26, 2016 Hearing at 245.) TDCJ now has plans to install a second filtration system and estimates that construction will be completed between January and June of 2017, over ten years after the 10 ppb requirement went into effect.

Currently, however, the prisoners in the Wallace Pack Unit are forced both to endure extremely high temperatures and to drink water with impermissibly high levels of arsenic. The evidence establishes that the increased risk of cancer posed by these arsenic levels (20-45 ppb) is very low, even over a period of two or nine years. But every day that passes in this manner contributes, albeit only slightly, to the inmates' risk of developing skin, lung, bladder, or kidney cancer due to arsenic in their drinking water.

Defendants point out that the Wallace Pack Unit is not the only public water system in violation of the EPA arsenic standard, although it is the only prison water system of which they are aware in violation of the standard. (Tr. of May 26, 2016 Hearing, at 9.) It is undisputed that many free world residents of the United States still drink water with arsenic concentrations at or above the concentrations in the Pack Unit water system.[3] But those individuals do so with EPA-mandated notice from the water system, and they do so voluntarily. A free individual who

---

[3] According to Defendants, approximately 65 public water systems (out of thousands) in Texas do not meet the EPA maximum contaminant level requirement for arsenic. (Tr. of May 26, 2016 Hearing, at 152.)

4

receives notice that his water system does not meet EPA regulations has several options[4]: he can drink the water, knowing it will (slightly) increase his risk of cancer; he can find or buy a different water source to drink from; he can buy and use a personal water filter; he can even move, if he wishes, if the water system has not been fixed within a year or within ten years. For prisoners, those options obviously do not exist.[5]

In addition to the above, this Court finds the following:

1. Plaintiffs complied with all jurisdictional and procedural prerequisites for the filing of this suit, including exhaustion of all pre-suit remedies required by the Prison Litigation Reform Act.[6]

2. The Wallace Pack Unit is a Type I Geriatric Facility operated by the Texas Department of Criminal Justice. The Wallace Pack Unit houses approximately 1,400 inmates, many of whom suffer from medical conditions. Approximately 728 inmates have been diagnosed with hypertension, approximately 212 with diabetes, approximately 142 with coronary artery disease, approximately 111 with obesity, approximately 53 with a psychiatric condition, approximately 22 with cirrhosis of the liver, approximately 84 with COPD, approximately 189 with thyroid dysfunction, and approximately 113 with asthma.

---

[4] *See* Tr. of May 26, 2016 Hearing (Testimony of Dr. Honeycutt), at 169-170.

[5] Water at the Wallace Pack Unit commissary costs thirty cents per bottle, and TDCJ recommends that inmates drink two gallons of water per day. (Tr. of May 26, 2016 Hearing (Testimony of Cody Ginsel), at 128-129.) Common sense dictates that most if not all of the inmates would be unable to buy enough water to last through the summer, and they should not have to. Defendants alluded to inmates' buying habits from the commissary. That inmates could spend their money more wisely is, even if true, not sufficient to defeat Plaintiffs' arguments.

[6] It is undisputed that Plaintiffs have properly exhausted their grievances regarding the inmates' allegedly unconstitutional exposure to extreme indoor temperatures. (Tr. of June 1, 2016 Hearing, at 19-20.) The Court notes that Plaintiffs need not administratively exhaust every remedy for the alleged constitutional violation.

Approximately 188 inmates are over the age of 65. Of course, many inmates suffer from several such conditions.

3. Inmates at the Wallace Pack Unit experience prolonged exposure to extremely high temperatures during the summer months. (*See* Expert Report of Professor Sager, Doc. No. 434-2, Appx. 10-19.)

4. The heat index is a measure of the apparent temperature, calculated from the ambient air temperature and the relative humidity, used by the National Weather Service to determine the risk to the general population of heat-related injuries.

5. Between June 17, 2014 and August 26, 2014, a 71-day period, inmates at the Wallace Pack Unit spent more than 43% of their time enduring a heat index of 90° F or above while indoors. On 28 of the 71 days, the heat index indoors never dropped below 80°.

6. During the first three weeks of September 2014, the heat index inside the Pack Unit exceeded 90° on all but two days and exceeded 95° on all but three days.

