UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM, RICHARD KING, MICHAEL DENTON, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated, | § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 4:14-cv-1698 |
| | § | |
| v. | § | |
| | § | |
| BRYAN COLLIER, in his official capacity, | § | |
| ROBERT HERRERA, in his official capacity, and | § | |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS BRANNUM, KING, DENTON, WALLACE, AND YATES' UNOPPOSED MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT AND AMENDMENT OF CLASS CERTIFICATION ORDER**

Plaintiffs Brannum, King, Denton, Wallace, and Yates, in order to resolve this class action litigation, move to amend the Court's class certification order (Doc. 473), approve the settlement entered into by the parties, and enter judgment pursuant to Federal Rule of Civil Procedure 23(e). Defendants are unopposed to the relief requested in this motion.

TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... iv

I. PROCEDURAL HISTORY ................................................................................ 1

   A. Counsel's Investigation and Discovery ............................................... 1

   B. Class Certification ............................................................................. 4

   C. Preliminary Injunctions..................................................................... 4

   D. Settlement Negotiations .................................................................... 6

   E. Notice to Class Members .................................................................. 6

II. TERMS OF THE SETTLEMENT ...................................................................... 6

   A. Certification of the Settlement Class and Subclass............................ 7

   B. Benefits to the Settlement Class and Subclass .................................. 9

      1. Air Conditioning the Pack Unit ............................................... 9

      2. Permanent Assignment to Air-Conditioned Housing................. 9

      3. Transportation in Air-Conditioned Vehicles ........................... 10

   C. Notification of Rights ...................................................................... 11

   D. Opt Out Rights .............................................................................. 11

   E. Payment of Attorneys' Fees, Costs, and Expenses.......................... 12

   F. Continuing Jurisdiction of the Court............................................... 13

III. ARGUMENT AND AUTHORITIES ................................................................ 13

   A. The Court Should Certify the Settlement Class and Subclass.......... 14

      1. The Settlement Class and Subclass Satisfy Rule 23(a) ............. 15

      2. The Settlement Class and Subclass Satisfy Rule 23(b) ............. 18

   B. Fairness of the Settlement............................................................... 19

      1. No Fraud or Collusion Exists ................................................. 20

    *2.   The Plaintiffs' Probability of Success*.................................................. 20

    *3.   The Range of Possible "Recovery"* ................................................. 21

    *4.   The Complexity and Likely Duration of the Litigation;* ................... 22

    *5.   The Advanced Stage of the Proceedings and Advanced Discovery* .............. 23

    *6.   The Opinions of Class Counsel, and Class Representatives* ......................... 23

  **C.   The Attorneys' Fees are Fair and Reasonable** ............................................. **24**

    *1.   The Lodestar Analysis* ................................................................... 26

    *2.   The Hours Expended were Reasonable and Necessary to Achieve the Result.* ............ 26

    *3.   Plaintiffs' Counsels' Hourly Rates and are Reasonable.* ................. 27

    *4.   The Johnson Factors Justify and Confirm the Reasonable Fee.* .................. 28

    *5.   The "Value" of the Injunctive Relief* ............................................. 33

    *6.   Costs and Litigation Expenses* ...................................................... 34

    *7.   Attorneys' Fees and Expenses Summary* ...................................... 35

  **D.   Continuing Jurisdiction and the Prison Litigation Reform Act** ................................ **35**

**IV.  C**ONCLUSION ................................................................................................... **36**

TABLE OF AUTHORITIES

## Cases

*AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305 (11th Cir. 2004)........... 14

*Alvarado v. Memphis-Shelby County Airport Auth.*, No. 99-5159, 2000 WL 1182446 (6th Cir. Aug. 15, 2000) ...................................................................................................................... 14

*Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003) ........................................................ 34

*Ball v. LeBlanc*, 881 F.3d 346 (5th Cir. 2018)............................................................... 20

*Beckford v. Irvin*, 60 F.Supp.2d 85 (W.D. N.Y. 1999) .................................................. 34

*Blanchard v. Bergeron*, 489 U.S. 87 (1988) ............................................................ 24, 25

*Blum v. Stenson*, 104 S.Ct. 1541 (1984) ....................................................................... 25

*Bynum v. Dist. of Columbia*, 412 F.Supp.2d 73 (D. D.C. 2006).................................... 32

*Carruthers v. Israel*, 274 F.Supp.3d 1345 (S.D. Fla. Aug. 15, 2017) .......................... 34

*Cerdes v. Cummins Diesel Sales Corp.*, No. 06-922, 2010 WL 2835755 (E.D. La. July 15, 2010) .................................................................................................................................. 35

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977)..................................................... 21, 23

*Craft v. Cty. of San Bernardino*, 624 F.Supp.2d 1113 (C.D. Cal. 2008) ...................... 32

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ........................... passim

*Evans v. Jeff D.*, 475 U.S. 717 (1986)........................................................................... 14

*Guajardo v. Estelle*, 568 F.Supp. 1354 (S.D. Tex. 1983) ....................................... 19, 23

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................ 25

*Hernandez v. Cty. of Monterey*, No. 13-CV-2354-PSG (N.D. Cal. May 11, 2015) .................... 32

*In re Enron Corp. Securities, Derivatives, & ERISA Litig.*, 586 F.Supp.2d 732 (S.D. Tex. 2008) .............................................................................................................................. 25, 27

*In re High Sulfur Content Gasoline Liability Litig.*, 517 F.3d 220 (5th Cir. 2008)..................... 25

*In re Motorola Sec. Litig.*, 644 F.3d 511 (7th Cir. 2011)............................................... 14

*In re Nassau Cty. Strip Search Cases*, 12 F.Supp.3d 485 (E.D. N.Y. 2014)................................ 32

*In re: Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016)..... 24

*James v. City of Dallas, Tex.*, 254 F.3d 551 (5th Cir. 2001) ........................................................ 16

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)........................... 25, 27

*Jones v. Gusman*, 296 F.R.D. 416 (E.D. La. June 6, 2013) ........................................................ 14

*Jones v. White*, No. H-03-2286, 2007 WL 2427976 (S.D. Tex. Aug. 22, 2007)......................... 34

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016)........................................................................ 34

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007) ........................................... 16

*Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992) ............................................................. 33

*Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521 (5th Cir. 2007) ......................................... 18

*Matter of Continental Illinois Securities Litig.*, 962 F.2d 566 (7th Cir. 1992)........................... 26

*Mehling v. N.Y. Life Ins. Co.*, 246 F.R.D. 467 (E.D. Pa. 2007) ................................................. 14

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ............................... 15

*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) .................................................. 24

*Nunez v. City of New York*, No. 1:11-cv-05845-LTS-JCF, Doc. 209-1, p. 59 (S.D. N.Y. July 1, 2015) ....................................................................................................................................... 32

*Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982) ................................................................... 19

*Parsons v. Ryan*, No. 2:12-cv-00601-DJH, Doc. 1185, p. 14 (D. Az. Oct. 14, 2014)................ 32

*Perdue v. Kenny A.*, 559 U.S. 542 (2010)................................................................................... 31

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980) .................................................................... 13

*Pierce v. Cty. of Orange*, 905 F.Supp.2d 1017 (W.D. Cal. 2012) .............................................. 34

*Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983)..................................................... 19

*Riverside v. Rivera*, 477 U.S. 561 (1986) .................................................................................. 31

*Rowe v. E.I. Dupont de Nemours & Co.*, No. 06-1810, 2011 WL 3837106 (D. N.J. Aug. 26, 2011) ....................................................................................................................................... 14

*Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir. 1984)...................................................................... 19

*Sanchez v. City of Austin*, 774 F.3d 873 (5th Cir. 2014)............................................................ 24

*Tex. State Teachers Assn. v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989) ............................ 30

*Wallace v. Powell*, 288 F.R.D. 347 (M.D. Penn. Dec. 14, 2012) ................................ 32

*Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011) ........................................ 16

*Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017)................................................... passim

*Yates v. Collier*, 677 Fed. Appx. 915 (5th Cir. Jan. 30, 2017)........................................ 5

*Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017).................. 32

## Statutes

18 U.S.C. § 3626 ................................................................................. passim

42 U.S.C. § 12205 ........................................................................ 24, 34

42 U.S.C. § 1988 ...................................................................... 23, 24, 34

42 U.S.C. § 1997e .......................................................................... 1, 34

42 U.S.C. § 12102 ............................................................................... 8

42 U.S.C. § 1983 ..................................................................... 1, 24, 35

## Rules

Fed. R. Civ. Proc. 23 ................................................................... passim

## Treatises

4 Newberg on Class Actions (4th Ed. 2002) ................................................... 19, 24

Wright & Miller, Federal Practice and Procedure ........................................ 31

## I.   PROCEDURAL HISTORY

This case is yet "another chapter in a long saga of challenges to conditions of confinement" exposing prisoners to "high temperatures in the prison housing areas." *Yates v. Collier*, 868 F.3d 354, 358 (5th Cir. 2017). Having reached an agreement providing extensive relief to prisoners incarcerated in the Texas Department of Criminal Justice's Pack Unit, Plaintiffs Brannum, King, Denton, Wallace, and Yates[1] request that the Court approve the class action settlement pursuant to Federal Rule of Civil Procedure 23(e), and reform the class definitions pursuant to the settlement agreement.

