```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE SOUTHERN DISTRICT OF TEXAS
 2                              HOUSTON DIVISION

 3
     KEITH COLE, et al.,              )
 4   Plaintiffs,                      )    NO. H-14-CV-1698
                                      )
 5   v.                               )    August 9, 2019
                                      )
 6   BRYAN COLLIER, et al.,           )
     Defendants.                      )
 7

 8
                               TELECONFERENCE
 9                BEFORE THE HONORABLE KEITH P. ELLISON

10

11

12

13   For the Plaintiffs:           Jeffrey S. Edwards
                                   David James
14                                 Scott Medlock
                                   Mike Singley
15                                 The Edwards Law Firm
                                   1101 East 11th Street
16                                 Austin, TX 78702

17
     For the Defendants:           Leah O'Leary
18                                 Jeanine Coggeshall
                                   Office of the Attorney General
19                                 State of Texas
                                   P.O. Box 12548
20                                 Austin, TX 78711

21
     Court Reporter:               Bruce Slavin, RPR, CMR
22

23

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

```
           1              THE COURT:  Okay.  Here we are on Cole v. Collier.
           2    We'll take appearances of counsel beginning with Plaintiffs.
           3              MR. EDWARDS:  Jeff Edwards for the Plaintiffs, Your
           4    Honor.
14:34      5              THE COURT:  Anybody else?
           6              MR. SINGLEY:  Michael Singley for the Plaintiffs,
           7    Your Honor.
           8              MR. MEDLOCK:  And Scott Medlock for the Plaintiffs,
           9    Your Honor.
14:35     10              MR. JAMES:  And, finally, David James is also here
          11    for the Plaintiffs, Your Honor.
          12              THE COURT:  Thank you.
          13                  For Defendants.
          14              MS. O'LEARY:  Leah O'Leary and Jeanine Coggeshall
14:35     15    for the Defendants.
          16              THE COURT:  Let me say at the outset that when I
          17    was a young lawyer I got sent to court to argue some
          18    absolutely impossible positions on behalf of clients.
          19                  So, Ms. O'Leary, I sympathize with the
14:35     20    position in which you find yourself, but I am concerned.
          21    This looks like there's been a severe regression from what
          22    was very clearly understood to be the law of the case.
          23                  Can you offer any explanation?
          24              MS. O'LEARY:  Yes, Your Honor.
14:35     25                  When Mr. Medlock, for the class, began
```

14:36 1 communicating with me that he was receiving complaints from
2 the inmates that live at the Leblanc Unit, I started trying
3 to get information and so did officials from TDCJ. I don't
4 think, at this point, they have determined exactly what the
14:36 5 problem is with the air-conditioning systems at Leblanc, but
6 they did figure out that there is, in fact, a problem with
7 the air-conditioning system there.
8       And I was providing information to Mr. Medlock
9 over the last several weeks as I was receiving it and, in
14:36 10 reality, some of that information changed as TDCJ and I
11 continued to look into the matter. So, it certainly was not
12 my or my client's intention to mislead or misrepresent
13 information. I just wanted to continue to update him as we
14 continued to look at the situation and the situation
14:37 15 evolved.
16       THE COURT: Well, what's the current state of play?
17       MS. O'LEARY: Yes, Your Honor.
18       So, as of this morning, TDCJ planned to move
19 all of the class members. There's 37 of them that were
14:37 20 living at the Leblanc Unit. They plan to move them
21 throughout the next week.
22       Right before we got on this call I was told by
23 TDCJ that they believe that all of the class members can be
24 moved tonight and, specifically, 36 of the class members
14:37 25 will be moved to the Pack Unit tonight. One of the class

1 members will be moved to the Stiles Unit because of some
2 type of conflict he had with the Pack Unit.  So, that will
