UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM, RICHARD KING, MICHAEL DENTON, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated, | § § § § § | CIVIL ACTION NO. 4:14-cv-1698 |
| Plaintiffs, | § § | |
| v. | § § | |
| BRYAN COLLIER, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § § § § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION FOR CONTEMPT, TO SHOW CAUSE & FOR SANCTIONS

Enough is enough.

After this Court determined Bryan Collier and the Texas Department of Criminal Justice acted with deliberate indifference to the class of Pack Unit inmates – first by exposing them to arsenic-laden drinking water; and second, by endangering their lives with brutal indoor heat – TDCJ entered a settlement agreement entitling the entire class to live in air conditioned housing.

Instead of honoring that agreement, TDCJ and Collier continue to jeopardize the lives and safety of the class members. TDCJ has repeatedly violated the settlement agreement and the Court's orders, and knowingly and deliberately placed hundreds of men at substantial risk of serious harm. When confronted with their misconduct, TDCJ repeatedly misrepresented conditions in the prisons, and actively tried to prevent Class Counsel from discovering the extent of the abuse. Accordingly, Plaintiffs respectfully request a finding of contempt, an award of sanctions, and a show cause hearing to determine the full extent of TDCJ's contempt.

TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................II

TABLE OF AUTHORITIES ..............................................................................................III

I.   SUMMARY OF THE ARGUMENT .........................................................................1

II.  NATURE AND STAGE OF PROCEEDINGS – TDCJ'S REPEATED CONTEMPT ..........2

III. STANDARD OF REVIEW ...................................................................................17

IV. ARGUMENT AND AUTHORITIES .......................................................................19

    A.   This Court's Order and the Settlement Agreement are Specific and Definite. ........19

    B.   TDCJ Violated the Settlement Agreement. ...................................................19

    C.   Sanctions are Necessary to Compensate Class Members and Class Counsel, Deter
         Additional Violations, and to Ensure Future Compliance..............................22

         1.   Compensatory Fines Should be Awarded to Affected Class Members........................24

         2.   The Court Should Award Class Counsel Attorneys' Fees and Expenses.....................27

         3.   Additional Sanctions are Warranted ..................................................29

         4.   Show Cause Hearing..............................................................30

V.  CONCLUSION ..................................................................................31

TABLE OF AUTHORITIES

## Cases

*Alberti v. Heard*, 600 F. Supp. 443 (S.D. Tex. 1984) ..................................................... 24

*Alberti v. Klevenhagen*, 610 F.Supp. 138 (S.D. Tex. 1985) ..................................... 18, 24

*Albro v. Onondaga Cnty., N.Y.*, 681 F.Supp. 991 (N.D. N.Y. 1988)............................... 27

*Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574 (5th Cir. 2000) ................................. passim

*Badgley v. Santacroce*, 800 F.2d 33 (2d Cir. 1986)........................................................ 27

*Benjamin v. Horn*, No. 75-cv-3078-HB (S.D. N.Y. Feb. 11, 2009) ............................... 26

*Benjamin v. Schirro*, 370 Fed. Appx. 168 (2d Cir. 2010)............................................. 26

*Benjamin v. Sielaff*, 752 F.Supp. 140 (S.D. N.Y. 1990) ............................................... 26

*Blackmon v. Garza*, 484 F.App'x 866 (5th Cir. 2012) ................................................. 26

*Cook v. Ochsner Foundation Hospital,* 559 F.2d 270 (5th Cir. 1977) ..................................... 19, 23

*Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212 (5th Cir. 1970)................................... 28

*Feliciano v. Vila*, No. Civ. 79-4-PG, 2007 WL 4404730 (D. P.R. Dec. 13, 2007) ..................... 26

*Hutto v. Finney*, 437 U.S. 678 (1973)........................................................ 18, 19, 23, 25

*In re Reno*, 299 B.R. 823 (Bankr. N.D. Tex. 2003)........................................................ 26

*Inmates of Allegheny Cnty. Jail v. Wecht*, 901 F.2d 1191 (3d Cir. 1990) ................................... 27

*Jackson v. Whitman*, 642 F.Supp. 816 (W.D. La. 1986) ................................................. 27

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016)........................................................ 29

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) .................................................... 18, 25

*Mead Johnson & Co. v. Baby's Formula Service, Inc.*, 402 F.2d 23 (5th Cir. 1968) ................. 23

*Mendoza v. Regis Corp.*, 2005 WL 1950118 (W.D. Tex. Aug. 11, 2005) ................................. 26

*Miller v. Carson*, 550 F.Supp. 543 (M.D. Fla. 1982) .................................................... 27

*Mobile County Jail Inmates v. Purvis*, 581 F.Supp. 222 (S.D. Ala. 1984)................................ 27

*Morales-Feliciano v. Parole Bd. of Com. of Puerto Rico*, 887 F.2d 1 (1st Cir. 1989)................ 26

*N.Y. State Nat'l Organization for Women v. Terry*, 159 F.3d 86 (2nd Cir. 1998)....................... 27

*Norman Bridge Drug Co. v. Banner*, 529 F.2d 822 (5th Cir. 1976)...................................... 23, 25

*Parsons v. Ryan*, No. CV-12-0601-PHX-DKD, 2018 WL 3239691 (D. Ariz. June 22, 2018).... 27

*Ruiz v. McCotter*, 661 F.Supp. 112 (S.D. Tex. 1986)........................................................ 19, 23, 24

*Scott v. Clarke*, No. 3:12-cv-00036, 2014 WL 1463755 (W.D. Va. Apr. 15, 2014) ................... 29

*Sebastian v. Texas Dept. of Corrections*, 558 F. Supp. 507 (S.D. Tex. 1983) ...................... 23, 26

*Sec. & Exch. Comm'n v. First Fin. Grp. of Texas, Inc.*, 659 F.2d 660 (5th Cir. 1981) ............... 18

*Tate v. Frey*, 673 F.Supp. 880 (W.D. Ky. 1987) .......................................................... 26

*Trueblood v. Wash. State Dep't of Social & Health Servs.*, No. C-14-1178-MJP, 2017 WL 4700326 (W.D. Wash. 2017) ........................................................................ 27

*U.S. v. City of Jackson*, 359 F.3d 727 (5th Cir. 2004) .................................................... 18

*U.S. v. State of Mich.*, 680 F.Supp. 928 (W.D. Mich. 1987) ............................................. 27

*U.S. v. United Mine Workers,* 330 U.S. 258 (1947) ...................................................... 19, 24

*United States v. State of Hawai`i*, 885 F. Supp. 212 (D. Haw. 1995)................................... 24

**Statutes**

18 U.S.C. § 401 .................................................................................................. 18

**Rules**

FED. R. CIV. P. 70 ................................................................................................ 18

# I.    SUMMARY OF THE ARGUMENT

TDCJ has repeatedly violated this Court's orders, putting numerous men at risk of heat-related injury, illness, and death. During the most recent episode, when Class Counsel notified TDCJ's attorneys about concerns regarding the air conditioning at the LeBlanc Unit (where TDCJ chose to imprison class members), TDCJ's counsel stated "the tempered air system is and has been operable" and that "the tempered air system has been functioning properly and has maintained the temperature just below 85 degrees."[1] An inspection of the prison revealed these statements were demonstrably false: indoor heat indices exceeded 88ºF in areas the class members were housed the day of the inspection, and actually *exceeded 100ºF* in portions of the prison where class members had been housed as recently as one day before.[2] Sanctions, including fines to compensate class members and additional attorneys' fees, are warranted for the violation of the settlement agreement, compounded by the deliberately false statements TDCJ made as Class Counsel attempted to investigate the well-founded complaints of class members.

Moreover, this is not the first time TDCJ has violated the settlement agreement and the Court's orders. In fact, Class Counsel is aware of several discrete instances where TDCJ endangered class members by exposing them to indoor heat indices in excess of the 88ºF limit. In fact, TDCJ continues to flout its obligations, and refuses – despite telling the Court otherwise – to cooperate with Class Counsel to ensure Defendants are complying with the agreement. Thus, sanctions are necessary to deter and limit further violations.

Finally, a show cause hearing is necessary to determine the scope of TDCJ's past violations (and which may reveal additional, heretofore unknown, violations of the agreement and the Court's

---

[1] Ex. 41, Email from TDCJ Counsel to S. Medlock (July 18, 2019).

