UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM, RICHARD KING, MICHAEL DENTON, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated, | § § § § § | CIVIL ACTION NO. 4:14-cv-1698 |
| Plaintiffs, | § § | |
| v. | § § | |
| BRYAN COLLIER, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § § § § | |
| Defendants. | § | |

**PLAINTIFFS' MOTION FOR CONTEMPT, TO SHOW CAUSE & SANCTIONS**

# Exhibit 56

# Transcript of Telephone Conference (August 9, 2019)

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3

KEITH COLE, et al.,              )
4    Plaintiffs,                      )      NO. H-14-CV-1698
                                 )
5    v.                               )      August 9, 2019
                                 )
6    BRYAN COLLIER, et al.,           )
     Defendants.                      )
7

8
                         TELECONFERENCE
9              BEFORE THE HONORABLE KEITH P. ELLISON

10

11

12

13

     For the Plaintiffs:          Jeffrey S. Edwards
14                                David James
                                  Scott Medlock
15                                Mike Singley
                                  The Edwards Law Firm
16                                1101 East 11th Street
                                  Austin, TX 78702
17

18   For the Defendants:          Leah O'Leary
                                  Office of the Attorney General
19                                State of Texas
                                  P.O. Box 12548
20                                Austin, TX 78711

21
     Court Reporter:              Bruce Slavin, RPR, CMR
22

23

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.

1          THE COURT:  Okay.  Here we are on Cole v. Collier.

2     We'll take appearances of counsel beginning with Plaintiffs.

3          MR. EDWARDS:  Jeff Edwards for the Plaintiffs, Your

4     Honor.

14:34  5          THE COURT:  Anybody else?

6          MR. SINGLEY:  Michael Singley for the Plaintiffs,

7     Your Honor.

8          MR. MEDLOCK:  And Scott Medlock for the Plaintiffs,

9     Your Honor.

14:35 10          MR. JAMES:  And, finally, David James is also here

11     for the Plaintiffs, Your Honor.

12          THE COURT:  Thank you.

13              For Defendants.

14          MS. O'LEARY:  Leah O'Leary and ^  Jeanine Kavishaw

14:35 15     for the Defendants.

16          THE COURT:  Let me say at the outset that when I

17     was a young lawyer I got sent to court to argue some

18     absolutely impossible positions on behalf of clients.

19              So, Ms. O'Leary, I sympathize with the

14:35 20     position in which you find yourself, but I am concerned.

21     This looks like there's been a severe regression from what

22     was very clearly understood to be the law of the case.

23              Can you offer any explanation?

24          MS. O'LEARY:  Yes, Your Honor.

14:35 25              When Mr. Medlock, for the class, began

 1    communicating with me that he was receiving complaints from

 2    the inmates that live at the Leblanc Unit, I started trying

 3    to get information and so did officials from TDCJ.  I don't

 4    think, at this point, they have determined exactly what the

14:36    5    problem is with the air-conditioning systems at Leblanc, but

 6    they did figure out that there is, in fact, a problem with

 7    the air-conditioning system there.

 8            And I was providing information to Mr. Medlock

 9    over the last several weeks as I was receiving it and, in

14:36   10    reality, some of that information changed as TDCJ and I

11    continued to look into the matter.  So, it certainly was not

12    my or my client's intention to mislead or misrepresent

13    information.  I just wanted to continue to update him as we

14    continued to look at the situation and the situation

14:37   15    evolved.

16            THE COURT:  Well, what's the current state of play?

17            MS. O'LEARY:  Yes, Your Honor.

18            So, as of this morning, TDCJ planned to move

19    all of the class members.  There's 37 of them that were

14:37   20    living at the Leblanc Unit.  They plan to move them

21    throughout the next week.

22            Right before we got on this call I was told by

23    TDCJ that they believe that all of the class members can be

24    moved tonight and, specifically, 36 of the class members

14:37   25    will be moved to the Pack Unit tonight.  One of the class

1    members will be moved to the Stiles Unit because of some

2    type of conflict he had with the Pack Unit.  So, that will

3    remove all 37 class members from the Leblanc Unit.

