UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM, RICHARD ELVIN KING, LAVAR SANTEE, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated,<br>  Plaintiffs,<br><br>v.<br><br>BRYAN COLLIER, in his official capacity, ROBERT HERRERA, in his official capacity and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,<br>  Defendants. | § § § § § § § § § § § § § § § | No. 4:14-cv-1698 |

**RESPONSE TO ECF NO. 1459 BY BRYAN COLLIER,**
**IN HIS OFFICIAL CAPACITY AS THE EXECUTIVE DIRECTOR OF TDCJ**

Defendants Texas Department of Criminal Justice and Bryan Collier (collectively, TDCJ) submit this response to Plaintiffs' motion for contempt, to show cause and for sanctions. ECF No. 1459.

As stated to the Court at the September 10th hearing, the Court has TDCJ's attention and TDCJ hears the message. TDCJ is working to live up to its agreement with class members to ensure their continued safety and well-being. In light of Plaintiffs' motion for sanctions and motion for an order of contempt, the Court asked undersigned counsel what should be the response from the Court. The answer is not to levy backward-looking fines or create additional burdens that serve no remedial purpose. Responding to this problem requires a forward-looking approach. TDCJ is taking such an approach, as explained below, by both accounting for its mistakes and by taking steps to reassure this Court that TDCJ shares the same goal as class counsel and the Court: compliance with the terms of the settlement agreement and orders currently in place.

1

As this Court has recognized during previous hearings, the goal is compliance, not engaging in endless litigation. In line with that approach, TDCJ has identified and admitted errors, acted to correct the errors, and detailed the issues and TDCJ's responses at both a live hearing and again below. Should this Court deem any sanction appropriate, formally adopting TDCJ's changes in practice concerning class members, along with a reasonable award of attorney's fees, is enough to ensure future compliance from TDCJ.

## I. CLARIFICATION OF REPRESENTATIONS TO THE COURT AND PLAINTIFFS' COUNSEL

Ongoing efforts to investigate and respond to the outstanding motion revealed several inaccuracies in earlier representations made to Plaintiffs' counsel and to the Court. Undersigned counsel and TDCJ provide the following corrections:

- The LeBlanc Unit air conditioning system malfunctioned at least as early as August of 2019. It is unknown whether the air conditioning system stopped cooling the housing areas to below 88 degrees in July. A rolling schedule of preventative and corrective maintenance was conducted throughout August. Exh. X. That information was not reported to Plaintiffs' counsel prior to the pending motion for sanctions. As Mr. Collier testified at the September 10, 2019 hearing, the LeBlanc Unit housing temperatures exceeded the settlement agreement's 88 degree heat index threshold in early August. The air-conditioning malfunction and resulting heat indices were not timely discovered or reported in accordance with the terms of the settlement. Exh. H at 42:15–22.

- It was reported to Plaintiffs' counsel that as a general matter, no temperature logs were created for the LeBlanc Unit. Though routine temperatures were not measured or recorded at the LeBlanc Unit, undersigned counsel learned of four recorded temperature readings after the September 10th hearing while preparing TDCJ's response to the motion for sanctions. The temperature readings have now been provided to Plaintiffs' counsel. Exh. J, K, L, M.

- It was reported to Plaintiffs' counsel that LeBlanc Unit staff were monitoring the temperatures and that temperatures were being maintained below 85 degrees. Later, undersigned counsel discovered that the only thermostats mounted at the LeBlanc Unit were mounted inside the air conditioning components, and only maintenance staff performing maintenance work were likely to access them.

- On August 7, 2019, undersigned counsel conveyed that the LeBlanc Unit senior warden was not available for the planned August 8, 2019 inspection, and the inspection needed to be moved to a later date. In preparing this response, undersigned counsel determined that neither representation was accurate. Exh. H at 86:2–4.

Undersigned counsel believed each of the representations to be true and accurate at the time the representations were made.

## II. Current Information Regarding Class Member Status

As of September 25, 2019, there are 818 class members. Exh. U. Since the settlement was reached, several class members have opted out of the class, been released from prison, or passed away from natural causes unrelated to heat. The remaining class members live in air-conditioned housing areas at the following units:

- Pack Unit              733
- Estelle Unit           37
- Stiles Unit            17
- Jester III             9
- Hospital Galveston     9
- Jester IV              2
- Carole Young           2
- Michael                1

Nine (9) class members are not currently in TDCJ custody because they are out on a bench warrant or some other reason, but are expected to return to TDCJ custody. Exh U.

