UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 4:14-cv-1698 |
| | § | |
| BRYAN COLLIER, et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT, TO SHOW CAUSE & FOR SANCTIONS**

Enough is still enough. This is at least the *fourth* time TDCJ has been caught telling significant lies in this case and the related prison heat-stroke litigation.[1]

What should be an incredibly simple settlement to implement and monitor – keep class members in apparent temperatures below 88°F – has proven to be anything but because of Defendants' misrepresentations, indifference, and incompetence.

This is a long-term relationship that Class Counsel and the Court must have confidence in so that, in Defendants' words, the parties can "look forward." Given TDCJ's pattern of lying and dissembling, Class Counsel has no such confidence. Thus, as the Court observed, "when there has been a perversion of a settlement that was as important … as this settlement, it does make sense to find out why that perversion occurred, and what can be done to prevent another perversion."

---

[1] *See, e.g.*, (1) *McCollum v. Livingston*, No. 3:12-cv-02037-L, Doc. 219 (N.D. Tex. Jan. 26, 2015) (granting plaintiffs' motion for sanctions, finding TDCJ and the Office of the Attorney General mislead plaintiffs about the existence of documents); (2) *Webb v. Livingston*, No. 4:14-cv-03302, Doc. 473 (S.D. Tex. Dec. 13, 2017) (plaintiffs' motion for sanctions, pending at time of settlement, showing TDCJ destroyed highly relevant documents); (3) Doc. 1459, pp. 3-4 (describing TDCJ's violations of the Court's preliminary injunction); and, (4) *id*. at pp. 7-13 (describing TDCJ's violations regarding conditions in 2019 at the LeBlanc Unit).

Transcript of Hearing of Sept. 10, 2019, 70:17-21. Monetary sanctions are necessary to compensate class members and Class Counsel, and deter TDCJ going forward. But a show cause hearing and discovery are also necessary, not to punish Defendants, but for Class Counsel and the Court to understand what happened, how it happened, who knew about it, and what Defendants did to cover it up – so that Class Counsel and the Court can have any confidence in any plan TDCJ proposes going forward.

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. iii

TABLE OF AUTHORITIES .......................................................................................... iv

I.   DEFENDANTS' ACTIONS TODAY ARE FAR TOO LITTLE, AND FAR TOO LATE ...................... 1

II.   THE CRIME AND THE COVER UP .......................................................................... 2

    A.   The Crime ................................................................................................ 2

    B.   The Cover Up ........................................................................................... 7

    C.   The Liars ................................................................................................. 9

III.   DISCOVERY IS NECESSARY .................................................................................. 10

    A.   Stiles Unit ............................................................................................. 11

    B.   LeBlanc Unit ......................................................................................... 11

    C.   Buses ..................................................................................................... 12

    D.   Parole-Voted Programs ........................................................................ 13

IV.   NECESSARY REMEDIES ....................................................................................... 14

    A.   Necessary Additional Monitoring ......................................................... 15

    B.   Compensatory Fines ............................................................................. 17

    C.   Prospective Fines ................................................................................. 17

    D.   Attorneys' Fees .................................................................................... 18

V.   CONCLUSION ...................................................................................................... 18

TABLE OF AUTHORITIES

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574 (5th Cir. 2000).........................................17

*Crowe v. Smith*, 151 F.2d 217 (5th Cir. 1998)..................................................................................7

*David C. v. Leavitt*, 242 F.3d 1206 (10th Cir. 2001) ...................................................................15

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016)...................................................................14, 16

*Recinos-Recinos v. Express Forestry, Inc.*, No. 05-1355, 2008 WL 444997 (E.D. La. Sept. 26, 2008) .......................................................................................................................................15

*Thompson v. U.S. Dep't Housing & Urban Development*, 404 F.3d 821 (4th Cir. 2005)............15

*U.S. EEOC v. Univ. La. Monroe*, No. 05-1158, 2016 WL 917331 (W.D. La. Mar. 8, 2016) ......15

I.     DEFENDANTS' ACTIONS TODAY ARE FAR TOO LITTLE, AND FAR TOO LATE

It is difficult to imagine any twenty-first century building where someone cannot answer the basic question "what is the indoor temperature?" It is even more difficult to imagine that, if such a building existed, and if a class action settlement required the building's interior be kept below a specified temperature, that no devices to ascertain the temperature would be installed. But, presumably in an effort to retain deniability, that is exactly what TDCJ did here. The key settlement term is exceedingly simple: indoor apparent temperatures must remain below 88°F. But until Class Counsel was inspecting conditions at the LeBlanc Unit by literally climbing inside air conditioning units, TDCJ was doing absolutely nothing to ensure compliance with this term – and instead was actively denying there was a problem that any honest person of below-average intelligence could have quickly discovered. Thermometers should have been installed everywhere a class member was imprisoned on the day the settlement was approved – the position TDCJ has only belatedly come around to, after being caught violating this basic term. Instead, TDCJ deliberately and repeatedly chose to take the position that the agency was not required to monitor indoor temperatures at all. *See*, *e.g.*, Transcript of Hearing of Sept. 10, 2019, 82:25-83:9. At *best*, this evidences TDCJ's willful indifference to its obligations under the settlement.

