UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 4:14-cv-1698 |
| | § | |
| BRYAN COLLIER, et al., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION TO COMPEL RESPONSES TO REQUESTS FOR PRODUCTION AND INTERROGATORIES

This Court ordered discovery to reopen because TDCJ admitted that it violated the Court's orders, endangered men's lives, and then lied about it. Now TDCJ's responses to that discovery are deficient and saddled with numerous objections. The Court should overrule TDCJ's objections and compel responses to this discovery for four reasons.

First, TDCJ has withheld or redacted, 1,200 pages of documents under vague privilege assertions, without any basis to show facts to defeat waiver or the crime-fraud exception.

Second, TDCJ's privilege log is inadequate generally.

Third, TDCJ also refuses to search for, much less produce, everything it deems outside its own view of the scope of its violations—thus, again covering up the evidence of its violations.

Finally, TDCJ is still not done "supplementing" its responses, despite months of undue delay.

Thus, Court should overrule TDCJ's objections and order responses to written discovery so that Plaintiffs may begin depositions and decipher TDCJ's abuses.[1]

---

[1] Alternatively, given the reticence with which TDCJ is answering discovery and producing documents, the Court should increase the number of depositions permitted.

TABLE OF CONTENTS

I.   NATURE AND STAGE OF PROCEEDINGS .................................................................. 1

II.  LEGAL STANDARD ................................................................................................... 7

   A.   The Burden of Asserting Privilege ................................................................. 7

   B.   Crime-Fraud Exception to Attorney-Client Privilege ................................. 7

   C.   Waiver by Affirmative Use of Attorney-Client Communications .............. 8

   D.   Standard of Review ......................................................................................... 8

   E.   Rule 26 Discoverability .................................................................................. 8

III. ARGUMENT AND AUTHORITIES ............................................................................... 9

   A.   The Court should overrule TDCJ's privilege objections or, at a minimum, conduct an *in camera* review of the responsive information and documents. ................................... 9

     1.   TDCJ's assertion of attorney-client privilege is inadequate. ........................................ 10

     2.   The crime-fraud exception applies to most of TDCJ's withheld documents and the responses to interrogatories 1, 13, 14, and 15. .................... 11

     3.   The doctrine of waiver applies to the same subset of withheld documents and information as the crime-fraud exception. ............................ 14

     4.   Interrogatory 1 goes to facts which TDCJ cannot hide using privilege. ....................... 16

   B.   The Court should overrule TDCJ's improper scope objections. ................................ 16

     1.   Personnel files pertaining to the individuals involved. Ex. 15, Resp. to 1st Requests for Production, p. 3; Ex. 16, Resp. to 2nd Requests for Production, p. 4. .................................. 19

     2.   Unspecified disciplinary case files related to the settlement and Class Counsel's allegations of violations. Ex. 15, Resp. to 1st Requests for Production, p. 4; Ex. 16, Resp. to 2nd Requests for Production, pp. 4–5. .................................. 19

     3.   Communications prior to July 1, 2019 concerning compliance with the settlement by those involved in the 2019 violations. Ex. 15, Resp. to 1st Requests for Production, p. 5; Ex. 16, Resp. to 2nd Requests for Production, p. 5. ........................................ 20

     4.   Grievances, emails, IOCs, letters, and other records about air conditioning or heat complaints by non-class members housed at LeBlanc, Stiles, and Duncan during July and August 2019 if they were not housed in the same areas. Ex. 15, Resp. to 1st Requests for Production, pp. 6–8. ........................................ 20

5.   Unspecified investigation records concerning subclass members being transported without air conditioning. Ex. 15, Resp. to 1st Requests for Production, p. 8. ..................... 21

6.   Unspecified documents relating to Class Counsel's allegations that TDCJ violated the settlement. Ex. 15, Resp. to 1st Requests for Production, pp. 9–10. ................................... 21

7.   Maintenance records and any investigation records concerning bus rides to Estelle in June and September that allegedly violated the settlement. Ex. 15, Resp. to 1st Requests for Production, pp. 10–11. ...................................................................................................... 21

8.   Documents obtained by TDCJ's settlement compliance monitor that TDCJ asserts do not relate to the period July to August 2019, Ex. 15, Resp. to 1st Requests for Production, p. 12.   22

**C.   The Court should order TDCJ to complete its responses to discovery** ..................... **22**

**IV. CONCLUSION** .................................................................................................................. **25**

TABLE OF AUTHORITIES

## Cases

*Adam Friedman Associates LLC v. Media G3, Inc.*, 2012 WL 1563942 (S.D.N.Y. May 1, 2012) .............................................................................................................................. 14

*Alaniz v. U.S. Renal Care, Inc.*, No. 1:17-CV-00146, 2018 WL 8622313 (S.D. Tex. Aug. 20, 2018) ...................................................................................................................... 18

*Blair v. Pride Indus., Inc.*, No. EP:14-CV-00183-DCG RFC, 2015 WL 10818665 (W.D. Tex. July 17, 2015) .................................................................................................... 17

*Carr v. State Farm Mut. Auto. Ins., Co.*, 312 F.R.D. 459 (N.D. Tex. 2015) ................................ 17

*Clockwork IP LLC v. Parr Mgmt. LLC*, No. 14-CV-03879, 2016 WL 3350703 (N.D. Tex. Mar. 21, 2016) ............................................................................................ 9

*Conkling v. Turner*, 883 F.2d 431 (5th Cir. 1989) .................................................................. 8, 14

*Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690 (5th Cir. 2017)7, 10, 11

*First Am. CoreLogic, Inc. v. Fiserv, Inc.*, No. 2:10-CV-132, 2010 WL 4975566 (E.D. Tex. Dec. 2, 2010) ............................................................................................ 8

*Fisher v. United States*, 425 U.S. 391 (1976) ............................................................................... 7

*General Electric Co. v. Hoechst Celanese Corp.*, 15 U.S.P.Q.2d 1673, 1990 WL 154218 (D. Del. 1990) ..................................................................................................... 14

*Gondola v. USMD PPM, LLC*, No. 15-CV-411, 2016 WL 3031852 (N.D. Tex. May 27, 2016).. 9

*Gonzalez v. Volkswagen Grp. Of Am., Inc.*, No. A-14-CV-574-LY-ML, 2015 WL 5097271 (W.D. Tex. Aug. 28, 2015) .......................................................................... 17

*Heller v. City of Dallas*, 303 F.R.D. 466 (N.D. Tex. 2014) .................................................... 17, 24

*Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719 (5th Cir. 1985) ......................... 7, 10

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) ......................................................... 8

*In re Grand Jury Subpoenas*, 561 F.3d 408 (5th Cir. 2009) ........................................................ 8

