UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 4:14-cv-1698 |
| | § | |
| BRYAN COLLIER, et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO RECONSIDER**

This Court should not reconsider its prior order. The Court ordered discovery to reopen because TDCJ admitted that it violated the Court's orders, endangered men's lives, and then lied about it to hide evidence from this Court. Because TDCJ inappropriately withheld numerous related documents under generic, inscrutable privilege objections, this Court carefully conducted an *in camera* review of over 400 documents. As the Court gave enormous deference to the objections, it ordered only 24 be disclosed—and even then, only small portions of 11 of those documents. Nonetheless, TDCJ asks to hide even more, asking this Court to reconsider its already extremely deferential order. The Court should deny this motion for at least three reasons.

First, TDCJ's arguments fail to identify any new evidence or manifest injustice justifying the extraordinary remedy of reconsideration.

Second, TDCJ's fraud on the Court and class counsel continued until at least September 26, 2019, when it falsely represented to the Court that its staff mistakenly failed to relay excessive temperatures to counsel. Thus, the September 17, 2019 document that TDCJ seeks to suppress is likely a part of continuing fraudulent misconduct which defeats privilege.

1

Third, the September 26, 2019 filing refers to communications between TDCJ staff and TDCJ's counsel—exactly like the September 17, 2019 document (including with its false representation of fact). As TDCJ chose to use its attorney-client communications as a "sword" to assert supposed facts for this Court and class counsel to rely upon, they waived the privilege.

Thus, Court should deny TDCJ's motion.

I. **NATURE AND STAGE OF PROCEEDINGS**

On August 9, 2019, Plaintiffs moved to enforce the settlement agreement, precipitating an emergency order to transfer class members out of the LeBlanc Unit and back into a prison with functioning air conditioning. Doc. 1448; Doc. 1449.

On September 5, 2019, Plaintiffs moved for contempt, to show cause, and for sanctions because TDCJ has repeatedly lied and violated the Court's orders—most recently, TDCJ failed to keep class members housed at the LeBlanc Unit in indoor heat index below 88°F, and then failed to report that violation. Doc. 1459.

Even after Plaintiffs filed the motion for contempt, Defendants sought to blame the misrepresentations and omissions on low-level officials and counsel's deficient knowledge.

For example, Defendants wrote on September 26, 2019 that only *after* incorrectly reporting to Plaintiffs' counsel that TDCJ was monitoring the indoor temperature at LeBlanc, "undersigned counsel discovered that the only thermostats mounted at the LeBlanc Unit were mounted inside the air conditioning components, and only maintenance staff performing maintenance work were likely to access them." Doc. 1472, p. 2.[1]

---

[1] It bears reiterating that even this language is extremely misleading, as the "thermostats" inside the air conditioning system only set a *desired* temperature, they do not *display* the actual temperature—but by the time TDCJ's response was written, Plaintiffs' counsel had seen the devices. *See* Doc. 1448-2, pp. 3, 5.

As to the state of the air conditioning at LeBlanc, TDCJ contended on September 10, 2019 that the falsehoods originated at the prison itself—with the warden and maintenance supervisor relaying them to Collier (and, impliedly, the attorneys). Doc. 1546-8, Hearing Transcript (Sep. 10, 2019), pp. 45:16–46:6. But without the underlying communications, including communications with attorneys, Plaintiffs had no way to test this contention. The Court thus reopened discovery on December 11, 2019. Doc. 1504.

Plaintiffs served discovery, but TDCJ resisted discovery with extensive assertions of privilege as to approximately 389 documents.[2]

On May 28, 2020, on Plaintiffs' motion, the Court ordered TDCJ to provide the documents for *in camera* review. Doc. 1568. The Court also ordered TDCJ to supplement withheld information for its interrogatory responses.

TDCJ sent the documents to the Court on June 12, 2020. Ex. 1.

On July 17, 2020, the Court completed its review and ordered TDCJ to produce thirteen of the withheld documents in full, and to provide eleven documents with redactions. Doc. 1574.

On August 17, 2020, TDCJ moved to reconsider as to one redacted document from the July 17, 2020 order. Doc. 1583. The next day, at Plaintiffs' request, TDCJ supplemented its discovery responses as to the remaining twenty-three documents. TDCJ also supplemented its interrogatories as to interrogatory 18, but has not supplemented its response to interrogatory 1.