7. Without proper mitigation measures in place, such prolonged exposure to high temperatures poses a substantial risk to the health of all the inmates, young and old, whether or not they have comorbidities that affect their ability to thermoregulate.

8. As Dr. McGeehin testified: "These are heat indices that we know increase the risk of the general population to suffer effects from heat waves and certainly increase the risk [for] people who have risk factors that cause them to be more affected by heat." (Tr. of May 27, 2016 Hearing, at 83.)

9. Multiple scientific articles have shown that the danger posed by heat to a population increases sharply when the heat index exceeds a threshold of approximately 88° F, although the threshold itself may vary between 86° and 90°.

10. If the human body does not have time to recover from the hazard of extreme heat, the risk of heat-related injury or death increases. That is why the definition of a heat wave includes minimum temperature.

11. Heat is the number one cause of weather-related deaths in the United States. Forty-three percent of all deaths from heat in the United States occur in the South. Most people who die from heat are indoors.

12. At least 20 prisoners have died indoors in non-air-conditioned TDCJ prisons from hyperthermia since 1998. Others have suffered from heat exhaustion and other heat-related injuries such as headaches, nausea and vomiting, and dizziness.

13. Ten inmates died of heatstroke in 2011 while in TDCJ custody. Since that time, TDCJ has made only minimal changes to its policies to protect inmates from the dangers of extreme heat. TDCJ introduced the practice of "wellness checks," described below, and implemented changes regarding the production and distribution of ice to inmates, but TDCJ did not make any substantial changes that would meaningfully reduce the dangers to the inmates of prolonged exposure to extreme heat.

14. With limited exceptions, the housing areas in the Pack Unit are not air conditioned.

15. TDCJ does not currently monitor the temperatures or heat index inside the housing areas of the Wallace Pack Unit.

16. TDCJ is aware of the dangers of extreme heat, but has taken no steps to lower the temperatures inside the housing areas.

17. TDCJ does not have a specific policy in place to respond to heat waves, beyond its general incident command system. TDCJ's incident command system is designed to help TDCJ respond to various emergencies, including weather emergencies, but it has never

been implemented in response to extreme heat events, even in 2011 when multiple prisoners died of heat stroke indoors.

18. TDCJ encourages the inmates to drink up to two gallons of water per day during periods of extreme heat.

19. TDCJ provides the inmates with ice and regular access to cold showers, and TDCJ allows inmates to wear light clothing during periods of extreme heat.

20. TDCJ allows inmates to have personal fans, and each housing area contains large fans.

21. TDCJ correctional officers perform "wellness checks" on inmates who TDCJ has determined are particularly susceptible to heat-related illness and injury. A "wellness check" is defined by TDCJ as "when a correctional officer performing routine security rounds goes to an offender's cell or bunk to visualize the offender for wellness due to the offender previously being identified as having a condition or being on a medication that makes the offender more susceptible to temperature-related issues." (Administrative Directive of March 17, 2015, Doc. No. 327-8, at 14.)

22. TDCJ claims to provide on demand access to air conditioned areas, called "respite areas," to all inmates at the Pack Unit. On July 24, 2015, Deputy Director Robert Eason authorized an email to all TDCJ Wardens and Regional Directors ordering all Wardens to designate air-conditioned areas as respite areas, to allow staff to use respite areas as needed, to notify "all offenders of the location of respite areas on the unit, as well as instructions for requesting the use of a respite area," to require that "[a]ll offenders who are provided access to a respite area … be under direct supervision," and to allow inmates on the Wellness Checklist to "have access to respite areas during the late afternoon and

early evening hours during periods of low offender movement." (Email of July 24, 2015, Doc. No. 327-7 at 112.)

23. Despite TDCJ's contentions, declarations by inmates at the Pack Unit show that they do not believe they have unlimited access to the respite areas.[7]

24. TDCJ has taken no steps to encourage inmates to use the respite areas, despite minimal actual use by the inmates.

25. Although regular time spent in an air-conditioned environment would reduce the inmates' risk of heat-related injury and death, an order from this Court making such respite areas mandatory, rather than voluntary, could have a negative impact on the operation of the Wallace Pack Unit. Requiring the Pack Unit to carry out mandatory rotation of prisoners in and out of respite areas for three hours per day may create a necessity to use force or impose disciplinary measures if a prisoner did not want to go to the respite at the times determined by the prison authorities. A mandatory respite schedule also might disrupt the Pack Unit's day-to-day operations to provide food, maintain cleanliness, and other duties.