### A.   Counsel's Investigation and Discovery

The original named Plaintiffs – Marvin Yates, Keith Cole, David Bailey, and Nicholas Diaz – filed suit seeking injunctive and declaratory relief on June 18, 2014, pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and Rehabilitation Act. Doc. 1.[2] Prior to filing suit, the named Plaintiffs, with the assistance of Class Counsel, exhausted administrative remedies pursuant to 42 U.S.C. § 1997e. Counsel spoke with numerous prisoners at the Pack Unit before identifying the named Plaintiffs and ensuring their administrative remedies were exhausted. Throughout the litigation, Counsel visited the Pack Unit dozens of times and spoke with hundreds of prisoners about conditions at the prison.

Counsel reviewed tens of thousands of pages of medical records, and hundreds of thousands of other documents concerning the Pack Unit, conditions at the prison, and the

---

[1] Cole has yet to sign the settlement agreement.

[2] During the pendency of this litigation, Bailey and Diaz were released on parole. An amended complaint (Doc. 245) was filed, adding additional plaintiffs (Richard King, Fred Wallace, Ray Wilson, Jackie Brannum, and Dean Mojica). Wilson and Mojica also earned parole, and were replaced with Michael Denton (Doc. 629). The current named plaintiffs are Cole, Yates, King, Brannum, Wallace, and Denton. Brannum, Yates, King, Wallace, and Denton have signed the agreement.

consequences of forcing inmates to live in the dangerous summer heat throughout the TDCJ system.

The suit moved in tandem with several wrongful death and injury lawsuits where inmates at other TDCJ prisons suffered and died from heatstroke.[3] Though not formally consolidated,[4] the parties agreed discovery in any one case could be used in all the cases to "streamline" development of the record. Hundreds of thousands of pages of documents were produced. A total of 163 depositions were taken in the cases, including forty specific solely to conditions at the Pack Unit. The vast majority of the depositions touched on policies and procedures at all TDCJ prisons, including the Pack Unit, and nearly all impacted the Pack Unit litigation. Plaintiffs retained extremely qualified experts, whom the Court acknowledged were impressive and well-prepared.[5] Plaintiffs' counsel, and their experts, inspected the Pack Unit on multiple occasions (including once with the Court). *See* Doc. 40.

---

[3] *See*, *McCollum v. Livingston*, No. 4:14-cv-03253; *Adams v. Livingston*, No. 4:14-cv-03311; *Webb v. Livingston*, No. 4:14-cv-3302; *Togonidze v. Livingston*, No. 4:13-cv-3324; *Martone v. Livingston*, No. 4:13-cv-3369; *Hinojosa v. Livingston*, No. 4:14-cv-03311; *Caddell v. Livingston*, No. 4:14-cv-3323.

[4] Defendants in each of the cases sought consolidation in a multi-district litigation panel, which was ultimately denied. *See In re: Texas Prison Conditions of Confinement Litigation*, 52 F.Supp.3d 1379 (J.P.M.L. 2014). Nonetheless, the cases all proceeded before this Court as a quasi-MDL.

[5] Dr. Susanne Vassallo, M.D. (whose work has been cited with approval in three Fifth Circuit opinions addressing the dangers of high temperatures in prisons); Dr. Michael McGeehin, Ph.D. (an epidemiologist who conducted many of the leading studies addressing the dangers of summer heat for the Centers for Disease Control); Sec. Eldon Vail (ret.) (former director of the Washington State Department of Corrections, where he oversaw construction of air-conditioned prisons), Dr. Linda Mearns, Ph.D. (a recipient of the Nobel Peace Prize for her work with the Intergovernmental Panel on Climate Change), Prof. Thomas Sager (a statistics professor at the University of Texas at Austin who computed indoor heat indexes using mathematical formulas), and Ron Brown (a professional engineer experienced in installation of air-conditioning systems). *See* Doc. 268, 737. Despite these experts' eminent qualifications, Defendants moved to disqualify some of them as experts or limit their testimony. Doc. 399.

As the Court is well aware, the litigation was zealously defended by TDCJ, and required multiple discovery skirmishes, status conferences, and significant motion practice. Plaintiffs prevailed on many discovery disputes, including the placement of temperature and humidity monitors in the Pack Unit (Docs. 53 and 70) (which resulted in data relied on in the Court's later orders, *see* Doc. 737, p. 24), Defendants' ability to produce inmates' medical records (Docs. 120 and 202), the scope of Federal Rule 30(b)(6) depositions (Doc. 160), Defendants' attempt to "bifurcate" discovery (Doc. 164), Defendants' efforts to stay discovery (Docs. 44 and 359), Defendants' obligations to produce electronically stored information (Doc. 375, p. 4), Defendants' objections to counsel taking photographs during prison inspections[6] (Doc. 536), Plaintiffs' need for discovery to investigate last-minute changes at the prison before the second preliminary injunction hearing (Doc. 655), and motions to compel depositions of essential defense witnesses (Doc. 161).

Because the case involved an issue touching numerous lives, dozens of inmates at prisons around the state moved to intervene or seek other relief from the Court.[7] Plaintiffs responded to these motions to appropriately limit the scope of the suit. At the Court's request, the Parties also investigated several complaints that inmates brought to the Court's attention. *See* Doc. 636 and Doc. 743.

Along the way, Plaintiffs defeated multiple motions to dismiss the case, exclude Plaintiffs' experts, and reconsider previous orders. *See* Docs. 23 ("Motion to Dismiss Motion for Class Certification"); 158 (Herrera's motion to dismiss); 326 (motion for summary judgment);

---

[6] Many of which were used at the second preliminary injunction hearing. *See* Doc. 921-1, Plaintiffs' Second Preliminary Injunction Hearing Exhibit 2.

[7] *See, e.g.*, Docs. 7, 26, 38, 43, 47, 48, 49, 50, 51, 52, 55, 57, 58, 61, 65, 68, 72, 73, 79, 80, 81, 83, 84, 87, 88, 89, 92, 93, 94, 95, 97, 98, 101, 102, 104, 111, 115, 123, 137, 235, 488, 496, 497, 561, 580, 590, 591, 600, 622, 651, 730, 738, 775, 777, 788, 800, 823, 853, 864, 905.

399 (motion to disqualify Dr. Vassallo and Dr. McGeehin); 479 (motion to reconsider first preliminary injunction order).

### B.    Class Certification

Plaintiffs moved to certify a class of all inmates at the Pack Unit, and two subclasses of sick and disabled inmates. Docs. 5 and 272. The Court granted Plaintiffs' amended motion (Doc. 473) after a four-day evidentiary hearing, and defined the Class and two Subclasses as follows:

> **The Class**: All inmates who currently are, or in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas.
>
> **The Heat-Sensitive Subclass**: All people who are incarcerated at the Pack Unit, or in the future will be, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas, and either: (1) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or (2) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or (3) are over age 65.
>
> **The Disability Subclass**: All people incarcerated at the Pack Unit, or who will be in the future, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas and suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or medical treatment necessary to treat their disability.

Doc. 473. The Court's order was affirmed after an interlocutory appeal. *Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017) (pet. for en banc review pending).[8]

### C.    Preliminary Injunctions

Following weeks of contentious hearings, where several out-of-state experts flew in to testify, the Court entered two preliminary injunctions. Docs. 477 and 737.

---

[8] Pending the Court's approval of the class settlement, all pending appeals have been stayed.

The first injunction, effective during the summer of 2016, required TDCJ to provide safe drinking water to abate the heat during that summer. Doc. 473. For years, drinking water at the Pack Unit had contained arsenic in levels far in excess of the Environmental Protection Agency's maximum limits. *Id*. This injunction expired by its own terms while TDCJ's interlocutory appeal of the order was pending. *See* 18 U.S.C. § 3626(a)(2); *Yates v. Collier*, 677 Fed. Appx. 915 (5th Cir. Jan. 30, 2017).

The second injunction, entered after a nine-day evidentiary hearing, found Defendants were deliberately indifferent to the Plaintiffs' Eighth Amendment rights, and required TDCJ to take entirely new steps to protect Pack Unit inmates from the heat. Subclass members, who TDCJ acknowledged were even more vulnerable to the heat, could no longer be housed in locations where the indoor heat index exceeded 88°F. Doc. 737, pp. 98-99. Other class members, who due to their good health were at less (though still substantial) risk, received improved access to "respite" areas (air-conditioned portions of the prison). *Id*. The order also required TDCJ to develop a heat wave policy for the Pack Unit, and institute an improved training regimen for inmates' about the heat's dangers. *Id*. Finally, the order required installation of window screens to prevent insects from entering windows kept open to abate the heat. *Id*.

To comply with the injunction, TDCJ created a heat wave policy and training, began installation of insect-proof window screens, and decided to move subclass members to twenty other air-conditioned TDCJ prisons around the state. Beginning on August 8, 2017, TDCJ moved over 1,000 members of the subclass away from the Pack Unit. *See* Doc. 769 (TDCJ's compliance plan) and 771 (order approving plan). TDCJ always represented the subclass members would return to the Pack Unit when the injunction expired. Doc. 873, Transcript of Aug. 8, 2017 Hearing, pp. 51-52.

An interlocutory appeal of the second preliminary injunction order was pending when the parties agreed to settle the litigation.