3 remove all 37 class members from the Leblanc Unit.
4 　　　　　THE COURT:  Mr. Edwards.  Mr. Edwards, anything you
5 want to say?
6 　　　　　MR. EDWARDS:  Yes.  Unfortunately, there's quite a
7 bit I'd like to say.
8 　　　　　　With regards to Ms. O'Leary speaking on behalf
9 of her clients that it was not the client's intent to
10 mislead, the facts suggest the exact opposite.  And while I
11 have some sympathy for Ms. O'Leary carrying water for people
12 who aren't, frankly, doing their job, I do not want it left
13 unsaid that, from Plaintiffs' position, its incontrovertible
14 that we were misled and, perhaps even worse than being
15 misled, there was a specific intent to try to cover this up
16 by delaying this until Monday on false pretenses.  That's
17 just kind of the lay of the land from a lawyering
18 standpoint.
19 　　　　　　Secondly, the disconnect here on -- I have to
20 believe TDCJ's side but somewhat the Attorney General's
21 side -- is that there is not a problem until it is
22 specifically communicated to them by Scott Medlock in my
23 office or someone in my office.  That's not true.  TDCJ runs
24 the prison.  TDCJ knows what the temperatures are and TDCJ
25 is obligated to comply with the settlement agreement.  It's

1  difficult for me to imagine how they wouldn't be in contempt
2  of the settlement agreement, but that may be a subject for a
3  later motion.
4  　　　　　　I am glad that now, after we notified the
5  Court about an emergency and filed a motion highlighting the
6  emergency, that TDCJ is going to do what it should have done
7  three weeks ago.  But, you know, I think it's very important
8  that -- I think from the Plaintiffs' perspective I --
9  Obviously, I will defer to the Court, but the word of
10 lawyers doesn't appear to be good enough versus when you
11 balance against the safety of the men incarcerated at TDCJ.
12 So, some certification under penalty of perjury from the
13 head of TDCJ or some senior leader, I think, is a bare
14 minimum that has to happen with regards to this transfer.
15 　　　　　　And, again, as of this morning -- and, first,
16 we're hearing that there was a change of heart -- there was
17 not the concern that they needed to move people right away;
18 they would get to it when they got to it.  And that is just,
19 frankly, unacceptable.  I am a little, you know, more
20 passionate, perhaps, and I don't know if that's coming
21 through on the phone.
22 　　　　　　But, you know, when we have conversations with
23 TDCJ we say, 'You know, you guys ought to be taking
24 temperatures and providing us logs.'  When you say that the
25 problem is fixed and that 'We have provided information

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | establishing that the problem is fixed,' which is what        |
|       | 2  | Ms. O'Leary communicated to the Court on Wednesday -- in      |
|       | 3  | fact, when I said that the air-conditioning wasn't working I  |
|       | 4  | believe the exact comment -- and we will be getting the       |
| 14:41 | 5  | transcript -- is that what Mr. Edwards said was not true.     |
|       | 6  | Well, of course, it was true.                                 |
|       | 7  | And, so, I have a lot of respect for advocacy, |
|       | 8  | but this problem was brought to the attention of TDCJ in      |
|       | 9  | early July or -- I'm sorry -- sometime in July and it         |
| 14:41 | 10 | appears, based on what Mr. Medlock and Mr. James documented   |
|       | 11 | yesterday, that these temperatures and these heat indexes     |
|       | 12 | have been going on for quite some time.  The idea that, once  |
|       | 13 | notified, TDCJ, you know, didn't try to fix it or pretended   |
|       | 14 | that it was acceptable, it defies explanation.                |
| 14:42 | 15 | In many ways we're right back to where we were |
|       | 16 | when you first began hearing this case, when over time me     |
|       | 17 | having to say, you know, this is -- what they're saying is    |
|       | 18 | not accurate and, unfortunately, that's proving time and      |
|       | 19 | time again to be the case.                                    |
| 14:42 | 20 | So, I am extremely surprised and, at the risk |
|       | 21 | of sounding paternalistic, extremely disappointed that this   |
|       | 22 | is the way they're choosing to enforce, you know, what we     |
|       | 23 | all came together and lauded as a landmark agreement where    |