[2] Doc. 1448-2, Declaration of David James, p. 5.

orders). TDCJ's intransigence to Class Counsel's legitimate inquiries regarding class members allegations (now known to be true) has prevented Class Counsel from fully investigating the scope of even the known violations. Thus, the Court should require TDCJ to show cause why additional sanctions are not also warranted, and to assess the scope of TDCJ's already-known violations.

## II.    NATURE AND STAGE OF PROCEEDINGS – TDCJ'S REPEATED CONTEMPT

TDCJ has repeatedly violated this Court's orders and the settlement agreement. In July 2017, this Court found TDCJ and Collier were deliberately indifferent to the class members' safety by exposing them to dangerously hot indoor temperature. The Court entered a preliminary injunction that, in part, required TDCJ to house class members with "heat-sensitive" medical conditions "in areas with apparent temperatures lower than 88 degrees." Doc. 737, p. 96. This requirement was later codified in the parties' settlement agreement – all class members must be imprisoned only in locations where "[t]he heat index in the … housing areas shall not exceed  88 degrees." Doc. 989-4, p. 9 (approved at Doc. 1188, p. 5).

Recognizing that, periodically, air conditioners will malfunction, the settlement agreement gives TDCJ "no longer than 96 hours" to fix a broken air conditioner in locations where class members are housed. Doc. 989-4, p. 9. But, if the malfunction persists for just 24 hours, "TDCJ shall notify Class Counsel on the first business day after the disruption," and institute several additional heat-mitigation measures for the duration of the malfunction – including "access to air-conditioned 'respite' areas for an unlimited amount of time, 24 hours a day … upon request by any inmate"; unlimited access to cold drinking water; and "access to cool showers of unlimited length, 24 hours a day." Doc. 989-4, p. 9.

TDCJ has repeatedly violated each of these provisions.

2

### A. The Pack Unit (Summer/Fall 2017)[3]

Though this Court's preliminary injunction found TDCJ deliberately violated the Eighth Amendment, and commanded TDCJ to remove all "heat-sensitive" prisoners from dangerous temperatures, TDCJ failed to remove more than 180 "heat-sensitive" class members. Instead, TDCJ left them in the brutally hot temperatures at the Pack Unit and other prisons.[4]

Shockingly, the 130+ subclass members TDCJ left at the Pack Unit were all elderly or obese – the easiest men for even a lay-person to identify and determine were inappropriately left behind when the other subclass members were transferred to air-conditioned prisons. Indeed, fourteen class members over the age of 65 (including several men older than 80, and even an 88-year-old prisoner),[5] as well as 120 obese class members (including a 330 pound prisoner),[6] never left the Pack Unit – despite being clearly identified in the Court's orders as "heat sensitive" subclass members at heightened risk of heat-related injury. Doc. 737, p. 6. Tragically, one of the gentlemen struggling with obesity, David Ramos, Sr., suffered a fatal heart attack at the Pack Unit

---

[3] Class Counsel does not seek a remedy for these violations of the preliminary injunction, as the class agreed not to pursue those claims for sanctions as part of the settlement agreement. Class Counsel brings them to the Court's attention only to place the most recent violations of the Court's orders and the settlement agreement in the proper context.

[4] Ex. 24, Summary of Heat-Sensitive Inmates That TDCJ Housed in Violation of Court Orders. TDCJ mishoused 190 heat-sensitive inmates, including about 181 during days where outdoor heat indices exceeded 88 degrees.

[5] Ex. 27, Deposition of T. Bailey (as TDCJ), p. 40:8–16; Ex. 12, Excerpts from Pack Unit Roster (Sept. 7, 2017); Ex. 11, TDCJ List of Inmates Assigned to Pack Unit on Aug. 8, 2017.

[6] Ex. 15, BMI Summary Table (citing Ex. 12, Excerpts from Pack Unit Roster, Sept. 7, 2017, Ex. 11, TDCJ List of Inmates Assigned to Pack Unit on Aug. 8, 2017, Ex. 13, Excerpts from Pack Unit Roster, Nov. 1, 2017).

– a cause of death well known to increase during periods of high temperatures – on September 7, 2017, when the heat index was above 88ºF.[7]

Likewise, TDCJ also violated the Court's order by affirmatively transferring 49 *more* subclass members out of the air-conditioned prisons the preliminary injunction required back into prisons without air conditioning[8] – including a subclass member who had to file a notice with the Court to alert Class Counsel.[9]

In short, while its behavior was expressly limited by a federal court order, TDCJ violated the injunction and endangered over 180 men (one of whom died). Far from curing its deliberate indifference, TDCJ continued it – knowingly putting these men's lives at risk.

**B.  The Pack Unit (Summer 2018)**

Shortly after temporary air conditioning was installed at the Pack Unit in 2018 (as a condition of the settlement), the system failed and temperatures indoors exceeded 88ºF.[10] Despite an equipment malfunction that lasted more than 24 hours, TDCJ did not notify Class Counsel as required by the settlement agreement.[11] It is unclear at this time if TDCJ provided the required

---

[7] Ex. 26, Custodial Death Report of D. Ramos; Ex. 12, Pack Roster, p. 32; National Institute of Health, *Assessing   Your   Weight   and   Health   Risk*, *available at*: https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm (last accessed Nov. 27, 2017); Doc. 465, Testimony of Dr. S. Vassallo, M.D., June 1, 2016 hearing, pp. 83-86, 113-114; Ex. 16, Summary of Heat Index at various locations including Brenham.

[8] Ex. 28, Deposition of K. Hall (as TDCJ), vol. 2, pp. 290:4-291:12; Ex. 23, Housing Histories of Select Subclass Members; Ex. 24, Summary of Heat-Sensitive Inmates That TDCJ Housed in Violation of Court Orders.

[9] Doc. 800.

[10] Ex. 19, Pack Unit Temperature Logs, May 20, 2018 – May 30, 2018, pp. 4-6. *See also* Doc. 786 (TDCJ's false statement to the Court that "all [medically sensitive] inmates have been moved from the Pack Unit").

[11] Ex. 30, S. Medlock Letter of June 4, 2018 to TDCJ Counsel; Ex. 29, S. Medlock Letter of May

heat-mitigation measures during the outage (as it refused to produce any documents demonstrating that it had), but there is no dispute that TDCJ failed to comply with the agreement's notice provisions.

Likewise, on several other dates in 2018, problems with the air conditioner at the Pack Unit resulted in temperatures indoors exceeding 88°F.[12] When Class Counsel requested proof that these violations were due to an "equipment malfunction" – the only violation excused by the settlement agreement (Doc. 989-4, p. 9) – TDCJ refused to produce evidence regarding the cause of the violations. And TDCJ refused to produce any evidence that the "mitigation measures" were in place during any of the disruptions (one of which lasted nine hours).[13] TDCJ also did not provide Class Counsel timely notice of any of these violations.[14]

### C.  The Terrell Unit (March/April 2019)

Class Counsel received complaints from a class member living in the Terrell Unit's infirmary that the air conditioning had been broken for several days. Class Counsel contacted TDCJ's counsel about the problem – again, because TDCJ did not provide the required notice. Though the problem was eventually resolved, TDCJ refused to provide any documentation related to the matter, and even obstructed Class Counsel's requests for public documents about the air conditioning at the Terrell Unit, claiming it was exempted from public disclosure due to this

---

24, 2018 to TDCJ Counsel; Ex. 70, Declaration of S. Medlock.

[12] *See* Ex. 19, Temperature and Humidity Logs, Pack Unit. *See also* Ex. 31, Letter from J. Edwards to TDCJ Counsel, Aug. 13, 2018.

[13] *Id*; Ex. 70, Declaration of S. Medlock.

[14] *Id*.

ongoing "litigation."[15] Thus, TDCJ not only prevented Class Counsel from discovering the extent of its violations, it also chose to hide the violations from the press, public, and interested inmates' families.

### D. The Stiles Unit (July 2019)

In July 2019, TDCJ housed approximately 23 class members at the Stiles Unit in Beaumont.[16] The class members were living in a converted solitary confinement cell block that was designed to be air conditioned. Class Counsel began receiving complaints about the temperatures in the cell block in mid-July,[17] and an attorney was dispatched to investigate on July 18, 2019.[18] Class members at the Stiles Unit reported "the air conditioning has not been working," making inmates feel "hot, sweaty, dizzy," "disoriented," "nauseous," and like they were on the verge of "pass[ing] out."[19] Despite these ongoing elevated temperatures, TDCJ was not providing the other countermeasures required when the temperature exceeds 88ºF – such as cold showers, ice water, and respite areas.[20] After several days – and correspondence to TDCJ from Class

---

[15] Ex. 71, Declaration of D. James; Ex. 33, Class Counsel Public Information Act Request re: Terrell Unit; Ex. 34–35, TDCJ Objection to PIA Request; Ex. 36, Office of Attorney General Open Records Decision. *See* TEX. GOV'T CODE § 552.103 (Texas Public Information Act, "Exception: Litigation … Involving the State").