4            THE COURT:  Mr. Edwards.  Mr. Edwards, anything you

14:37   5    want to say?

6            MR. EDWARDS:  Yes.  Unfortunately, there's quite a

7    bit I'd like to say.

8                 With regards to Ms. O'Leary speaking on behalf

9    of her clients that it was not the client's intent to

14:38  10    mislead, the facts suggest the exact opposite.  And while I

11    have some sympathy for Ms. O'Leary carrying water for people

12    who aren't, frankly, doing their job, I do not want it left

13    unsaid that, from Plaintiffs' position, its incontrovertible

14    that we were misled and, perhaps even worse than being

14:38  15    misled, there was a specific intent to try to cover this up

16    by delaying this until Monday on false pretenses.  That's

17    just kind of the lay of the land from a lawyering

18    standpoint.

19                 Secondly, the disconnect here on -- I have to

14:39  20    believe TDCJ's side but somewhat the Attorney General's

21    side -- is that there is not a problem until it is

22    specifically communicated to them by Scott Medlock in my

23    office or someone in my office.  That's not true.  TDCJ runs

24    the prison.  TDCJ knows what the temperatures are and TDCJ

14:39  25    is obligated to comply with the settlement agreement.  It's

1  difficult for me to imagine how they wouldn't be in contempt

2  of the settlement agreement, but that may be a subject for a

3  later motion.

4  I am glad that now, after we notified the

14:39  5  Court about an emergency and filed a motion highlighting the

6  emergency, that TDCJ is going to do what it should have done

7  three weeks ago.  But, you know, I think it's very important

8  that -- I think from the Plaintiffs' perspective I --

9  Obviously, I will defer to the Court, but the word of

14:40  10  lawyers doesn't appear to be good enough versus when you

11  balance against the safety of the men incarcerated at TDCJ.

12  So, some certification under penalty of perjury from the

13  head of TDCJ or some senior leader, I think, is a bare

14  minimum that has to happen with regards to this transfer.

14:40  15  And, again, as of this morning -- and, first,

16  we're hearing that there was a change of heart -- there was

17  not the concern that they needed to move people right away;

18  they would get to it when they got to it.  And that is just,

19  frankly, unacceptable.  I am a little, you know, more

14:40  20  passionate, perhaps, and I don't know if that's coming

21  through on the phone.

22  But, you know, when we have conversations with

23  TDCJ we say, 'You know, you guys ought to be taking

24  temperatures and providing us logs.'  When you say that the

14:41  25  problem is fixed and that 'We have provided information

1    establishing that the problem is fixed,' which is what

2    Ms. O'Leary communicated to the Court on Wednesday -- in

3    fact, when I said that the air-conditioning wasn't working I

4    believe the exact comment -- and we will be getting the

14:41  5    transcript -- is that what Mr. Edwards said was not true.

6    Well, of course, it was true.

7              And, so, I have a lot of respect for advocacy,

8    but this problem was brought to the attention of TDCJ in

9    early July or -- I'm sorry -- sometime in July and it

14:41  10   appears, based on what Mr. Medlock and Mr. James documented

11   yesterday, that these temperatures and these heat indexes

12   have been going on for quite some time.  The idea that, once

13   notified, TDCJ, you know, didn't try to fix it or pretended

14   that it was acceptable, it defies explanation.

14:42  15             In many ways we're right back to where we were

16   when you first began hearing this case, when over time me

17   having to say, you know, this is -- what they're saying is

18   not accurate and, unfortunately, that's proving time and

19   time again to be the case.

14:42  20             So, I am extremely surprised and, at the risk

21   of sounding paternalistic, extremely disappointed that this

22   is the way they're choosing to enforce, you know, what we

23   all came together and lauded as a landmark agreement where

24   everyone got together and kind of -- you know, the better

14:43  25   parts of everyone prevailed.

             1          It is our expectation that if air-conditioning

             2   breaks they need to know what the temperatures are, they

             3   need to know what the heat indexes are, and they can't leave

             4   people in for a month until Austin class counsel is able to

    14:43     5   have inspections and verify temperatures.

             6          I really do think some explanation is in order

             7   from TDCJ as to why they left these men in these dangerous

             8   conditions for so long and why they didn't bother to take

             9   heat index temperatures until yesterday.