## III. Information Regarding Violations of the Settlement

**A.      Complaints Regarding the 2017 Preliminary Injunction. ECF No. 1459 at 7.**

The preliminary injunction is no longer in place, and the terms of the settlement agreement now govern the class. The preliminary injunction required TDCJ to house the sub-class of heat-sensitive inmates in housing areas that maintained heat indices of 88 degrees or lower. ECF No. 737 at 96–97. TDCJ moved inmates identified as heat sensitive off the Pack Unit and into units that had air-conditioned housing. ECF No. 769. The injunction required TDCJ to transfer all of the sub-class members to air-conditioned housing by August 29, 2017. ECF No. 771 at 1. On August 25, 2017, Hurricane Harvey struck the Houston area, requiring evacuations of some area such as the Stringfellow Unit. The condition of the roads and region wide evacuations caused delays in inmate movement. ECF No. 789. Plaintiffs filed a roster of the Pack Unit from September 7, 2017, which

3

was days after Hurricane Harvey necessitated the evacuation of inmates from the Stringfellow Unit temporarily to the Pack Unit. ECF No. 796 (explaining that approximately 7,000 were evacuated from nine prison facilities due to the hurricane); ECF No. 1459-12 at 2–12 (listing the residents of the Pack Unit as of September 7, 2017, and delineating which inmates were temporary evacuees from the Stringfellow Unit). The Stringfellow Unit suffered flooding during Hurricane Harvey, and TDCJ temporarily housed Stringfellow evacuees at the Pack Unit for several weeks. ECF No. 796; ECF No. 1188 at 14–15. Naturally, the hurricane caused logistical challenges both at the Pack Unit and elsewhere. ECF No. 796. The remaining men older than 65 at the Pack Unit were transferred to air-conditioned housing at some time before November 1, 2017. ECF 1459-13.

Despite the emergency conditions, TDCJ undertook reasonable measures given the circumstances to comply with this Court's injunction and to protect the safety of inmates in TDCJ's custody. Plaintiffs' claim focuses *backward*, not *forward*, as this Court has suggested is appropriate here. Any outstanding claim Plaintiffs may have had relating to the preliminary injunction was superseded and waived by the settlement agreement. Accordingly, this Court should not impose sanctions based on this allegation.

**B.     Initial Challenges with the Temporary Air-Conditioning at the Pack Unit in 2018. ECF No. 1459 at 8.**

On one occasion in May 2018, TDCJ failed to provide timely notice to Plaintiff's counsel as required by the settlement agreement. TDCJ denies any other alleged violations during the summer of 2018, because TDCJ promptly provided notice and continuously updated information in compliance with the settlement.

On May 31, 2018, undersigned counsel emailed Plaintiffs' counsel to notify them of a malfunction with the air-conditioning in a dorm at the Pack Unit, and the air conditioning had already been repaired and restored. Ex. A. Undersigned counsel mailed a detailed update on the situation the next day. Ex. B. The correspondence detailed the equipment malfunction, the repair timeline, and

4

explained that during the brief periods when the heat index rose above 88 degrees, the inmates were provided the requisite mitigation measures. *Id.* Under the terms of the settlement agreement, Plaintiffs' counsel should have been notified of this equipment malfunction that caused to the heat index to rise above 88 degrees Fahrenheit on May 29, 2018. Notice was not given until May 31, 2018.

The next business day, June 4, 2018, undersigned counsel provided an update on the repairs, notified Plaintiffs' counsel of additional repairs performed on June 1, 2018, and included temperature logs for Plaintiffs' counsel's review. Ex. C.

On June 6, 2018, undersigned counsel sent Plaintiffs' counsel a letter, informing them that one of the 50-ton air conditioning units for Dorm 19 stopped working due to a bad motor, but it was repaired the same day. Ex. D. The letter also informed Plaintiffs' counsel that inmates housed in Dorm 19 were relocated during the repairs, and only after the air-conditioning was fully functioning and sufficiently cooled were inmates relocated back to Dorm 19. Ex. D.

The notifications of equipment malfunctions on June 4, 2018 and June 6, 2018 were in compliance with the notice provisions of the settlement agreement.