While digital, Bluetooth-enabled thermometers are a necessary (but wholly insufficient) development, Class Counsel, the class members, and the Court still must rely on TDCJ to read, produce, save, and act on that data. And it is TDCJ (through multiple employees at the mid to the highest level) who lied and enabled lying to occur and endangered the class.

## II.    THE CRIME AND THE COVER UP

More shocking than TDCJ's indifference towards its basic settlement obligations is the fact that when Class Counsel raised good-faith questions regarding TDCJ's compliance, instead of working cooperatively with fellow members of the bar, TDCJ responded by dismissing Class Counsel's concerns hypocritically, insinuating the class members are simply liars, and (at best) wholly failing to actually investigate the allegations. Then – when it became clear that Class Counsel and the inmates were demonstrably and undeniably correct – TDCJ actively concealed and covered up what happened. Here, it's the crime *and* the cover up. Thus, today, "it's not inappropriate for us to ask who knew what." Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 99:20-21.[3]

### A.  The Crime

Though TDCJ's response concedes some misrepresentations, the response ignores numerous lies we know were told.

The LeBlanc Unit's Warden James Danheim told Director Collier it "felt cool" at the prison – when no rational human being would believe indoor temperatures in (at best) the high-80s and 90s were "cool." TDCJ's General Counsel, Sharon Felfe Howell, told Director Collier "we're fine" – when Howell either knew her client was plainly not "fine," or had done absolutely nothing to actually investigate the conditions on the ground. Director Collier, Transcript of Hearing of Sept. 10, 2019, 45:1-46:2. Again, this is not a difficult question to resolve – a rational person could immediately determine the indoor temperatures were not "cool," and a person with a device costing less than $100 could definitively determine the conditions violated the settlement agreement.

---

[3] Class Counsel notes that the Court's inherent power permits it to pursue sanctions even if the parties resolve matters between themselves. *Crowe v. Smith*, 151 F.3d 217, 225 (5th Cir. 1998).

Likewise, Class Counsel was repeatedly told facts with no basis in reality, and for which there has been zero accounting. As Class Counsel began expressing concerns about the Stiles and LeBlanc Units in July 2019, TDCJ's counsel represented that "staff will notice if the temperatures get close to 88 degrees," and "staff have been visually checking the thermostats frequently at those units." Doc. 1459-40, pp. 1-2. The inspection revealed, however, that there were actually *no thermostats to check*. This lie is audacious, goes to the core of Class Counsel's ability to have any confidence in TDCJ (and its lawyers) going forward, and is even perpetuated in TDCJ's response.[4]

Similarly, some, as of now, unknown person at TDCJ created a false and misleading document to deceive Class Counsel: the "Offender Housing A/C Issues for LeBlanc and Duncan Units: July 2019." Doc. 1459, Ex. 47, p. 3. This document not only omits the entire reality documented in the work orders produced with TDCJ's response (*see infra*), but cannot have been created for any other purpose but to mislead Class Counsel. It was created by an unknown person, and presented to Class Counsel and the Court as the gospel by the Attorney General. *See* Hearing Transcript, Aug. 7, 2019, 12:3-8. TDCJ's proposal now is "we will produce new documents – trust us this time!" Until the author, or likely, authors, of this fabrication are identified, however, Class Counsel cannot trust in any document TDCJ produces.

Only since TDCJ filed its response is the picture of what happened at the LeBlanc Unit beginning to come into focus – and that picture matches the class members' descriptions that indoor temperatures at the LeBlanc Unit had been excessively hot throughout the summer. *See, e.g.*, Doc. 1459, Exs. 6, 7, 8, 9, 10, 59, 60, 64, 65, 66, 67, 68, & 69. Though TDCJ's exhibits still

---

[4] TDCJ's response suggests the problem was that the "thermostats" were not easily accessible and not checked often enough.  Doc. 1472, p. 2. But, in fact, the "thermostats" are merely dials to set the desired temperature – they provide no information about the temperature no matter how often they were checked or "accessed."

raise far more questions than answers, the prison's air conditioning system apparently began experiencing problems in (at the latest) April and May of 2019. In fact, air conditioners were broken, then not repaired for weeks, in (at least) the following inmate dormitories: [5]

- **Building 3 (Dorms G, H, and I)** – on April 22, 2019, a TDCJ work order noted a "coil" needed to be replaced. The replacement part was not ordered for six weeks, even though the initial maintenance request ominously noted "**these items are essential to keep the units operating**," and "**if these air handlers fail, then the [prisoner] housing areas will not have A/C [and] this could result in heat related [sic] issues.**" Doc. 1472-35, pp. 18, 20. The parts arrived only after another month had passed, but even more parts were actually required to complete the repair – and the class members had already departed the prison by the time those parts finally arrived on September 20.