*Jackson v. Stevens Transp., Inc.*, No. 3:14-CV-1416-M, 2015 WL 11019131 (N.D. Tex. June 17, 2015) ............................................................................................ 9

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482 (5th Cir. 1990) ................ 9

*Moore v. Willis Indep. School Dist.*, 233 F.3d 871 (5th Cir. 2000) ................................ 8

*Mushroom Associates v. Monterey Mushrooms*, 25 U.S.P.Q.2d 1304, 1992 WL 056397 (N.D. Cal. 1992) ............................................................................................. 14

*Nalco Co. v. Baker Hughes Inc.*, No. 4:09-CV-1885, 2017 WL 3033997 (S.D. Tex. July 18, 2017) .................................................................................................. 8

*Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250 (N.D. Tex. 2017) ..................... 18

*Sand Storage, LLC v. Trican Well Serv., L.P.*, No. 2:13-CV-303, 2015 WL 1976463 (S.D. Tex. Apr. 30, 2015) ...................................................................................... 10

*SEC v. Microtune, Inc.*, 258 F.R.D. 31 (N.D. Tex. 2009) ...................................... 7

*Smith v. Alyeska Pipeline Service Co.*, 538 F.Supp. 977 (D. Del. 1982) ....................... 14

*Starsight Telecast, Inc. v. Gemstar Development Corp.*, 158 F.R.D. 650 (N.D.Cal.1994) ......... 14

*United States v. Ballard*, 779 F.2d 287 (5th Cir. 1986) ...................................... 7

*United States v. Edwards*, 303 F.3d 606 (5th Cir.2002) ...................................... 8

*United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982) .................................. 7

*United States v. Robinson*, 121 F.3d 971 (5th Cir. 1997) .................................... 7

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) .......................................... 16

*Willy v. Admin. Review Bd.*, 423 F.3d 483 (5th Cir. 2005) .................................. 15

**Rules**

FED. R. CIV. P. 26 ..................................................................... 8, 9

FED. R. CIV. P. 33 .................................................................... 16, 17

FED. R. CIV. P. 34 .................................................................... 17, 23

FED. R. EVID. 502 .................................................................... 8, 14

## I.   NATURE AND STAGE OF PROCEEDINGS

On August 9, 2019, Plaintiffs moved to enforce the settlement agreement, precipitating an emergency order to transfer class members out of the LeBlanc Unit and back into a prison with functioning air conditioning. Doc. 1448; Doc. 1449.

On September 5, 2019, Plaintiffs moved for contempt, to show cause, and for sanctions because TDCJ has repeatedly lied and violated the Court's orders—most recently, TDCJ failed to keep class members housed at the LeBlanc Unit in indoor heat index below 88°F, and then failed to report that violation. Doc. 1459.

Defendants asserted privilege during questioning of Bryan Collier at a subsequent hearing on September 10, 2019. *See* Doc. 1489-1, Ex. 8, Hearing Transcript (Sep. 10, 2019), pp. 87:18–88:3, 90:12–13. The Court took the objections under advisement. *Id.* Plaintiffs moved to compel on November 1, 2019. Doc. 1489. The Court later orally granted Plaintiffs' motion, which cited the crime/fraud exception to the privilege. Ex. 10, Hearing Transcript (Nov. 6, 2019), p. 30:2–3. The Court indicated that a written order would issue. *Id.* p. 30:9.

Although the parties subsequently attempted to confer about this issue, Defendants have refused to comply with the Court's November 6, 2019 order until it is committed to writing.

On December 11, 2019, the Court found that TDCJ violated the settlement agreement, including by housing class members in heat indices in excess of 88 degrees at the LeBlanc Unit during the summer of 2019. Doc. 1504, p. 1. The Court also found that this behavior continued a pattern of TDCJ's violations of the settlement agreement. Doc. 1504, p. 6. Particularly troubling was TDCJ's failure to identify who was responsible for the violations and the repeated misrepresentations to Class Counsel and the Court. *Id.* Thus, the Court  deferred ruling on the issues of contempt and sanctions, and authorized discovery in anticipation of an eventual show

cause hearing in the hopes that the parties would "identify why previous violations occurred in the first place." Doc. 1504, p. 8. The Court's order states that "Class Counsel may … serve written discovery requests relating to Defendants' violations of the settlement agreement that took place during July and August 2019, and the ensuing misrepresentations made to Class Counsel and this Court." Doc. 1504, p. 7.

On December 20, 2019, Plaintiffs sent written requests for production to Defendants. Ex. 11, Requests for Production. On December 31, 2019, Plaintiffs sent additional requests for production as well as interrogatories. Ex. 13, 2nd Requests for Production, Ex. 12, Interrogatories.

Defendants' responses, served more than 30 days later by agreement, were grossly incomplete, and did not include any indication of when production would be completed despite Plaintiffs' repeated inquiries in telephone conferences, until Defendants' substitute counsel falsely represented on February 21, 2020 that supplementation would be completed by March 31, 2020.

Ultimately, despite the parties' attempts to confer, Defendants are still standing on three broad categories of objections.

First, Defendants are withholding virtually all documents and information exchanged within TDCJ that included any attorneys or legal staff. TDCJ's privilege log and responses to interrogatories in general withhold virtually every communication that was made by, or in the presence of, its attorneys, without individual facts that indicate why the particular communication would be privileged. *See* Ex. 21, Reformatted Privilege Log.[2]

---

[2] TDCJ's privilege log is an Excel spreadsheet. In order to comply with e-filing rules, Plaintiffs converted it to pdf. The original privilege log converted to a pdf is the unwieldy, practically unreadable 305-page document in size 10 font filed as Exhibit 20. Plaintiffs accordingly reformatted the log, including by removing the mostly redundant "Treatment" and "Subject" columns, omitting the predicate for Bates labels, removing email addresses, and consolidating the "Date Created" and "Date Sent" fields. *See* Ex. 21, Reformatted Privilege Log.

Second, TDCJ's privilege log does not offer any facts to refute waiver or the crime-fraud exceptions that this Court already ruled on concerning Bryan Collier's testimony. In particular, TDCJ's privilege log indicates that of the 1,200 pages withheld or redacted, 550 pages are responsive to requests for production 6 and/or 8, which are tailored to the LeBlanc Unit violations that TDCJ misrepresented the facts about. Ex. 21, Reformatted Privilege Log (red highlights showing RFPs 6, 8, or both).

6.  Please produce all documents, including, but not limited to, all email, text messages, or other electronically stored information, concerning the inspection of the LeBlanc Unit scheduled for August 8, 2019. This request specifically includes, but is not limited to, all communications regarding the alleged "family emergency" which allegedly required postponing the inspection.