Some of the documents the Court ordered produced are critical documents with unique information that was, until the Court's order, successfully suppressed by TDCJ.

---

[2] TDCJ withheld at least 26 more documents in whole or in part, but never included them on any privilege log—instead, the first Plaintiffs learned of them was when TDCJ sent them to the Court for *in camera* review and listed them by Bates number on a transmittal letter, copying Plaintiffs' counsel. Ex. 1, Letter from J. Coggeshall, p. 9 (June 12, 2020); *see* Doc. 1574, p. 4 (noting two documents ordered disclosed do not appear on the privilege log).

For example, the Court ordered TDCJ to disclose an email revealing that TDCJ's general counsel continued to emphasize the presence of "thermostats" at the LeBlanc Unit to the Attorney General's Office on July 29, 2019. Ex. 2, Email from K. Stokes (July 29, 2019). In reality, these "thermostats" were merely dials to set the desired temperature and were not relevant to TDCJ's compliance—for example, one thermostat was set to 30 degrees even as the indoor heat index ranged from 88 to 100 degrees. Doc. 1448-2, pp. 3, 5. Thus, even as late as August 7, 2019, TDCJ incorrectly represented to class counsel and the Court that TDCJ used these "thermostats" to monitor indoor temperatures at LeBlanc when TDCJ knew that to be false. Doc. 1459-49, p. 7:3–5.

More egregiously, the production reveals, on August 6, 2019, in a group text between chief-of-staff Jason Clark, general counsel Sharon Howell, and Bryan Collier, either Clark or Howell relayed that the heat index exceeded 88 inside every housing area at LeBlanc and the system "was not designed to bring temp down to comfort level." Ex. 3, Text messages, at 2 (Aug. 5–6, 2019).

This message confirms that TDCJ's executive director and general counsel knew that every housing area at LeBlanc was out of compliance with the settlement by August 6, 2019—and, in fact, that the facility was actually "not designed" to maintain the required temperature.

The next afternoon, August 7, 2019, however, the Court inquired of TDCJ, "tell me what you understand the temperature to be." Doc. 1459-49, p. 6.

Instead of providing these temperature measurements known to the highest level of TDCJ's leadership, TDCJ's counsel reported "there's no areas that don't have air-conditioning right now" and "one area they have not figured out what's wrong with the air-conditioning. It seems to be running, but it does seem to not be cooling as the others." Doc. 1459-49, pp. 5–6.

It remains unclear from TDCJ's production whether TDCJ chose to provide its attorney this incorrect information, but it is now apparent that even its executive director knew the truth *before* the falsehood was presented to the Court in TDCJ's effort to delay the inspection. Prior to the Court's order and the production of that single document, TDCJ had only produced records showing Bryan Collier learned of the excess heat indices *after* the hearing on August 7, 2019.

That text message also contradicts TDCJ's representations to this Court and class counsel as late as September 26, 2019, when TDCJ falsely claimed that "[o]n August 6, 2019, … TDCJ staff failed to recognize their duty to report the problem under the terms of the settlement and failed to notify counsel of the elevated temperatures." Doc. 1472, p. 8. To the contrary, TDCJ's counsel *were* notified—even its general counsel knew of the heat index. *See* Ex. 3; Doc. 1559-1, p. 21 (showing the participants).

## II.     LEGAL STANDARD

### A.     Reconsideration is disfavored

"The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration." *Thakkar v. Balasuriya*, No. CIV.A.H-09-0841, 2009 WL 2996727, at *1 (S.D. Tex. Sept. 9, 2009) (Lake, J.) (citing *Shepherd v. International Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004)). While a Court may reconsider a previous order under Rule 59, that "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (citing *Simon v. U.S.*, 891 F.2d 1154, 1159 (5th Cir. 1990)). A motion to reconsider should only be granted to "correct manifest errors or law or present newly discovered evidence" and is an "extraordinary remedy that should be used sparingly." *Id.*

### B. Crime-Fraud Exception to Attorney-Client Privilege

"The privilege for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act." *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986). "Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome where communication or work product is intended to further continuing or future criminal or fraudulent activity." *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005) (quoting *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002)); *see also In re Grand Jury Subpoenas*, 561 F.3d 408, 412 (5th Cir. 2009).