26. The Environmental Protection Agency requires that public water systems maintain their water at a maximum contaminant level (MCL) of 10 ppb of arsenic. Arsenic is a known human carcinogen.

---

[7] *See, e.g.* 2nd Declaration of Fred Wallace, Doc. 340-2, Appx. 44-45 ¶ 9 ("I've only ever tried to use an area listed on TDCJ's 'Notice to Offenders' once, and that was a bad experience. In mid-August 2015, I was standing out in front of the commissary when I started feeling faint and overheated. I felt like I was going to pass out. I asked a guard if I could go into the barbershop which was the closest listed area to where I was standing. The posters TDCJ hung up said the barbershops would be open to help with the heat, so I asked to go there. The guard said no and walked away. I needed to go to an air conditioned area, and was unable to.").

27. Since 2006, the Wallace Pack Unit has been in violation of the EPA requirement, with levels of arsenic in the water that are two to four-and-a-half times the EPA maximum.

28. The arsenic levels in the water are still low enough that scientists would not expect them to cause any non-cancerous health effects.

29. However, the arsenic levels do pose a low, but measurable, increased risk of cancer. According to Dr. Bojes, if an inmate weighing 78 kilograms drinks an average of three liters of water per day, she would expect to find "a potential excess of lifetime cancer of 3.4 cases over 100,000 people … and 1.5 cases for 10,000 people for over a two- and nine-year period [respectively]." (Tr. of May 26, 2016 Hearing, at 206.)  The inmates at the Wallace Pack Unit are encouraged to drink 7.4 liters of water during the summer to mitigate the effects of extreme heat, so it is possible that over the course of the year their intake exceeds an average of three liters per day; nevertheless, the Court accepts Dr. Bojes' estimate of the increased risk.

30. Low arsenic levels have also been associated with elevated risks of cardiovascular disease and diabetes.

31. There is no evidence in the record that the water at the Pack Unit poses a health risk if used for showering.  There is also no evidence addressing the effects of using ice made from the water, or how much ice diluted in clean water would be necessary to raise the overall arsenic level above the MCL.

32. TDCJ claims that the cost of providing bottled water to all the inmates and the storage of such large amounts of bottled water would be problematic, and the evidence in the record is not sufficient to show that such measures would indeed be feasible.

33. However, the evidence shows that TDCJ has the ability to bring in to the Pack Unit clean drinking water from other water sources. Cody Ginsel testified that the "state currently has three large water tanker trucks and two small water tanker trucks." He admitted that the state "routinely [has] water wells or city water supply sources that go down across the state in all of our facilities," and that TDCJ uses the water tanker trucks to move water to where it is needed. If all of the trucks are in use, than an injunction requiring TDCJ to provide clean water to the inmates at the Pack Unit could mean that TDCJ would need to lease a truck. It is possible, as well, that TDCJ would need to reallocate its drivers or even hire an additional driver capable of operating (and licensed to operate) an 18-wheeler. It is also possible, depending on the functionality of the other water systems within the state, that TDCJ would be able to accomplish the task using the trucks and drivers already at its disposal.

34. The provision of ice that meets EPA requirements would be more difficult to accomplish. According to Cody Ginsel, the ice machines at the Pack Unit are directly hooked up to the current water supply. Making ice from imported water would place a heavy burden on the freezer system and potentially affect the operation of the Wallace Pack Unit. Ginsel stated that "when you store ice inside of our freezer vaults, there is limited space because that's where we have to put our frozen food for the offender population. … [I]t is very burdensome on that freezer system and routinely those freezers will freeze up and go down because that water brings humidity into the freezer vault. And it is very tasking on that freezer to freeze water in cans or whatever way and means we have to freeze that, small bags, water, small containers." (Tr. of May 16, 2016 Hearing, at 60.)

11

35. With regard to water used for cooking, the record is insufficient for this Court to determine the health risks posed to the inmates from the current water supply.

36. Every day that the inmates are forced to drink water with arsenic levels above the EPA requirements contributes, albeit minutely, to their risk of developing skin, lung, bladder, or kidney cancer. The doses of arsenic ingested by the inmates cannot be undone or remedied in the future.