### D.    Settlement Negotiations

Following Plaintiffs' victory in the second preliminary injunction (and while monitoring TDCJ's implementation of the Court's orders), the parties began negotiations to resolve the case in November 2017. Over twenty phone calls and in-person meetings between lead counsel resulted in the exchange of detailed written settlement proposals. Mediation took place on January 29 and 30, 2018, with the Hon. Scott Brister. Shortly before 2:00 am on January 31, an agreement in principle providing extensive relief to the prisoners was reached for the Court to ratify.

### E.    Notice to Class Members

Pursuant to Rule 23(c)(2) and 23(e)(1), the Court must "direct appropriate notice to the class" in a Rule 23(b)(2) class. Here, if approved by the Court, all members of the proposed class will be sent Exhibit 1, The Class Action Notice and Opt Out Form. With the cooperation of Defendants, a copy of Exhibit 1 will be personally delivered to all prisoners who resided at the Pack Unit between July 19, 2017 and August 8, 2017 or who reside there now. A copy of Exhibit 1 will also be posted in the housing areas and law library at the Pack Unit. TDCJ has represented to Class Counsel that nearly all Pack Unit prisoners who were transferred to other locations pursuant to the preliminary injunction order will be returned to the Pack Unit before the notice is scheduled to be posted. Plaintiffs' counsel will also send a detailed, privileged letter further explaining the benefits of the settlement and the class members' rights created by the agreement.

## II.    TERMS OF THE SETTLEMENT

The Settlement Agreement (Exhibit 2) resolves the claims of Plaintiffs Brannum, Yates, King, Wallace, and Denton and the proposed amended Class and Subclass members against all

the Defendants. The details are contained in the Settlement Agreement, the key terms of which are described below.

### A.   Certification of the Settlement Class and Subclass

Plaintiffs Brannum, Yates, King, Wallace, and Denton request the Court amend the class certification order to re-define the Class and Subclass pursuant to Rule 23(c)(1)(C).

Plaintiffs Brannum, Yates, King, Wallace, and Denton seek amended certification of a Settlement Class and Subclass, defined in pages 6 to 8 of the Settlement Agreement. The proposed Settlement Class includes all people who will be imprisoned at the Pack Unit on the date of execution of the agreement as well as all prisoners who TDCJ represents were housed at the Pack Unit between July 19, 2017 and August 8, 2017 (the period after the Court's order granting the motion for preliminary injunction (Doc. 737) and before TDCJ's preliminary injunction compliance plan was approved by the Court (Doc. 771)) and who remain in TDCJ custody today. A list of all Class members is attached as Exhibit 3.[10] This is a minor alteration from the original class definition, which, instead of being a specified list of prisoners' names, generically identified "all inmates who currently are, or in the future will be, incarcerated at the Pack Unit."[11]

---

[10] As discussed in Exhibit 4, the declaration of TDCJ's executive director, Bryan Collier, the list was compiled by confirming the identity of every inmate at the Pack Unit between July 19, 2017 and August 8, 2017, using databases maintained by TDCJ's executive services division. The list was cross-checked by Plaintiffs' counsel, which resulted in the addition of a small number of names using records provided in discovery.

[11] Because the relief will be permanently installed air conditioning, rather than lesser, non-structural, relief, there is no necessity to include "future" Pack Unit inmates in the class. If, for any reason, TDCJ were not to turn on the permanently installed air conditioning, future Pack Unit inmates not listed on Exhibit 3 would not be bound by the Settlement Agreement.

The proposed Settlement Subclass is made up of the Class members who suffer from certain medical conditions that place them at additional risk of heat-related illness, injury, or death. The list of medical conditions is similar to the list approved by the Court when it granted Plaintiffs' motion to certify the Class and Subclass (which the Fifth Circuit affirmed, *Yates*, 868 F.3d at 358). The definition of the Settlement Subclass differs only in that it is more narrowly tailored, based on the consultation of the Parties with their medical experts.[12]

The re-defined Settlement Subclass likely excludes very few, if any, inmates who made up the original subclasses. For example, the original subclass definition included "hypertension" while the settlement subclass definition includes hypertension "if uncontrolled by medication." In reality, however, many of the medications that would control hypertension – like diuretics and beta blockers – would also make the inmate a subclass member. Thus, if a patient's "controlled" hypertension excludes him from the Subclass, the medications necessary to "control" the condition would likely bring him back within the Subclass. Likewise, numerous conditions included in the settlement subclass definition are frequently co-morbid. A diabetic patient without target organ damage (who would now be excluded), would, for example, still likely be obese or also suffer from uncontrolled hypertension.[13]

---

[12] For example, rather than the broad "psychiatric conditions," which could include relatively mild conditions like an anxiety disorder, the settlement subclass definition defines "psychiatric disorder" as only serious psychiatric conditions which are likely to make a patient more vulnerable to the heat. According to TDCJ, it also intends to utilize this list of conditions to modify its existing policies to identify prisoners most vulnerable to the heat.

[13] The re-defined subclass also eliminates the separate "disability" subclass. The disability subclass was only certified to constrain a class to elements of the Plaintiffs' claims under the Americans with Disabilities Act and Rehabilitation Act. Since the remedy is the same for both the certified "heat-sensitive" and "disability" subclasses, separate subclasses are redundant and unnecessary for settlement purposes. The inmates who are "disabled" under the ADA and Rehabilitation Act's definitions, however, receive substantial accommodations for their disabilities under the Settlement Agreement. If anything, the "disability" subclass was always

### B.      Benefits to the Settlement Class and Subclass

#### 1.      Air Conditioning the Pack Unit

To settle the case, TDCJ is agreeing to air condition all housing areas at the Pack Unit. Every Class member – young and old, sick and healthy – will now live in air conditioning every summer until they are freed from TDCJ custody. From April 15, 2018 to October 15, 2018, and again from April 15, 2019 to October 15, 2019, TDCJ will install temporary air conditioning in all the Pack Unit's housing areas. During the 2019 legislative session, TDCJ will seek an appropriation for the funds necessary to install permanent air conditioning before summer 2020. If, for any reason, the necessary funds are not appropriated, TDCJ will continue to provide temporary air conditioning from April 15 to October 15 every year, in perpetuity, until permanent air-conditioning is installed.

The Settlement provides greater benefits to the Class and Subclass than the preliminary injunction, which did not require TDCJ to provide air conditioning to inmates without heat-sensitive medical conditions. Doc. 737, pp. 95-96.

All Class and Subclass members will receive the benefit at the Pack Unit (unless they voluntarily opt out).

#### 2.      Permanent Assignment to Air-Conditioned Housing

If any Class members are transferred out of the Pack Unit to another TDCJ prison for security or medical reasons, the Settlement obligates TDCJ to provide air-conditioned housing at any other TDCJ prisons to which they are sent for the duration of their present incarceration. All

---

merely a subset of the "heat sensitive" subclass, as "disability" subclass members were required to have one of the "heat sensitive" medical conditions *and* also a legally "substantially limiting" disability. *See* Doc. 737, pp. 4 & 22 (declining to reach ADA and Rehabilitation Act claims for preliminary relief); 42 U.S.C. § 12102 (definition of "disability"). Eliminating the "disability" subclass does not deny relief to any prisoner in this subclass, as the Settlement calls for air conditioning the entire Pack Unit for the benefit of all members of the General Class.

necessary programs for parole must be provided at the Pack Unit or other air-conditioned locations.[14] A class member will only lose his air-conditioning rights if he voluntarily chooses to leave the Class to participate in programming unavailable at the Pack Unit.[15] In short, Class members will be guaranteed the option of air-conditioned housing for the remainder of their current incarceration.

This is also a significant benefit to the Class members, which they may not have been able to secure after a trial on the merits.

3.   *Transportation in Air-Conditioned Vehicles*

Subclass members will receive a significant additional benefit – transportation in an air-conditioned vehicle whenever they leave the Pack Unit. This is an important benefit. Some prisoners refuse transportation to off-site specialty medical appointments specifically because they do not want to ride in a dangerously hot bus during the summer. *See* Ex. 5, Deposition of M. Yates, p. 10:18–25. Indeed, several of the TDCJ inmates who died of heatstroke were struck down shortly after being transported around the state in a hot vehicle.[16] One of the recent heat-

---

[14] The only exception is the "Innerchange Freedom Initiative," a voluntary, faith-based pre-release program only offered at TDCJ's Carol Vance Unit. Only 200 inmates at any time participate in the program. Participants are selected from the entire TDCJ population. Participation is further limited to inmates about to be released to the Houston area. *See* Byron R. Johnson and David B. Larson, InnerChange Freedom Initiative: A Preliminary Evaluation of a Faith-Based Prison Program (Baylor Institute for Studies of Religion, 2008) *available at*: https://www.baylor.edu/content/services/document.php/25903.pdf. *See* Ex. 4, Declaration of B. Collier.

[15] Examples could include a "hardship transfer" for prisoners to be closer to family who would otherwise be unable to visit them, or participation in a voluntary religious or vocational program unavailable at the Pack Unit.

[16] *See, e.g.*, Doc. 921-25, Plaintiffs' Second Preliminary Injunction Hearing Exhibit 18 (Autopsy of Charles Finke, Jr.).

exhaustion victims at the Pack Unit, K.W., had arrived at the prison on a hot bus just a few hours before he was taken to the infirmary.[17]

This is another significant benefit for Subclass members that had not previously been ordered by the Court.

### C.    Notification of Rights

Every Class and Subclass member will receive a short, three-page form informing them of their rights under the Settlement Agreement. The proposed notification is attached as Exhibit 1.[18] The notification form is agreed by the Parties and will be useful to ensure the Class and Subclass members know their rights under the agreement. Defendants have agreed to provide a copy of the Notification form to every Class and Subclass member. A copy of the notification form will also be maintained in the Pack Unit's law library, and posted on a bulletin board in every Pack Unit housing area. Plaintiffs' counsel hope to make presentations to inmates at the Pack Unit before the fairness hearing to explain the settlement and their rights under the agreement.

### D.    Opt Out Rights

Though a Rule 23(b)(2) class does not need to contain an opt-out requirement because it seeks only declaratory and injunctive relief,[19] the Parties agreed (at the Court's direction) to give Class members the ability to "opt out" of the class. The Notification contains an explanation of

---

[17] *See* Doc. 921-69, Plaintiffs' Second Preliminary Injunction Hearing Exhibit 38.

[18] The Parties ask the Court to approve the notice so it can be provided to the Class members, as described herein.

[19] *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 294 (W.D. Tex. 2007) ("When a class falls within the classic Rule 23(b)(2) paradigm as it does here, no opt-out procedure is necessary to protect the interests of the class").

the "opt out" provisions, and allows prisoners to "opt out" by submitting the form to Class Counsel. *See* Ex. 1, p. 4. The "opt out" form will require the prisoner to submit his name, TDCJ identification number, and a brief reason he wishes to "opt out" to ensure his decision is completely voluntary. A prisoner may "opt out" at any time, such as if he later becomes eligible for a voluntary program unavailable at the Pack Unit and wishes to leave the protections of air-conditioning to attend that program.[20] The "opt out" form explicitly tells the prisoner he is forever giving up all rights secured by the Settlement Agreement. Class Counsel will administer the "opt out" requests to ensure all "opt outs" are truly voluntary.

The Parties anticipate few prisoners will "opt out."

### E.   Payment of Attorneys' Fees, Costs, and Expenses

Defendants have agreed to pay Plaintiffs' counsel attorneys' fees, costs and expenses of $4,500,000.00 as of the date of the Court's order. Because the Class and Subclass seek only injunctive and declaratory relief, and not damages, there is no common fund and the amount of the fee will not change any benefit to the Class or Subclass.

The amount of attorneys' fees, costs, and expenses is agreed as a material term of the settlement agreement. A summary of Class Counsel's hours, reasonable hourly rates, and expenses is attached as Exhibit 6. Detailed time sheets for each attorney and staffer are attached as Exhibits 7 through 23. The amount of attorneys' fees, costs, and expenses were negotiated separately after agreement was reached on the other material terms of the agreement. Significantly, Defendants stipulate that this is a fair and reasonable amount of fees, costs, and expenses.

---

[20] As part of the Settlement Agreement, however, Defendants agree to make all programs required for release on parole available at the Pack Unit or other air-conditioned prisons. The only exception is the Innerchange Freedom Initiative, *see supra* at p. 9, n.14.

### F.     Continuing Jurisdiction of the Court

The Settlement provides the Court will have continuing jurisdiction over this case. The expenditure for permanent air conditioning of the Pack Unit will require legislative approval, and until permanent air conditioning is installed, prospective relief, in the form of temporary air conditioning each summer, is necessary to correct the ongoing violation of federal rights that Plaintiffs allege. *See* 18 U.S.C. § 3626(b)(3); Doc. 737. The Settlement reflects the agreement that the relief afforded by the Settlement extends no further than necessary to correct the alleged violation of the Class and Subclasses' federal rights and that the relief will not cause any adverse impact on public safety or operation of the criminal justice system. *See* 18 U.S.C. § 3626(a)(1).

Upon the permanent installation of air conditioning, the Parties shall notify the Court and ask for the case to be dismissed. Defendants have represented that the next legislative appropriation will become available on September 1, 2019, the beginning of the first biennial fiscal year after the first opportunity for the Texas legislature to approve the installation costs. Defendants anticipate installation of permanent air conditioning at the Pack Unit will be completed before the summer of 2020.

Defendants have agreed they will not appeal any of the relief the parties request the Court approve, including the installation of permanent air conditioning and the amount of attorneys' fees and expenses.

### III.    ARGUMENT AND AUTHORITIES

A class action may not be settled without the approval of the Court. FED. R. CIV. PROC. 23(e); *Piambino v. Bailey*, 610 F.2d 1306, 1327-28 (5th Cir. 1980). The Court must ensure the settlement is "fair, reasonable, and adequate" to protect the rights of absent class members. *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 285 (W.D. Tex. 2007) (citing FED. R. CIV. PROC. 23(e)(1)(C)). "The purpose of this salutary requirement is to protect the nonparty members of the

class from unjust or unfair settlements affecting their rights." *Piambino*, 610 F.2d at 1327-28. "[T]he court cannot modify the terms of the proposed settlement; rather, the Court must approve or disapprove of the proposed settlement as a whole." *DeHoyos*, 240 F.R.D. at 286. "[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Id.* (citing *Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986)). Appellate review is only for "clear[] abuse of discretion" as "a product of the strong judicial policy favoring the resolution of disputes through settlement." *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982).

Though the Court previously certified a class and subclasses, because the Parties have agreed to a redefined Settlement Class and Subclass, the Court should also perform the Rule 23 certification analysis for the Settlement Class and Subclass. *See DeHoyos*, 240 F.R.D. at 279. *See also Jones v. Gusman*, 296 F.R.D. 416 (E.D. La. June 6, 2013) (approving settlement of jail class action).

A.     **The Court Should Certify the Settlement Class and Subclass**

The Court should reform the Class and Subclass definitions to approve the proposed settlement. "[L]itigants are free to modify a class via a court-approved settlement agreement." *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011) (citing *Mehling v. N.Y. Life Ins. Co.*, 246 F.R.D. 467 (E.D. Pa. 2007)); *see also Alvarado v. Memphis-Shelby County Airport Auth.*, No. 99-5159, 2000 WL 1182446, at *7 (6th Cir. Aug. 15, 2000) (unpublished) (affirming approval of settlement with modified class); *Rowe v. E.I. Dupont de Nemours & Co.*, No. 06-1810, 2011 WL 3837106 (D. N.J. Aug. 26, 2011) (unpublished) (approving settlement with modified class). Amending a class definition when approving a settlement does not prejudice any person that might be excluded from the new definition, because such a person is not bound by

the settlement, and therefore would retain the right to bring his or her own suit. *See, e.g.*, *AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305, 1311 (11th Cir. 2004) (holding objectors who were excluded by modification of class definition had no right to appeal settlement approval because they "are simply potential plaintiffs who have yet to litigate any claims"). When amending a class definition, the new class must continue to satisfy the certification requirements of Rule 23.

       *1.*     *The Settlement Class and Subclass Satisfy Rule 23(a)*

       i)     <u>Numerosity</u>

The Class and Subclass are sufficiently numerous. The Class consists of over 1,300 individuals. This number is "so numerous that joinder of all members is impracticable." FED. R. CIV. PROC. 23(a)(1); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (suggesting that a class of more than 40 "should raise a presumption that joinder is impracticable"). The Court previously found the Class was sufficiently numerous, a finding not challenged on appeal. Doc. 473, pp. 13-14; *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017).

While the number of Subclass members before the settlement was more than 1,200, and will almost certainly vary as some as prisoners age and develop heat-sensitive medical conditions while others are released from custody, it is certainly sufficiently numerous.[21] *See id*. Before the preliminary injunction hearing, TDCJ had identified 478 Pack Unit prisoners as "heat sensitive."[22] After the hearing, TDCJ moved 1,046 subclass members away from the Pack Unit

---

[21] Defendants had not completed their review of the number of inmates in the subclass before the filing of this motion. The Parties will update the Court on the size of the subclass before the final approval hearing.

[22] Doc. 921-74, p. 11, Plaintiffs' Preliminary Injunction Exhibit 45.

to comply with the preliminary injunction. *See* Doc. 769 (Defendants' Compliance Proposal).[23] While the settlement Subclass is likely slightly smaller, it is still sufficiently numerous to justify certification.

ii)   Commonality

"[P]utative class members' claims must depend upon a common contention that must be of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (citing *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011)).

The Fifth Circuit affirmed that the previously certified class and subclasses raised common questions capable of common resolution. This is still the case. For the Class, common questions include: "(1) that excessive heat constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all inmates; (2) that TDCJ officials were deliberately indifferent to the risk posed to the inmates." *Yates*, 868 F.3d at 362. The Subclass has a narrower common question: does the heat pose "a substantial risk of serious harm, and deliberate indifference, to the inmates with heat sensitivity." *Id*. These are "question[s] of law or fact common to the class." *Id*. at 365-66 (citing FED. R. CIV. PROC. 23(a)(2)).

iii)   Typicality

"Rule 23(a) requires the named representatives' claims be typical of those of the class." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007). "The claims of all class members need not be identical," "[b]ut typicality demands that claims arise from a similar course

---

[23] Plaintiffs contend another approximately 140 inmates should have been afforded the relief required for the subclass under the preliminary injunction.

of conduct and share the same legal theory." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001).

Here, the Class representatives' claims remain typical. The Court previously determined that "[t]he TDCJ policies and practices related to heat exposure affect all the inmates in the Wallace Pack Unit, including the named Plaintiffs. The named Plaintiffs' claims arise from the same conduct of TDCJ and share the same legal theory as the rest of the class." Doc. 473, p. 17, *aff'd at Yates*, 868 F.3d at 361 n.3. Likewise, named Plaintiffs King, Brannum, Wallace, and Yates "bring claims that are typical" of Subclass members. Doc. 473, p. 17. Denton, who has no significant medical problems, has claims typical of the remainder of the Class. This is still true with the modified class definitions.

### iv)    Adequacy of Representation

King, Brannum, Yates, Wallace, and Denton are adequate Class and Subclass representatives, and Class Counsel will adequately represent the class.

The Court previously found King, Brannum, Yates, and Wallace were adequate representatives. *See* Doc. 473, pp. 18-20. This finding was not challenged on appeal. *Yates*, 868 F.3d at 361 n.3. Since that time, King, Brannum, Yates, and Wallace have assisted in preparation for the second preliminary injunction hearing, where many of them testified (including King, and Brannum), and helped monitor the implementation of the second preliminary injunction. Though Plaintiff Denton only became a named Plaintiff after the original certification order,[24] after his testimony the Court noted: "[h]is memory was clear, he was not evasive, and his testimony appeared unbiased. Even when it hurt Plaintiffs' case, Mr. Denton was honest." Doc. 737, p. 60. Like the other named Plaintiffs, Denton also gave a deposition, assisted counsel, submitted

---

[24] Denton was added as a "healthy" plaintiff after previous representatives with no heat-related illnesses were released on parole.

declarations, and admirably stood in for the absent class members. *See* Doc. 473, pp. 19-20; Ex. 26, Declaration of M. Denton. Denton has represented the class commendably, and is certainly an "adequate" representative.

At this time, Cole has yet to sign the settlement agreement. As five of the other six named plaintiffs have approved the agreement, these five plaintiffs (King, Brannum, Yates, Wallace, and Denton) should be appointed as adequate class representatives for purposes of recertification and settlement.[25]

Likewise, the Court previously found Class Counsel "adequate." The Court found Class Counsel has "extensive experience litigating class actions, prisoner civil rights, and conditions of confinement claims" and "shown themselves to be both competent and zealous in this case." Doc. 473, p. 18. Since that time, Class Counsel has defended three interlocutory appeals, won two preliminary injunctions, and negotiated a landmark settlement providing significant relief to the Settlement Class and Subclasses as previously defined. Class counsel remains qualified to represent the Class and Subclass for purposes of the Settlement.

### 2. The Settlement Class and Subclass Satisfy Rule 23(b)

The Class and Subclass also satisfy the requirements of Rule 23(b)(2). Federal Rule of Civil Procedure 23(b)(2) "permits class certification where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole." *Yates*, 868 F.3d at 366 (citing FED. R. CIV. PROC. 23(b)(2)). Rule 23(b)(2) certification is appropriate where "(1) class members … have been harmed in essentially the same way; (2) injunctive relief … predominate[s] over monetary

---

[25] The Court can approve a class action settlement without the consent of all the named plaintiffs. *Parker v. Anderson*, 667 F.2d 1204, 1211-12 (5th Cir. 1982); *Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004); *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581 (3rd Cir. 1999).

damage claims; and (3) the injunctive relief sought [is] specific." *Id*. (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)).

This Court previously found that Plaintiffs' claims "easily" satisfies Rule 23(b)(2). Doc. 473, p. 20. The Fifth Circuit affirmed. *Yates*, 868 F.3d at 367. "All inmates … are subject to the *same* policy on climate control, … all have the *same* heat-mitigation measures available to them, … and all are (allegedly) harmed in essentially the *same* way – i.e., by exposure to a substantial risk of serious harm because of exposure to excessive heat." *Id*. at 368 (emphasis in original). Plaintiffs' request for injunctive relief to "enjoin Defendants to maintain a safe indoor apparent temperature" satisfies the requirement that an injunction "provide relief to each member of the class." *Id*. Plaintiffs have never sought monetary relief (other than attorneys' fees and expenses), ensuring injunctive relief predominates. All of this is still true with respect to the Settlement Class and Subclass.

### B.    Fairness of the Settlement

The Settlement Agreement, which provides near complete relief to the Class and Subclass, is fair and reasonable. "There is a strong presumption in favor of finding the Settlement Agreement fair." *DeHoyos*, 240 F.R.D. at 286. In evaluating a class action settlement, the Court should consider the following factors: "(1) the existence of fraud or collusion behind the settlement; (2) the probability of plaintiffs' success on the merits; (3) the range of possible recovery; (4) the complexity, expense, and likely duration of the litigation; (5) the stage of the proceedings and the amount of discovery completed; and (6) the opinions of class counsel, class representatives, and absent class members." *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983). *See also Guajardo v. Estelle*, 568 F.Supp. 1354, 1358 (S.D. Tex. 1983) (approving prison class action settlement).

### 1. No Fraud or Collusion Exists

The Settlement Agreement provides a substantial benefit to the Class and Subclass, and affords relief that is broader than what they sought in their original complaint or were awarded in the second preliminary injunction. Doc. 1, p. 34, ¶ 181. Especially in such a case, it is presumed no fraud or collusion exists. 4 NEWBERG ON CLASS ACTIONS § 11:51 (4th Ed. 2002). *See also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (approving prison class action settlement over inmate objections). The Settlement Agreement was the product of extensive arms-length negotiations between able counsel, and attorneys' fees (discussed below) were not negotiated until the parties had resolved all other material terms.

### 2. The Plaintiffs' Probability of Success

When evaluating a class action settlement, "the most important factor is the probability of plaintiffs' success on the merits." *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). "[T]he Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *DeHoyos*, 240 F.R.D. at 287 (citing *Reed*, 703 F.2d at 172).

Though the Plaintiffs' previously won a preliminary injunction providing important relief, the Settlement Agreement provides greater benefits to the Class and Subclass. First, the entire Class now receives air-conditioned housing – a benefit "healthy" Class members did not win in the preliminary injunction. Doc. 737, pp. 95-96. Second, Class and Subclass members are now entitled to air-conditioned housing for the rest of their current incarceration, no matter where TDCJ may incarcerate them. In contrast, the suit only originally sought to protect inmates from dangerous temperatures while *at the Pack Unit*. Reforming the Class and Subclass definition to a defined list of inmates, coupled with the Settlement Agreement terms, guarantees this group of prisoners air-conditioned housing even if TDCJ transfers them to another prison for

legitimate security or medical reasons. Third, the Settlement Agreement also provides the Subclass members transportation between TDCJ facilities in air-conditioned vehicles – another benefit not awarded in the second preliminary injunction. As discussed above, this benefit is substantial, as it will encourage prisoners to attend off-site specialty medical appointments during the summer, and also protect prisoners from the special dangers the heat poses during transports. *See supra*, p. 10.

Finally, despite Plaintiffs' success before this Court, a successful trial on the merits would likely result in lengthy appeals, during which more individuals may be harmed by the heat (or even die). While Plaintiffs expect they could have won the relief described above at trial, this Court has recognized "deliberate indifference" is an "extremely high standard to meet." Doc. 737. Likewise, whether air conditioning is an available remedy would engender a lengthy and contentious appeal. *See Ball v. LeBlanc*, 881 F.3d 346 (5th Cir. 2018). Importantly, the Settlement Agreement provides a guarantee that all class members will be housed in air-conditioned locations beginning before summer 2018, a benefit that is not certain after trial on the merits if any court should stay any future relief.[26]

### 3.    The Range of Possible "Recovery"

Air conditioning the Pack Unit, and the other relief, is the best and most protective relief the Plaintiffs could achieve. When evaluating a class action settlement, Courts should consider "[t]he relief sought in the complaint [as] helpful to establish a benchmark by which to compare the settlement terms." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). The Settlement Agreement gives the Plaintiffs all the relief sought in their original complaint (and then some). Doc. 1, p. 34 ¶ 181 ("Plaintiffs ask that the Court enjoin Defendants to maintain a heat index of

---

[26] This is not an academic point as at least twenty-three men have died of heat stroke in TDCJ prisons, and hundreds more have suffered diagnosed heat-related injuries (including Cole and others at the Pack Unit). *See* Doc. 737, pp. 43-44.

88 degrees or lower inside each of the Pack Unit's housing areas"). In Plaintiffs' second motion for preliminary injunction, they sought a wide-range of possible relief. Air-conditioning was the first and best choice. Doc. 620, p. 2. Air conditioning is the only "mitigation" mechanism scientifically proven to prevent heat-related illness. Air conditioning the entire prison also removes the potential for human error in identifying "heat sensitive" inmates for purposes of separate housing. Air conditioning also alleviates the significant suffering any human being consistently exposed to these temperatures endures. Beyond this, the Settlement Agreement provides the Class and Subclass further relief, including Class members' permanent entitlement to air-conditioned housing throughout the TDCJ system, and Subclass members' right to transportation in air-conditioned vehicles. If Plaintiffs were to successfully try their claims (and defend them on appeal), they might increase their attorneys' fees, but it is not likely they could achieve a better result.

### 4.    *The Complexity and Likely Duration of the Litigation;*

This case has already been compared by the Courts hearing it to a "saga" and a Russian novel. *See Yates*, 868 F.3d at 358; Doc. 737, p. 100. Yet several additional chapters would need to be written in the absence of the Settlement: A petition for en banc review, third interlocutory appeal, and trial on the merits were all pending when the settlement in principle was reached. After trial on the merits, additional appeals to the Fifth Circuit were a near certainty, with the losing party likely to consider en banc review or seek *certiorari* to the U.S. Supreme Court. As noted above, Plaintiffs' likelihood of victory was likely, but not certain, especially on any terms more favorable than the Settlement Agreement. Under the best vision of the future for the Plaintiffs, the case would continue for several additional years. The Settlement Agreement, on the other hand, provides immediate, substantial relief (including relief the inmates may not have been able to win at trial or fully defend on appeal).

22

5.      *The Advanced Stage of the Proceedings and Advanced Discovery*

Plaintiffs' counsel is well-informed about the possibility of ultimate success. When evaluating a potential settlement, "[t]he Court should consider all information which has been available to the parties." *DeHoyos*, 240 F.R.D. at 292. In addition to the forty depositions taken in this case, including the related wrongful death actions Plaintiffs' counsel has attended or defended a total of 163 depositions about conditions at multiple other prisons, and reviewed hundreds of thousands of pages of documents in the combined actions before the Court. This evidence was tested in the crucible of a nine-day preliminary injunction hearing where the bulk of the parties' trial witnesses (including experts) testified. This Court produced a 101-page order thoroughly evaluating the documentary evidence (in addition to the 22-page class certification order), the credibility of the witnesses, and the expert testimony. Plaintiffs' experts were consulted prior to entering into the settlement (including Dr. Vassallo and Sec. Vail). The parties' information was exceptionally well-developed and complete.

6.      *The Opinions of Class Counsel, and Class Representatives*

Class Counsel endorses the Settlement Agreement as the best possible result from this litigation. All Class and Subclass members will receive the primary relief sought throughout the litigation: protection from the heat while in the housing areas. Though the Subclass may be a slightly smaller group of inmates, this marginally smaller group will receive a significant additional protection from the heat – transport in air-conditioned vehicles. Likewise, for both the Class and Subclass the relief now extends beyond the confines of the Pack Unit. Class and Subclass members will be protected from the heat regardless of what prison they may inhabit in the future. Class Counsel believes that the Class and Subclass "were able to secure substantially more modifications in the [TDCJ] [policies] than they would have achieved had they prevailed

on their request for injunction." *Guajardo*, 568 F.Supp. at 1358 (approving prison class action settlement).

The trial court may rely on "the judgment of experienced counsel for the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). "The endorsement of class counsel is entitled to deference." *DeHoyos*, 240 F.R.D. at 292. *See* Ex. 7, Declaration of J. Edwards.

Brannum, Yates, King, Wallace, and Denton are similarly pleased with the result. *See* Ex. 26, Declaration of Michael Denton; Ex. 28, Declaration of Fred Wallace; Ex. 25, Declaration of Jackie Brannum; Ex. 27, Declaration of Richard King; Ex. 24, Declaration of Marvin Yates.

### C.    The Attorneys' Fees are Fair and Reasonable.

The Court may award "reasonable attorneys' fees" as part of a class action settlement. FED. R. CIV. PROC. 23(h). Plaintiffs seek fees and expenses under 42 U.S.C. § 1988 and 42 U.S.C. § 12205. "In any action or proceeding to enforce provisions of [42 U.S.C. § 1983] the court … may allow the prevailing party … a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. Likewise, the ADA provides a prevailing party may recover "a reasonable attorney's fee, litigation expenses, and costs." 42 U.S.C. § 12205. "[T]he judicial gloss on § 1988, and its legislative history, have converted the statute's 'may' into a 'must.'" *Sanchez v. City of Austin*, 774 F.3d 873, 880 (5th Cir. 2014) (reversing district court's denial of attorneys' fees). "The prevailing party [in a § 1983 case] should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1 (1988) (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)). *See also Hopwood v. Texas*, 236 F.3d 256, 278 (5th Cir. 2000) *cert. denied*, 533 U.S. 929 (2001).

Before an award of fees, "[n]otice of the motion must be served on all parties and … directed to class members in a reasonable manner." *Id*. Notice will be provided to Class members

of "the content of the settlement and the scope of the fee." *In re: Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 447 (3d Cir. 2016) (citing NEWBERG ON CLASS ACTIONS § 8.22 (5th ed.)). The Class Action Notice and Opt Out Form, Ex. 1, informs the Class and Subclass that their attorneys are seeking fees and the amount of the award.

Here, the Settlement provides for an agreed amount of the fees and expenses, which are not part of a common fund available to the Class or Subclass. "[C]ourts have encouraged litigants to resolve fee issues by agreement, if possible." *DeHoyos*, 240 F.R.D. at 321. "[C]ourts are authorized to award attorneys' fees and expenses where all parties have agreed to the amount, subject to court approval, particularly where the amount is in addition and separate from the defendants' settlement with the class." *Id*. This is especially appropriate where the attorneys' fees are "separate and apart from the class settlement – which is not a common monetary fund – and will not in any way diminish the class settlement." *Id.* at 322. Here, "[w]ere the Court to reduce the award of class counsel's fees, this would not confer a greater benefit upon the class, but rather would only benefit [the defendants]." *DeHoyos*, 240 F.R.D. at 323. *See Blum v. Stenson*, 104 S.Ct. 1541 (1984); *In re Enron Corp. Securities, Derivatives, & ERISA Litig.*, 586 F.Supp.2d 732, 759-60 (S.D. Tex. 2008) (comparing fee awards in statutory fee shifting and common fund cases).

When the amount of attorneys' fees is agreed upon, reached after all other terms of the settlement, and not the subject of a common fund, the attorneys' fee is presumed to be reasonable. *See DeHoyos*, 240 F.R.D. at 322-23 (approving total award of $11,720,000). "[W]e will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than the cases from which they arose." *In re High Sulfur Content Gasoline Liability Litig.*, 517 F.3d 220, 228-29 (5th Cir. 2008).

### 1.     The Lodestar Analysis

A reasonable fee is determined using the lodestar method. *See In re High Sulfur Content Gasoline Products Liability Litig.*, 517 F.3d at 228. Using a lodestar is particularly appropriate in civil rights litigation for injunctive relief because "there is no way to gauge the net value of the settlement or any percentage thereof." *DeHoyos.*, 240 F.R.D. at 324 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)).

The amount of attorneys' fees a prevailing party is entitled to recover is determined by calculating "the reasonable number of hours expended on the litigation multiplied by a reasonable hourly rate." *Blanchard*, 489 U.S. at 89. *See also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). This amount is then adjusted upward or downward by applying a multiplier to determine a final, reasonable fee. *Id*. As Judge Posner explained, in attorneys' fee litigation, "it is not the function of judges … to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Matter of Continental Illinois Securities Litig.*, 962 F.2d 566, 568 (7th Cir. 1992).

### 2.     The Hours Expended were Reasonable and Necessary to Achieve the Result.

First, as outlined above, and as this Court is well aware, describing the amount of time and labor required in this litigation as only "substantial" minimizes how much effort this litigation has required to date. Plaintiffs' attorneys spent almost 10,000 hours working on their behalf. This is a reasonable amount of hours billed for a case that required 40 depositions (with 163 depositions in related cases), review of over 500,000 pages of documents, certifying the class and subclasses (with a four-day evidentiary hearing, and interlocutory appeal), defeating a 73-page motion for summary judgment (with a 1,298 page appendix) (Doc. 326) and multiple

motions to dismiss (*see e.g.* Doc. 23; Doc. 158), numerous discovery disputes, a nine-day evidentiary hearing on the motion for a second preliminary injunction (with a 30,000 page record), defense of three interlocutory appeals, and a two-day mediation that lasted until the early hours of a third calendar day. Of course, much of Plaintiffs' attorneys' efforts involved interviewing witnesses at remote prisons, requiring significant travel.

A summary accounting of the hours spent working on the case is attached as Exhibit 6, with detailed accounting in Exhibit 7.B, Exhibits 9 through 18, Exhibit 19.A, Exhibit 20.A, Exhibit 21.A, Exhibit 22.B, Exhibit 23.A, Doc. 481-14, and Doc. 599-5, p. 5 (Exhibit A).

Likewise, Plaintiffs' counsel has exercised careful billing judgment, discounting or excluding hours where appropriate. Typically, Plaintiffs' counsel did not even record time spent on short phone calls, responding to brief emails, or other similar tasks that would add up significantly in litigation lasting over four years from investigation to settlement.

### 3. *Plaintiffs' Counsels' Hourly Rates and are Reasonable.*

Likewise, the hourly rates charged by Plaintiffs' counsel are reasonable for attorneys' of their skill and experience. Hourly rates for Plaintiffs' counsel vary from $650/hour for lead counsel, to $225 for first-year attorneys' assigned to the case. These rates are reasonable. *See* Ex. 7, Declaration of Jeff Edwards; Ex. 22, Declaration of Mimi Marziani; Ex. 23, Declaration of Nathan Smith. These rates are comparable to rates awarded in other civil rights litigation. *DeHoyos*, 240 F.R.D. at 322-23  (approving 2007 hourly rates between $550 and $500 for lead counsel, $475 and $350 for associates, and $200 and $130 for legal assistants).[27]

---

[27] Adjusted for inflation, the 2007 rates become $660-$605 for lead counsel, and $575-$424 for associates – amounts very comparable to the rates sought here. *See* Bureau of Labor Statistics, *CPI Inflation Calculator*, *available at*: https://data.bls.gov/cgi-bin/cpicalc.pl.

4.      *The Johnson Factors Justify and Confirm the Reasonable Fee.*

Though the lodestar amount alone reaches the agreed fee award, evaluating the *Johnson* factors typically used to calculate a fee multiplier also justifies the result. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *In re: Enron Corp. Securities, Derivatives & ERISA Litig.*, 586 F.Supp.2d 732 (S.D. Tex. Sept. 8, 2008) (approving multiplier of 5.2 after evaluation of *Johnson* factors). The *Johnson* factors are:

(1)    the time and labor required for the litigation;
(2)    the novelty and difficulty of the questions presented;
(3)    the skill required to perform the legal services properly;
(4)    the preclusion of other employment by the attorney due to acceptance of the case;
(5)    the customary fee;
(6)    whether the fee is fixed or contingent;
(7)    time limitations imposed by the client or the circumstances;
(8)    the amount involved and the result obtained;
(9)    the experience, reputation and ability of the attorneys;
(10)   the "undesirability" of the case;
(11)   the nature and length of the professional relationship with the client; and,
(12)   awards in similar cases.

These factors weigh heavily in favor of determining the fee is reasonable.

i)      <u>The Litigation is Extremely Time Consuming.</u>

As the Court is well aware, and as the timesheets show, this case has been extremely time consuming for all involved. Plaintiffs' counsel has spent over 10,000 hours litigating this matter (a figure not including numerous hours spent litigating the related matters that benefitted this case). *See*, *e.g.*, Ex. 7, Declaration of J. Edwards. The docket report contains almost 1,000 entries.

ii)     <u>The Case Presented Multiple Complex Questions.</u>

Though the core facts of the case were not inherently complex, Plaintiffs' claims involve numerous issues of constitutional and disability law, nuanced application of the Prison Litigation Reform Act (as well as class action and appellate procedures), and an array of shifting details as

28

the underlying practices at the Pack Unit have allegedly changed during the litigation. Defendants robustly staffed the case and vigorously contested all aspects of it, requiring Plaintiffs' counsel to research and brief many legal and scientific issues. Developing Plaintiffs' arguments required intricate knowledge of a large body of Fifth Circuit and Supreme Court decisions stretching over several decades. Likewise, the case required evaluating complicated concepts in medicine, corrections, epidemiology, engineering, and climate modeling. *See* Doc. 268. *See also* Ex. 7, Declaration of J. Edwards.

iii)   <u>Highly Skilled Attorneys were Required.</u>

Plaintiffs' counsel have "extensive experience" in prisoner and civil rights litigation, prevailed on two separate preliminary injunctions, certified a class and subclass, and defended three interlocutory appeals. Ex. 7. Defendants pursued an "all hands on deck" defense, utilizing more than thirty attorneys over the course of the litigation to date. *See*, *e.g.*, Ex. 7, Declaration of J. Edwards; Docket Report (listing Defendants' counsel appearing in litigation).

iv)   <u>Other Employment Opportunities Have Been Precluded.</u>

Plaintiffs' counsel at Edwards Law have been precluded from pursuing other matters due to their commitment to this litigation, and had to hire multiple attorneys to successfully litigate this case. Devoting thousands of hours to this case required Plaintiffs' counsel to forgo numerous other opportunities to represent clients with meritorious claims. *See*, *e.g.*, Ex. 7, Declaration of J. Edwards.

v)   <u>The Proposed Fees are Customary and Market-Based.</u>

As discussed above, the lodestar amount alone would result in a customary, market-based fee.

29

vi)   The Fee is Entirely Contingent.

The Plaintiffs are indigent inmates, who do not have the ability to pay their counsel. Absent an award of fees, counsel will not receive any compensation for their work on this matter (or recover any of the significant expenses). *See*, *e.g.*, Ex. 7, Declaration of J. Edwards. Moreover, Defendants are not agreeing to pay fees until as late as September 2019, so the Court should also consider the time value of the fee. Ex. 6.

vii)   The Litigation Imposed Unique Time Limitations.

In addition to the contentious nature of this matter, there are other severe time limitations imposed by inmate litigation. Simply speaking with the Plaintiffs required a four-to-five-hour round-trip drive from Austin when they were imprisoned at the Pack Unit. Following the preliminary injunction, when most of the named Plaintiffs were moved to prisons in Beaumont, this burden increased considerably for Plaintiffs' lead counsel. *See*, *e.g.*, Ex. 7, Declaration of J. Edwards.

viii)   The Result is Impressive.

Air conditioning the Pack Unit is an extremely impressive result, providing inmates the best possible protection from the extreme summer temperatures. *See supra* at pp. 9-11. The ancillary relief – permanent assignment to air-conditioned housing and transportation in air-conditioned vehicles – is similarly impressive, and would have been significant had it been pursued in separate litigation. Likewise, the preliminary relief afforded inmates during the past two summers ensured safe drinking water and (for the inmates who did not leave the prison) an enhanced "respite" and heat-safety training program. Simply put, the relief secured in this litigation will save lives and prevent injuries (and likely already has).

If anything, but for the agreement of the parties on the amount of fees and expenses, this is a case where the lodestar amount should be adjusted upward because "the case is rare and exceptional." *DeHoyos*, 240 F.R.D. at 326.

ix)   The Attorneys' Experience is Impressive and Extensive.

As discussed above, counsel's experience and expertise in civil and disability rights and class action litigation is impressive and extensive. *See* Ex. 7, Declaration of J. Edwards; Ex. 19, Declaration of S. Medlock; Ex. 19, Declaration of M. Singley.

x)   The Case is "Undesirable."

Inmate litigation is considered "undesirable" for many reasons. Inmates are not a popular clientele. The standard of proof is very high. *See* Doc. 737, p. 86. This case has been particularly expensive to litigate, requiring medical, climate, engineering, statistical, and epidemiological experts. Plaintiffs' counsel fronted these significant costs for years. This is precisely the type of litigation where a "reasonable fee" is necessary to attract competent counsel to vindicate federal rights, and the type of "private attorney general" action the fee shifting statutes are meant to encourage—cases that will ensure individuals' fundamental federal rights are protected. *See Tex. State Teachers Assn. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793 (1989).

> A civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. And Congress has determined that the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff.

*Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (internal citations omitted). "[A]ttorneys successfully challenging civil rights violations should be rewarded an enhanced customary fee." *DeHoyos*, 240 F.R.D. at 329. "[T]he objective of the award is to create a financial incentive to initiate socially desirable litigation and thereby enhance access to the adjudicative process,

taking into account the amount of benefit actually produced and allowing fees to be enhanced accordingly seems particularly appropriate." WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1803.1.

xi)     <u>Counsel has Cultivated a Strong Relationship with the Clients.</u>

Counsel has interviewed hundreds of inmates at the Pack Unit. The original named Plaintiffs – Cole and Yates – have now been represented by counsel for almost four years. The second crop of Plaintiffs – Brannum, King, and Wallace – have worked with counsel for approaching three years. Counsel has come to know numerous other prisoners at the Pack Unit, a handful of whom testified during the preliminary injunction hearing.

xii)     <u>Similar Awards in Suits Seeking Injunctive Relief.</u>

The Supreme Court upheld an award of over $6,000,000 in *Perdue v. Kenny A.*, 559 U.S. 542 (2010) (affirming the lodestar amount without any multiplier), a civil rights class action for injunctive relief with no damages component. The Western District of Texas affirmed a much larger settlement in *DeHoyos*, 240 F.R.D. at 323 (approving fee of $11,720,000 in suit reforming insurance company's "red lining" practices). Numerous courts have approved similar fees in inmate class actions. *See also Parsons v. Ryan*, No. 2:12-cv-00601-DJH, Doc. 1185, p. 14 (D. Az. Oct. 14, 2014) (stipulation settling prison class action with fee of $4,900,000) (attached as Ex. 30); *Nunez v. City of New York*, No. 1:11-cv-05845-LTS-JCF, Doc. 209-1, p. 59 (S.D. N.Y. July 1, 2015) (settlement agreement in jail class action with agreed attorneys' fee of $6,500,000) (attached as Ex. 31); *Hernandez v. Cty. of Monterey*, No. 13-CV-2354-PSG, p. 21 (N.D. Cal. May 11, 2015) (settlement agreement in jail class action with agreed attorneys' fee of $4,800,000) (attached as Ex. 32); *Craft v. Cty. of San Bernardino*, 624 F.Supp.2d 1113 (C.D. Cal. 2008) (approving $6,375,000 fee); *Wallace v. Powell*, 288 F.R.D. 347 (M.D. Penn. Dec. 14,

32

2012) (approving \$4,335,000 fee); *Bynum v. Dist. of Columbia*, 412 F.Supp.2d 73, 81 (D. D.C.

2006) (approving \$4,000,000 fee); *In re Nassau Cty. Strip Search Cases*, 12 F.Supp.3d 485, 502

(E.D. N.Y. 2014) (approving \$4,018,030.25 fee); *Young v. Cty. of Cook*, No. 06 C 552, 2017 WL

4164238, \*5 (N.D. Ill. Sept. 20, 2017) (approving \$10,000,000 fee).[28]

### 5.    The "Value" of the Injunctive Relief

The fee is also reasonable given the monetary value of the benefits afforded to the Class

and Subclass. Of course, it is impossible to reduce the value of improved health and protection

from death to a dollar amount. But the dollar cost of air-conditioning the Pack Unit can be

calculated, and justifies the amount of the attorneys' fee. In pure dollar amounts, TDCJ estimates

permanently air conditioning the Pack Unit will cost up to \$26,424,282.60 plus \$477,678 in

annual operating costs.[29] If these permanent construction estimates are correct, the sum of

attorneys' fees and expenses will be approximately 17% of the monetary cost of the benefit the

Class eventually receives (ignoring the annual operating costs going forward). If this were a

damage award and part of a common fund, the fee would be eminently reasonable. *See Longden*

*v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992) (approving award of 27.5% of \$19,200,000

common fund as attorneys' fee).

TDCJ's expenses to comply with the preliminary injunction alone confirm the fee is

reasonable. TDCJ actually expended \$563,969.60 to comply with the Court's summer 2017

preliminary injunction order through September 30, 2017. Ex. 33, Exhibit 8 to Deposition of R.

Steffa. At the injunction hearing, there was significant conflicting evidence about the cost of

---

[28] *See also* David Chen, "\$8 Million Offered to End Attica Inmates' Suit," NEW YORK TIMES, Jan. 5, 2000 (describing class action settlement including \$4,000,000 attorneys' fee) *available at*: http://www.nytimes.com/2000/01/05/nyregion/8-million-offered-to-end-attica-inmates-suit.html.

[29] As the Court noted, the experts' estimates differ markedly on this point. Plaintiffs' expert's estimates were much lower.

temporarily air conditioning the prison, but, after it was ordered to protect the heat-sensitive inmates, TDCJ internally estimated it would spend $798,296 for three months of temporary air conditioning in 2017 alone. Ex. 29, Deposition of F. Inmon Corrected Exhibit Excerpt, "Analysis Packaged HVAC Units." Extrapolating this estimate to the agreed time period before any legislative approval yields an estimated cost of $2,640,720 for two summers of temporary air conditioning.[30] Thus, before construction of any permanent air-conditioning begins, TDCJ will have already spent around $3,204,689.60 to protect the Plaintiffs' health and welfare. If *Plaintiffs'* expert's estimates for permanently air-conditioning the prison are correct (though the Court found "neither [party's] estimates accurately describe[] the cost," Doc. 737, p. 77), the installation costs will be another $1,373,969.60, plus $175,000 in annual operating costs in perpetuity. By these measures, before the permanent air-conditioning is ever turned on, TDCJ will have spent more than the amount of the attorneys' fee to comply with the settlement.

### 6.    *Costs and Litigation Expenses*

The agreed amount for costs and fees is further justified by Plaintiffs' costs and litigation expenses, which they incurred in conjunction with the claims on which they prevailed, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205. *See also Jones v. White*, No. H-03-2286, 2007 WL 2427976, *8 (S.D. Tex. Aug. 22, 2007) (awarding experts' fees as litigation costs under the ADA). Plaintiffs' counsel paid these expenses with no contribution from the clients.

A detailed breakdown of the costs is attached as Exhibit 8, totaling $300,721.99. *See also* Ex. 7, Declaration of Jeff Edwards.

---

[30] TDCJ's litigation expert had previously estimated that temporarily air conditioning the Pack Unit's main building would cost $443,452 for the first month, with an additional $359,752 for each subsequent month. Doc. 922-7, TDCJ Ex. 20, Traknyak Report Supplement C (June 1, 2017); *see also* Test. of F. Traknyak, Doc. 758, pp. 1565:25–1566:1 (a vendor estimated the cost at $408,000 per month). This totals to $3,764,920 for the two summers that TDCJ has agreed to temporarily air condition the facility in this settlement. Plaintiffs' expert testified this estimate was high; extrapolating from his estimate yields a cost of $360,000.

7.    *Attorneys' Fees and Expenses Summary*

The total amount of the lodestar attorneys' fees and expenses is $4,729,188.24, without applying a multiplier, more than the amount Defendants agreed to pay in the settlement agreement. Defendants agree these fees and expenses were directly and reasonably incurred in litigating the alleged violation of Plaintiffs' federal rights, the amount of the fees and expenses are proportionately related to the relief required for the alleged violation, and the fee was directly and reasonably incurred in enforcing the relief ordered for the violation. *See* 42 U.S.C. § 1997e(d).[31]

**D.    Continuing Jurisdiction and the Prison Litigation Reform Act**

The extremely hot conditions inside the Pack Unit will continue to exist every summer until housing areas are air-conditioned. Plaintiffs allege that these conditions will continue to violate the Class and Subclass members' rights under the Eighth Amendment, 42 U.S.C. § 1983, and the Americans with Disabilities Act and Rehabilitation Act, every summer absent air conditioning. The Court should find the relief agreed to in the Settlement Agreement is necessary to remedy the alleged violations of the Class and Subclass members' federal rights, and, due to

---

[31] Defendants do not invoke the caps on attorneys' fees pursuant to 42 U.S.C. § 1997e(3), and agree not to appeal the Court's judgment. The Court is thus not constrained by the caps. Moreover, the cap only applies to fees sought under 42 U.S.C. § 1988, but Plaintiffs also seek fees under the ADA and Rehabilitation Act's fee provisions (42 U.S.C. § 12205). Thus, the caps do not apply. *See, e.g, Armstrong v. Davis*, 318 F.3d 965, 974 (9th Cir. 2003); *Pierce v. Cty. of Orange*, 905 F.Supp.2d 1017, 1025 (W.D. Cal. 2012); *Beckford v. Irvin*, 60 F.Supp.2d 85, 88 (W.D. N.Y. 1999). But even if the Court were obligated to evaluate the caps, it should still award the agreed fee of $4,199,278.01 (the agreed amount minus expenses, which are uncapped). The amount of the cap is $219/hour, which would result in a total capped fee of $2,080,807.85. *See Carruthers v. Israel*, 274 F.Supp.3d 1345, 1353 (S.D. Fla. Aug. 15, 2017). The exceptional result in this case, however, justifies a fee multiplier to reach the "reasonable" fee required by 42 U.S.C. § 1988. *See Kelly v. Wengler*, 822 F.3d 1085, 1100-02 (9th Cir. 2016) (affirming use of 2.0 multiplier to reach a "reasonable" fee); *supra* at pp. 27-32 (evaluating *Johnson* factors justifying a multiplier). A multiplier of 2.02 results in the agreed amount of the fee (minus expenses). This multiplier produces a reasonable result. *Cerdes v. Cummins Diesel Sales Corp.*, No. 06-922, 2010 WL 2835755, *5 (E.D. La. July 15, 2010) (approving 2.5 multiplier).

agreement of the parties, extends no further than necessary to correct the alleged violation of the Class and Subclass' federal rights. The Court should find the relief will not cause any adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626. Thus, the Court will retain continuing jurisdiction until the permanent air conditioning system is installed and operational at the Pack Unit, at which time the parties will notify the Court and the case can be dismissed.

IV.   CONCLUSION

The Court should grant the following relief.

1)   Amend the certification order (Doc. 473) to define the Class and Subclass as described above;

2)   Approve the notice (Ex. 1) for the Parties to provide to the Class and Subclass as described above;

3)   Set a fairness hearing to approve the settlement no later than April 11, 2018, to hear any objections from the Class and Subclass members, and approve the Settlement Agreement and the associated agreed award of attorneys' fees and costs.[32]

Dated: March 6, 2018.

Respectfully submitted,

Edwards Law
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
Tel.   512-623-7727
Fax.   512-623-7729

---

[32] The current iteration of the preliminary injunction expires by operation of law on April 12, 2018. *See* 18 U.S.C. § 3626(a)(2); Doc. 955. Likewise, the Settlement Agreement provides that temporary air conditioning at the Pack Unit will become operational on April 15, 2018.

By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

Jeremy Doyle
State Bar No. 24012553
Federal ID No. 24559
Nathan Smith
State Bar No.: 24053060
Federal ID No. 1075505
REYNOLDS FRIZZELL LLP
1100 Louisiana
Suite 3500
Houston, Texas 77002
   Tel.       (713) 485-7200
   Fax.       (713) 485-7250

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Court's electronic filing system.

By      /s/ Jeff Edwards
JEFF EDWARDS

## <u>CERTIFICATE OF CONFERENCE</u>

By my signature above, I certify that I conferred with counsel for the Defendants, Craig Warner and Darren McCarty, and they agree with the relief requested, and approve the proposed order as to form and substance, without adopting any of the characterizations of the litigation as described in this motion.

By      /s/ Jeff Edwards
JEFF EDWARDS