|       | 24 | everyone got together and kind of -- you know, the better     |
| 14:43 | 25 | parts of everyone prevailed.                                  |

14:43   1    It is our expectation that if air-conditioning
2    breaks they need to know what the temperatures are, they
3    need to know what the heat indexes are, and they can't leave
4    people in for a month until Austin class counsel is able to
5    have inspections and verify temperatures.
6    I really do think some explanation is in order
7    from TDCJ as to why they left these men in these dangerous
8    conditions for so long and why they didn't bother to take
9    heat index temperatures until yesterday.

14:43 10    THE COURT: Ms. O'Leary, has the air-conditioning
11    been malfunctioning for a month now or when did the problems
12    with the air-conditioning start?
13    MS. O'LEARY: Well, Your Honor, there was -- I have
14    a log that was handed over that reflected some maintenance

14:43 15    issues with the air-conditioning at the Leblanc Unit and the
16    times that those issues were resolved. However, there
17    remains -- there continues to be some type of issue with the
18    AC. I don't know what that problem is.
19    As I said before, as TDCJ has been looking

14:44 20    into the problem, they discovered that there is something
21    wrong, and I certainly did not -- I did not represent to the
22    Court at our hearing on Wednesday that there was no AC
23    problem or that Mr. Edwards was just wrong that there was an
24    AC problem. I was referring to whether we had produced any

14:44 25    information or documents. But that's neither here nor

1 there.

2 When TDCJ discovered that there was a serious
3 problem with the air-conditioning, which was Wednesday, they
4 moved the offenders to different housing areas.

14:44   5 THE COURT: Well, that's the part I don't
6 understand.

7 When there is an asbestosis problem you may be
8 unaware of it for a long time to everyone's detriment. When
9 there is an air-conditioning problem I would think everyone
14:45 10 would be aware of it instantly. Why did it take so long to
11 discover a problem with the air-conditioning?

12 MS. O'LEARY: As I said, I don't believe they know
13 the extent of the problem yet. However, from my
14 understanding, the ACs were still running. It wasn't as
14:45 15 easy to recognize as 'This machine is off. Why is it off?'
16 It was just someone had to notice the feeling of the
17 temperature being higher in order to trigger the
18 understanding that there might be a problem, which is
19 exactly what happened. The gentlemen that live in those
14:45 20 housing areas sent complaints to their class counsel because
21 they felt like it was hotter, and they were right.

22 I also want to speak to Mr. Edwards' request
23 that there be some, I guess, explanation about why the
24 offenders were left there or, more so, what we do going
14:46 25 forward.

14:46  1    On behalf of TDCJ and the AG's Office, we are
2  working to try to get ahead of these AC problems.  We
3  acknowledge that it did not go as we would have liked, as
4  far as the course of how it happened, learning there is a
14:46  5  problem, moving the offenders, talking to class counsel.
6  And we would really like to come up with a system where we
7  can get in front of the problem, because ACs are going to
8  have mechanical issues in the future.  There is no way for
9  us to guarantee against that, but we certainly want to get
14:46  10  in front of the problem.  It's not for class counsel to have
11  to discover the problem for us, and Mr. Edwards is right on
12  that point.  And, so, we are having some discussions with
13  TDCJ about how to get in front of these problems so that
14  this doesn't continue to occur.
14:47  15    THE COURT:  Well, what I don't understand,
16  though -- and I am willing to concede you're not the person
17  in charge -- but this air-conditioning problem was ongoing
18  for quite some time and it sounds like it might have kept on
19  being a problem for quite some time had it not been for the
14:47  20  intervention of Plaintiffs' counsel.
21    I mean, why is that necessary, for a third
22  party to cause TDCJ to live up to its obligations?
23    MS. O'LEARY:  Well, you're right, Your Honor.  It's
24  not the responsibility of class counsel to ensure that we
14:47  25  are complying with the settlement agreement.  That's on our

```
14:48

14:48

14:48

14:48

14:49
```

1  agency, to make sure that we're complying.
2           I can't answer why nobody at the unit noticed
3  that the temperature -- and I did not go to the unit, Your
4  Honor; so, I can't tell you whether it was that noticeable.
5  And, of course, I have no basis of comparison.  Maybe it
6  felt very cool before and -- I don't know why the officers
7  or people on the unit did not recognize a difference in
8  temperature.  Maybe it was --
9           MR. EDWARDS:  Your Honor --
10          MS. O'LEARY:  -- subtle.  I don't know.
11          THE COURT:  Mr. Edwards.
12          MR. EDWARDS:  The last statement that Ms. O'Leary
13  made -- 'I don't know why the officers didn't notice that
14  this was hot' or 'I didn't know why they didn't recognize
15  it' -- it's not credible on its face.  They did notice it.
16  They did recognize it.  The inmates noticed it.  The inmates
17  recognized it.  The problem is not that it was not
18  discoverable.  The problem is that it was consciously
19  hidden.
20          I would like to ask counsel for TDCJ:  When
21  does TDCJ admit to knowing there was a problem?
22          THE COURT:  Well, I'd like to know that, too.  I
23  don't know that Ms. O'Leary is in a position to provide the
24  answer.
25          Can you help us, Ms. O'Leary?

| | |
|---|---|
| 1 | MS. O'LEARY: My understanding is that on |
| 2 | Wednesday, before our hearing, the deputy director and maybe |
| 3 | also the director of maintenance for TDCJ visited the unit |
| 4 | and they discovered for the first time that there was a |
| 14:49  5 | problem with the air-conditioning at the Leblanc Unit that |
| 6 | had not been resolved. |
| 7 | THE COURT: How can that be when we're in the midst |
| 8 | of a record hot summer, that people don't know the |
| 9 | air-conditioning is not functioning? That just makes no |
| 14:49 10 | sense at all. |
| 11 | MS. O'LEARY: Well, Your Honor -- |
| 12 | MR. EDWARDS: And, Your Honor -- |
| 13 | MS. O'LEARY: -- I'm not trying to minimize the |
| 14 | length of time, but it has not been all summer. It's a |
| 14:49 15 | matter of about two weeks, which -- |
| 16 | MR. EDWARDS: First of all, we don't know that to |
| 17 | be true and I am highly sceptical of that. |
| 18 | The only reason the people went out to the |
| 19 | prison to even look at the air-conditioning is because we |
| 14:50 20 | had an inspection regarding complaints that were beginning |
| 21 | several weeks ago. Why the director or the maintenance |
| 22 | people chose not to go and check it for several weeks is |
| 23 | just yet another problem. |
| 24 | But my concern here, Your Honor, is -- And we |
| 14:50 25 | had several phone calls like this. And while I am |

14:50

1 sympathetic to Ms. O'Leary, at some point it's not okay that
2 she didn't go out to the prison.  It's not okay that she
3 didn't get temperature readings or had someone out there to
4 take the temperatures.  It's not okay she acted like people
5 were taking temperature readings when point of fact they
6 couldn't be done until panels were taken off the actual AC
7 units.  That's not okay.
8        Now, I'm not here to relitigate the Cole case
9 and I'm a little out of practice from having to depose

14:51

10 everyone who begins with something and two hours later
11 admits to things that are absolutely contrary.  I agree with
12 Ms. O'Leary that going forward there needs to be a system in
13 place, but here is the big difference and what I hope
14 Ms. O'Leary will concede.

14:51

15        We're past the point that TDCJ alone can be
16 relied on to implement that system.  They need to provide
17 that information -- The information needs to be provided to
18 an outside source, be it the Court, be it class counsel.
19 This is not the first time TDCJ has been made aware of

14:51

20 problems relating to the air-conditioning.
21        Up until this hearing the position of TDCJ has
22 been, 'We're not obligated to tell you anything, class
23 counsel.  We're not obligated to take temperature readings.
24 That's not in the settlement agreement.  We're not obligated

14:51

25 to do heat index readings or tell them to you, even when

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | complaints are made.'  And, so, there's just a disconnect.         |
|       | 2  | Obviously, we have monitoring                                      |
|       | 3  | responsibilities, but, really, it's not class counsel that         |
|       | 4  | has brought this to the attention of TDCJ.  It's, really,          |
| 14:52 | 5  | the inmates themselves, and they shouldn't be in a position        |
|       | 6  | where they're completely dependent on TDCJ for their safety,       |
|       | 7  | their well-being, of being the ones to continually raise the       |
|       | 8  | outcry.  We're not talking about, you know, whistleblowing         |
|       | 9  | here.  We're talking about heat in the summer.  Record heat        |
| 14:52 | 10 | waves all in the media.  The idea that nobody from TDCJ went       |
|       | 11 | and checked on these things is very disturbing.                    |
|       | 12 | And I will just end with this.  I will say                         |
|       | 13 | that while class counsel is very proud of the work they've         |
|       | 14 | done and proud of the result that they achieved -- and that        |
| 14:53 | 15 | wouldn't have been achieved if Ms. O'Leary and some of the         |
|       | 16 | other people in her office hadn't really put their heads           |
|       | 17 | together and tried to achieve it -- there is something             |
|       | 18 | rotten here and it really, really needs to be fixed.  And          |
|       | 19 | TDCJ needs to acknowledge that it can't do it on its own.          |
| 14:53 | 20 | And, unfortunately, you know, I'm afraid that                      |
|       | 21 | the Court is going to need to issue an order that is crystal       |
|       | 22 | clear how they follow going forward, because, you know, it's       |
|       | 23 | still August and we're going to have yet another summer next       |
|       | 24 | year and it is just a matter of time until, you know, this         |
| 14:53 | 25 | inaction until getting caught with their hand in the cookie        |

1  jar leads to something really dire and that's -- You know, I
2  don't mean to be overly dramatic, but that is the absolute
3  fact.
4              Thank you, Your Honor.
14:53 5              THE COURT:  I had understood -- and it may have
6  been my misapprehension -- I had understood that the Leblanc
7  Unit was an air-conditioned unit.
8              Is that right, Ms. O'Leary?
9              MS. O'LEARY:  Yes, Your Honor.  It's an air-
14:54 10  concerned unit.  It's just that the air-conditioning is not
11  working properly.
12             THE COURT:  No.  I understand that part.
13             So, you're proposing to move out the 37 class
14  members but leave everybody else in there?
14:54 15             MS. O'LEARY:  Yes, Your Honor.  And they're
16  working to -- continuing to work to fixing and resolving the
17  AC issue, whatever that might be.  It's certainly being
18  treated as an emergency.
19             THE COURT:  And how many other inmates are there?
14:54 20             MS. O'LEARY:  The population of the Leblanc Unit is
21  approximately 1,200.
22             THE COURT:  So, these other --
23             MR. EDWARDS:  And, Ms. O'Leary, how many of the
24  inmates in there are heat-sensitive and have gotten, you
14:54 25  know, heat scores that this new process that you've put in?

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | MS. O'LEARY: I don't have that information at this                   |
|       | 2  | time.                                                                |
|       | 3  | THE COURT: Well, my concern is -- I understand                       |
|       | 4  | that the balance of the population is not within our class,          |
| 14:55 | 5  | but, still, I would think that every officer of the court            |
|       | 6  | would be concerned, given the proof that was adduced in this         |
|       | 7  | case, about that large a population facing a record heat             |
|       | 8  | wave with no air-conditioning. I mean, I --                          |
|       | 9  | MS. O'LEARY: Well, Your Honor, I do want to point                    |
| 14:55 | 10 | out -- I'm sorry.                                                    |
|       | 11 | THE COURT: No. Go ahead.                                             |
|       | 12 | MS. O'LEARY: At the Leblanc Unit there is a                          |
|       | 13 | respite area in every building, including the G&H dorms              |
|       | 14 | where the class members were. They're multipurpose rooms             |
| 14:55 | 15 | and there is two of them. They share the same                        |
|       | 16 | air-conditioning unit as the picket areas and those rooms            |
|       | 17 | are available for respite. The ice water is being                    |
|       | 18 | diligently refilled and the showers at the Leblanc Unit are          |
|       | 19 | all cool-down showers. Every single one of them has had the          |
| 14:56 | 20 | hot water turned off for the summer.                                 |
|       | 21 | So, the mitigation measures are available at                         |
|       | 22 | the Leblanc Unit and TDCJ is treating the malfunctioning             |
|       | 23 | air-conditioning as an urgent matter because, as you                 |
|       | 24 | recognize, there are other offenders that still live there.          |
| 14:56 | 25 | THE COURT: A couple points on that.                                  |

1                   One, TDCJ really lost its credibility in
2     respite areas in our case in chief.  I mean, the "respite
3     areas" were things like a few extra seats in the barber shop
4     and it was really minimal.
5                   Secondly, is the air-conditioning still
6     functioning in the Warden's office and the space that's
7     occupied by prison staff?
8             MS. O'LEARY:  I can't say, Your Honor.  I believe
9     that they took some measurements of some of those areas
10    yesterday.
11                  The whole unit is air-conditioned and none of
12    the air-conditioning systems are just off.  They're not so
13    broken that the system is turned off.  So, I can't say what
14    the extent of the malfunction is.
15            THE COURT:  But I would strongly suspect that, if
16    the Warden's office and the offices of the staff were
17    suffering the same malfunction as the air-conditioning units
18    relevant to the general population, there would be a quicker
19    fix than we have seen thus far.  That, in itself, is
20    disturbing, too.  I mean, I need to figure that out, whether
21    the Warden's office still has functioning air-conditioning
22    while the rest of the unit does not.
23                  Okay.  I --
24            MS. O'LEARY:  Well, Your Honor, the --
25            THE COURT:  Go ahead.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | MS. O'LEARY: -- there are multiple                           |
|       | 2  | air-conditioning systems that cover different areas of the   |
|       | 3  | prison. So, it's possible that some of the AC systems and    |
|       | 4  | the chillers and the compressors are not functioning         |
| 14:58 | 5  | properly while others are.                                   |
|       | 6  | THE COURT: Are air-conditioning repairmen and                |
|       | 7  | women on site as we speak?                                   |
|       | 8  | MS. O'LEARY: I can't -- I can't say, Your Honor,             |
|       | 9  | as we speak. I don't know.                                   |
| 14:58 | 10 | THE COURT: That's really a pretty basic question,            |
|       | 11 | isn't it? I mean, is there even an attempt being made to     |
|       | 12 | fix the problem?                                             |
|       | 13 | MS. O'LEARY: Yes, Your Honor, but I don't want to            |
|       | 14 | make any statements that I don't know to be true or that my  |
| 14:58 | 15 | client, at least, hasn't told me. So, I would just be        |
|       | 16 | guessing if I told you that maintenance crews were on the    |
|       | 17 | unit at this moment.                                         |
|       | 18 | THE COURT: Okay. Well, I am going to issue an                |
|       | 19 | order before close of business today.                        |
| 14:58 | 20 | Is there anything else anybody wants to say?                 |
|       | 21 | MR. EDWARDS: Yes, Your Honor.                                |
|       | 22 | MS. O'LEARY: Yes, Your Honor. I'm sorry.                     |
|       | 23 | MR. EDWARDS: Well, a couple of things from the               |
|       | 24 | Plaintiffs.                                                  |
| 14:59 | 25 | First, you know, when you start saying that      |

1   it's being treated like an emergency, it needs to actually
2   be treated like an emergency.  And from Plaintiffs' position
3   somebody from TDCJ under penalty of perjury needs to explain
4   what "treated like an emergency" really means.  Because if,
5   you know, the Dell building in Austin went out and there was
6   AC and it was 100 degrees, as the chart documents, there
7   would be maintenance crews out there or Carrier would be out
8   there solving the problem.  We're not, you know, splitting
9   atoms here.  We're just fixing an air-conditioner in the
10  state of Texas.
11              Secondly, in the -- You know, obviously, I do
12  not represent the men in the unit.  One issue that the Court
13  should consider is the fact that it is an air-conditioned
14  environment and if the air-conditioning goes out -- you
15  know, it's hard for me to get back into the expert part of
16  the case -- it's actually even more dangerous, potentially,
17  for the men that are there.
18              Third -- and this is my final point -- one of
19  the very important issues here with why these men were at
20  the Leblanc Unit to begin with had to do with parole and
21  programming.  And, you know, we would like a certification,
22  I mean, under penalty of perjury from TDCJ that they will
23  receive that programming and that it will not delay their
24  future parole.  Because one of the issues that comes up is,
25  well, now they're not at the Leblanc Unit, they don't have

1 the same programming and education classes -- and
2 Mr. Medlock can speak more to this -- than they do at the
3 Leblanc Unit.  So, that could delay their future release,
4 which isn't fair to the class members.
5 　　　　　　　　Thank you, Your Honor.
6 　　　　　THE COURT:  Ms. O'Leary, you were trying to say
7 something.
8 　　　　　MS. O'LEARY:  Yes, Your Honor.
9 　　　　　　　　Regarding the parole programs, we understand
10 and acknowledge that we have to provide the pre-release
11 program to the class members regardless of what unit they
12 are housed in; and, so, TDCJ is working out the logistics of
13 how to provide that program for these particular class
14 members from the Leblanc Unit.  So, that's definitely on our
15 radar.  It's a requirement under the settlement.  We're on
16 it.
17 　　　　　　　　My only second point is by tomorrow morning
18 there will be no class members at the Leblanc Unit.  And,
19 so, I certainly understand the Court's and all of our
20 concern regarding an AC that's not working at the Leblanc
21 Unit; however, an order in this case could not extend to a
22 unit where there is no class members.
23 　　　　　THE COURT:  Anything else from anybody?
24 　　　　　　　　Okay.  Thank you.  You're excused.  Thank you
25 very much.

```
 1              MS. O'LEARY:  Thank you.

 2

 3

 4              COURT REPORTER'S CERTIFICATE

 5         I, BRUCE SLAVIN, certify that pursuant to
      28 USC § 753 the foregoing is a correct transcript from the
 6    record of proceedings in the above entitled matter, to the
      best of my ability.
 7                                  _____
                                    s/Bruce Slavin
 8                                  BRUCE SLAVIN, RPR, CMR

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```