[16] Ex. 37, Excerpt from TDCJ's "Class Member Locations" (July 1, 2019).

[17] Ex. 70, Declaration of S. Medlock.

[18] Ex. 71, Declaration of D. James.

[19] *See* Ex. 1, Declaration of T. Henry; Ex. 2, Declaration of D. Armstrong; Ex. 3, Declaration of G. Click; Ex. 4, Declaration of C. Brown; Ex. 5, Declaration of J. Crocker.

[20] *Id.*

Counsel[21] – the inmates finally reported the air conditioning appeared to resume functioning.[22] Again, when Class Counsel requested relevant documents – such as inmate grievances, work orders, and temperatures logs – TDCJ refused to cooperate.[23] Again, TDCJ never provided Class Counsel notice of the problem.[24]

### E.  LeBlanc Unit (July/August 2019)

Also in mid-July 2019, Class Counsel began receiving complaints that the air conditioning was not functioning at the LeBlanc Unit (also in Beaumont, where approximately 37 class members had been transferred).[25] Class Counsel reported the problem to TDCJ's counsel, and requested documentation to evaluate the class members' claims – including temperature logs.[26]

In response, TDCJ's counsel repeatedly said the class members were wrong, that the LeBlanc Unit was completely air conditioned, and that the air conditioning was functioning properly: "the tempered air system is and has been operable" and that "the tempered air system has been functioning properly and has maintained the temperature just below 85 degrees."[27] When Class Counsel continued reporting class members' complaints that the air conditioning was

---

[21] Ex. 39, Email from S. Medlock to TDCJ Counsel (July 16, 2019).

[22] Ex. 70, Declaration of S. Medlock.

[23] Ex. 42, Letter from S. Medlock to TDCJ Counsel (July 22, 2019).

[24] Ex. 71, Declaration of S. Medlock.

[25] Ex. 37, Roster of Class Members (July/August 2019).

[26] *See*, *e.g.*, Ex. 42, Correspondence from S. Medlock to TDCJ Counsel (July 22, 2019).

[27] Ex. 41, Email from TDCJ Counsel to S. Medlock (July 18, 2019). *See also* Ex. 71, Declaration of S. Medlock. "Tempered air" is a euphemism that TDCJ uses for air conditioning, presumably so that it can deny it provides prisoners the "comfort" of air conditioning. *See* Ex. 46, Email from TDCJ Counsel to S. Medlock (Aug. 1, 2019). There is no such thing as "tempered air." *Id.*

actually broken, TDCJ's counsel then represented that "there was an A/C mechanical issue at the LeBlanc Unit on July 16th," but that the problem was "resolved" and that "when there is an A/C issue at any unit, that is treated as an urgent issue that is addressed immediately."[28] TDCJ even created a misleading document intended to show that, while there had been minor problems with the air conditioning at the LeBlanc Unit, the problems had always been resolved in a matter of hours.[29] The document – wholly manufactured by TDCJ – was presented as conclusive evidence that there were no problems at the LeBlanc Unit, though anyone who had actually set foot in the prison or had bothered to honestly enquire about the temperatures would know this was patently untrue.[30] But when pressed by Class Counsel, TDCJ refused to produce evidence underlying the document (such as emails discussing the issue, work orders, and maintenance logs that might confirm the document's veracity). And TDCJ's counsel continued to rely on the document – despite its obvious falsity – as late as the August 9, 2019 hearing with the Court.[31]

When Class Counsel visited the prison on July 19, 2019, however, class members reported TDCJ's statements were false, and the air conditioning was broken.[32]

---

[28] Ex. 46, Email from TDCJ Counsel to S. Medlock (Aug. 1, 2019). Thus, while counsel for the parties agree that air conditioning breakdowns are emergencies, TDCJ refuses to actually treat these dangerous situations as such.

[29] Ex. 47, p. 2, Summary of A/C Issues in LeBlanc and Duncan Units. Class Counsel had also received temperature complaints from prisoners at the Duncan Unit, but those class members were returned to the Pack Unit before Class Counsel had the opportunity to visit the class members imprisoned there.

[30] *See* Ex. 49, Transcript of Aug. 7, 2019 hearing, p. 11:3-9 ("We have provided a spreadsheet of all of the maintenance and work on the air-conditioning that was performed at the Leblanc Unit over the past month. That spreadsheet indicated what the problem was, when it was reported and the time and date that it was resolved.")

[31] *See* Ex. 56, Transcript of Aug. 9, 2019 hearing, p. 7:13-16.

[32] *See* Ex. 6, Declaration of C. Bell; Ex. 7, Declaration of J. Alcocer; Ex. 8, 1st Declaration of K.

After several weeks of false statements and intransigence by TDCJ, Class Counsel finally demanded a site inspection to take place on August 8.[33] The inspection was scheduled. The morning of August 7, however, TDCJ declared it was unilaterally postponing the visit – claiming the warden had suffered a "family emergency" that would prevent him from attending, and the agency's executive leadership was away at a trade show but needed to be back in Texas for the inspection to go forward.[34] When Class Counsel asked, in exchange for the delay, that TDCJ record the indoor temperatures for the four days, TDCJ flatly refused. During these discussions, at no point did TDCJ acknowledge that ongoing violations of the settlement agreement were occurring.[35] Even when Class Counsel requested an emergency hearing to force the inspection to go forward, TDCJ did not acknowledge that indoor temperatures were in violation of the settlement agreement.

In fact, TDCJ's counsel told the Court the opposite: "there's no areas that don't have air-conditioning right now."[36]

> The Court: Well, tell me what's the problem. Why is one part of it hot? What's the problem, is the air conditioning –
>
> TDCJ's Counsel: Well, it's all air-conditioned, Your Honor. However, one area does seem – they're getting more complaints from offenders. As the Plaintiffs' class counsel are getting complaints, TDCJ always receives the same type of complaint. And, so, in one area they have not figured out what's wrong with the air-conditioning. It seems to be running, but it does seem to not be cooling as the others. So, as an immediate fix, TDCJ has suggested that they move the class members to

---

Abbott; Ex. 9, 1st Declaration of R. Anderson.

[33] Ex. 47, Email from S. Medlock to TDCJ Counsel (Aug. 5, 2019).

[34] Ex. 51, Email from TDCJ Counsel to S. Medlock (Aug. 7, 2019).

[35] Ex. 70, Declaration of S. Medlock.

[36] Ex. 50, Transcript of Aug. 7, 2019 hearing, p. 5:11-12.

the other housing areas that there doesn't seem to be any complaints about the air conditioning.[37]

After the Court intervened (*see* Doc. 1446 & Ex. 49), the inspection took place as scheduled, and Class Counsel found widespread violations of the 88ºF maximum, with indoor heat indices actually exceeding 100ºF.[38]

Interestingly, the warden attended the inspection.[39] More interestingly, the trade show had actually concluded on August 6 – the day before TDCJ made its excuses to Class Counsel and the Court.[40] (TDCJ's counsel, in response to the Court's question: "All of the high-level executive officials at TDCJ are out of the state attending the ACA conference.")[41]

At the LeBlanc Unit, class members reported temperatures felt similarly "hot" indoors for several weeks before the inspection finally confirmed TDCJ was in violation of the settlement agreement.[42] "The air conditioning was not blowing cold air the entire time I was at LeBlanc."[43]

---

[37] Ex. 49, Transcript of Aug. 7, 2019 hearing, pp. 5:17-6:6.

[38] Ex. 71, Declaration of D. James.

[39] Ex. 71, Declaration of D. James.

[40] Notably, this same trade show appears to take place in the first week of August each year. It is the same trade show TDCJ executives were attending despite knowing the state was suffering one of the worst heat waves in history in 2011, when ten prisoners died of heat stroke, many of them during the first weeks of August. *See* Ex. 72, Email from R. Williams to G. Crippen (Aug. 5, 2011) (stating Dr. Linthicum "is away at ACA").

[41] Ex. 45, ACA Conference Website (conference in Boston scheduled from August 1 to August 6, 2019); Ex. 44, ACA Conference Program; Ex. 51, Email from TDCJ Counsel to S. Medlock, Aug. 7, 2019; Ex. 49, Transcript of Aug. 7, 2019 Hearing, 11:20-24.

[42] Ex. 6, Declaration of C. Bell; Ex. 7, Declaration of J. Alcocer; Ex. 64, 2nd Declaration of K. Abbott; Ex. 9, 1st Declaration of R. Anderson; Ex. 65, Declaration of K. Tuttle; Ex. 66, Declaration of M. Denton; Ex. 68, Declaration of R. Angton, Jr.

[43] Ex. 68, Declaration of R. Angton, Jr.

Class members describe the heat throughout the summer as "as bad, or worse" than on the date of the inspection.[44] "It was consistently hot all summer and almost always as hot inside as it was on August 8, 2019."[45] Class members reported feeling "dizzy," "light headed," "nauseous," "weak," and "hot and sweaty" indoors.[46] Class members had "trouble breathing," suffered "loss of appetite," experienced "headaches," and "could not sleep" due to the heat indoors.[47] "I felt like I was roasting."[48] Class members (and Class Counsel) observed the hallway outside the dormitories (which used a separate air conditioning system) was "much cooler" than inside the housing area.[49] "It was nice and cold in the parts of the dorm where the officers worked but very hot where we were living."[50] Class members had "trouble breathing," suffered "loss of appetite," and "could not sleep" due to the heat indoors.[51] Just as significantly,

---

[44] Ex. 59, Declaration of B.J. Campbell. *See also* Ex. 60, Declaration of D. Shepherd; Ex. 65, Declaration of K. Tuttle; Ex. 66, Declaration of M. Denton; Ex. 69, Declaration of T. Williamson.

[45] Ex. 66, Declaration of M. Denton.

[46] Ex. 6, Declaration of C. Bell; Ex. 7, Declaration of J. Alcocer; Ex. 8, Declaration of K. Abbott; Ex. 59, Declaration of B.J. Campbell; Ex. 60, Declaration of D. Shepherd; Ex. 65, Declaration of K. Tuttle; Ex. 66, Declaration of M. Denton; Ex. 67, 2nd Declaration of R. Anderson; Ex. 69, Declaration of T. Williamson.

[47] Ex. 59, Declaration of B.J. Campbell; Ex. 64, 2nd Declaration of K. Abbott; Ex. 69, Declaration of T. Williamson.

[48] Ex. 68, Declaration of R. Angton, Jr.

[49] *Id. See also* Ex. 70, Declaration of S. Medlock.

[50] Ex. 60, Declaration of D. Shepherd.

[51] Ex. 59, Declaration of B.J. Campbell.

the class members reported that they had felt the hot temperatures that Class Counsel found existed on August 8 had prevailed inside the prison since at least early July.[52]

Despite these harsh conditions, TDCJ was also failing to make the interim remedies available to class members. Class members reported spending just fifteen minutes in the respite areas before officers told them to leave, and even said, "I don't give a fuck about your heat restrictions. Fuck you and your lawsuit."[53]

TDCJ officials knew about the conditions in the prison. Class members saw high-ranking TDCJ officials, including the LeBlanc Unit warden, enter the housing areas throughout the summer and experience the hot indoor temperatures.[54] Class members heard TDCJ officials taking temperature measurements in the dormitories acknowledge "it was in the 90s."[55] One class member even reported that, when he saw another inmate ask an assistant warden about the obvious problems with the air conditioning, that "the assistant warden [just] poured a bottle of water onto his own arm, then walked away" – as if to indicate that the inmate should just attempt to cool himself with water, there was no air conditioning.[56]

And, as has been its practice, TDCJ violated the notice provisions – choosing (again) to hide the danger rather than disclose it. In fact, TDCJ has *never* notified Class Counsel of any

---

[52] Ex. 59, Declaration of B.J. Campbell; Ex. 60, Declaration of D. Shepherd; Ex. 66, Declaration of M. Denton; Ex. 67, 2nd Declaration of R. Anderson; Ex. 68, Declaration of R. Angton, Jr.

[53] Ex. 67, 2nd Declaration of R. Anderson. *See also* Ex. 66, Declaration of M. Denton; Ex. 68, Declaration of R. Angton, Jr.

[54] Ex. 60, Declaration of D. Shepherd; Ex. 68, Declaration of R. Angton, Jr.; Ex. 69, Declaration of T. Williamson.

[55] Ex. 68, Declaration of R. Angton, Jr.

[56] Ex. 8, 1st Declaration of K. Abbott.

violation – no matter how minor, no matter how quickly air-conditioning was restored. Even as late as August 7, TDCJ insisted that "there has been no event at the [LeBlanc] [U]nit triggering [the settlement agreement's] notice requirements."[57] But just two days later, on August 9, TDCJ told the Court that it actually had high-level maintenance supervisors at the prison on August 7 who would have known about the obvious problems, literally at the same time the agency continued insisting no "triggering event" had taken place.[58] Class members also report seeing TDCJ officials inside the housing areas earlier in the summer, discussing that the temperatures inside were in the 90s.[59] Of course, it is inconceivable that any of the dozens of TDCJ employees (in addition to the warden and maintenance officials) who entered the inmate dormitories every day and felt indoor temperatures as high as 100°F would not have immediately known something was wrong, and the settlement was being violated. As the Court noted, "When there is an air-conditioning problem I would think everyone would be aware of it instantly."[60]

### F.  Other Settlement Agreement Violations

And these are not the only times TDCJ has violated the settlement agreement.

The agreement requires TDCJ to provide air conditioned buses to transport subclass members. Doc. 989-4, p. 12. But TDCJ has also failed to keep this part of the agreement. Multiple subclass members have reported to class counsel that TDCJ has required them to travel in buses

---

[57] Ex. 51, Email from TDCJ Counsel to S. Medlock, Aug. 7, 2019.

[58] Ex. 56, Transcript of Aug. 9, 2019 hearing, p. 11:1-6.

[59] Ex. 60, Declaration of D. Shepherd.

[60] Ex. 56, Transcript of Aug. 9, 2019 hearing, p. 8:8-11. Of course, the Court was correct. As soon as Class Counsel entered the housing areas on August 8, the heat was immediately overwhelming and it was obvious the air conditioner could not have been working. *See* Ex. 70, Declaration of S. Medlock.

without air conditioning.[61] Stunningly, even the bus that brought the class members back to the Pack Unit from the LeBlanc Unit did not have a functioning air conditioner – forcing the bus to make an emergency stop when a class member suffered chest pains on the trip.[62] To date, TDCJ has not responded to these concerns (effectively thwarting Class Counsel's ability to investigate).

The settlement agreement required TDCJ to provide "parole-voted programs" – programs class members are required to complete before they can be released[63] – "in air-conditioned facilities." Doc. 989-4, p. 12. But for several weeks in early 2019, class members who had been transferred to the LeBlanc Unit – specifically to attend necessary programming – were not provided access to their "parole-voted" programs necessary for release.[64] This problem was also only resolved *after* Class Counsel intervened.

### G.  TDCJ Cannot, or has Chosen Not To, Ensure its Own Compliance

Throughout these episodes, TDCJ has steadfastly refused to record indoor heat indices at prisons other than the Pack Unit to ensure the agency is complying with the settlement agreement, and (partially as a consequence) refuses to produce documents as basic as temperature logs to Class Counsel.[65] "It is TDCJ's position that it is not required to [create temperature logs] under

---

[61] *See* Ex. 73, Letter from S. Medlock to TDCJ Counsel (July 15, 2019); Ex. 61, Declaration of D. Pieczonka; Ex. 62, Declaration of J. Mozingo; Ex. 63, Declaration of G. Butaud.

[62] Ex. 65, Declaration of K. Tuttle; Ex. 66, Declaration of M. Denton; Ex. 67, 2nd Declaration of R. Anderson; Ex. 68, Declaration of R. Angton, Jr.; Ex. 69, Declaration of T. Williamson.

[63] *See* TEX. BD. OF PARDONS & PAROLES, "Parole/Mandatory Supervision Information," available at: https://www.tdcj.texas.gov/bpp/what_is_parole/vote-options.htm (last visited Aug. 23, 2019) ("Release to parole only after program completion").

[64] *See* Ex. 66, Declaration of M. Denton; Ex. 74, Letter from S. Medlock to TDCJ Counsel (March 15, 2019).

[65] Of course, it is possible it is the other way around – that TDCJ is not recording temperatures specifically to *avoid* creating a document to produce to Class Counsel.

14

the settlement agreement … TDCJ does not agree to create temperature logs."[66] Likewise, though terms of the agreement require TDCJ ensure indoor heat indices remain below 88ºF, TDCJ outrageously insists that "[t]here is no requirement that the staff monitor the thermostat … on a daily basis."[67]

Of course, at the LeBlanc Unit, there was no actual "thermostat" for anyone *to* monitor – instead of an indoor thermostat, the temperatures inside the housing areas were controlled with a mechanical dial inside the outdoor components of air conditioner, which was set to a theoretical temperature the technicians wished it would achieve. Class Counsel actually had to climb *inside the air conditioner* to read the dial. But there was no evidence that the air conditioning actually came close to reaching the temperatures the dial was set to achieve, and there was no corresponding device showing the actual indoor temperature the air conditioners did reach. Indeed, in one dormitory, the dial was set to 30ºF, but the actual indoor heat index *exceeded 90ºF.*[68]

Even after the Court's order to remove the class members from the LeBlanc Unit (Doc. 1449), and TDCJ's representations at the hearing that the agency wanted to "get in front of the problem" in the future, TDCJ is *still* refusing to cooperate with Class Counsel to ensure future compliance with the settlement agreement.[69] Far from focusing on protecting the people in its

---

[66] *See*, *e.g.*, Ex. 51, Email from TDCJ Counsel to S. Medlock (Aug. 7, 2019).

[67] Ex. 48, Email from TDCJ Counsel to S. Medlock (Aug. 6, 2019).

[68] Ex. 71, Declaration of D. James.

[69] Ex. 56, Transcript of Aug. 9, 2019 hearing, p. 9:1-2. *See* Ex. 57, Letter from J. Edwards to TDCJ Counsel (Aug. 12, 2019); Ex. 58, Email from S. Medlock to TDCJ Counsel (Aug. 16, 2019). TDCJ did later confirm by letter that the class members' parole programming would not be interrupted – a claim Class Counsel is working to verify. To date, TDCJ has not otherwise responded to Class Counsel's requests. Ex. 70, Declaration of S. Medlock.

custody and care, TDCJ seems determined to simply make it difficult for Class Counsel to investigate legitimate complaints. This obfuscation is dangerous because, as the Court already observed, "why is [it] necessary, for a third party to cause TDCJ to live up to its obligations?"[70]

### H. TDCJ Repeatedly Misrepresented Conditions at the LeBlanc Unit to Class Counsel and the Court

Throughout the LeBlanc Unit episode, TDCJ's counsel misrepresented conditions at the prison to Class Counsel and the Court. Each of these misrepresentations appear designed to slow down Class Counsel's investigation, to offer reassurance when none was warranted, and to imply class members are incorrect while indifferently leaving them exposed to dangerous temperatures.

- In the July 18, 2019 email, TDCJ's counsel wrote, "staff have been visually checking the thermostats frequently [and] the temperatures have not gotten near 88 degrees" – an impossibility since there was literally no thermostat to "check."[71]

- In the August 1, 2019 email, TDCJ's counsel wrote, "I've learned there was an A/C mechanical issue at the LeBlanc Unit on July 16th, which was resolved" – though class members complaints continued and *none* of the inmate housing areas inspected were properly cooled three weeks later.[72]

- In the document produced on August 5, 2019, TDCJ represented that only six mechanical problems had occurred at the LeBlanc Unit, and that each had been quickly resolved – though during the inspection air conditioners were not working throughout the prison just three days later, and the heat index exceeded 100°F in housing areas.[73]

- On August 7, 2019, TDCJ asked to postpone the date of the inspection by email because the warden was undergoing a "family emergency," and the "executive administration" was away at the "ACA conference out of state" – though the

---

[70] Ex. 56, Transcript of Aug. 9, 2019 hearing, p. 9:21-22. To her credit, TDCJ's counsel conceded, "It's not the responsibility of Class Counsel to ensure that [TDCJ is] complying with the settlement agreement." *Id*. at p. 9:23-24.

[71] Ex. 40, Email from S. Medlock to TDCJ Counsel (July 19, 2019) (showing earlier email).

[72] Ex. 46, Email from TDCJ Counsel to S. Medlock (Aug. 1, 2019).

[73] Ex. 47, Email from TDCJ Counsel to S. Medlock (Aug. 5, 2019) attachment.

warden actually attended the entire five-hour inspection, and the trade show materials demonstrate it ended the day before the TDCJ's counsel sent the email.[74]

- Also on August 7, 2019, in a second email, TDCJ's counsel represented that "there has been no event at the [LeBlanc U]nit triggering notice requirements" – though there clearly had been, on the very next day, widespread "triggering events," and later that afternoon TDCJ's counsel hinted to the Court that at least some problem existed.[75]

- At the August 7, 2019 hearing, TDCJ's counsel represented that, "there's no areas [of the prison] that don't have air-conditioning right now,"[76] that the emergency nature of the problem was "allayed by moving the offenders to a different housing area,"[77] that "all of the high-level executive officials at TDCJ are out of the state attending the ACA conference."[78] None of this was true.

## III.   STANDARD OF REVIEW

Federal courts' power "to punish for contempt is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *Sec. & Exch. Comm'n v. First Fin. Grp. of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981). That power extends to enforce class action settlement agreements, which are incorporated into court orders. *See Lelsz v. Kavanaugh*, 673 F.Supp. 828, 840 (N.D. Tex. 1987) (Sanders, C.J.) ("The Court's power to enforce a [court-approved settlement agreement] is axiomatic"). *See also White Farm Equip. Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir. 1986) & Doc. 1188, pp. 25-26, 34-35 (final order and judgment approving settlement agreement and retaining jurisdiction for enforcement of agreement).

---

[74] Ex. 51, Email from TDCJ Counsel to S. Medlock (Aug. 7, 2019).

[75] Ex. 51, Email from TDCJ Counsel to S. Medlock (Aug. 7, 2019).

[76] Ex. 50, Transcript of Aug. 7, 2019 hearing, p. 5:11-12.

[77] Ex. 50, Transcript of Aug. 7, 2019 hearing, p. 11:12-13.

[78] Ex. 50, Transcript of Aug. 7, 2019 hearing, p. 20-24.

A party who violates a definite and specific court order is in civil contempt. *Sec. & Exch. Comm'n,* 659 F.2d at 669; FED. R. CIV. P. 70(e); *see also* 18 U.S.C. § 401.  Contempt is proven by clear and convincing evidence that: (1) a court order is or was in effect; (2) the order requires certain conduct; and (3) the opposing party has failed to comply. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). "[G]ood faith is not a defense." *United States v. City of Jackson*, 359 F.3d 727, 735 n.25 (5th Cir. 2004); *Am. Airlines, Inc.*, 228 F.3d at 581. A party must take "all reasonable steps within their power to insure compliance with the orders." *Alberti v. Klevenhagen*, 610 F.Supp. 138, 141 (S.D. Tex. 1985). "The contemptuous actions need not be willful" – though here, they are – "so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc.*, 228 F.3d at 581. The defendant's intent, for good or ill, is simply "not an element of civil contempt." *Alberti*, 610 F.Supp. at 141 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). Civil contempt simply includes "the failure to accomplish what was ordered in meaningful respects." *Ruiz v. McCotter*, 661 F.Supp. 112, 116 (S.D. Tex. 1986) (Justice, J.) (holding TDCJ's predecessor agency in contempt).

On finding civil contempt, courts may impose sanctions in the form of remedial fines and attorneys' fees. *Hutto v. Finney*, 437 U.S. at 690–91; *Cook v. Ochsner Foundation Hospital,* 559 F.2d 270, 272 (5th Cir. 1977); *Am. Airlines, Inc.*, 228 F.3d at 586. Remedial sanctions compensate the injured party "for the effects of his opponent's noncompliance." *U.S. v. United Mine Workers,* 330 U.S. 258 (1947). Such sanctions are particularly appropriate here. "If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Hutto*, 437, U.S. at 690–91.

IV.   **ARGUMENT AND AUTHORITIES**

TDCJ violated the plain terms of the settlement agreement and the Court's order when TDCJ housed class members in apparent temperatures of 88°F or higher, failed to provide required countermeasures, and failed to provide notice of the violations to Class Counsel.

**A.      This Court's Order and the Settlement Agreement are Specific and Definite.**

Here, the Court's order is clear. TDCJ violated its most straightforward component: "The Settlement requires TDCJ to air-condition the housing areas … to maintain indoor heat indices at or below 88 degrees Fahrenheit," and that "even if Class members are involuntarily transferred to [prisons other than the Pack Unit] the temperature limitation will continue to apply to them." Doc. 1188, p. 5. *See also* Doc. 989-4.

Likewise, "If there is an equipment malfunction for longer than twenty-four hours that causes the heat index to rise above 88 degrees Fahrenheit, TDCJ will notify [Class Counsel] and provide temporary heat mitigation measures" – including "[a]ccess to cool showers of unlimited length, 24 hours a day, seven days a week"; "[a]ccess to air-conditioned 'respite' areas for an unlimited amount of time"; and "[c]old drinking water accessible 24 hours a day." Doc. 1188, p. 5 & Doc. 989-4, pp. 9-10.

There is no question that the settlement agreement, and thus the Court's order, is specific, and definite.

**B.      TDCJ Violated the Settlement Agreement.**

As the Court already found, there can be no dispute that TDCJ violated the settlement agreement. Doc. 1449.

As to the class members imprisoned at the LeBlanc Unit, during the inspection, Class Counsel observed 37 class members imprisoned in two housing areas with indoor heat indices

19

between 88.2ºF and 92.3ºF the afternoon of August 8.[79] These prisoners did not have access to all the countermeasures (specifically, cold showers), and Class Counsel received no notice that TDCJ was in violation – and actually discovered the violation only by personally travelling to Beaumont to inspect the prison. This is a concrete, incontrovertible violation of the settlement agreement, as the Court has already found. Doc. 1449.

Though TDCJ's intransigence has (thus far) prevented Class Counsel from determining the scope of the violations at the LeBlanc Unit, these violations were not confined to a single afternoon. The day before the inspection at the LeBlanc Unit, class members were spread throughout the prison.[80] In fact, when the inspection took place, heat indices in dormitories the class members occupied the previous day ranged from 89.1ºF to 100.2ºF.[81] The Beaumont area was under a National Weather Service Heat Advisory on the day of the inspection and the day prior,[82] and National Weather Service records show that the outdoor heat index in Beaumont exceeded 88 degrees on every day since the end of June, with 31 days out of those 39 days exceeding 100 degrees heat index.[83] Class members interviewed thus far testify the indoor

---

[79] Doc. 1448-2, Declaration of D. James, p. 2.

[80] Doc. 1448-2, Declaration of D. James, p. 2.

[81] Doc. 1448-2, Declaration of D. James, p. 5.

[82] Ex. 53–54, Text of August 8, 2019 Heat Advisories; Ex. 50, Text of August 7, 2019 Heat Advisory; *available at* https://mesonet.agron.iastate.edu/vtec/#2019-O-NEW-KLCH-HT-Y-0012/USCOMP-N0Q-201908111800.

[83] Ex. 55, Summary of Daily Maximum Outdoor Heat Index at Beaumont. The underlying data for this summary is available from the National Weather Service by downloading the Beaumont Municipal Airport Local Climatological Data, then computing the heat index for each entry. *See* National Weather Service, *Local Climatological Data Station Details* (last accessed, August 21, 2019), *available at* https://www.ncdc.noaa.gov/cdo-web/datasets/LCD/stations/WBAN:00313/detail; National Weather Service, *The Heat Index Equation* (last accessed, August 21, 2019), *available at*

temperatures felt this hot in the housing areas since at least early July.[84] Though TDCJ's refusal to record and provide indoor temperature data obviously frustrates this inquiry (and necessitate a show cause order, *see infra* at pp. 14–15), it is virtually certain the indoor heat indices had violated the heat index provisions of the settlement agreement for weeks.

Nor were these violations confined to a single prison. TDCJ almost certainly violated the heat index provisions at the Terrell Unit and Stiles Unit.

At the Terrell Unit, TDCJ imprisoned a single class member in the prison infirmary – presumably to receive medical treatment. When a class member is transferred to a "medical facilit[y]," TDCJ is required to ensure the facility is "air conditioned." Doc. 989-4, p. 12. In late March 2019, the class member wrote to Class Counsel to inform them that the air conditioning in his housing area – the infirmary – was broken, and it had become very hot indoors. This problem was only remedied after Class Counsel, not prison staff, alerted TDCJ's attorneys to the problem.

At the Stiles Unit, by early July 2019, TDCJ was imprisoning almost two dozen class members – purportedly because their security classifications prevented them from being imprisoned at the Pack Unit. *See* Doc. 989-4, p. 12 ("G4" and "G5" security classifications cannot be imprisoned at the Pack Unit).[85] When a class member leaves the Pack Unit for "security" reasons, the settlement agreement requires, "Class members shall be moved to other air-

---

https://www.wpc.ncep.noaa.gov/html/heatindex_equation.shtml. Plaintiffs will make the underlying data, over 1,000 pages long, available upon request.

[84] *See* Ex. 6, Declaration of C. Bell; Ex. 7, Declaration of J. Alcocer (transferred to LeBlanc Unit on or about July 4, 2019); Ex. 8, Declaration of K. Abbott (transferred to LeBlanc Unit on July 5, 2019); Ex. 9, 1st Declaration of R. Anderson (transferred to LeBlanc Unit in March 2019); Ex. 10, Declaration of S. Grigg (transferred to LeBlanc Unit on or about July 4, 2019).

[85] Ex. 37, Excerpt from TDCJ's "Class Member Locations" (July 1, 2019).

conditioned housing facilities." Doc. 989-4, p. 12. On July 18, 2019, after Class Counsel alerted TDCJ to a potential problem, TDCJ's counsel conceded the Stiles Unit was experiencing "intermittent trouble with the AC," but did not admit "the extent of the problem."[86] Shortly after Class Counsel intervened, class members did report the air conditioning began working again, though the extent of the settlement violations are unknown at this time due to TDCJ's failure to record heat indices indoors, and obstinate refusal to come clean when confronted with an obvious problem.[87]

Likewise, for perhaps now obvious reasons, TDCJ never notified Class Counsel of hot indoor temperatures at any of the above prisons, not even long after the 24-hour grace period had passed.[88] Instead, Class Counsel only learned about the problems through letters from class members (typically sent days earlier) and frantic phone calls from their family members.[89] Again, while TDCJ's intentional failure to create and keep temperature logs severely frustrates evaluating the scope of the problem, TDCJ has likely committed numerous violations of the settlement agreement's notice provisions.

**C.    Sanctions are Necessary to Compensate Class Members and Class Counsel, Deter Additional Violations, and to Ensure Future Compliance.**

The Court should award compensatory fines to class members, and award additional attorneys' fees and expenses associated with investigating the contempt and filing this motion (including any additional briefing and procedures related to a show cause hearing) to Class

---

[86] Ex. 39, Email from TDCJ Counsel to S. Medlock (July 18, 2019).

[87] Ex. 70, Declaration of S. Medlock.

[88] Ex. 70, Declaration of S. Medlock.

[89] Ex. 70, Declaration of S. Medlock.

Counsel. When awarding remedial sanctions, the Court has broad discretion "to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *Cook v. Ochsner Foundation Hospital,* 559 F.2d 270, 272 (5th Cir. 1977); *Sebastian*, 558 F. Supp. at 510 (citing *Mead Johnson & Co. v. Baby's Formula Service, Inc.*, 402 F.2d 23 (5th Cir. 1968)); *Ruiz*, 661 F.Suppl. at 152. Compensatory sanctions include "losses flowing from noncompliance and expenses reasonably and necessarily incurred in the attempt to enforce compliance." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976). Specifically, compensation for class members direct losses, attorneys' fees, and expenses is appropriate.[90]

Sanctions are especially appropriate here, where Defendants' misconduct following the settlement endangered hundreds of inmates through a combination of deliberately indifferent choices – even after TDCJ was alerted to potential problems by Class Counsel.[91] Defendants' new pattern of violations is even more egregious in combination with their extensive history of past violations that put hundreds of men at risk, their misrepresentations to Class Counsel and the Court, their refusal to monitor their own compliance (such as by recording temperature logs), and their conscious choice to violate the Court's orders.

---

[90] *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 691 (1973) (affirming remedial contempt in the form of attorneys' fees in prisoner civil rights case); *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) (affirming award of attorneys' fees as sanction); *Sebastian v. Texas Dept. of Corrections*, 558 F. Supp. 507, 510 (S.D. Tex. 1983) (awarding plaintiff's lost wages and attorneys' fees as contempt sanctions); *Marion Cty. Jail Inmates v. Anderson*, 270 F. Supp. 2d 1034, 1036 (S.D. Ind. 2003) (imposing future daily incremental fines for each prisoner housed without a safe bed); *see also Palmigiano v. DiPrete*, 700 F. Supp. 1180, 1193 (D. R.I. 1988) (threatening daily incremental fines for exceeding prison population caps).

[91] *See U.S. v. United Mine Workers,* 330 U.S. 258, 303–304 (1947) (finding that courts should take into account "the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired"); *Am. Airlines, Inc.*, 228 F.3d 574 at 585 (upholding sanctions issued "to protect the sanctity of judicial decrees and the legal process").

The settlement agreement was designed to protect the class members from dangerous heat above 88°F because those conditions caused the deaths of at least 22 prisoners in TDCJ custody and injuries to hundreds more. Doc. 737, pp. 43–44, 92. Defendants' violations of the settlement agreement not only disregarded the Court and violated the class members' rights under the agreement, but also actively endangered the class members. Doc. 737, p. 32. Because of the serious stakes, Defendants' violations must have serious consequences. *See Ruiz*, 661 F.Supp. at 147 (contempt is "obligatory" when failure to comply put "the physical … welfare of the … Texas prison population in jeopardy"). *See also United States v. State of Hawai`i*, 885 F. Supp. 212, 215 (D. Haw. 1995); *Palmigiano v. DiPrete*, 700 F. Supp. 1180, 1192 (D. R.I. 1988); *Alberti v. Klevenhagen*, 610 F. Supp. 138, 141 (S.D. Tex. 1985); *Alberti v. Heard*, 600 F. Supp. 443, 464 (S.D. Tex. 1984).

As a consequence of TDCJ's pattern of intransigence and the harm imposed by TDCJ's violations, the Court should order, at a minimum, the below remedies to (1) compensate the class members for harms suffered as a result of TDCJ's noncompliance, (2) award Class Counsel for fees and expenses necessarily expended to protect the class over TDCJ's intransigence and bring this motion, and (3) to eliminate any ongoing harms and ensure future compliance. *See Hutto*, 437 U.S. at 691 ("If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance").

*1.     Compensatory Fines Should be Awarded to Affected Class Members.*

Financial penalties "in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (affirming award of compensatory fines totaling $45,507,280.00

against airline pilots union). "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance." *Id*. (citing *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976)). Awarding civil compensatory penalties is appropriate to "protect the sanctity of judicial decrees and the legal process." *Id*. (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949). Civil monetary penalties are appropriate even when the underlying lawsuit does not (or cannot) seek compensatory damages. *Am. Airlines, Inc.*, 228 F.3d at 584–85.

The class members' need for (and entitlement to) injunctive relief is ongoing. Doc. 1188. TDCJ's massive failures to date to comply with the Court's orders and the settlement agreement require a significant fine today and the threat of significant fines in the future.

TDCJ has an annual budget of $3,220,854,057.[92]

Plaintiffs therefore propose a fine structure of $150 per inmate, per day the inmate was housed in a prison without fully functioning air conditioning where the outdoor apparent temperature reached 88°F (unless TDCJ can affirmatively show the indoor heat indices were in compliance). These retrospective fines will serve to compensate the inmates whose rights under the settlement agreement were violated by Defendants' failure to comply with the agreement. *See*, *e.g.*, *Am. Airlines*, 228 F.3d at 585; *Mendoza v. Regis Corp.*, 2005 WL 1950118, *5 (W.D. Tex. Aug. 11, 2005) (Nowak, Mag. J.); *Sebastian*, 558 F.Supp. at 510; *In re Reno*, 299 B.R. 823, 830 (Bankr. N.D. Tex. 2003). Courts enforcing orders regarding prison conditions regularly impose similar fines. *See Morales-Feliciano v. Parole Bd. of Com. of Puerto Rico*, 887 F.2d 1, 6 (1st Cir. 1989) (Breyer, J.) (affirming per-prisoner-per-day fines to compel compliance); *Benjamin v. Horn*,

---

[92] Ex. 32, Excerpts from the Texas Gen. Appropriations Act for the 2018-19 Biennium, p. V-62, *available at* https://www.lbb.state.tx.us/Documents/GAA/General_Appropriations_Act_2018-2019.pdf.

No. 75-cv-3078-HB, p. 5 (S.D. N.Y. Feb. 11, 2009) ($100 fine per day, and escalating thereafter, for failure to correct defects in prison ventilation system) *aff'd sub nom at Benjamin v. Schirro*, 370 Fed. Appx. 168, 171 (2d Cir. 2010) (unpublished); *Benjamin v. Sielaff*, 752 F.Supp. 140, 148-49 (S.D. N.Y. 1990) (awarding inmates fines of $150 for first 12 hours in unconstitutional conditions, and $100 for each additional 12 hours); *Tate v. Frey*, 673 F.Supp. 880, 883 (W.D. Ky. 1987) (ordering daily fines payable to inmates); *Feliciano v. Vila*, No. Civ. 79-4-PG, 2007 WL 4404730, *17 (D. P.R. Dec. 13, 2007) (ordering daily fines for noncompliance with court order in jail case). Each inmate who TDCJ imprisoned in dangerous conditions was placed at substantial risk of serious harm on each day the indoor apparent temperatures exceeded 88°F – a constitutional injury worthy of compensatory relief. *See, e.g.*, *Blackmon v. Garza*, 484 F.App'x 866, 874 (5th Cir. 2012) (unpublished). Likewise, the payments to inmates will serve as a deterrent to curb future abuses.[93]

Furthermore, in addition to continuing to compensate class members as described above going forward, the Court should institute a far harsher prospective fine structure to ensure TDCJ complies in the future. *See, e.g.*, *N.Y. State Nat'l Organization for Women v. Terry*, 159 F.3d 86, 95 (2nd Cir. 1998) (approving prospective fines as sanction for contempt); *Inmates of Allegheny Cnty. Jail v. Wecht*, 901 F.2d 1191, 1200 (3d Cir. 1990) (affirming entry of "substantial monetary sanction" for failure to comply with orders to remediate jail conditions); *Badgley v. Santacroce*, 800 F.2d 33 (2d Cir. 1986) (entering $5,000 per inmate fine for additional violations of court orders); *Trueblood v. Wash. State Dep't of Social & Health Servs.*, No. C-14-1178-MJP, 2017 WL 4700326, *7 (W.D. Wash. 2017) (imposing per inmate/per day fine structure); *Albro v. Onondaga*

[93] Administering these fines will be simple – every inmate already has a prison trust account into which the fines could be deposited.

26

*Cnty., N.Y.*, 681 F.Supp. 991, 997 (N.D. N.Y. 1988) (entering escalating fine structure for future noncompliance); *U.S. v. State of Mich.*, 680 F.Supp. 928, 1051 (W.D. Mich. 1987) (imposing $10,000 daily fine for future violations of court order); *Jackson v. Whitman*, 642 F.Supp. 816, 827 (W.D. La. 1986) (awarding $1,000 per day fine levied against individual jail officials if they fail to purge contempt); *Miller v. Carson*, 550 F.Supp. 543, 548 (M.D. Fla. 1982) (fining individual defendants $5,000 per day violations continue); *Mobile County Jail Inmates v. Purvis*, 581 F.Supp. 222, 225 (S.D. Ala. 1984) (entering $2,000,000 fine for noncompliance with court orders, and assigning "a portion of the accumulated contempt fines to pay bail fees" to secure release for low-income pretrial detainees); *Parsons v. Ryan*, No. CV-12-0601-PHX-DKD, 2018 WL 3239691 (D. Ariz. June 22, 2018) (fining prison system $1,400,000 for contempt of court's orders).

The violations here are equally serious to those in the cases above. Indeed, here TDCJ tried to hide them from Class Counsel and the Court. Therefore, in addition to imposing the same compensatory structure for class members ($150/per class member/per day in violation) in the future, Class Counsel proposes a fine of $300,000 (or less than 0.01% of TDCJ's budget) for the first violation, and $3,000,000 (less than 0.1% of TDCJ's budget) for each subsequent violation, which shall be segregated from TDCJ's operational budget, overseen by a special master (paid for at TDCJ's expense), and designated for installing heat-index monitors and/or air conditioning in housing areas first where class members are housed, then at additional prisons housing heat-sensitive inmates (as identified by the special master and Class Counsel).

    2.    *The Court Should Award Class Counsel Attorneys' Fees and Expenses.*

Courts routinely award attorneys' fees incurred unearthing violations of court orders. "There are contempt cases in abundant number holding that a court has discretion to award

attorneys' fees and other expenses necessary to make an innocent party whole." *See e.g.*, *Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212, 1215 (5th Cir. 1970).

The diligence of Class Counsel identified many (though far from all) of the class members TDCJ likely housed in hot indoor temperatures in violation of the settlement agreement.[94] But, of course, Class Counsel cannot know how many class members were truly endangered and for how long because TDCJ refuses to provide any documentation (such as temperature logs, grievances, or work orders) that would suggest who at TDCJ knew, and how long TDCJ officials knew the problems at the LeBlanc, Terrell, and Stiles Units existed (to say nothing of other prisons where class members may have been too afraid to speak up, or prisons like the Duncan Unit where Class Counsel's investigation was in its infancy before TDCJ returned the majority of class members to the Pack Unit). Because TDCJ regularly ignored the settlement's notice provisions, Class Counsel constantly raised class members' allegations with TDCJ's counsel – all while asking for basic documentation to confirm TDCJ was, in fact, complying with the settlement agreement.[95] As the Court noted, "this air-conditioning problem was ongoing for quite some time and it sounds like it might have kept on being a problem for quite some time had it not been for the intervention of Plaintiffs' counsel."[96]

Requiring TDCJ to pay Class Counsel's market-based rates for work associated with monitoring the events described above and drafting this motion is a fair sanction to adequately

---

[94] *See* Ex. 70, Declaration of S. Medlock; Ex. 71, Declaration of D. James.

[95] *See*, *e.g.*, Ex. 39, Email from TDCJ Counsel to S. Medlock (July 18, 2019); Ex. 38, Email from S. Medlock to TDCJ Counsel (July 16, 2019); Ex. 42, Correspondence from S. Medlock to TDCJ Counsel (July 22, 2019); Ex. 47, Email from S. Medlock to TDCJ Counsel (Aug. 5, 2019).

[96] Ex. 56, Transcript of Aug. 9, 2019 hearing, 9:17-20.

compensate Class Counsel for their time, and necessary to ensure TDCJ complies going forward. *See, e.g.*, *Kelly v. Wengler*, 822 F.3d 1085, 1098-99 (9th Cir. 2016); *Scott v. Clarke*, No. 3:12-cv-00036, 2014 WL 1463755, *3 (W.D. Va. Apr. 15, 2014). As TDCJ's counsel noted, "It's not for Class Counsel to have to discover the problem for us."[97] But because sanctions should have some deterrent effect, merely allowing TDCJ to pay fees it will already likely owe under the settlement agreement (at below-market rates) is exceptionally unlikely to serve as a meaningful deterrent. Thus, the Court should award additional fees, at market-based rates, for all activities related to investigating conditions at the LeBlanc Unit, as well as any other prison where it is determined TDCJ violated terms of the settlement agreement or made misleading statements regarding conditions, in addition to the fees necessary to bring this separate motion for sanctions.

As additional briefing and a show cause hearing will likely be necessary, Class Counsel requests to submit their attorneys' fees and expenses within 30 days of the Court's order on this motion.

### 3. Additional Sanctions are Warranted

As TDCJ still has not produced documents that would allow Plaintiffs' counsel to calculate the extent of the contempt,[98] TDCJ, through its executive leadership (Bryan Collier and Lorie

---

[97] Ex. 56, Transcript of Aug. 9, 2019 hearing, 9:10-11.

[98] At a minimum, Class Counsel would suggest TDCJ be ordered, as a sanction, to produce, for any prison where class members were housed after February 2, 2018: (1) inmate grievances, I-60's, correspondence or other complaints regarding hot indoor temperatures; (2) all emails concerning issues with (or complaints about) the heat or air conditioning at any prison where class members were housed (including the LeBlanc, Stiles, Terrell, and Duncan Units); (3) any temperature/heat index logs that were maintained; (4) any work orders and maintenance logs for any portion of the HVAC systems; (5) daily count sheets for any period class members were present; (6) the specifications of the HVAC systems and which portions of each facility they cool; (7) the dimensions of each housing area—the ceiling height and wall lengths; (8) the number and size of windows in each housing area; and (9) the number and wattage of overhead lights in each housing area. (As to numbers (6–9), Plaintiffs are aware that the as-built blueprints for the facilities

29

Davis) should be ordered to do so and instructed to inform the Court (under penalty of perjury and criminal contempt) the total number of class members who spent time at any prison where the air conditioning was not functioning as designed for any period exceeding 24 hours after February 2, 2018, the total number of days each prisoner was so housed, separately identify the number of hours each class member was exposed to indoor heat indices above 88°F, and, most importantly, provide a detailed explanation – under penalty of perjury – of how the results were determined.

4.      *Show Cause Hearing*

Class Counsel, despite laboring substantially on this issue, cannot fully assess the extent of TDCJ's contempt as TDCJ still flatly refuses to produce the documents necessary to investigate. Despite multiple requests for simple documents like inmate grievances, work orders, maintenance logs, and temperature records, TDCJ flatly refuses to produce these basic documents. Likewise, during the August 9, 2019 emergency hearing, TDCJ's counsel was unable to answer several basic questions for the Court about the current state of affairs at the LeBlanc Unit.[99] Thus, the Court should conduct a show cause hearing where TDCJ (through its senior leadership) would be required to inform the Court of the number of class members who were not provided air-conditioned housing for any period exceeding 24 hours after February 2, 2018, the number of days each such class member was imprisoned in such housing, the factual basis and documents reviewed

---

will contain this information.) Should additional documents become relevant, TDCJ should also be required to produce these as well.

[99] *See* Ex. 56, Transcript of Aug. 9, 2019 hearing, 16:5-7 ("[I]s the air-conditioning still functioning in the Warden's office and the space that's occupied by prison staff?"), 17:6-7 ("Are air-conditioning repairmen and women on site as we speak? … That's really a pretty basic question, isn't it? I mean, is there even an attempt being made to fix the problem?").

to provide the answers to these questions, and most importantly, explain to the Court's satisfaction why this monumental failure occurred, so that it is unlikely to recur again.

Furthermore, Class Counsel should also be granted the right to take five depositions of TDCJ officials of Class Counsel's choosing, at Defendants' expense (and at Class Counsel's market-based rates), to assess the extent of the contempt and examine the basis of representations made to Class Counsel and the Court, before reporting back to the Court. A similar sanction was awarded against TDCJ in related litigation. *See McCollum v. Livingston*, No. 3:12-cv-2037-L-BK, Doc. 219 (N.D. Tex. Jan. 26, 2015) (sanctioning TDCJ for discovery abuse, and awarding six depositions of TDCJ and UTMB officials, at defendants' expense).

Finally, as a further sanction, the Court should order TDCJ to comply with document requests from Class Counsel in the future, and, when asked, require TDCJ senior leadership to verify representations concerning alleged violations under penalty of perjury. *See supra* at pp. 29–30.

## V.   CONCLUSION

Plaintiffs do not seek a contempt finding or these sanctions lightly. But TDCJ's failure to comply with the settlement agreement and the Court's order impedes the sanctity of the judiciary itself, and threatens the lives and safety of the subclass members. The requested sanctions are therefore appropriate and necessary.

Dated: September 5, 2019.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
      Tel.    (512) 623-7727
      Fax.   (512) 623-7729

By:  /s/ *Jeff Edwards*
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
Texas Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

/s/ *Jeff Edwards*
Jeff Edwards

**<u>CERTIFICATE OF CONFERENCE</u>**

As discussed throughout this motion, Plaintiffs attempted to confer repeatedly about the subjects raised herein. Class Counsel also offered to assist TDCJ by correspondence on August 12, 2018, to develop a plan for monitoring compliance going forward to ensure effective compliance in the future, but was ignored. Thus, the nature of the harm requires the Court's intervention.

/s/ *Jeff Edwards*
Jeff Edwards