    14:43    10          THE COURT:  Ms. O'Leary, has the air-conditioning

            11   been malfunctioning for a month now or when did the problems

            12   with the air-conditioning start?

            13          MS. O'LEARY:  Well, Your Honor, there was -- I have

            14   a log that was handed over that reflected some maintenance

    14:43    15   issues with the air-conditioning at the Leblanc Unit and the

            16   times that those issues were resolved.  However, there

            17   remains -- there continues to be some type of issue with the

            18   AC.  I don't know what that problem is.

            19          As I said before, as TDCJ has been looking

    14:44    20   into the problem, they discovered that there is something

            21   wrong, and I certainly did not -- I did not represent to the

            22   Court at our hearing on Wednesday that there was no AC

            23   problem or that Mr. Edwards was just wrong that there was an

            24   AC problem.  I was referring to whether we had produced any

    14:44    25   information or documents.  But that's neither here nor

1  there.

2          When TDCJ discovered that there was a serious

3  problem with the air-conditioning, which was Wednesday, they

4  moved the offenders to different housing areas.

14:44  5          THE COURT:  Well, that's the part I don't

6  understand.

7          When there is an asbestosis problem you may be

8  unaware of it for a long time to everyone's detriment.  When

9  there is an air-conditioning problem I would think everyone

14:45  10  would be aware of it instantly.  Why did it take so long to

11  discover a problem with the air-conditioning?

12          MS. O'LEARY:  As I said, I don't believe they know

13  the extent of the problem yet.  However, from my

14  understanding, the ACs were still running.  It wasn't as

14:45  15  easy to recognize as 'This machine is off.  Why is it off?'

16  It was just someone had to notice the feeling of the

17  temperature being higher in order to trigger the

18  understanding that there might be a problem, which is

19  exactly what happened.  The gentlemen that live in those

14:45  20  housing areas sent complaints to their class counsel because

21  they felt like it was hotter, and they were right.

22          I also want to speak to Mr. Edwards' request

23  that there be some, I guess, explanation about why the

24  offenders were left there or, more so, what we do going

14:46  25  forward.

1          On behalf of TDCJ and the AG's Office, we are

2     working to try to get ahead of these AC problems.  We

3     acknowledge that it did not go as we would have liked, as

4     far as the course of how it happened, learning there is a

14:46  5     problem, moving the offenders, talking to class counsel.

6     And we would really like to come up with a system where we

7     can get in front of the problem, because ACs are going to

8     have mechanical issues in the future.  There is no way for

9     us to guarantee against that, but we certainly want to get

14:46  10     in front of the problem.  It's not for class counsel to have

11     to discover the problem for us, and Mr. Edwards is right on

12     that point.  And, so, we are having some discussions with

13     TDCJ about how to get in front of these problems so that

14     this doesn't continue to occur.

14:47  15          THE COURT:  Well, what I don't understand,

16     though -- and I am willing to concede you're not the person

17     in charge -- but this air-conditioning problem was ongoing

18     for quite some time and it sounds like it might have kept on

19     being a problem for quite some time had it not been for the

14:47  20     intervention of Plaintiffs' counsel.

21          I mean, why is that necessary, for a third

22     party to cause TDCJ to live up to its obligations?

23          MS. O'LEARY:  Well, you're right, Your Honor.  It's

24     not the responsibility of class counsel to ensure that we

14:47  25     are complying with the settlement agreement.  That's on our

1    agency, to make sure that we're complying.

2              I can't answer why nobody at the unit noticed

3    that the temperature -- and I did not go to the unit, Your

4    Honor; so, I can't tell you whether it was that noticeable.

14:48    5    And, of course, I have no basis of comparison.  Maybe it

6    felt very cool before and -- I don't know why the officers

7    or people on the unit did not recognize a difference in

8    temperature.  Maybe it was --

9              MR. EDWARDS:  Your Honor --

14:48    10             MS. O'LEARY:  -- subtle.  I don't know.

11             THE COURT:  Mr. Edwards.

12             MR. EDWARDS:  The last statement that Ms. O'Leary

13    made -- 'I don't know why the officers didn't notice that

14    this was hot' or 'I didn't know why they didn't recognize

14:48    15    it' -- it's not credible on its face.  They did notice it.

16    They did recognize it.  The inmates noticed it.  The inmates

17    recognized it.  The problem is not that it was not

18    discoverable.  The problem is that it was consciously

19    hidden.

14:48    20             I would like to ask counsel for TDCJ:  When

21    does TDCJ admit to knowing there was a problem?

22             THE COURT:  Well, I'd like to know that, too.  I

23    don't know that Ms. O'Leary is in a position to provide the

24    answer.

14:49    25             Can you help us, Ms. O'Leary?

1           MS. O'LEARY:  My understanding is that on

2     Wednesday, before our hearing, the deputy director and maybe

3     also the director of maintenance for TDCJ visited the unit

4     and they discovered for the first time that there was a

14:49  5     problem with the air-conditioning at the Leblanc Unit that

6     had not been resolved.

7           THE COURT:  How can that be when we're in the midst

8     of a record hot summer, that people don't know the

9     air-conditioning is not functioning?  That just makes no

14:49 10     sense at all.

11           MS. O'LEARY:  Well, Your Honor --

12           MR. EDWARDS:  And, Your Honor --

13           MS. O'LEARY:  -- I'm not trying to minimize the

14     length of time, but it has not been all summer.  It's a

14:49 15     matter of about two weeks, which --

16           MR. EDWARDS:  First of all, we don't know that to

17     be true and I am highly sceptical of that.

18                The only reason the people went out to the

19     prison to even look at the air-conditioning is because we

14:50 20     had an inspection regarding complaints that were beginning

21     several weeks ago.  Why the director or the maintenance

22     people chose not to go and check it for several weeks is

23     just yet another problem.

24                But my concern here, Your Honor, is -- And we

14:50 25     had several phone calls like this.  And while I am

1    sympathetic to Ms. O'Leary, at some point it's not okay that

2    she didn't go out to the prison.  It's not okay that she

3    didn't get temperature readings or had someone out there to

4    take the temperatures.  It's not okay she acted like people

14:50    5    were taking temperature readings when point of fact they

6    couldn't be done until panels were taken off the actual AC

7    units.  That's not okay.

8         Now, I'm not here to relitigate the Cole case

9    and I'm a little out of practice from having to depose

14:51   10    everyone who begins with something and two hours later

11    admits to things that are absolutely contrary.  I agree with

12    Ms. O'Leary that going forward there needs to be a system in

13    place, but here is the big difference and what I hope

14    Ms. O'Leary will concede.

14:51   15         We're past the point that TDCJ alone can be

16    relied on to implement that system.  They need to provide

17    that information -- The information needs to be provided to

18    an outside source, be it the Court, be it class counsel.

19    This is not the first time TDCJ has been made aware of

14:51   20    problems relating to the air-conditioning.

21         Up until this hearing the position of TDCJ has

22    been, 'We're not obligated to tell you anything, class

23    counsel.  We're not obligated to take temperature readings.

24    That's not in the settlement agreement.  We're not obligated

14:51   25    to do heat index readings or tell them to you, even when

1    complaints are made.'  And, so, there's just a disconnect.

2              Obviously, we have monitoring

3    responsibilities, but, really, it's not class counsel that

4    has brought this to the attention of TDCJ.  It's, really,

14:52    5    the inmates themselves, and they shouldn't be in a position

6    where they're completely dependent on TDCJ for their safety,

7    their well-being, of being the ones to continually raise the

8    outcry.  We're not talking about, you know, whistleblowing

9    here.  We're talking about heat in the summer.  Record heat

14:52    10   waves all in the media.  The idea that nobody from TDCJ went

11   and checked on these things is very disturbing.

12             And I will just end with this.  I will say

13   that while class counsel is very proud of the work they've

14   done and proud of the result that they achieved -- and that

14:53    15   wouldn't have been achieved if Ms. O'Leary and some of the

16   other people in her office hadn't really put their heads

17   together and tried to achieve it -- there is something

18   rotten here and it really, really needs to be fixed.  And

19   TDCJ needs to acknowledge that it can't do it on its own.

14:53    20             And, unfortunately, you know, I'm afraid that

21   the Court is going to need to issue an order that is crystal

22   clear how they follow going forward, because, you know, it's

23   still August and we're going to have yet another summer next

24   year and it is just a matter of time until, you know, this

14:53    25   inaction until getting caught with their hand in the cookie

1    jar leads to something really dire and that's -- You know, I

2    don't mean to be overly dramatic, but that is the absolute

3    fact.

4              Thank you, Your Honor.

14:53   5         THE COURT:  I had understood -- and it may have

6    been my misapprehension -- I had understood that the Leblanc

7    Unit was an air-conditioned unit.

8              Is that right, Ms. O'Leary?

9         MS. O'LEARY:  Yes, Your Honor.  It's an air-

14:54   10   concerned unit.  It's just that the air-conditioning is not

11   working properly.

12        THE COURT:  No.  I understand that part.

13             So, you're proposing to move out the 37 class

14   members but leave everybody else in there?

14:54   15        MS. O'LEARY:  Yes, Your Honor.  And they're

16   working to -- continuing to work to fixing and resolving the

17   AC issue, whatever that might be.  It's certainly being

18   treated as an emergency.

19        THE COURT:  And how many other inmates are there?

14:54   20        MS. O'LEARY:  The population of the Leblanc Unit is

21   approximately 1,200.

22        THE COURT:  So, these other --

23        MR. EDWARDS:  And, Ms. O'Leary, how many of the

24   inmates in there are heat-sensitive and have gotten, you

14:54   25   know, heat scores that this new process that you've put in?

 1          MS. O'LEARY:  I don't have that information at this

 2   time.

 3          THE COURT:  Well, my concern is -- I understand

 4   that the balance of the population is not within our class,

14:55  5   but, still, I would think that every officer of the court

 6   would be concerned, given the proof that was adduced in this

 7   case, about that large a population facing a record heat

 8   wave with no air-conditioning.  I mean, I --

 9          MS. O'LEARY:  Well, Your Honor, I do want to point

14:55  10  out -- I'm sorry.

 11          THE COURT:  No.  Go ahead.

 12          MS. O'LEARY:  At the Leblanc Unit there is a

 13  respite area in every building, including the G&H dorms

 14  where the class members were.  They're multipurpose rooms

14:55  15  and there is two of them.  They share the same

 16  air-conditioning unit as the picket areas and those rooms

 17  are available for respite.  The ice water is being

 18  diligently refilled and the showers at the Leblanc Unit are

 19  all cool-down showers.  Every single one of them has had the

14:56  20  hot water turned off for the summer.

 21              So, the mitigation measures are available at

 22  the Leblanc Unit and TDCJ is treating the malfunctioning

 23  air-conditioning as an urgent matter because, as you

 24  recognize, there are other offenders that still live there.

14:56  25          THE COURT:  A couple points on that.

1            One, TDCJ really lost its credibility in

2     respite areas in our case in chief.  I mean, the "respite

3     areas" were things like a few extra seats in the barber shop

4     and it was really minimal.

14:56    5            Secondly, is the air-conditioning still

6     functioning in the Warden's office and the space that's

7     occupied by prison staff?

8         MS. O'LEARY:  I can't say, Your Honor.  I believe

9     that they took some measurements of some of those areas

14:57   10     yesterday.

11            The whole unit is air-conditioned and none of

12     the air-conditioning systems are just off.  They're not so

13     broken that the system is turned off.  So, I can't say what

14     the extent of the malfunction is.

14:57   15         THE COURT:  But I would strongly suspect that, if

16     the Warden's office and the offices of the staff were

17     suffering the same malfunction as the air-conditioning units

18     relevant to the general population, there would be a quicker

19     fix than we have seen thus far.  That, in itself, is

14:57   20     disturbing, too.  I mean, I need to figure that out, whether

21     the Warden's office still has functioning air-conditioning

22     while the rest of the unit does not.

23            Okay.  I --

24         MS. O'LEARY:  Well, Your Honor, the --

14:57   25         THE COURT:  Go ahead.

1          MS. O'LEARY:  -- there are multiple

2     air-conditioning systems that cover different areas of the

3     prison.  So, it's possible that some of the AC systems and

4     the chillers and the compressors are not functioning

14:58   5     properly while others are.

6          THE COURT:  Are air-conditioning repairmen and

7     women on site as we speak?

8          MS. O'LEARY:  I can't -- I can't say, Your Honor,

9     as we speak.  I don't know.

14:58  10          THE COURT:  That's really a pretty basic question,

11     isn't it?  I mean, is there even an attempt being made to

12     fix the problem?

13          MS. O'LEARY:  Yes, Your Honor, but I don't want to

14     make any statements that I don't know to be true or that my

14:58  15     client, at least, hasn't told me.  So, I would just be

16     guessing if I told you that maintenance crews were on the

17     unit at this moment.

18          THE COURT:  Okay.  Well, I am going to issue an

19     order before close of business today.

14:58  20               Is there anything else anybody wants to say?

21          MR. EDWARDS:  Yes, Your Honor.

22          MS. O'LEARY:  Yes, Your Honor.  I'm sorry.

23          MR. EDWARDS:  Well, a couple of things from the

24     Plaintiffs.

14:59  25               First, you know, when you start saying that

1    it's being treated like an emergency, it needs to actually

2    be treated like an emergency.  And from Plaintiffs' position

3    somebody from TDCJ under penalty of perjury needs to explain

4    what "treated like an emergency" really means.  Because if,

14:59   5    you know, the Dell building in Austin went out and there was

6    AC and it was 100 degrees, as the chart documents, there

7    would be maintenance crews out there or Carrier would be out

8    there solving the problem.  We're not, you know, splitting

9    atoms here.  We're just fixing an air-conditioner in the

14:59   10   state of Texas.

11               Secondly, in the -- You know, obviously, I do

12   not represent the men in the unit.  One issue that the Court

13   should consider is the fact that it is an air-conditioned

14   environment and if the air-conditioning goes out -- you

15:00   15   know, it's hard for me to get back into the expert part of

16   the case -- it's actually even more dangerous, potentially,

17   for the men that are there.

18               Third -- and this is my final point -- one of

19   the very important issues here with why these men were at

15:00   20   the Leblanc Unit to begin with had to do with parole and

21   programming.  And, you know, we would like a certification,

22   I mean, under penalty of perjury from TDCJ that they will

23   receive that programming and that it will not delay their

24   future parole.  Because one of the issues that comes up is,

15:00   25   well, now they're not at the Leblanc Unit, they don't have

1  the same programming and education classes -- and

2  Mr. Medlock can speak more to this -- than they do at the

3  Leblanc Unit.  So, that could delay their future release,

4  which isn't fair to the class members.

15:00  5          Thank you, Your Honor.

6          THE COURT:  Ms. O'Leary, you were trying to say

7  something.

8          MS. O'LEARY:  Yes, Your Honor.

9              Regarding the parole programs, we understand

15:01  10  and acknowledge that we have to provide the pre-release

11  program to the class members regardless of what unit they

12  are housed in; and, so, TDCJ is working out the logistics of

13  how to provide that program for these particular class

14  members from the Leblanc Unit.  So, that's definitely on our

15:01  15  radar.  It's a requirement under the settlement.  We're on

16  it.

17              My only second point is by tomorrow morning

18  there will be no class members at the Leblanc Unit.  And,

19  so, I certainly understand the Court's and all of our

15:01  20  concern regarding an AC that's not working at the Leblanc

21  Unit; however, an order in this case could not extend to a

22  unit where there is no class members.

23          THE COURT:  Anything else from anybody?

24              Okay.  Thank you.  You're excused.  Thank you

15:02  25  very much.

1          MS. O'LEARY:  Thank you.

2

3

4                    COURT REPORTER'S CERTIFICATE

5          I, BRUCE SLAVIN, certify that pursuant to
28 USC § 753 the foregoing is a correct transcript from the
6   record of proceedings in the above entitled matter, to the
best of my ability.
7                              _____
                                s/Bruce Slavin
8                               BRUCE SLAVIN, RPR, CMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25