In response to a request from Plaintiffs' counsel, TDCJ provided copies of the temperature logs at the Pack Unit for the summer of 2018. Ex. E; Ex. F. Shortly after temperature logs were provided, Plaintiffs' counsel sent a letter accusing TDCJ of violating the settlement agreement on five occasions. ECF No. 1459-31. Two of these alleged violations involved instances where Plaintiffs' counsel received notice of equipment malfunctions and proper mitigation measures were in place as required by the settlement agreement. Ex. C; Ex. D.

The other instances cited by Plaintiffs' counsel involved minor disruptions that were addressed and remedied quickly. These instances did not last longer than twenty-four hours, and there is no obligation under the terms of the settlement to notify Plaintiffs' counsel of brief equipment disruptions that are quickly corrected. ECF No. 989-4 at 9. The notice provision of the settlement

agreement is triggered when there is an equipment malfunction that lasts longer than twenty-four hours which results in the indoor heat index rising above 88 degrees Fahrenheit. *Id.*

Undersigned counsel responded to Plaintiffs' counsel's concerns regarding the equipment malfunctions and explained TDCJ's position in an effort to remedy any misunderstandings. Ex. G. After this correspondence, Plaintiffs' counsel made no further inquiries into this matter.

**C.    Issues Relating to the Terrell Unit in March and April 2019. ECF. No. 1459 at 9.**

Plaintiffs complain that TDCJ asserted the litigation exception to their Public Information Request related to the Terrell Unit. Undersigned counsel is not involved in public information requests to TDCJ or the responses sent by Assistant Attorneys General responsible for handling such requests.

TDCJ officials received a single grievance relating to air-conditioning at the Terrell Unit during the time period referenced in Plaintiffs' motion. Mr. Gregory Allen, the sole class member who lived at the Terrell Unit at that time, submitted a grievance on February 27, 2019, complaining that the air conditioning was not working in his housing area. Exh. R. The settlement agreement requires air-conditioned housing from April 15 through October 15 of each year. *See* Settlement at 9.  The Terrell Unit is located in Rosharon, Texas, which is near Houston. The Terrell Unit would not have been running its air-conditioning systems in February. The outdoor temperature in Houston on February 27, 2019, was 62 to 71 degrees.  Exh. P at 3–4. When it was 71 degrees that day, the humidity was 90%, which equates to 72 degree heat index. There was no violation of the settlement agreement at the Terrell Unit, because air-conditioning with a heat index of 88 degrees was not required under the settlement in February when Mr. Allen complained, and because the temperatures were in the 60's and 70's during that time.

**D.    Air Conditioning Issues at the Stiles Unit. ECF. No. 1459 at 6.**

In June of 2019, the Stiles Unit began having mechanical issues with the chillers that serve the 12-building where Pack class members are housed. Exh. Z at 2. A temporary rental chiller was installed

on July 24, 2019, to serve the 12 building at the Stiles Unit while repairs continued on Chiller # 2. Exh. Z at 2–7.

Beginning on August 15, 2019, weekly temperatures were recorded at the Stiles Unit. Exh. H at 17:7–14; Exh. I at 1–7. The heat indices measured during the weekly readings remained below 88 degrees. Exh. I at 4–7. The temporary chiller remains operational in 12 building where class members reside. CITE. Unit staff have measured heat indices in the housing area five times per day since September 6, 2019, and they will continue to do so until October 15, 2019. Exh. CC at 2–3.

The one operational chiller and the temporary second chiller have maintained the heat indices below 88 degrees heat in the affected housing areas since at least August 15, 2019. Exh. I at 4–7; Exh. W at 52–63; Exh. H at 27:9–25; Exh. AA. TDCJ will continue to monitor the heat index in the affected housing areas and will keep the temporary chiller in place through the end of October 2019 or until the broken permanent chiller is replaced. Exh. H at 28:1–11.

**E.  Air-Conditioning Issues at the LeBlanc Unit. ECF. No. 1459 at 11.**

The LeBlanc Unit has been an air-conditioned facility since its construction. It did not need to be retrofitted for air conditioning. Because it is a permanently air-conditioned facility, TDCJ officials presumed the system would continue to maintain acceptable temperatures. Exh. H at 15:17–18, 26:4–16, 32:6–18. That presumption was proven incorrect when Plaintiffs' counsel raised concerns about the functionality of the air conditioning at the LeBlanc Unit. Exh. H at 26:17–24. Although the concerns were immediately conveyed to various TDCJ officials, a unit-level maintenance employee stated that he had checked the system and that it was working properly. Exh. H at 44:20–25, 45:1–10.

On August 2, 2019, the Region III HVAC Technician took temperatures in the LeBlanc Unit offender housing areas after he completed work in an administration building. Exh. M at 2. He used a volt meter and temperature probe to measure the ambient air temperatures at the vents and in the

7

respective housing areas away from the vents. Exh. M at 2.[1] The technician's measurements on August 2, 2019 show temperate ambient air temperatures. Exh. M at 3. On August 6, 2019, however, temperatures were measured and yielded much higher temperatures. Exh. L. TDCJ staff failed to recognize their duty to report the problem under the terms of the settlement and failed to notify counsel of the elevated temperatures. On August 9th, when the housing area heat indices measured above 88 degrees, TDCJ moved the class members off the LeBlanc Unit. ECF Nos. 1449–1450. TDCJ is working to replace old components of the air conditioning system at the LeBlanc Unit. No class members currently reside at the LeBlanc Unit, and TDCJ does not intend to move class members to the LeBlanc Unit in the future. Exh. H at 26:25, 27:1–2.

On August 6, 2019, when the temperatures at the LeBlanc Unit measured higher than expected, TDCJ ordered hand-held thermometers to monitor the temperatures at air-conditioned units where class members resided. Exh. H at 15:8–10, 17–25; 16:2–5; 17:10–25; 18:1–2; 19:9–25. The instruments were disseminated, and heat indices began being recorded on August 15, 2019. Exh. I. All temperature and humidity readings from August 15, 2019, to present date at units that house class members have yielded heat indices that are below 88 degrees. Exh. I; Exh. W.

**F.      Issues Relating to Bus Transports. ECF. No. 1459 at 13.**

TDCJ officials investigated a bus transport that occurred on June 27, 2019. The investigation revealed that two TDCJ transport officers mistakenly picked up an un-air-conditioned bus to transport inmates from the Pack Unit to the Estelle Unit for medical appointments instead of the air-conditioned bus that should have been used. Exh. Q at 1–3. Prior to departing the lot, the officers filled the bus coolers with ice and water. Fans were also available and functioning during the hour and

---

[1] Mr. Dike only measured ambient air temperature and not humidity. However, even if it were 100% humidity in those areas, the heat index would still be below 88 degrees based on the ambient temperature readings. Available at https://www.weather.gov/safety/heat-index (demonstrating that at 80 degrees Fahrenheit and 100% humidity, the heat index is 87 degrees).

forty-five minute transport. Exh. Q at 2. The officers' mistake was discovered while the bus was in route to the Estelle Unit. Exh. Q at 3. When the mistake was discovered, the inmates were dropped off at the Estelle Unit and the officers returned to the lot to pick up an air-conditioned bus. The officers then returned to the Estelle Unit in the air-conditioned bus to transport the inmates back to the Pack Unit. Exh. Q at 3–4.

Each summer, transportation officers and wardens are notified in writing of the settlement requirements regarding transporting class members. Exh. Q at 24–33; Exh. S at 3–6. The two officers responsible for the error on June 27, 2019 were disciplined. Exh. Q 8–23. Staff have been reminded that Pack class members must be transported in air-conditioned vehicles. Exh. S at 6. Transportation officers receive a roster of inmates being transported, which includes a notation of any Pack class member. The officer at the unit from which the inmates are departing also receives a roster that includes a notation of any Pack class members. Exh. S at 1. A flyer is posted at all transportation HUBs reminding staff that any inmate with the "ACPAC" designation must be transported in an air-conditioned vehicle. Exh. S at 8. TDCJ has a sufficient number of transport vehicles that are air-conditioned; so there is no impediment to transporting class members in air-conditioned vehicles. Exh. H at 34:8–16.

Plaintiffs allege that the bus used to transport class members from the LeBlanc Unit to the Pack Unit on August 9, 2019 was not air conditioned and that a class member suffered a heat-related injury during the transport. An investigation was conducted into the medical incident and circumstances of the transport, which confirmed that the bus's air conditioning system was fully functional during the transport. Exh. Y at 1–2. The investigation revealed that during the transport, several inmates aboard the bus opened the windows and refused to close them. The open windows hampered the air conditioner's ability to fully cool the bus. Exh. Y at 2. An inmate had a medical incident that required the bus to stop at the Plane Unit so that he could be evaluated and treated.

During that stop, the bus and its air-conditioner remained running. Warden Jackson boarded the bus and confirmed that the bus's air conditioner was working. Exh. Y at 2. The bus also stopped at the Byrd Unit, where Warden Pinney again checked the air conditioning system and ensured the ice-water coolers were full. Exh. Y at 2.

**G.     Pre-Parole Programs for Class Members. ECF No 1459 at 18.**

Plaintiffs complain that class members at the LeBlanc Unit were not provided parole-voted programs at the LeBlanc Unit in early 2019. ECF No 1459 at 18. Undersigned counsel explained to Plaintiffs' counsel in April of 2019, the three class members that complained about being denied pre-parole programming were, in fact, properly enrolled in the programs at the LeBlanc Unit. Exh. K. But the therapist who instructed the sex-offender treatment program at the LeBlanc Unit resigned, and there was a brief break in classes until an alternative therapist could begin. Exh. L at 1. The delay in programming was unrelated to the inmates' status as class members, and the break was experienced by all inmates in the program, whether class members or not. The break in programming did not affect any class members' parole eligibility. Exh. L. at 1–2.

**IV.     TDCJ HAS ESTABLISHED PROTOCOLS TO ENSURE COMPLIANCE GOING FORWARD.**

TDCJ has taken steps to (1) automate temperature readings at units where class members currently reside or where they may be transferred in the future; and (2) establish backup protocols to ensure the necessary personnel are notified of air-conditioning malfunctions if they should occur in the future.

1.     Every class member that can live at the Pack Unit has been moved back to the Pack Unit. Pre-parole programs, including sex offender treatment, are now provided at the Pack Unit. Exh. H at 13:9–12; Exh. U. There are some class members, however, that cannot be housed at the Pack Unit for medical or security reasons, but class members have been consolidated to as few units as possible. Exh. H at 13:1–12, 36:21–25, 37:1–3. This consolidation will help TDCJ officials ensure unit-level

staff members know and understand the requirements of the settlement and closely monitor and control the heat protocols. Exh. H at 37:1–3.

2. TDCJ has installed Kestrel Wireless Temperature and Humidity Date Loggers that measure temperature and heat index in every housing area where class members reside and in other air-conditioned areas. Exh. H at 23:1–9; Exh. V. The thermometers download data onto smart phone using an Application when the phone is held in close proximity to the thermometer. Exh. H at 21:3–15. The data can then be downloaded to a spreadsheet. Staff have been instructed to continue to record heat indexes five times per day through October 15, 2019. Exh. V at 3; Exh. CC at 2–3. The thermometers are permanently installed and will be utilized every summer to monitor temperatures. These automated thermometers are permanent devices[2] that will remove a potential level of human error and will assist TDCJ to ensure compliance with the settlement. Exh. H at 21:24–25, 22:1–7.

The thermometers have been installed in the following facilities: Pack Unit, Estelle Unit, Stiles Unit, Jester III Unit, Jester IV Unit, Carole Young Unit, and Michael Unit. Exh. V at 2–3. The thermometers cannot be installed at Hospital Galveston because TDCJ does not own that facility. But temperature and heat index readings are being taken using a handheld "General Digital Pocket Heat Index Monitor. Exh. V at 1.

3. Pack class members will be closely tracked and housing reassignments must be pre-approved by several levels of TDCJ officials. All Pack class members are identified as class members on any housing screen from the computer database, including classification screens, housing rosters, and transportation rosters. Exh. H at 30:8–15. TDCJ implemented a decision tree that must be followed if a Pack class member is going to be reassigned to a different housing area on units other than the Pack Unit. Class members may be assigned only to housing that is maintained below 88 degree heat

---

[2] The Kestrel devices will not be programmed to measure heat indices in the winter months.

index and is being monitored by staff using a hand-held thermometer that measures temperature and humidity or by one of the mounted Kestrel devices. Exh. H at 24:12–22; Exh. BB at 3.

4. Grievances submitted by Pack class members related to unit temperatures will be escalated to the unit warden who will send notifications up the chain of command to the division director and directly to Deputy Director Mendoza. This will enable high-level TDCJ officials to investigate and address potential issues with the affected air-conditioned housing areas. Exh. H at 28:18–25, 29:1–25, 30:1–19.

5. Director Bryan Collier has implemented notification protocols to ensure proper notice is provided in the event of future air conditioning malfunctions. He has directed staff that if a housing area where class members live reaches a heat index of 83 degrees, they must report it to Deputy Director Oscar Mendoza, who Director Collier has designated as the compliance monitor for heat settlement issues. Exh. H at 22:8–13. This will enable high-level TDCJ officials to address the issue before it potentially escalates into a larger issue. Exh. H at 22:14–17.

6. TDCJ will provide Plaintiffs' counsel with heat index readings from every housing area in which a class member lives on a weekly basis through October 15, 2019.[3] Although the Settlement does not impose ongoing production requirements, TDCJ desires to instill confidence in the Court and Plaintiffs' counsel that the class members are being housed safely and in conditions that strictly comply with the terms of the settlement.

7. Should Plaintiffs' counsel wish to visit a unit where class members live in order to assess settlement compliance, TDCJ will facilitate that visit. The necessary TDCJ employees know and understand that these unit visits will be facilitated as quickly as possible, whether or not a warden is

---

[3] This weekly production is intended to supplement, not replace, the notice requirement in the settlement that is triggered in the event of a malfunction lasting longer than 24 hours that causes the heat index to rise above 88 degrees.

available for the visit. A CID official will be present and ensure the visit occurs no later than 48 hours after the request.

## V. SANCTIONS ARE UNNECESSARY TO REMEDY VIOLATIONS.

Because there is no dispute here about whether mistakes were made, and TDCJ is ready and willing to work with the Court and Plaintiffs' counsel to demonstrate that it has remedied the problems, monetary sanctions are not necessary. A court may assess a remedial or coercive fine, but not punitive. "[T]he proper aim of judicial sanctions for civil contempt is 'full remedial relief.' " *Fla. Steel Corp. v. N.L.R.B.*, 648 F.2d 233, 239 (5th Cir. 1981) (citing *McComb*, 336 U.S. at 193). Sanctions may not be punitive. *Florida Steel Corp.*, 648 F.2d at 239–40. A court should assess what is necessary to ensure compliance going forward. *Id.*

The cases cited by Plaintiffs involve the implementation of a coercive fine structure for future violations, not retrospective fines. *See Morales-Feliciano v. Parole Bd. of Com. of Puerto Rico*, 887 F.2d 1, 6 (1st Cir. 1989) (Breyer, J.) (affirming per-prisoner-per-day fines to compel future compliance); *Benjamin v. Sielaff*, 752 F. Supp. 140, 148-49 (S.D. N.Y. 1990) (finding that the appropriate sanction is to impose compensatory damages to be paid to class members who in the future are housed in violation of the court's order); *Tate v. Frey*, 673 F. Supp. 880, 883 (W.D. Ky. 1987) (ordering daily fines payable to inmates if violations continue to occur 50 days after order); *Feliciano v. Vila*, No. Civ. 79-4-PG, 2007 WL 4404730, at *17 (D. P.R. Dec. 13, 2007) (ordering daily fines of $10 for instances of future noncompliance after the date of the court entered a contempt order).

The Court, of course, has authority to impose conditions necessary to remediate non-compliance with its orders. A coercive fine structure is not necessary to ensure compliance or remediate an on-going problem. If the Court wishes to impose future conditions, the Court should embrace the new policies and measures that have been put in place to ensure violations do not occur,

13

along with any temporary monitoring conditions necessary to satisfy the Court that compliance has been achieved.

## VI. Discovery is Unnecessary.

Discovery will not uncover temperatures readings taken prior to Plaintiffs' counsel and the Court's intervention in August. Mr. Collier testified that TDCJ was not taking temperature readings as a practice at units other than the Pack Unit. TDCJ acknowledges that it failed to take temperature readings at units other than the Pack Unit, so discovery will not aid to establish that mistake.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**DARREN McCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Division Chief, Law Enforcement Defense Division

**JEANINE COGGESHALL**
Assistant Attorney General, Co-Counsel

/s/ Leah O'Leary
**LEAH O'LEARY**
State Bar No. 24079074
Southern District No. 1563191
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 370-9814 Fax
Leah.OLeary@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS
COLLIER, HERRERA, AND TDCJ**

## NOTICE OF ELECTRONIC FILING

I, **Leah O'Leary**, Assistant Attorney General of Texas, do herby certify that I have electronically filed this pleading in accordance with the Electronic Case Files System of the Southern District of Texas, on September 26, 2019.

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **Leah O'Leary**, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing has been served to all attorneys of record by electronic notice in accordance with Rule 5(b)(2) of the Federal Rules of Civil Procedure on Sept. 26, 2019.

*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General