- **Building 6 (Dorms P, Q, and R)** – on May 9, 2019, a work request noted the building had "**No Air.**" Twelve days later, the problem was finally fixed – though the solution only required an hour of labor. Doc. 1472-35, p. 69.

- **Building 5 (Dorms M, N, and O)** – on May 21, 2019, this building had "**No A/C.**" Almost twenty days later, on June 12, 2019, repairs requiring only two hours of labor were finally completed. Doc. 1472-35, p. 70.

- **Building 2 (Dorms D, E, and F)** – on May 24, 2019, the "ignition control board" for these inmate dormitories needed to be replaced. The work order noted, "At this time, the **staff & [prisoners] assigned to this area have no air condition[ing] or ventilation**," and that "**This could potentially cause heat stress for staff & [prisoners] in this area.**" Doc. 1472-35, p. 3. The part did not arrive until over a month later, and it is unclear from the available documents when (or if) the repairs were actually completed.

- **Building 2 (Dorms D, E, and F)** – on May 30, 2019, an "**AC Malf[unction]**" began, requiring compressors be replaced. This work was not completed until at least August 9, 2019, when the class members departed. Doc. 1472-35, p. 72.

- **Building 3 (Dorms G, H, and I)** – on June 3, 2019, work orders showed "**A/C Not Working**" – that a compressor needed to be replaced (which did not occur until two months later, on August 2). Doc. 1472-35, p. 73.

- **Building 5 (Dorms M, N, and O)** – on July 3, 2019, yet another work order stated "**Air not working**." Doc. 1472-35. This problem was not corrected until August

---

[5] At this time, Class Counsel cannot determine how many class members were housed in these various locations, though this could be easily accomplished with the production of the dormitory rosters for these periods.

21, 2019 – seven weeks later, as the Beaumont area suffered multiple heat advisories (and after the class members had departed).[6]

- **Building 6 (Dorms P, Q, and R)** – on August 2, 2019, this area was experiencing "**No A/C**." Doc. 1472-35, p. 76. These repairs were not completed until August 28, 2019. *Id.*

If nothing else, the lengthy delays in making these repairs demonstrates that, as TDCJ's counsel represented in an August 1, 2019 email to Class Counsel, problems with air conditioning demonstrably are not "treated as an urgent issue that is addressed immediately." Doc. 1459-46.

We now know that TDCJ knew about air conditioning failures affecting at least approximately 46%[7] of the LeBlanc Unit dormitories from May 15 through August 9 – weeks before class members began complaining to Class Counsel in mid-July. TDCJ's new position that it does not know if the air conditioning was failing in July is purposely misleading; there is little ambiguity in the meaning of "No A/C," "No Air," "Air not working," "A/C not working," "no air condition[ing]," or "A/C Malf[unction]" during the middle of a brutal Texas summer. Doc. 1472-35, pp. 2, 3, 70, 72, 73, 76; *see also* Doc. 1459-55 (summarizing the daily maximum outdoor heat index in Beaumont from National Weather Service records).[8] And, of course, these records fail to

---

[6] Notably, these pages of the work order document conclusively prove that the "Offender Housing A/C Issues for LeBlanc and Duncan Units: July 2019" document is false. These problems in Building 5 are not even listed on the document.

[7] There are six dormitory buildings and 86 days in the period May 15 through August 9, 2019. Building 2 had "no air condition" or "A/C Malf[unction]" for 77 of those days. *See* Doc. 1472-35, pp. 2, 72. Building 3 had a missing coil and/or "A/C not working" for all 86 days. *Id.* at 68, 73. Building 5 had "No A/C" or "Air not working" for 59 days. *Id.* at 70, 73. Building 6 had "No Air" or "No A/C" for 19 days. *Id.* at 69, 76. (These tallies ignore the power failure incidents that TDCJ claims only affected A/C for one day or less at a time.) This averages to about 40 days per dormitory building, or 46% of the 86 day period.

[8] In light of TDCJ's objections, Plaintiffs also submit the temperature and humidity information from the National Weather Service for Beaumont during the relevant period and ask the Court to take judicial notice of the government website regarding the weather information referred to in Plaintiffs' summary exhibits. Ex. 76. *See* National Weather Service, *Local Climatological Data*

capture all of the problems – TDCJ's own measurements confirmed conditions in *every* dormitory violated the settlement agreement on August 8, 2019 (Doc. 1448, p. 3), in the majority of dormitories on August 7, 2019 (even as Defendants sent their lawyer to mislead the Court) (Doc. 1472-21), and in *every* dormitory on August 6, 2019 (when, at the latest, Defendants' senior executives began participating in the cover-up). In reality, the cover up had been going on for months at the LeBlanc Unit as it is virtually impossible to believe that the TDCJ officials at the prison did not know they were violating the settlement agreement.

And, of course, these are just the problems at the LeBlanc Unit. Similar conditions likely also existed at the Stiles Unit (*see* Doc. 1459, Exs. 1-5), and, with class members scattered at twenty-three prisons around the state, potentially at an unknown number of other prisons. Beyond the one transport violation TDCJ now admits to, it is unknown how many inmate transports were made on buses without air conditioning. TDCJ has certainly not offered up evidence where someone has said, under oath, that a person investigated and can now assure the Court that the violations uncovered by Class Counsel are the *only* violations. Until there is a full accounting,

---

(last accessed Oct. 1, 2019) *available at* https://www.ncdc.noaa.gov/cdo-web/datatools/lcd. The summary can be tested by confirming the maximum temperature and humidity are present on each day in the underlying NWS data columns for "Dry Bulb Temp (F)" and "Rel Hum %," then copying those numbers into the NWS heat index calculator. *See* National Weather Service, *Heat Index Calculator* (last accessed Oct. 1, 2019) *available at* https://www.wpc.ncep.noaa.gov/html/heatindex.shtml. Alternatively, the heat index can be computed manually from those two entries using the formula published by the NWS. *See* National Weather Service, *The Heat Index Equation* (last accessed Oct. 1, 2019) *available at* https://www.wpc.ncep.noaa.gov/html/heatindex_equation.shtml.

The records for Beaumont alone are 164 pages long. Ex. 76. TDCJ's contempt in 2017 spanned ten counties, so those underlying records are hundreds of pages long. *See* Doc. 1459-16, 1459-17, 1459-18 (summarizing the relevant 2017 maximum heat indices for ten counties in six pages). Rather than burden the Court's docket with the underlying voluminous public records, Plaintiffs respectfully ask that the Court take judicial notice of the freely accessible weather data, summarized in Plaintiffs' charts, which TDCJ has never substantively disputed and which also merely serve to confirm the Court's experience that Texas summers are hot.

there can be no confidence going forward. "When we are talking about life and death, these are not sufficient answers. They are just not." Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 93:25-94:1.

Sanctions under the Court's inherent power must be supported by a finding of "bad faith" by the Defendants. *Crowe v. Smith*, 151 F.2d 217, 236-37 (5th Cir. 1998). "Bad faith" includes "engag[ing] in affirmative misrepresentations or near misrepresentations" – conduct that plainly occurred here. *Id*.

### B. The Cover Up

The life-threatening nature of the crime is the only sorry facet of this disgrace that eclipses the audacity of TDCJ's cover up. When, according to TDCJ today, a problem was belatedly and undeniably confirmed at the LeBlanc Unit to people with authority, TDCJ's focus wasn't on solving the problem, but on covering it up. On August 6, 2019 at 5:52 pm, Paul Glass, TDCJ's Deputy Director of Maintenance, confirmed the heat index exceeded 88 degrees in *every* LeBlanc Unit dormitory. Doc. 1472-23, p. 2.[9] Even though TDCJ's counsel had confirmed the August 8, 2019 inspection was still going forward just six hours earlier, that agreement was suddenly withdrawn the next morning at 9:47 am – likely precisely because senior TDCJ officials now knew the prison was out of compliance with the settlement agreement and decided they were going to lie to keep Class Counsel and the Court from finding out. *Compare* Doc. 1459-48, p. 2 *with* Doc. 1459-51, p. 3. Someone told the unwitting Assistant Attorney General representing TDCJ to lie to the Court – but we still do not know who, or, more importantly, if this unknown person will have

---

[9] Of course, TDCJ was obligated under the settlement agreement to notify Class Counsel of this violation no later than August 7 – but decided to lie, conceal, and commit another independent violation of the agreement instead. *See* Doc. 989-4, p. 9.

any role in "assuring" the agency's "compliance" going forward. Transcript of Hearing of Sept. 10, 2019, 88:1-90:24.[10]

"[W]henever we try to blame anyone … it is always a midlevel person. It's an unknown person." Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 90:4. Here, the problem with "unknown persons" is that these same people may continue in their same critical roles going forward – inspiring absolutely zero confidence in Class Counsel that the settlement can be fairly implemented. These questions require answers not solely for the sake of the truth, but for the sake of continuing to implement the agreement.

Indeed, even now, senior TDCJ officials unbelievably *still continue lying* to the class members – even as TDCJ is throwing itself at the Court's mercy, even after assuring the Court it "has TDCJ's attention." Doc. 1472, p. 1. Class member Kenneth Tuttle filed a grievance at the LeBlanc Unit on July 12, 2019, alleging that Dormitory A "is not in compliance" with the settlement agreement – "the sun beating through the windows all day long bring[s] temperatures to unbearable levels." Mr. Tuttle put it succinctly – "The conditions of this [dorm] are dangerous and need to be addressed immediately."[11] He was also correct – during the August 8 inspection, the heat index inside Dormitory A was 97.2°F. Doc. 1448-2. Warden Kevin Benjamin attended the August 8 inspection, and observed the temperature measurements in violation of the agreement. But, nevertheless, three weeks later, Benjamin responded to Mr. Tuttle's grievance on September 11 by writing "[t]here is no evidence to substantiate your allegations. The tempered air system is

---

[10] Class Counsel is separately filing a motion to compel an answer to this question, which the Court took under advisement at the September 10, 2019 hearing.

[11] Ex. 75, K. Tuttle Grievance, p. 1.

working properly. … No further action is warranted."[12] At the very least, this high-ranking TDCJ official, a man still responsible for on-the-ground compliance with the agreement, has yet to receive the "message" and instead is still continuing the agency's outrageous pattern of dishonesty.[13]

### C.  The Liars

In summary, the following individuals are known to have lied to cover-up TDCJ's violations of the settlement agreement. These are all high-ranking officials in the agency, who purposefully misled their superiors, Class Counsel, and/or the Court.

1. **Warden James Danheim** – lied to Director Collier that "it's cool" inside the LeBlanc Unit inmate dormitories, when, in reality, apparent temperatures exceeded 90°F.[14]

2. **Assistant Warden Kevin Benjamin** – lied to class member Kenneth Tuttle that allegations the LeBlanc Unit dormitories were out of compliance with the settlement agreement were unsubstantiated, when he attended the inspection and first-hand saw the numerous violations recorded.[15]

3. **General Counsel Sharon Felfe Howell** – lied to Director Collier that "we're fine" when the agency was plainly violating the settlement agreement.[16]

---

[12] Ex. 75, K. Tuttle Grievance, p. 2. Importantly, Class Counsel only has this document because Mr. Tuttle provided it. It is entirely possible there are 36 other, identical grievance responses Benjamin provided to other class members, and innumerable responses to non-class members. Moreover, Tuttle received this after Director Collier testified that TDCJ violated the settlement agreement at Leblanc.

[13] In light of this, TDCJ's representations about its system and review by senior officials cannot be taken seriously and is unlikely to remedy future misconduct. This is why Director Collier's refusal to discipline the wardens at LeBlanc is so egregious. Far from deterring future misconduct, his silence actually encourages ongoing dishonesty.

[14] Alternatively, Director Collier committed perjury when he testified about his conversation with Danheim.

[15] Benjamin likely committed a criminal violation of Texas Penal Code § 37.10, which prohibits "knowingly mak[ing] a false entry in … a governmental record." *See also* p. 8, n.11.

[16] *See* p. 9, n.12. Given her role in managing the litigation, it is feared that Ms. Howell's deposition is likely to lead to the revelation of even more serious instances of fraud and misrepresentation.

4. **Unknown Assistant General Counsel** – lied to TDCJ's counsel in the Office of the Attorney General that a) a "family emergency" prevented the warden from permitting the LeBlanc Unit inspection on August 8, 2019, b) TDCJ executive leadership was attending a trade show out of state on August 8, also preventing the inspection; and c) either affirmatively told the Attorney General the prison was in compliance or failed to convey information showing it was not.

5. **Unknown Document Author** – Doc. 1459-47 is, at best, intentionally designed to mislead Class Counsel, as it does not reflect the information contained in the actual work order for the LeBlanc Unit (Doc. 1472-35), and, instead, conveys that there are no problems with the air-conditioning system. The author of this document remains unknown, as do the people that utilized it with class counsel despite knowing it to be misleading.

6. **Unknown TDCJ Staff** – TDCJ's counsel told Class Counsel that TDCJ staff was monitoring the thermostats inside the LeBlanc Unit, and the temperature never exceeded 85°F. This is brazenly false because *there are no thermostats* that measure temperatures inside the inmate living areas. The person or persons who conveyed this information to the assistant attorney general is unknown.[18]

## III.   DISCOVERY IS NECESSARY[19]

"[We] have to figure out the scope of the violations." Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 95:23-25. Discovery is the least burdensome mechanism available to do so, as TDCJ's accounting thus far is solely wanting.

The bare minimum way to give Class Counsel and the Court confidence going forward is a full understanding of what happened before. If TDCJ's current compliance plan were not laid atop a foundation of lies, it might be an acceptable starting point. But today, given the history,

---

[18] *See id.*

[19] Due to discovery conducted prior to the execution of the settlement agreement, Class Counsel has an adequate understanding of the events of 2017 involving the implementation of the preliminary injunction. Though these facts give important context to TDCJ's conduct in 2019, additional formal discovery is unnecessary as to the events of 2017 – except to the extent the Court believes any alleged defects in Plaintiffs' evidence must be cured, or the Court would like Class Counsel to investigate further. *See* Doc. 1473, Defendants' Objections to Plaintiffs' Evidence.

without a full accounting of what happened, who knew about it, and who lied about it, it is impossible for necessary trust to exist going forward. Likewise, to shape any fair compensatory remedies for injured and betrayed class members, discovery is necessary.[20] Class Counsel is asking "perfectly appropriate, even pressing questions [but] are invariably met with the response, 'I don't know.' 'It was somebody else.' 'We're not sure.'" Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 93:21-24. Whether through a show-cause hearing, through discovery, or through an audit completed by an outside law firm, something must be done to discover the facts.

### A. Stiles Unit

At this time, the only "evidence" that there were no violations at the Stiles Unit is the Defendants' word. Unfortunately, this is worthless: their conduct demonstrates that their representations are insufficient. Today, we know definitively that one of the two "chillers" necessary to air condition the building where class members were living became inoperable. We do not know how long it took to install the temporary chiller. We do not know what the indoor temperatures were between when the broken chiller failed and the temporary chiller was installed – or even if TDCJ cared enough to check. Especially because TDCJ is still housing 17 class members at the Stiles Unit (*see* Doc. 1472, p. 3), who are protected by the temporary chiller and the staff at the prison, these questions must be answered.

### B. LeBlanc Unit

At the September 10 hearing, Director Collier testified that "I do not know" how long the LeBlanc Unit was out of compliance. Transcript of Hearing of Sept. 10, 2019, 63:8-10. Given the

---

[20] For example, if, per Class Counsel's proposal, inmates in affected areas were compensated $100 each day that TDCJ was violating the settlement agreement, it would be necessary to learn which areas were out of compliance, for how long, and which class members were living in the dangerous conditions.

life-threatening conditions Defendants were tolerating, this answer is unacceptable, and discovery is necessary to find the truth. While it is heartening that TDCJ *presently* does not intend to house class members at the LeBlanc Unit again, when the settlement agreement was approved it was never contemplated by Class Counsel and the Court that class members would be housed at the LeBlanc Unit *at all*.[21] Given that two members of the senior leadership of the LeBlanc Unit – Warden Danheim[22] and Warden Benjamin – are demonstrably bald-faced liars and are lying to everyone from TDCJ inmates to the TDCJ executive director, extensive document production and depositions are necessary to uncover what happened, ensure that it does not reoccur, and to build confidence going forward.

### C.  Buses

TDCJ admits that at least one bus trip occurred without an air-conditioned vehicle, in violation of the settlement agreement. But they deny – albeit without evidence - the other violation identified thus far (when 37 inmates are likely to testify to the contrary – *see* Doc. 1459, Exs. 65-69).[23] Numerous inmate witnesses to the LeBlanc Unit exodus explained that the air-conditioning system was not keeping the bus cool on the *first* leg of the trip – before the bus stopped at another prison so a class member could receive emergency medical attention, and was left running to cool off. Instead of answering this charge, TDCJ inexplicably relies exclusively upon two witnesses who only boarded the bus *after* the problem was fixed. *See* Doc. 1472-36

---

[21]  Additionally, as TDCJ has not committed this representation to writing, it could be changed by TDCJ – making it unreliable at best.

[22] This, of course, assumes that Director Collier was telling the truth at the September 10 hearing.

[23] Numerous other inmates have contacted Class Counsel with the same allegations, and if a swearing match is necessary, Class Counsel can obtain additional declarations.

Since the motion for sanctions was filed, Class Counsel has learned of allegations regarding at least five bus trips that allegedly occurred without any air conditioning, and several others where the air conditioning did not appear to function correctly.[24] Class members continue to complain that buses remain hot.[25] Though TDCJ may have 65 buses that have air conditioning installed, the LeBlanc Unit and Stiles Unit experiences teach us that existing air conditioning is not the same thing as functioning air conditioning (and that TDCJ alone has great difficulty distinguishing between the two). The response also does not address how many of these buses have air conditioners that are currently under repair.

### D.  Parole-Voted Programs

Rather than account for its failure to provide the "parole-voted" programs in air-conditioned prisons – as required by the settlement agreement – TDCJ's response engages in misleading doublespeak. A class member becomes "parole eligible" after completion of a certain portion of their sentence – "eligibility" for parole is not controlled *at all* by the availability of programming. *See contra* Doc. 1472, p. 10 (TDCJ's response). Once the class member becomes eligible, the Texas Board of Pardons and Parole votes on whether to release the class member or not. As part of this decision, the Board can require the class member to complete certain "parole-voted" programming before release.[26] Thus, if TDCJ delays providing the programming that does

---

[24] In addition to the July 27 and August 9 incidents discussed in TDCJ's response, class members have also alleged the following bus trips occurred without air conditioning: 1) an August 7 trip from the Pack Unit to UTMB Galveston; 2) an August 8 trip leaving the Pack Unit; and 3) an August 30 trip from the Estelle Unit to UTMB Galveston. Class Counsel's investigation into these incidents is ongoing.

[25] Current complaints are alleging that the buses are hot, leading inmates to open windows, which TDCJ contends prevents the interior of the bus from cooling. Of course, if the bus interiors were cool to begin with, there would be no reason to open the windows.

[26] *See*, *e.g.*, TEXAS BOARD OF PARDONS AND PAROLE, PAROLE IN TEXAS: ANSWERS TO COMMON QUESTIONS, p. 16 (available at  https://www.tdcj.texas.gov/bpp/publications/PIT_2017_Eng.pdf).

not change the class member's "eligibility" for parole (as TDCJ discusses in its response, Doc. 1472, p. 10), but it does delay his actual *release from custody* as he cannot leave prison until the program is completed.

TDCJ further misleads by supporting this position with an affidavit that obscures the impact on class members' release dates. Rene Hinojosa's affidavit specifically mentions that five of the eight inmates who had no program-required therapist for three months were no longer able to be released by their original "Release No Earlier Than" date due to the three-month delay – but Mr. Hinojosa specifically avoids explaining whether the three affected class members were among those five. Doc. 1472-26, pp. 1–2. At the very least, it is apparent that Mr. Hinojosa needs to be deposed to answer the real questions – were class members required to spend more time in custody because TDCJ violated the agreement, which class members were imprisoned excessively, and how long did these class members suffer due to TDCJ's failure to keep its bargain.

In short, because it is clear the Court has not "discovered it all," additional fact finding is required. Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 116:7.

## IV.   NECESSARY REMEDIES

Class Counsel agrees with the Court: "I'm just not sure we have seen the impetus toward change." Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 117:2-3. The Court has wide latitude in fashioning remedies, and may modify prior orders and the settlement agreement to ensure future compliance. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (modifying class action settlement agreement through court's inherent power when defendant prison operator found in contempt); *Thompson v. U.S. Dep't Housing & Urban Development*, 404 F.3d 821, 828 (4th Cir. 2005) (affirming modifications to consent decree resolving class action litigation when defendants failed to comply with significant terms); *David C. v. Leavitt*, 242 F.3d 1206, 1212-13

(10th Cir. 2001) (same); *U.S. EEOC v. Univ. La. Monroe*, No. 05-1158, 2016 WL 917331, *5 (W.D. La. Mar. 8, 2016) (modifying consent decree terms as remedy to cure contempt); *Recinos-Recinos v. Express Forestry, Inc.*, No. 05-1355, 2008 WL 4449973, *2 (E.D. La. Sept. 26, 2008) (requiring settling class action defendant to submit to discovery "to further probe the veracity and accuracy" of records submitted to support settlement compliance). Class Counsel suggests the below sanctions will force change.

### A.  Necessary Additional Monitoring

It is now apparent that Class Counsel must (unfortunately) take a more aggressive, proactive, "trust but verify" approach to the post-settlement phase of this litigation. The Court should authorize this additional monitoring as a sanction. The agreement capped the amount of attorneys' fees for monitoring, and provided that Class Counsel could only seek payment from TDCJ at below-market rates.[27] These caps limit Class Counsel to 219 compensated monitoring hours annually, at below-market rates. The monitoring provisions were important to the Court's approval of the agreement, as many class members objected because they (sadly, accurately) anticipated TDCJ's chicanery. *See, e.g.*, Doc. 1188, p. 17 (Order Approving Settlement, addressing objectors' concern that "the temporary air conditioning that TDCJ is already not working well" with "Class Counsel will monitor implementation of the agreement and may bring concerns about compliance to the Court"). *See also* Doc. 1160, p. 8 (Plaintiffs' Response to Class Member Objections, addressing objections that settlement agreement did not include provisions for "surprise inspections"), p. 17 (addressing objections about retaliation against class members), p. 15 (addressing objection that TDCJ "cares nothing for … court orders" and settlement agreements). When the settlement seemed simple to implement and monitor, these caps appeared

---

[27] Doc. 989-4, p. 17.

reasonable. TDCJ's subsequent conduct, however, demonstrates additional monitoring hours, at market-based rates and for an extended period of time, are necessary and an appropriate sanction. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (affirming sanction of extended monitoring period, and awarding market-based rates).

Until TDCJ's malfeasance this summer, Class Counsel believed a reactive approach was appropriate – respond to complaints from class members. In the future, Class Counsel now recognizes the necessity of a more proactive approach. Class Counsel now intends to periodically visit all prisons where class members are imprisoned, conduct inspections of the locations where class members are living, inspect all the buses used to transport subclass members, and aggressively request and review documents. This now (unfortunately) necessary approach requires additional un-capped monitoring fees, at market-based rates, as a sanction. *See* Doc. 1188, pp. 28-29 (setting market-based attorneys' fees for Class Counsel).

Likewise, TDCJ should be ordered to produce any non-privileged document that Class Counsel requests within one week. Production of the April and May 2019 work orders at the LeBlanc Unit, for example, would have shown Class Counsel that serious problems likely existed at the prison long before the August 8, 2019 inspection. Which is precisely why Class Counsel requested this very document on July 18, 2019, only to be rebuffed by TDCJ. Doc. 1459-40. Before the September 10, 2019 hearing, where Director Collier told the Court his agency would produce any requested documents, TDCJ had flat refused to comply with extremely reasonable document requests from Class Counsel. *Compare* Hearing Transcript, Sept. 10, 2019, 95:6-8 (Collier: "If we have a document, I don't know why we wouldn't [produce it]") *with* Doc. 1459-40 ("the agency's position [is] … production of documents [is] not required under the settlement agreement"). TDCJ

16

should be ordered to comply with Class Counsel's document requests as a sanction (subject to seeking relief from hypothetical inappropriate requests from the Court).

Finally, the Court should, as a sanction, order TDCJ to permit Class Counsel (and any necessary experts) to inspect inmate housing areas where class members were imprisoned within 24-hours of making a request.

### B.  Compensatory Fines

Compensatory fines are an appropriate remedy to compensate class members injured by TDCJ's misconduct. The Fifth Circuit has upheld orders awarding tens of millions of dollars of compensatory fines, amounts far in excess of anything Class Counsel is requesting here. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (affirming compensatory fines in excess of $45,000,000, for violations of a court order over just two days). TDCJ's only response is that the small number of cases involving fines payable to prisoners set prospective fine schedules, rather than require payment of retrospective fines. But that retrospective compensatory fines for prisoners are rare does not mean they are inappropriate here. As noted in Plaintiffs' motion, TDCJ's violations of the settlement agreement and the Court's orders in 2019 were not TDCJ's first rodeo – numerous prior violations occurred in 2017 and 2018 as well. Being caught, and allegedly making changes, was insufficient before to correct TDCJ's misbehavior. Fines to compensate men made to suffer from abominable conditions – which TDCJ (at best) ignored – are now the appropriate remedy. The compensatory fine structure proposed in the motion is appropriate.

### C.  Prospective Fines

Given the magnitude and gravity of TDCJ's misconduct, and the efforts to cover it up, a prospective fine schedule is wholly appropriate. For weeks, TDCJ officials obfuscated and outright

lied about conditions class members were living in, going so far as to fabricate documents and (at best) use their attorneys[28] to lie to Class Counsel and the Court. This grotesque behavior can only be deterred in the future through very coercive fine structures. While TDCJ begs that such fines are "not necessary," its reasons *why* are wholly unpersuasive. As explained above, the "new policies and measures" TDCJ has implemented inspire no confidence from Class Counsel as long as the old officials responsible for implementing the new policies remain. "New measures" were promised after TDCJ violated the notice provisions of the settlement agreement in 2018 as well, but made no difference in 2019. And, of course, if the "new measures" are effective, TDCJ will never need to pay a fine. Thus, the fine schedule proposed in the motion is appropriate and necessary to compel future compliance.

### D.  Attorneys' Fees

"[A]ttorneys' fees at the very least are appropriate" Judge Ellison, Transcript of Hearing of Sept. 10, 2019, 109:16-17. TDCJ agrees. Doc. 1472, p. 2. As fees are continuing to accumulate on this issue, rather than litigate the amount of fees piecemeal, Class Counsel asks to file a motion for attorneys' fees after the merits of the sanctions motion are decided (and any necessary discovery is completed).

### V.   CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and order substantial remedial, compensatory, and prospective relief both to ensure that TDCJ's settlement violations do not recur (again) and to compensate class members for the harm they suffered from TDCJ's deliberate indifference.

Dated: November 1, 2019.

---

[28] *See* p. 10, n.16.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
      Tel.   (512) 623-7727
      Fax.   (512) 623-7729

By:  /s/ *Jeff Edwards*
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
Texas Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

/s/ *Jeff Edwards*
Jeff Edwards

19