8.  For the Stiles, Duncan, and LeBlanc Units from July 1, 2019 to August 31, 2019, please produce:
    a.  Any TDCJ investigation records concerning the heat, including, but not limited to, any grievance investigations, any Office of the Inspector General investigations, and any administrative reviews;
    b.  Daily count sheets for any day when class members were present, or housing summary pages for each class member who was housed there, during the period;
    c.  Any records reflecting the total occupancy of any housing area where class members were present at the time;
    d.  Work orders and work order logs for the air conditioning system;
    e.  Any records reflecting maintenance of air conditioning systems;
    f.  Grievance files (including, but not limited to, the initial grievance, any response, the investigation file, and any step 2 grievance for the same subject) concerning the heat or air conditioning system;
    g.  All other records, such as IOCs, emails, and letters, concerning inmate or officer complaints/statements about indoor heat or the air conditioning system; and,
    h.  Any documentation of the actual heat indices inside the housing areas.

Ex. 11, Requests for Production, p. 10. In addition, 113 pages are withheld communications that may have concerned other settlement violations before TDCJ's lies were revealed. *See* Ex. 21, Reformatted Privilege Log (yellow highlights). Notably, TDCJ relies upon at least one of the *withheld* emails, (apparently Bates numbered 14976–14980), as the source of misrepresentations

to the Court in its interrogatory responses. Ex. 21, Reformatted Privilege Log, p. 76; Ex. 22, TDCJ's 1st Supp. Resp. to Interrogatories (Feb. 24, 2020), p. 20. TDCJ also has not provided all of the emails transmitting the highly misleading summary of maintenance work, or even identified which of the withheld emails are responsive. *See* Ex. 15, Resp. to 1st Requests for Production, p. 4 (vaguely referring to the privilege log in response to requests 4 and 5).

TDCJ also asserted generic privilege objections to interrogatories that plainly encompass its misrepresentations. For example, TDCJ failed to fully respond to Interrogatory 1, which asked:

1. Identify all investigations that TDCJ has conducted into all allegations that a violation of the settlement agreement occurred.

   This interrogatory specifically requests, but is not limited to, information regarding all allegations by Class Counsel that the settlement agreement has been violated, including allegations in Class Counsel's correspondence of June 4, 2018, August 13, 2018, September 10, 2018, October 9, 2018, January 18, 2019, March 21, 2019, July 15, 2019, July 16, 2019, and July 18, 2019; allegations in the Court's orders of August 9, 2019 (Doc. 1449), November 8, 2019 (Doc. 1495), and December 2, 2019 (Doc. 1501); and allegations in Plaintiffs' Motion to Show Cause (Doc. 1459) and the Reply to Plaintiffs' Motion to Show Cause (Doc. 1488).

   For each responsive investigation, identify when the investigation was conducted, who performed the investigation (including job titles), who the investigators spoke to (including job titles) and what documents investigators examined, identify any measurements that were taken (such as temperature and humidity measurements), describe what conclusions (if any) the investigators drew, and describe what corrective action (if any) was recommended and/or taken as a result of any investigation.

Ex. 12, Interrogatories, p. 7. Instead of substantively responding as to Class Counsel's inquiries, TDCJ only identified individuals who "may have knowledge" and summarily asserted that all knowledge of its attorneys and Amy Lee (a legal assistant) "is subject to attorney-client communications and attorney work product privileges"—without identifying any of this knowledge or explaining who they spoke to in their investigations. Ex. 22, TDCJ's 1st Supp. Resp. to Interrogatories (Feb. 24, 2020), pp. 4–7.

TDCJ similarly only identified names, while refusing to provide any substance of any communications whatsoever, for Interrogatories 13, 14, and 15, which asked:

13. Identify all persons who communicated with Bryan Collier regarding the inspection of the LeBlanc Unit of August 8, 2019. For each identified communication, describe the substance of the discussion between Collier and the person identified.

14. Identify all persons who communicated with Bryan Collier regarding apparent temperatures at the Stiles, Duncan, and/or LeBlanc Unit in July and/or August 2019. For each identified communication, describe the substance of the discussion between Collier and the person identified.

15. Identify all persons who communicated with the Office of the Attorney General regarding the purported need to delay the August 8, 2019 inspection. Please specifically identify who told the Office of the Attorney General that "the Warden of the LeBlanc Unit has had a family emergency," that "the executive administration" was "out of state" at the "ACA conference," and any other factual assertions made by TDCJ and its agents in Doc. 1459-51.

Ex. 22, TDCJ's 1st Supp. Resp. to Interrogatories (Feb. 24, 2020), pp. 18–20.

Third, TDCJ is withholding virtually all documents that were not created during, or created in response to events from, the period July 1, 2019 to August 31, 2019, and declining to address any inquiries relating to earlier violations. *See* Ex. 15, Responses to 1st Requests for Production; Ex. 16, Responses to 2nd Requests for Production. Meanwhile, TDCJ remained non-responsive to informal requests for the same information and documents until Plaintiffs issued the written discovery—despite Mr. Collier's testimony at the September 2019 hearing that the agency would freely produce requested documents. *See, e.g.*, Ex. 6, Letter from Class Counsel (Aug. 12, 2019); Ex. 8, Hearing Transcript (Sep. 10, 2019), p. 95:6–8.

TDCJ refuses to produce, based upon unspecified objections that the records do not relate to the violations during the period July 1, 2019 to August 31, 2019, the following documents:

- Personnel files pertaining to the individuals involved, Ex. 15, Resp. to 1st Requests for Production, p. 3; Ex. 16, Resp. to 2nd Requests for Production, p. 4;

- Unspecified disciplinary case files related to the settlement and Class Counsel's

allegations of violations, Ex. 15, Resp. to 1st Requests for Production, p. 4; Ex. 16, Resp. to 2nd Requests for Production, pp. 4–5;

- Communications prior to July 1, 2019 concerning compliance with the settlement by those involved in the 2019 violations, Ex. 15, Resp. to 1st Requests for Production, p. 5; Ex. 16, Resp. to 2nd Requests for Production, p. 5;

- Grievances, emails, IOCs, letters, and other records about air conditioning or heat complaints by non-class members housed at LeBlanc, Stiles, and Duncan during July and August 2019 if they were not housed in the same areas, Ex. 15, Resp. to 1st Requests for Production, pp. 6–8;

- Unspecified investigation records concerning subclass members being transported without air conditioning, *id.* at 8;

- Unspecified documents relating to Class Counsel's allegations that TDCJ violated the settlement, *id.* at 9–10;

- Maintenance records and any investigation records concerning bus rides to Estelle in June and September that allegedly violated the settlement, *id.* at 10–11; and

- Unspecified documents obtained by TDCJ's settlement compliance monitor that TDCJ asserts do not relate to the period July to August 2019, *id.* at 12.

TDCJ stood on its objections in response to several attempts to confer. *See* Ex. 28.

At the same time, despite receiving these requests in December 2019, TDCJ had promised to finish supplementing its responses by March 31, 2020. Ex. 26. As of this filing, TDCJ has still not fully supplemented its interrogatory answers or document production. Indeed, TDCJ still has not provided any electronic records except emails and a handful of employees' text messages, and has actually already destroyed the electronic records of cell phones for several important witnesses including Sharon Howell, the former general counsel for TDCJ. *See* Ex. 23, Second Supp. Resp. to Interrogatories, p. 9 ("Sharon Howell's Iphone [sic] was retrieved and wiped on or about September 30, 2020 [sic].").

## II.   LEGAL STANDARD

### A.   The Burden of Asserting Privilege

[S]ince the [attorney-client] privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.

*Fisher v. United States*, 425 U.S. 391, 403 (1976). A communication is only protected by attorney-client privilege if it is "(1) a confidential communication; (2) made to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion, legal services, or assistance in a legal proceeding." *SEC v. Microtune, Inc.*, 258 F.R.D. 310, 315 (N.D. Tex. 2009) (citing *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)). The party asserting privilege bears the burden to prove these elements. *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985).

"There is no presumption that a company's communications with counsel are privileged." *Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017). "[A] privilege log's description of each document and its contents must provide sufficient information to permit courts and other parties to 'test[ ] the merits of' the privilege claim." *Id.* at 697 (quoting *United States v. El Paso Co.*, 682 F.2d 530, 541 (5th Cir. 1982)). "[S]imply describing a lawyer's advice as 'legal,' without more, is conclusory and insufficient to carry out the proponent's burden of establishing attorney-client privilege." *Id.* at 696.

### B.   Crime-Fraud Exception to Attorney-Client Privilege

"The privilege for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act." *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986). "Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome

7

where communication or work product is intended to further continuing or future criminal or fraudulent activity." *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005) (quoting *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir.2002)); *see also In re Grand Jury Subpoenas*, 561 F.3d 408, 412 (5th Cir. 2009).

### C.      Waiver by Affirmative Use of Attorney-Client Communications

"The attorney-client privilege was intended as a shield, not a sword." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) (internal quotation marks omitted). "[T]he attorney-client privilege is waived when a litigant place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Id*.; *see also* FED. R. EVID. 502(a); *First Am. CoreLogic, Inc. v. Fiserv, Inc.*, No. 2:10-CV-132, 2010 WL 4975566, at *3 (E.D. Tex. Dec. 2, 2010); *Nalco Co. v. Baker Hughes Inc.*, No. 4:09-CV-1885, 2017 WL 3033997, at *4 (S.D. Tex. July 18, 2017).

### D.      Standard of Review

The application of the attorney-client privilege, the crime-fraud exception, and waiver are fact questions, so this Court's decision on those issues would only be reviewed for clear error on appeal. *Id.*; *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002).

Discovery orders are reviewed for abuse of discretion. *Moore v. Willis Indep. School Dist.*, 233 F.3d 871, 876 (5th Cir. 2000).

### E.      Rule 26 Discoverability

Federal Rule of Civil Procedure 26 permits discovery of any nonprivileged matter that is relevant to either party's claims or defenses and reasonably calculated to lead to admissible evidence. FED. R. CIV. P. 26. Additionally, discovery must be proportional to the needs of the case

considering six factors: (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. *Id*.

Objections to discovery are not "intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." FED. R. CIV. P. 26 (Committee Notes on Rules—2015 Amendments); *see McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (boilerplate contentions that a request is "overly broad, burdensome, oppressive, and irrelevant" are inadequate to voice a successful objection). Rather, TDCJ must show why the requested discovery is irrelevant, overly broad, or unduly burdensome or otherwise objectionable, through particular and supported objections, which their boilerplate objections plainly do not. *See Clockwork IP LLC v. Parr Mgmt. LLC*, No. 14-CV-03879, 2016 WL 3350703, at *3 (N.D. Tex. Mar. 21, 2016) (granting motion to compel); *Gondola v. USMD PPM, LLC*, No. 15-CV-411, 2016 WL 3031852, at *4 (N.D. Tex. May 27, 2016) (overruling objections); *Jackson v. Stevens Transp., Inc.*, No. 3:14-CV-1416-M, 2015 WL 11019131, at *1 (N.D. Tex. June 17, 2015) ("Broad-based, non-specific objections are almost impossible to assess on their merits") (citation omitted).

## III.   ARGUMENT AND AUTHORITIES

### A.   The Court should overrule TDCJ's privilege objections or, at a minimum, conduct an *in camera* review of the responsive information and documents.

TDCJ's privilege log and privilege objections are improper and those objections should be overruled. At the very least, the Court should review TDCJ's allegedly privileged documents *in camera* and direct TDCJ to respond to interrogatories where it asserts a privilege objection for an *in camera* review of those responses for the purported privilege.

TDCJ's assertions of privilege are improper and should be overruled for four reasons.

### 1. *TDCJ's assertion of attorney-client privilege is inadequate.*

TDCJ has not offered proof to show the documents and information are privileged attorney-client communications because the non-conclusory assertions in the privilege log do not show that information was conveyed in the course of the attorney-client relationship or confidential.

Attorney-client "privilege attaches only to communications made for the purpose of giving or obtaining legal advice or services, not business or technical advice or management decisions." *Sand Storage, LLC v. Trican Well Serv., L.P.*, No. 2:13-CV-303, 2015 WL 1976463, at *3 (S.D. Tex. Apr. 30, 2015). Thus, for example, Sharon Howell's text messages with Frank Inmon and Kim Farguson (officials in the TDCJ maintenance department) were likely made in her capacity as a TDCJ executive rather than an attorney, and thus are not privileged. *See, e.g.*, Ex. 2, Redacted Text Messages of F. Inmon; Ex. 3, Redacted Text Messages of K. Farguson; Ex. 21, Reformatted Privilege Log, p. 1. It is TDCJ's burden to prove the privilege applies. *Hodges, Grant & Kaufmann*, 768 F.2d at 721 (5th Cir. 1985). TDCJ cannot merely rely on the involvement of attorneys in the communication. *See Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d at 698 (vacating protective order because lower court "wrongly swe[pt] under the umbrella of non-disclosure all communications involving an attorney").

Moreover, those communications made in anticipation of filings, hearings, and Plaintiffs' complaints were not confidential where TDCJ intended that the substance of the communications be relayed to Class Counsel and the Court. *See, e.g.*, Ex. 21, Reformatted Privilege Log, pp. 2, 3, 5, 13, 36 (withholding emails "regarding inspection of the LeBlanc Unit"), pp. 14, 43, 74 ("regarding hearing"), pp. 39, 40, 49–51 ("regarding responding to inquiries from Class Counsel").

For its interrogatories, TDCJ has provided no facts to support its privilege objections.

Accordingly, TDCJ has not met its burden and the Court should overrule its privilege objections on that basis alone. *See, e.g.*, *BDO USA, L.L.P.*, 876 F.3d at 698.

> ### 2. The crime-fraud exception applies to most of TDCJ's withheld documents and the responses to interrogatories 1, 13, 14, and 15.

In addition to falling short of the burden to assert privilege, prima facie evidence shows the crime-fraud exception applies to over half of the withheld or redacted production and all of TDCJ's withheld interrogatory answers.

As this Court already found, TDCJ made multiple misrepresentations to Class Counsel and to the Court related to its violations of the plain terms of the settlement agreement. The Court specifically directed discovery related to those misrepresentations. Doc. 1504, p. 7. TDCJ is withholding or redacting approximately 663 pages,[3] as well as interrogatory answers, responsive to that discovery, but the nature of that topic means privilege will not apply for the same reasons privilege did not apply to Bryan Collier's communications. *See* Doc. 1489. Prima facie evidence shows these communications lead to intentionally misleading falsehoods directed to Class Counsel and the Court through TDCJ's counsel, which Plaintiffs and the Court detrimentally relied upon.

The representations were known to be false. The warden certainly knew a routine doctor's visit was not a family emergency. *Compare* Doc. 1459-49, Hearing Transcript, August 7, 2019, at 4:10–12 ("the Warden has had a family emergency"); *with* Ex. 8, Hearing Transcript (Sept. 10, 2019), at 85:20–86:4 (denying it was a family emergency). TDCJ executives certainly knew they were not going to be at an ACA trade show after the trade show was over. *Compare* Doc. 1459-49, Hearing Transcript (Aug. 7, 2019), at 12:20–24 ("All of the high-level executive officials at

---

[3] 550 pages are marked as responsive to requests 6 and 8, and the limited descriptions and dates for an additional 113 pages, with yellow highlighted descriptions, indicate they concern the admitted violations and the representations being made to Class Counsel before TDCJ's lies were uncovered. Ex. 21, Reformatted Privilege Log.

TDCJ are out of the state attend[ing] the ACA conference [on August 8]") *with* Ex. 8, Hearing Transcript (Sept. 10, 2019), at 87:9–15 (explaining Ms. Davis would not have attended the tour regardless) *and* Docs. 1459-44, 1459-45 (publicly available ACA materials showing the show ended August 6) *and*  Ex. 22, 1st Supp. Resp. to Interrogatories, pp. 16–17 (showing that Bryan Collier, Kim Farguson (facilities director), Jason Clark (chief of staff), never attended the trade show). The LeBlanc maintenance staff and regional maintenance staff certainly knew they had not "been visually checking the thermostats frequently" because LeBlanc had no such thermostats. *Compare* Doc. 1459-40, pp. 1–2 *with* Doc. 1459-70, p. 7. The unit-level maintenance staff at LeBlanc also knew the air-conditioning system needed maintenance, as the air-conditioning system had damage visible to the (trained) naked eye. *Compare* Doc. 1459-41, p. 2 ("the tempered air system has been functioning properly and has maintained the temperature just below 85 degrees.") *and* Doc. 1459-47 (emailing a purported summary of maintenance listing no damage to the A/C) *with* Ex. 4, Text message from P. Glass to K. Farguson, pp. 3–4 (Aug. 7, 2019) ("units that take care of the offender living areas … ha[ve] bad evaporators, bad condensers and worn blower equipment") *and* Ex. 5, Email from K. Farguson (Aug. 9, 2019) ("all the equipment at Leblanc needs to be replaced"). TDCJ has admitted the representations were false. Doc. 1472, p. 2.[4] Director Collier also testified the warden told him the LeBlanc Unit housing areas "felt cool" and that the LeBlanc Unit maintenance supervisor told him the systems were working. Ex. 8, Hearing Transcript (Sep. 10, 2019), pp. 45:16–46:6.

---

[4] Initially TDCJ did not admit to the thermostat misrepresentation, and actually continued to suggest the thermostats were being checked as late as September 26, 2019. *See* Doc. 1472, p. 2 (discussing thermostats but only conceding that they were difficult to access). TDCJ apparently intended to admit this in response to requests for admission, although its response refers to the Stiles Unit. Ex. 14, Resp. to Requests for Admission, p. 11.

The Court can infer these misrepresentations were intended to mislead under the circumstances, where the two misrepresentations about the inspection originated just after TDCJ executives confirmed that they were violating the settlement. Early on August 6, 2019, TDCJ still agreed to an inspection. Doc. 1459-48, p. 2. But, suddenly, after an afternoon temperature reading that day undeniably confirmed the agency was violating the Court order, Doc. 1472-23, the next morning, TDCJ withdrew its agreement. Doc. 1459-51, p. 3. The only reasons TDCJ has offered for this change in position are the false representations; under these circumstances, the Court can infer that these fictions were created *so that* the inspection would be rescheduled. Likewise, the Court can infer that the warden's alleged misrepresentation to Mr. Collier and the maintenance supervisor's alleged misrepresentation to the warden were intended to mislead, in light of the widespread damage to the air conditioning discovered on August 6, 2019.[5] The Court should infer that the only motive for such falsehoods could be, at the least, deliberate indifference to the class members' safety and rights under the settlement, and a deliberate intent to mislead Class Counsel.

Finally, the class members obviously detrimentally relied upon these falsehoods. Had TDCJ corroborated class members' allegations in July, then inmates could—and should—have been moved to safe housing a month earlier. Had TDCJ not continued to relay falsehoods through August 7, 2019, the inspection would not have been necessary—certainly there was no reason for TDCJ to continue to place class members in danger once executives confirmed it, but they made Plaintiffs come to Court, fight for an inspection, and then spend an entire day confirming what the agency already knew and was hiding—the housing areas were brutally hot and dangerous, the settlement agreement and Court order were being violated, and class members had to be moved.

---

[5] *See* Ex. 27, Sealed exhibit.

      3.    *The doctrine of waiver applies to the same subset of withheld documents and information as the crime-fraud exception.*

The entire purpose of TDCJ's communications leading up to its misrepresentations was to be disclosed to Class Counsel and the Court, and TDCJ has further put those communications at issue by arguing that despite their knowledge to the contrary, they were somehow made in good faith or due to innocent mistakes. Thus, TDCJ has waived any purported privilege with respect to those communications. FED. R. EVID. 502(a); *see Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) ("The great weight of authority holds that the attorney-client privilege is waived when a litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'").

"[T]he [attorney-client communication] privilege may be waived if the privilege holder makes factual assertions the truth of which can only be assessed by examination of the privileged communication." *Adam Friedman Associates LLC v. Media G3, Inc.*, 2012 WL 1563942 (S.D.N.Y. May 1, 2012); *see also Starsight Telecast, Inc. v. Gemstar Development Corp.*, 158 F.R.D. 650 (N.D.Cal.1994) (affirmative representations by party and counsel—regarding their communications about prior art in a patent case—are more than mere denial, and thus privilege was waived); *Mushroom Associates v. Monterey Mushrooms*, 25 U.S.P.Q.2d 1304, 1992 WL 056397 (N.D. Cal. 1992) (privilege waived because party claiming privilege had submitted attorney's declaration with its summary judgment papers); *General Electric Co. v. Hoechst Celanese Corp.*, 15 U.S.P.Q.2d 1673, 1990 WL 154218 (D. Del. 1990) (party claiming privilege offered testimony regarding lack of intent, which was more than mere denial and therefore waived privilege); *Smith v. Alyeska Pipeline Service Co.*, 538 F.Supp. 977 (D. Del. 1982) (privilege

waived when attorney, acting on behalf of client, voluntarily sent information to opposing party), *aff'd*, 758 F.2d 668 (Fed. Cir. 1984).

TDCJ admits it made the misrepresentations, but testified that they reported to their counsel accurately as to at least two issues. As to the warden's availability, TDCJ testified they told counsel that it was merely "a medical appointment for his daughter, not a family emergency." Ex. 8, Hearing Transcript, Sept. 10, 2019, at 86:15–21. TDCJ's counsel likewise attempted to protect their client, explaining, "I may have been the one to characterize it as an emergency." *Id.* at 88:20–21. Even at the September 10, 2019 hearing, TDCJ had not yet admitted to the misrepresentation as to the ACA trade show, but testified, "the person in the general counsel's office communicating with the Attorney General's office was making assumptions that the warden and/or Ms. Davis need to be there. … when our general counsel came to me and told me about the attempt to postpone, I said, 'Why? Stop. Let them come. Let's go.'" Ex. 8, Hearing Transcript (Sept. 10, 2019), at 93:6–15. TDCJ is attempting to blame its attorneys—either the general counsel's office or the Attorney General's Office—for these misrepresentations. The Court should not permit TDCJ to cherry-pick which part of this subject matter it discloses under the veil of attorney-client privilege.

As to the state of the air conditioning at LeBlanc, TDCJ now contends that the falsehoods originated at the prison itself—with the warden and maintenance supervisor relaying them to Collier (and, impliedly, the attorneys). Ex. 8, Hearing Transcript (Sep. 10, 2019), pp. 45:16–46:6. Again, this position is convenient for TDCJ, which is arguing the LeBlanc Unit violations and misrepresentations were isolated incidents. Plaintiffs need to have discovery into the underlying communications to test TDCJ's self-interested interpretation of these facts.

Because TDCJ is using attorney-client communications as a sword to affirmatively make its case that it has not been deliberately indifferent at the executive level, it has waived the alleged

privilege. *Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("[W]hen a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege.").

> ### 4.     *Interrogatory 1 goes to facts which TDCJ cannot hide using privilege.*

TDCJ's refusal to fully respond to interrogatory 1 is deficient for the foregoing reasons and also because the attorney client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Thus, TDCJ cannot refuse to reveal the results of its investigations into the settlement violations, even if those results were reported to its attorneys—in direct conflict with its objections to Interrogatory 1. Ex. 22, 1st Supp. Resp. to Interrogatories (Feb. 24, 2020), pp. 4–7.

In this case, there is obviously prima facie evidence of waiver and a fraud. Further, TDCJ has not carried its burden to state facts in support of privilege for its privilege log, and certainly not for its interrogatory responses. Thus, the Court should overrule the assertion of privilege and compel TDCJ to respond to the discovery.

> ## B.     The Court should overrule TDCJ's improper scope objections.

TDCJ has also asserted the same boilerplate objection to scope, apparently contending that only events it knows affected class members in July and August 2019 are discoverable under the Court's order. These objections are meritless and also improper for three reasons.

First, TDCJ's copy-and-paste objections are insufficient to resist discovery under Rule 26.[7] Boilerplate objections such as TDCJ has made here are consistently rejected by federal district

---

[7] *See also* FED. R. CIV. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity.").

courts. *See Blair v. Pride Indus., Inc.*, No. EP:14-CV-00183-DCG RFC, 2015 WL 10818665, at *3-4 (W.D. Tex. July 17, 2015); *Gonzalez v. Volkswagen Grp. Of Am., Inc.*, No. A-14-CV-574-LY-ML, 2015 WL 5097271, at *2 (W.D. Tex. Aug. 28, 2015); *Carr v. State Farm Mut. Auto. Ins., Co.*, 312 F.R.D. 459, 464 (N.D. Tex. 2015). TDCJ has not explained how each objected-to request falls outside the scope of the Court's order. In fact, TDCJ's boilerplate is overly expansive, as TDCJ literally writes that it will not produce anything "relevant to occurrences before July 1, 2019 or after August 31, 2019" (instead of the converse). Read literally, TDCJ is refusing to produce documents related to the period July to August 2019 even if those documents are also relevant to occurrences before July 1, 2019. Because TDCJ's sloppy boilerplate makes no attempt to actually explain how the requests exceed the appropriate scope of discovery, the Court should overrule its objections.

Second, TDCJ did not properly state whether any requested information is being withheld based on any of its objections in violation of Rules 33(b)(4) and 34(b)(2)(C). Pursuant to Rule 34, "[a]n objection must state whether any responsive materials are being withheld on the basis of that objection."[8] "Rule 34(b) is structured in this way so that, in combination with [Rule 26(g)(1)], both the requesting party and the court may be assured that *all* responsive, non-privileged materials are being produced, except to the extent a valid objection has been made." *Heller v. City of Dallas*, 303 F.R.D. 466, 487 (N.D. Tex. 2014) (internal quotation marked omitted). The same is true of interrogatories. *Id.* ("[A] responding party must describe what portions of the interrogatory or document request it is, and what portions it is not, answering or responding to based on its objections and why."); *Alaniz v. U.S. Renal Care, Inc.*, No. 1:17-CV-00146, 2018 WL 8622313,

---

[8] FED. R. CIV. P. 34; *see* FED. R. CIV. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity.").

at *2, n.2 (S.D. Tex. Aug. 20, 2018); *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 282 (N.D. Tex. 2017). Plaintiffs and the Court can only assume that TDCJ is withholding responsive documents about other violations, disciplinary cases, and the like, obfuscating the scope of this discovery dispute.

Finally, this Court's order allows written discovery of facts *related to* the July and August 2019 violations and TDCJ's misrepresentations, so TDCJ's objections are meritless. For example, if TDCJ also knew it was in violation in June 2019, that fact would be obviously related to the subsequent violations, but TDCJ has nonetheless objected to the scope of discovery that would go this scenario, such as interrogatories 1, 2, 6, 7, 8, and 10 and requests for production 2, 7, 10, 13, 14, 16, and 17, which seek evidence of TDCJ's knowledge of past violations. *See* Ex. 22, 1st Supp. Resp. to Interrogatories, pp. 4–8, 12–16; Ex. 15, Resp. to 1st Requests for Production, pp. 3–12. Similarly, many of the officials who it appears were disciplined had that discipline imposed *after* August 31, 2019. *See, e.g.*, Ex. 22, First Sup. Resp. to Interrogatories, p. 14 (in answer to the question about discipline, stating Sharon Howell retired on Sep. 30, 2019, Warden James Danheim was verbally counseled "sometime between August 9, 2019 and September 9, 2019" and again "October 21–25, 2019"). Thus, later communications are relevant and cabined within the Court's order. Furthermore, Plaintiffs need to investigate the knowledge of the individuals who made the misrepresentations in order to determine whether they were wrong due to neglect, an intent to lie, or a misguided policy—that knowledge may very well originate from outside the specific facts on the ground at LeBlanc or other units during July and August 2019. For each broad category of documents TDCJ has refused to provide under these objections, the documents are clearly related to the violations:

1.    *Personnel files pertaining to the individuals involved. Ex. 15, Resp. to 1st Requests for Production, p. 3; Ex. 16, Resp. to 2nd Requests for Production, p. 4.*

Plaintiffs needs discovery into background information for each TDCJ employee involved in the violations. Facts about those individuals—their background, expertise, job description, and disciplinary history—are relevant to the violations because Plaintiffs need to investigate their culpability. Investigation is needed not just into whether these individuals did something wrong, but also "why … violations occurred in the first place." Doc. 1504, p. 6. That means examining whether these individuals should have known it was wrong and whether TDCJ should have expected them to misbehave. TDCJ's complete refusal to provide this information is improper and the Court should overrule TDCJ's objections to requests 1 and 18.

2.    *Unspecified disciplinary case files related to the settlement and Class Counsel's allegations of violations. Ex. 15, Resp. to 1st Requests for Production, p. 4; Ex. 16, Resp. to 2nd Requests for Production, pp. 4–5.*

TDCJ also vaguely refuses to provide records of discipline related to the settlement and Class Counsel's allegations if that discipline did not arise from conduct in July and August 2019. Due to the vague nature of TDCJ's objections, it is unclear whether such cases exist, but if they do, then they are obviously relevant. If a TDCJ employee was disciplined for causing a settlement violation before July 2019, but TDCJ did nothing to prevent such misconduct from recurring, that fact is relevant to TDCJ's culpability for the July and August 2019 violations. Certainly, if the same people involved in the prior violations were involved in the July and August 2019 violations, then TDCJ is that much more at fault for leaving them in positions of responsibility. Thus, the Court should overrule TDCJ's objections to requests 2 and 19.

3.    Communications prior to July 1, 2019 concerning compliance with the settlement by those involved in the 2019 violations. Ex. 15, Resp. to 1st Requests for Production, p. 5; Ex. 16, Resp. to 2nd Requests for Production, p. 5.

Likewise, the earlier communications about the settlement of those who precipitated the July and August 2019 violations are relevant. Their communications will go to what those individuals knew, and how they were trained, about complying with the settlement. Preceding communications may also reflect earlier indifference or violations that gave TDCJ notice of the risk of the July and August 2019 violations. Accordingly, the Court should overrule TDCJ's objections to requests 7 and 20.

4.    Grievances, emails, IOCs, letters, and other records about air conditioning or heat complaints by non-class members housed at LeBlanc, Stiles, and Duncan during July and August 2019 if they were not housed in the same areas. Ex. 15, Resp. to 1st Requests for Production, pp. 6–8.

TDCJ is withholding records concerning air conditioning at the affected units if they originate from a prisoner who was not a class member housed in an area where class members were not housed. This delineation is too narrow. The LeBlanc facility, for example, has air conditioning systems that cover multiple inmate housing areas. If the air conditioner failed in Dorm 1, housing a non-class member, it would almost certainly fail in Dorm 2, housing class members, as well. Moreover, TDCJ's objection appears to exclude those inmates who were housed in a different area when they filed the grievance, even if the grievance response could have concerned an area with class members if the non-class member or class members were moved—or if the grievance investigation lead to the discovery of air conditioning problems pertaining to class members. The Court should overrule TDCJ's objections to request 8.

5.      *Unspecified investigation records concerning subclass members being transported without air conditioning. Ex. 15, Resp. to 1st Requests for Production, p. 8.*

TDCJ generically objects to the scope of a request for documents about problems with the bussing of subclass members, without clarifying whether any responsive records exist that are being withheld. Of course, if TDCJ put subclass members on un-air conditioned buses before July 2019, that fact is directly relevant to the July 2019 violations because it means TDCJ has even less excuse for its deficient training in July. But most importantly, it would mean the TDCJ is covering-up other violations of the agreement that Class Counsel had not yet discovered to alert the Court to. (Notably, the violation of this provision that TDCJ *admits to* occurred in June 2019. Doc. 1472, p. 8.) The Court should overrule TDCJ's objections to request 10.

6.      *Unspecified documents relating to Class Counsel's allegations that TDCJ violated the settlement. Ex. 15, Resp. to 1st Requests for Production, pp. 9–10.*

TDCJ asserts improper boilerplate objections to a request for communications about Class Counsel's allegations of settlement violations. It is unclear what documents TDCJ is withholding, but certainly if TDCJ learned about violations of the settlement in June 2019 when responding to class counsel's allegations, then that would be highly relevant to its culpability for continuing to violate the settlement in July and August 2019. The Court should overrule TDCJ's objections to request 13.

7.      *Maintenance records and any investigation records concerning bus rides to Estelle in June and September that allegedly violated the settlement. Ex. 15, Resp. to 1st Requests for Production, pp. 10–11.*

TDCJ also refuses to provide records for specific bus rides that allegedly violated the settlement because they took place in June and September. These records are nonetheless relevant to the July and August violations. The June violations show TDCJ knew it needed to fix its

procedures (or perhaps that the malfunction was noted in June but never addressed), while the September violations show TDCJ failed to do so even after the July and August violations. Both incidents go to TDCJ's culpability and are related to the July and August violations. The Court should overrule TDCJ's objections to request 14.

> 8. *Documents obtained by TDCJ's settlement compliance monitor that TDCJ asserts do not relate to the period July to August 2019, Ex. 15, Resp. to 1st Requests for Production, p. 12.*

Finally, TDCJ is withholding unspecified documents under the purview of its settlement compliance monitor. On top of failing to explain what is being withheld, TDCJ's objections are meritless because the compliance monitor may have uncovered evidence that TDCJ had cause to anticipate the July and August 2019 violations based on earlier information—that information is related to the July and August violations and thus discoverable. The Court should overrule TDCJ's objections to request 17.

### C.    The Court should order TDCJ to complete its responses to discovery.

TDCJ is scheduled to complete permanent air conditioning at the Pack Unit by April 15, 2020. The agency indicated it would finish supplementing its discovery responses by March 31, 2020. Ex. 26. Yet, the agency's production and interrogatory responses relating to *last summer's* settlement violations remain woefully inadequate, and class counsel does not know if the decisionmakers in the agency are the same people who lied and covered up violations last year. TDCJ's discovery responses are incomplete in the following ways.

First, it is obvious that there are more than the 5,000 pages of electronic documents that TDCJ has either produced or withheld in its privilege log.

Among the individuals who signed TDCJ's responses to interrogatories are Rene Hinojosa (director of the rehabilitation division), Oscar Mendoza (the deputy executive director and

settlement compliance monitor), and Bryan Collier himself. TDCJ has not produced *any* emails in any of these employees' custody, sent by any of them, or sent to any of them. Moreover, as the Court will recall, much of the violations center on the LeBlanc Unit, whose senior warden is James Danheim. His Assistant Wardens are Kevin Benjamin and Aaron Tompkins. Warden Danheim was apparently the subject of the "family emergency" misrepresentation, while Wardens Benjamin and Tompkins attended the inspection where Plaintiffs' counsel confirmed the LeBlanc Unit violations were ongoing. *See* Ex. 22, TDCJ's Supp. Resp to Interrogatories, p. 9. Only five electronic records were produced from Warden Danheim's custody, and he only sent eight emails in the production. Only two emails were produced from the Warden Benjamin's custody, and he sent only two. No documents were produced from Warden Tompkins' custody or sent by him.

Because TDCJ's objections are so sweeping, it is unclear whether TDCJ does not have more responsive documents, or if it instead chose not to produce them. Obviously, the latter seems highly likely where, as here, so many important witnesses have not provided many documents, if any—but the scope of what's missing is impossible for Plaintiffs to discern. TDCJ violates Rule 34 by obscuring the scope of withheld documents in this manner; instead, TDCJ should state what parts of the requests it is actually responding to. FED. R. CIV. P. 34(b)(C). "Rule 34(b) is structured in this way so that, in combination with [Rule 26(g)(1)], both the requesting party and the court may be assured that *all* responsive, non-privileged materials are being produced, except to the extent a valid objection has been made." *See Heller v. City of Dallas*, 303 F.R.D. 466, 487 (N.D. Tex. 2014).

Second, rather incredibly, on paper, TDCJ still takes the position that it does not know what happened to cause the violation at LeBlanc, how long the heat index exceeded the settlement thresholds, or what other violations occurred. Its interrogatory responses, despite having the

benefit of over six-months' time and ample notice of the pressing need to investigate during that time, still simply refer back to its opposition to the motion response from September on this issue. *See* Ex. 22, p. 8. At the same time, in its response to the interrogatory asking for the investigations it has conducted, their scope, and their conclusions, TDCJ has only stated it conducted an on-the-ground inspection of LeBlanc's air conditioning, collected ESI (in response to discovery), reviewed work orders, and provided a laundry list of people who "may have knowledge." *Id.* at pp. 4–6. Thus, either TDCJ has utterly failed to investigate or it is withholding the scope and results of its investigation.

Third, TDCJ's responses appear to contain no documents from hard drives, cell phones (other than text messages), or Microsoft OneDrive. Indeed, its interrogatory responses indicate that the agency is not even taking steps to preserve those documents—and intentionally wiped several important devices including Sharon Howell's cell phone. *See* Ex. 23, Second Supp. Resp. to Interrogatories, p. 2 (describing litigation hold as covering only email accounts), p. 9 ("Sharon Howell's Iphone [sic] was retrieved and wiped on or about September 30, 2020 [sic]."). While more discovery is needed on the issue of spoliation, the agency's decision to throw caution to the wind and outright destroy records while a motion for contempt—filed September 5, 2019, Doc. 1459—is pending highlights the need for Court intervention.

In short, in addition to levelling a bevy of meritless objections, TDCJ's production even within the narrow time frame it theoretically agrees it must conduct discovery is blatantly deficient. The agency is missing documents from people it identified as witnesses in its own responses. The agency has not described any investigation into even the most basic facts such as: How long were they exposing LeBlanc Unit inmates to dangerous indoor heat? Without this information, the

parties cannot hope to address the key issues underlying the Court's order, such as why those violations occurred, with only five depositions.

## IV.   CONCLUSION

TDCJ is still abusing the attorney-client privilege in order to escape the consequences of lying to Class Counsel and the Court. Permitting TDCJ to do so will jeopardize compliance with the settlement, because the same individuals could continue to obfuscate future efforts to enforce the settlement. The Court should overrule TDCJ's assertions of privilege.

TDCJ is also attempting to improperly narrow the scope of discovery pursuant to the Court's order, and failing to even identify the scope of records it is refusing to produce. The Court should overrule these improper objections and order TDCJ to respond.

Finally, even apart from these objections, TDCJ's responses to written discovery are woefully inadequate. In light of the impending summer, the Court should order TDCJ to respond fully to Plaintiffs' discovery within seven days of issuing an order, and, to prevent any future delay, permit additional depositions so that Plaintiffs and the Court may get to the bottom of TDCJ's fraud before the hottest summer months arrive.

Dated: April 10, 2020.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
       Tel.    (512) 623-7727
       Fax.   (512) 623-7729

By:  /s/ *Jeff Edwards*
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
Texas Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

/s/ *Jeff Edwards*
Jeff Edwards

**<u>CERTIFICATE OF CONFERENCE</u>**

By my signature below, I certify that I conferred with opposing counsel by letter as reflected in Exhibit 28. Numerous issues raised in this motion were also discussed at various times by telephone and electronic mail. Defendants are opposed to the relief requested.

/s/ *Jeff Edwards*
Jeff Edwards