### C. Waiver by Affirmative Use of Attorney-Client Communications

"The attorney-client privilege was intended as a shield, not a sword." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) (internal quotation marks omitted). "[T]he attorney-client privilege is waived when a litigant place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Id.*; *see also* FED. R. EVID. 502(a); *First Am. CoreLogic, Inc. v. Fiserv, Inc.*, No. 2:10-CV-132, 2010 WL 4975566, at *3 (E.D. Tex. Dec. 2, 2010); *Nalco Co. v. Baker Hughes Inc.*, No. 4:09-CV-1885, 2017 WL 3033997, at *4 (S.D. Tex. July 18, 2017).

### D. Standard of Review

The application of the attorney-client privilege, the crime-fraud exception, and waiver are fact questions, so this Court's decision on those issues would only be reviewed for clear error on appeal. *Id.*; *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002).

Discovery orders are reviewed for abuse of discretion. *Moore v. Willis Indep. School Dist.*, 233 F.3d 871, 876 (5th Cir. 2000).

### III. ARGUMENT AND AUTHORITIES

#### A. Defendants have pointed to no reason to reconsider the Court's well-reasoned order.

In its motion, Defendants identify no overlooked fact, change in the law, or manifest injustice that justifies reconsideration. Instead, in its third written motion to reconsider in this litigation, Defendants again attempt to take a second bite at the apple—causing unnecessary delay (as they waited 30 days to even file the motion) and waste of resources—including the Court's time and Plaintiffs' counsel's time. Doc. 479; Doc. 717. Defendants' failure to do anything more than reiterate their generic arguments countenances denial on this basis alone.

#### B. The crime-fraud exception almost certainly applies to Document 163.

Although Plaintiffs do not have the benefit of reviewing the actual language at issue, it is apparent from the documents thus far provided that TDCJ's general counsel was aware that LeBlanc dormitories' heat index exceeded 88 degrees before TDCJ's litigation counsel (or, at least, before TDCJ's litigation counsel says they were aware). *See* Ex. 3 (group text relaying the heat index to general counsel on August 6); Doc. 1472, p. 8 (stating litigation counsel was not alerted to heat index on August 6). Moreover, the fact that TDCJ leadership learned on August 6 was *also* withheld from litigation counsel as late as September 26, 2019, if TDCJ's own filing is to be believed. *Id.* Thus, the timing of knowledge of misrepresentations was still at issue as of September 17, 2019, when Document 163 was written. If Document 163 was any part of that then-ongoing fraud on the Court and class counsel, then it is not privileged. *See, e.g.*, *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005).

7

### C. Waiver almost certainly applies to Document 163.

Critically, TDCJ's response to the motion for sanctions in late September is full of unsupported representations by counsel which almost certainly were relayed—in documents like Document 163—through the TDCJ general counsel's office. *See generally* Doc. 1472. At least one of those has since proven false. *Compare See* Ex. 3 (relaying the heat index to general counsel on August 6), *with* Doc. 1472, p. 8 (stating counsel was not aware of heat index on August 6). Because it has chosen to deploy this litigation strategy, TDCJ cannot invoke privilege to cover up the basis for its assertions to class counsel and this Court—especially when they turn out to be misleading.

Privilege is waived if a party places the underlying communication at issue. FED. R. EVID. 502(a); *see, e.g.*, *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) ("The great weight of authority holds that the attorney-client privilege is waived when a litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'"); *Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("[W]hen a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege.").

If Document 163 conveys to litigation counsel part of the scapegoat story—that lower level staff, rather than executive leadership or counsel, was involved in hiding information, *see* Doc. 1472, pp. 2, 3, 8—then the Court should find any privilege to be waived.

### IV. CONCLUSION

TDCJ almost succeeded in suppressing critical evidence of its abuses of the settlement agreement—first by deliberately misleading this Court, and then again by using the attorney-client privilege to shift responsibility for that deception. While Plaintiffs do not know what other piece

of the puzzle TDCJ seeks to bury with this new motion to reconsider, the ongoing fraud against the Court in an effort to hide—and then escape the consequences of—violating the settlement nullified TDCJ's privilege as to those deceptions at least through September 26, 2019. The Court should deny TDCJ's motion and order the agency to promptly comply with the Court's order.

Dated: September 8, 2020.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
    Tel.   (512) 623-7727
    Fax.  (512) 623-7729

By: /s/ *Jeff Edwards*
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
Texas Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

/s/ *Jeff Edwards*
Jeff Edwards