37. TDCJ has no plan or intention to supply safe drinking water to mitigate the effects of extreme heat during the summer of 2016.

38. The risks to the inmates' health posed by the combination of extreme heat exposure and arsenic-laden drinking water are obvious, and TDCJ is aware of those risks.

### III. CONCLUSIONS OF LAW

The Supreme Court has stated that the Constitution "does not mandate comfortable prisons" (*Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes on prison officials the duty to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This Court believes that among the duties imposed by the Eighth Amendment is the duty to provide safe drinking water when the temperatures are so hot that excessive water consumption is recommended, and necessary, to prevent heatstroke or other heat-related injuries. According to EPA standards, the water currently provided at the Wallace Pack Unit is not safe to drink over extended periods of time, and the water has been out of compliance with EPA standards for more than ten years.

"The four elements a plaintiff must establish to secure a preliminary injunction are:

>  (1) a substantial likelihood of success on the merits,
>
>  (2) a substantial threat of irreparable injury if the injunction is not issued,
>
>  (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and
>
>  (4) that the grant of an injunction will not disserve the public interest."

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (internal quotation marks omitted).

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their Eighth Amendment claim by showing:

>  1) That the prolonged exposure to extreme heat faced by the Wallace Pack inmates, with only the mitigation measures currently in place (including the arsenic-laden drinking water), poses an ongoing substantial risk of serious harm to the inmates; and
>
>  2) That TDCJ is deliberately indifferent to that risk.

Moreover, Plaintiffs have demonstrated that Defendants' current and ongoing conduct violates contemporary standards of decency.

Plaintiffs have clearly demonstrated that, if this Court denied relief to the inmates, they would face a substantial threat of irreparable injury, damages for which there is no adequate remedy at law.

Plaintiffs have shown that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted. After considering the burden on TDCJ of providing clean water, the Court concludes that the balance of equities tilts heavily in favor of

the Plaintiffs. The increased risk of cancer, although minute, is significantly more troublesome than the prospect of reassigning or leasing a truck and reassigning or hiring an employee to drive it.

The Court concludes that an injunction will not disserve the public interest, as it will prevent constitutional deprivations.

Pursuant to the Prison Litigation Reform Act, this Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A). This order, therefore, will not mandate that TDCJ provide ice from water that meets the EPA requirements. Inmates can choose whether or not to add ice to their water, and how much they wish to ingest. They cannot choose whether or not to drink the water. (On the contrary, in order to mitigate the dangerous impact of the extreme heat, all parties agree that the inmates must ingest copious amounts of water.) It would adversely affect the operation of the Wallace Pack Unit to require the prison to disconnect the ice machines currently in operation, and it has not been demonstrated that such course of action would substantially benefit the inmates' health. The Court also declines, at this time, to order TDCJ to amend its policy regarding respite areas, to adopt a formal policy to address the dangers of heat waves, or to regularly monitor the temperatures inside the Pack Unit.

The Court has weighed the adverse impact on the criminal justice system and finds that this relief is narrowly drawn. The Court finds that this relief extends no further than necessary to correct the violation of the Federal right of prisoners. The Court finds that this relief is the least intrusive means necessary to correct the violation of the Federal rights currently being denied to the inmates at the Pack Unit.

The Court reaches its holding reluctantly. It understands that no one should intrude cavalierly upon the administration of our state's prison systems, nor unnecessarily require expenditure of scarce criminal justice funds. But, in the ten years that the water at the Pack Unit has been in violation of federal standards, prison officials have not provided effective redress. Moreover, the funds expended by the State in litigating this case likely would have been sufficient to have afforded such redress.

## IV.     SECURITY

This Court finds that Plaintiffs are indigent prisoners seeking to vindicate Constitutional rights. Therefore, no bond will be required of Plaintiffs. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'").

## IV.     CONCLUSION

TDCJ is hereby **ORDERED** to provide drinking water to the inmates at the Wallace Pack Unit that conforms with EPA maximum contaminant level requirements for arsenic beginning not later than fifteen days from the date of this Order and continuing until September 22, 2016. TDCJ is free to provide drinking water, which complies with EPA standards, from whichever source and in whatever manner it deems best.

**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas, on this the 21st day of June, 2016.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE